

EXHIBIT

A

# Trout Point Lodge Ltd. v. Handshoe, 2012 NSSC 245 (CanLII)

Date:    2012-02-01
Docket: Yar No. 353654
Citation:Trout Point Lodge Ltd. v. Handshoe, 2012 NSSC 245 (CanLII),
         <http://canlii.ca/t/fs8pp> retrieved on 2015-03-23

---

### SUPREME COURT OF NOVA SCOTIA
### Citation: Trout Point Lodge Ltd. v. Handshoe, 2012 NSSC 245

**Date:** 20120201
**Docket:** Yar No. 353654
**Registry:** Yarmouth

**Between:**

Trout Point Lodge Limited, Charles Leary
and Vaughn Perret

Plaintiffs

v.

Douglas Handshoe and Jane Doe

Defendants

---

**LIBRARY HEADING**

---

**Judge:**           The Honourable Justice Suzanne M. Hood

**Heard:**           January 30 and February 1, 2012, in Yarmouth,
                     Nova Scotia

**Written Decision:** August 7, 2012
                     (Written release of oral decision of February 1,
                     2012)

**Subject:**    1)    Damages for defamation; and
             2)    Invasion of privacy.

**Summary:**    Trout Point Lodge, Charles Leary and Vaughn Perret have obtained default judgment against Doug Handshoe in an action filed in August 2011 and amended in September 2011, for defamation, invasion of privacy, injurious falsehood, intentional interference with contractual relations, intentional interference with economic relations, intentional infliction of emotional and mental distress and assault.  Default judgment was entered on December 12th, 2011 with damages to be assessed.

**Issue:**    1)    Damages for defamation:
                  a)    corporation; and
                  b)    individual plaintiffs;
             2)    Aggravated damages;
             3)    Punitive damages;
             4)    Injunction; and
             5)    Should award be made for invasion of privacy (intrusion on seclusion)?

**Result:**    1)    Damages awarded:
                  a)    corporation - $75,000.00;
                  b)    individuals - $100,000.00 each;
                  c)    aggravated damages - $50,000.00 to each individual plaintiff;
                  d)    punitive damages - $25,000.00 to each individual plaintiff;
             2)    Injunction and mandatory injunction granted; and
             3)    No award for intrusion on seclusion.

*THIS INFORMATION SHEET DOES NOT FORM PART OF THE COURT'S DECISION.  QUOTES MUST BE FROM THE DECISION, NOT THIS LIBRARY SHEET.*

-
-
-

- 
- 
- 
- 
- 
- 
- 
- 
- 

## SUPREME COURT OF NOVA SCOTIA

**Citation:** Trout Point Lodge Ltd. v. Handshoe, 2012 NSSC 245

**Date:** 20120201
**Docket:** Yar No. 353654
**Registry:** Yarmouth

**Between:**

Trout Point Lodge Limited, Charles Leary
and Vaughn Perret

Plaintiffs

v.

Douglas Handshoe and Jane Doe

Defendants

| | |
|---|---|
| **Judge:** | The Honourable Justice Suzanne M. Hood |
| **Heard:** | January 30 and February 1, 2012, in Yarmouth, Nova Scotia |
| **Written Decision:** | August 7, 2012 |
| | (Written release of oral decision of February 1, 2012) |
| **Counsel:** | Plaintiffs:  Trout Point Lodge, self-represented |
| | Charles Leary, self-represented |
| | Vaughn Perret, self-represented |

Defendant:   Douglas Handshoe, not appearing

**By the Court**:

[1]     Trout Point Lodge, Charles Leary and Vaughn Perret have obtained default judgment against Doug Handshoe in an action filed in August 2011 and amended in September 2011, for defamation, invasion of privacy, injurious falsehood, intentional interference with contractual relations, intentional interference with economic relations, intentional infliction of emotional and mental distress and assault.  Default judgment was entered on December 12th, 2011 with damages to be assessed.

[2]     The plaintiffs moved for an assessment of damages on January 12th, 2012.  Mr. Handshoe was given notice of a hearing for the assessment of damages.  The plaintiffs had provided a copy of a FedEx tracking slip showing delivery to Mr. Handshoe's home in Mississippi.  It notes the materials were left at the house.  Efforts were also made, according to the testimony of Mr. Leary, to fax the documents to Mr. Handshoe's fax number but the transmission was not complete as the fax appeared to have been disconnected.  These materials appear also to have been sent by e-mail.  These documents are at Tab 3 to the materials presented in evidence by Mr. Leary at the hearing.

[3]     It appears from Mr. Handshoe's blog that he had knowledge of the hearing since he referred to receiving, "nasty grams" from Mr. Leary and Mr. Perret in a blog dated January 17th, 2012.  Mr. Handshoe did not appear or participate in the assessment of damages.

[4]     Default judgment is conclusive of the claim set out in the statement of claim.  The authority for that, among others, is *E. Sands and Associates v. Dextras Engineering& Construction Ltd.*, 2009 BCSC 42 (CanLII).  The amended statement of claim sets out in detail the claims against Mr. Handshoe, which are now to be treated by this Court as proven.  The statement of claim lists many examples of the defamatory comments made by Mr. Handshoe.  Below is a brief summary of them.

[5]     The defamatory comments originated with a news story which was published in the *Times Picayune* newspaper in Louisiana about Jefferson Parish President, Aaron Broussard, being involved in a political corruption scandal.  The plaintiffs were erroneously identified

as being connected with Mr. Broussard in a business venture and Mr. Broussard was named in error as owning Trout Point Lodge. The allegations against him are kickback schemes, money laundering and fraud while in his office as Parish President.

[6]     The defamatory comments later included claims that Trout Point Lodge, Mr. Leary and Mr. Perret, had misled ACOA and that Mr. Leary committed perjury in litigation with ACOA. The defamation continued with statements that Trout Point Lodge was losing business or going bankrupt because of the investigation of Mr. Broussard and his inability to continue to support it.

[7]     Also, there were claims that Charles Leary and Vaughn Perret had been involved in a series of businesses which failed and are con men. The statements also contained anti-gay rhetoric and homophobic comments.

[8]     After the original story was retracted by the Louisiana newspaper that published it, Mr. Handshoe made statements that Mr. Leary and Mr. Perret had improperly influenced it to retract the story. He also said that Mr. Leary and Mr. Perret were improperly using the legal system by commencing the defamation action.

[9]     The individual plaintiffs have filed affidavits. In his affidavit, Mr. Leary has related incidents affecting him and Trout Point Lodge. He said in that affidavit in paragraph 26:

> Due to the publications on Slabbed and by Mr. Handshoe elsewhere on the Internet I have a very real fear that anyone performing due diligence on us as businesspeople or innkeepers will discover and believe Mr. Handshoe's publications.

[10]     He also said in paragraph 27:

> I have felt embarrassed in my local community. Mr. Perret and I have at times changed our usual shopping patterns in Yarmouth in order to avoid persons we consider friends who may have read the Slabbed publications.

[11]     He also testified about the stress of the defamation on him paragraph 30 of the affidavit where he said:

> In April, 2011, at the time when Mr. Handshoe's publications about us became threatening and homophobic, I experienced tightened shoulder&

neck muscles, sleeplessness, and developed a severe outbreak of fever
blisters for which I had to take Zovirax, an antiviral medication.
Previously, I always slept very well, never waking up early. Since April,
2011, I have experienced regular sleeplessness, particularly waking up
early in the morning worrying about Slabbed and its effect on our
business.

[12]   His affidavit concluded with paragraph 39 where Mr. Leary says:

I am seriously concerned about Slabbed hurting the Lodge's business,
which Mr. Perret and I rely on as our primary source of income. In 2011,
occupancy rates at Trout Point were 3% lower than in 2010. This
represents a value of at least $15,000.00.

[13]   Mr. Leary testified in court as well. His evidence was about
events since the notice of action was served and about the effect of the
words of the defendant on him and Trout Point Lodge.

[14]   Mr. Perret also filed an affidavit in which he stated the effects of
the defamation on him. He said in his affidavit in paragraphs 9 and 10:

Mr. Handshoe's Internet publications have added a great deal of stress to
our lives, including with physical manifestations.

I have also felt genuinely afraid of his published threats and of the
existence of the Slabbed Nation and members of that group being in
Nova Scotia. I now keep my doors locked at night, whereas previously I
never feared for my safety in my own home.

[15]   He says in his affidavit in paragraph 11:

I have told my personal physicians in Spain and Nova Scotia about stress
and sleeplessness related to the Handshoe publications. My physician,
Dr. Fernandez-Noguera has prescribed medication to help me sleep after
the Slabbed publications commenced and to help control my anxiety. I
have also experienced embarrassment, humiliation, and irritability. It
was hard to get through work in 2011 knowing that nearly every day a
new source of embarrassment and business disruption might be published
by Handshoe. I have been embarrassed that friends and acquaintances in
Yarmouth might confront me about the Slabbed allegations. I can never
be sure that members of the local community might secretly harbour a
belief in the truth of the blog's allegations.

[16]   In paragraph 13 he says:

Mr. Handshoe has also made publications about my mother, stating that I "split" and left her with a surrogate son in Louisiana. I was traumatized by his suggestions that I had somewhat neglected or abused my mother.

[17]   Mr. Perret also testified briefly. He said he had lost his appetite in the last two weeks as a result of the material, which has been published by Mr. Handshoe and the volume of it.

[18]   In addition, materials were submitted to the Court which were testified to by Charles Leary. These included defamatory comments made after the Louisiana newspaper printed a retraction of the story. They include references to a cover-up of a crime and dirty secrets (April 20th, 2011); that Charles Leary and Vaughn Perret and others were the "bag holders" for Aaron Broussard and only the purported owners of Trout Point Lodge. That same blog referred to the fleecing of investors in Trout Point Lodge by Mr. Broussard and his close connection to Mr. Leary and Mr. Perret. It also refers to Charles Leary as a liar and a perjurer in the litigation with ACOA. That blog was April 26th, 2011.

[19]   On August 15th, 2011, the blog refers to, "A Trout Point Lodge/Jefferson Parish Political Corruption Scandal up-date", linking Trout Point Lodge with the corruption scandal involving Aaron Broussard. In that same blog, he refers to Charles Leary and Vaughn Perret in the context of "Buy a reporter, get a good story." On August 17th his blog said that he was meticulously laying down, "the trail of scams and political corruption that leads to Nova Scotia and Trout Point Lodge."

[20]   After being served with a notice of action, further defamatory comments were made. On August 18th he wrote, "First class bitches, common thugs or just plain ol' morons." He also refers to the, "elite fraternity of crooks, miscreants", who have sued him.

[21]   On August 24th, 2011, he referred to "political wrong-doing involving Leary and Perret in Canada and it had nothing to do with Broussard, per se." He continues to make accusations of fraud against them and in bilking local contractors. He refers to "The chances Trout Point Lodge will be bankrupt within a year." He said that on August 30th, 2011. In the same blog he refers to the "nefarious practices" of

Charles Leary and Vaughn Perret. He refers to them being involved in money laundering. He calls them "grifters" and "grafters". He accuses them of fabricating positive reviews of Trout Point Lodge. Ultimately he links them with organized crime. These types of comments continue throughout 2011. Further defamatory comments were made earlier this month, January, 2012, when the notice of assessment of damages was served on him.

[22]   I mention a few additional postings as follows. There is a posting from September 14th, 2011:

> I'll add here, in case it is not self–evident, that I built complete dossiers on all the players in this social group and I intend through time to roll out each and every one in excruciating detail as long as the lawsuit in Canada is an outstanding issue for Slabbed. The reason for this is that this band of gay men act as a unit that will also scatter like cockroaches when the heat is applied.

[23]   In January of 2012 the blog says:

> Some of those names of the property owners at Trout Point have well documented connections to organized crime here in the U.S. From my standpoint flushing all this out only gets better from here.

Another blog from September 14th, 2011 ... sorry, no, that's the same one. Blog from January 29th, of 2012, when I'm ... "When I'm done even Perret's niece, who filed an affidavit in that Fox 8 case will understand her uncle is a grifting scumbag pussy." And on January 26th, 2012 a blog says, "He, meaning D'Quila, is also has enough stroke to tell Charles and Vaughn what to do at Broussard's request."

[24]   There are many, many more blogs which contain defamatory materials such as this which are included in the materials filed with the Court on January 30th.

## The Hearing

[25]   A comprehensive brief was filed with the Court with many case authorities. Mr. Leary made oral submissions to the Court outlining the principles the Court should consider in deciding the quantum of damages for defamation, aggravated damages and punitive damages. In addition, he referred to a recent Ontario Court of Appeal decision with

respect to invasion of privacy, which is also claimed by the individual plaintiffs.

[26]   When questioned by the Court, Mr. Leary said that the plaintiffs' other claims are subsumed in the claim of defamation, that is, the claims for intentional interference with economic relations, for intentional interference with contractual relations and injurious falsehood.

[27]   Mr. Leary submits that the invasion of privacy, assault and intentional infliction of emotional and mental distress stand alone and individual plaintiffs seek damages for these separate from the defamation and related claims.

[28]   The plaintiffs seek damages of $250,000 for each of the three plaintiffs, aggravated damages for each individual plaintiff, as well as punitive damages.  They say that their original demand of aggravated damages of $300,000 each should be increased because the amount was requested before the recent defamatory remarks, which have continued since default judgment was entered, and in particular, since Mr. Handshoe was given notice of the assessment of damages.  He said they would seek special damages for loss of business but it is too difficult to prove, although he believes they have lost business because of the defamation.

[29]   In addition, the individual plaintiffs, as I have said, seek damages for invasion of privacy.  In *Jones v. Tsige*, 2012 ONCA 32 (CanLII), the Ontario Court of Appeal said that the range for such damages is up to $20,000.  In that case the Court of Appeal awarded damages in the amount of $10,000.  The plaintiffs here say that the extent of the invasion of privacy in that case was less than is the case here.

[30]   The plaintiffs also seek an injunction preventing further defamatory comments and a mandatory injunction seeking to have the existing comments removed.

## Defamation

[31]   The leading case on defamation in Canada is the Supreme Court of Canada decision in *Hill v. Church of Scientology of Toronto*, 1995 CanLII 59 (SCC), [1995] 2 S.C.R. 1130.  In that case Justice Cory, writing for the majority, referred to the fact that the defamatory

comments were published on the local television news, reported in the *Globe and Mail* and reported on by CBC. He referred to the audience numbers of those media outlets and said that the audience for the local TV station was approximately 132,000, the *Globe* circulation that day was 108,000 and the CBC broadcast was seen by approximately 118,000 people (paragraph 26).

[32]   He said in paragraph 108 and I quote:

> False allegations can so very quickly and completely destroy a good reputation. A reputation tarnished by libel can seldom regain its former lustre.

[33]   And he said with respect to defamatory statements in paragraph 166:

> A defamatory statement can seep into the crevasses of the subconscious and lurk there ever ready to spring forth and spread its cancerous evil. The unfortunate impression left by a libel may last a lifetime. Seldom does the defamed person have the opportunity of replying and correcting the record in a manner that will truly remedy the situation.

[34]   Justice Cory later said in paragraph 178 with respect to Mr. Hill:

> He would never know who, as a result of the libellous statement, had some lingering suspicion that he was guilty of misconduct which was criminal in nature. He would never know who might have believed that he was a person without integrity who would act criminally in the performance of his duties as a Crown counsel. He would never be certain who would accept the allegation that he was guilty of a criminal breach of trust, which was the essential thrust of the libel.

[35]   In considering whether the jury award of damages was approximate, the Court quoted from Gatley on *Libel and Slander* (8th ed.) at paragraph 182. In that text the authors state:

> The amount of damages is "peculiarly the province of the jury", who in assessing them will naturally be governed by all the circumstances of the particular case. They are entitled to take into their consideration the conduct of the plaintiff, his position and standing, the nature of the libel, the mode and extent of publication, the absence and refusal of any retraction or apology and 'the whole conduct of the defendant from the time the libel was published down to the very moment of their verdict. They may take into consideration the conduct of the defendant before

action, after action, and in court at the trial of the action,' and also, it is submitted, the conduct of his counsel, who cannot shelter his client by taking responsibility for the conduct of the case. They should also allow 'for the sad truth that no apology, retraction or withdrawal can ever be guaranteed completely to undo the harm it has done or the hurt it has caused.' They should also take into account the evidence led in aggravation or mitigation of the damages.

[36]   The Court then said in paragraph 184:

In considering and applying the factors pertaining to general damages in this case it will be remembered that the reports in the press were widely circulated and the television broadcast had a wide coverage. The setting and the persons involved gave the coverage an aura of credibility and significance that must have influenced all who saw and read the accounts. The insidious harm of the orchestrated libel was indeed spread widely through the community.

[37]   In considering the issue of aggravated damages, Justice Cory again quoted from Gatley, in paragraph 183:

The conduct of the defendant, his conduct of the case, and his state of mind are thus all matters which the plaintiff may rely on as aggravating the damages. 'Moreover, it is very well established that in cases where the damages are at large the jury (or the judge if the award is left to him) can take into account the motives and conduct of the defendant where they aggravate the injury down to the plaintiff. There may be malevolence or spite or the manner of committing the wrong may be such as to injure the plaintiff's proper feelings of dignity and pride. These are matters which the jury can take into account in assessing the appropriate compensation.' 'In awarding 'aggravated damages' the natural indignation of the court at the injury inflicted on the plaintiff is a perfectly legitimate motive in making a generous, rather than a more moderate award to provide an adequate solatium...that is because the injury to the plaintiff is actually greater, and, as the result of the conduct exciting the indignation, demands a more generous solatium.'

[38]   The Court then referred to aggravated circumstances in that case at paragraph 185:

The misconduct of the appellants continued after the first publication. Prior to the commencement of the hearing of the contempt motion before Cromarty, J., Scientology was aware that the allegations it was making against Casey Hill were false. Yet, it persisted with the contempt hearings, as did Morris Manning. At the conclusion of the contempt hearing, both appellants were aware of the falsity of the allegations.

Nevertheless, when the libel action was instituted, the defence of justification was put forward by both of them. The statement of defence alleging justification or truth of the allegation was open for all the public to see. Despite their knowledge of its falsity, the appellants continued to publish the libel... Finally, the manner in which Hill was cross-examined by the appellants, coupled with the manner in which they presented their position to the jury, in light of their knowledge of the falsity of their allegations, are further aggravating factors to be taken into account.

[39]   Justice Cory dealt with the issue of aggravated damages in paragraphs 188 and 189:

188.   Aggravated damages may be awarded in circumstances where the defendants' conduct has been particularly high-handed or oppressive, thereby increasing the plaintiff's humiliation and anxiety arising from the libellous statement. The nature of these damages was aptly described by Robins, J.A. in *Walker v. CFTO Ltd., supra*, in these words at p. 111:

Where the defendant is guilty of insulting, high-handed, spiteful, malicious or oppressive conduct which increases the mental distress - the humiliation, indignation, anxiety, grief, fear and the like - suffered by the plaintiff as a result of being defamed, the plaintiff may be entitled to what has come to be known as 'aggravated damages'.

189.   These damages take into account the additional harm caused to the plaintiff's feelings by the defendant's outrageous and malicious conduct. Like general or special damages, they are compensatory in nature. Their assessment requires consideration by the jury of the entire conduct of the defendant prior to the publication of the libel and continuing through to the conclusion of the trial. They represent the expression of natural indignation of right-thinking people arising from the malicious conduct of the defendant.

[40]   In paragraph 191, Justice Cory considered the factors in that case that warranted an award of aggravated damages:

There are a number of factors that a jury may properly take into account in assessing aggravated damages. For example, was there a withdrawal of the libellous statement made by the defendants and an apology tendered? If there was, this may go far to establishing that there was no malicious conduct on the part of the defendant warranting an award of aggravated damages. The jury may also consider whether there was a repetition of the libel, conduct that was calculated to deter the plaintiff from proceeding with the libel action, a prolonged and hostile cross-examination of the plaintiff or a plea of justification which the defendant knew was bound to fail. The general manner in which the

defendant presented its case is also relevant. Further, it is appropriate for a jury to consider the conduct of the defendant at the time of the publication of the libel. For example, was it clearly aimed at obtaining the widest possible publicity in circumstances that were the most adverse possible to the plaintiff?

[41]    Cory, J. also considered the issue of punitive damages beginning at paragraph 196 where he said:

> Punitive damages may be awarded in situations where the defendant's misconduct is so malicious, oppressive and high−handed that it offends the court's sense of decency. Punitive damages bear no relation to what the plaintiff should receive by way of compensation. Their aim is not to compensate the plaintiff, but rather to punish the defendant. It is the means by which the jury or judge expresses its outrage at the egregious conduct of the defendant. They are in the nature of a fine which is meant to act as a deterrent to the defendant and to others from acting in this manner. It is important to emphasize that punitive damages should only be awarded in those circumstances where the combined award of general and aggravated damages would be insufficient to achieve the goal of punishment and deterrence.

[42]    One of the important factors for the Court was set out in paragraph 202:

> During the appeal, it was conceded and the evidence and events confirmed that in all likelihood, no amount of general or aggravated damages would have deterred Scientology. Clearly then, this was an appropriate case for an award of punitive damages.

It is important that each case of defamation must be looked at on its own facts and the awards given in other decisions are, therefore, not of much assistance. The Supreme Court of Canada acknowledged this in the *Hill* decision in paragraph 187.

[43]    *Barrick Gold Corporation v. Lopehandia* (2004), 2004 CanLII 12938 (ON CA), 71 O.R. (3d) 416 (C.A.), dealt with defamation in the Internet context. Justice Blair said, in paragraph 28, about Internet defamation:

> Is there something about defamation on the Internet – 'cyber libel', as it is sometimes called – that distinguishes it, for purposes of damages, from defamation in another medium? My response to that question is 'Yes'.

[44]   He referred to the principles set out in *Hill*. He then in paragraph 30 quoted from an Australian decision the, "ubiquity, universality and utility" of the Internet. He continued in paragraph 31:

> Thus, of the criteria mentioned above, the mode and extent of publication is particularly relevant in the Internet context, and must be considered carefully. Communication via the Internet is instantaneous, seamless, inter-active, blunt, borderless and far-reaching. It is also impersonal, and the anonymous nature of such communications may itself create a greater risk that the defamatory remarks are believed...

[45]   He then said in paragraph 34:

> ... Internet defamation is distinguished from its less pervasive cousins, in terms of its potential to damage the reputation of individuals and corporations, by the features described above, especially its interactive nature, its potential for being taken at face value, and its absolute and immediate worldwide ubiquity and accessibility. The mode and extent of publication is therefore a particularly significant consideration in assessing damages in Internet defamation cases.

[46]   In *Barrick Gold* an injunction was issued. Justice Blair said in paragraph 75:

> The highly transmissible nature of the tortious misconduct at issue here is a factor to be addressed in considering whether a permanent injunction should be granted. The courts are faced with a dilemma. On the one hand, they can throw up their collective hands in despair, taking the view the enforcement against such ephemeral transmissions around the world is ineffective, and concluding therefore that only the jurisdiction where the originator of the communication may happen to be found can enjoin the offending conduct. On the other hand, they can at least protect against the impugned conduct in their own jurisdiction. In this respect I agree with the following observation of Kirby, J. in *Dow Jones* at para. 115:
>
>> Any suggestion that there can be no effective remedy for the tort of defamation (or other civil wrongs) committed by the use of the Internet (or such wrongs must simply be tolerated is the price to be paid for the advantages of the medium) is self-evidently unacceptable.

[47]   A permanent injunction was granted and the Court said in paragraph 78:

I would set aside the decision of the motions judge in this regard and grant a permanent injunction as requested, restraining the defendants from disseminating, posting on the Internet or publishing further defamatory statements concerning Barrick or its officers, directors or employees.

[48]   In *Astley v. Verdun*, 2011 ONSC 3651 (CanLII), Chapnik, J. cited *Barrick Gold* and ordered an injunction and a mandatory injunction against the defendant.  In that case, the defendant stated that in spite of a jury verdict against him he would continue to "disparage and discredit the reputation of the plaintiff" (paragraph 16). Chapnik, J. in that case, said in paragraph 33:

Injunctive relief is an exceptional remedy that will not be imposed by the Courts lightly.  I certainly agree with the defendant when he states that any form of prior restraint on freedom of speech is extremely serious and can only be imposed in the clearest and rarest of cases.  This, however, is one of those cases.

[49]   He then outlined in paragraph 34 the circumstances of the case which caused him to grant an injunction.  He said:

This is so, given the plaintiff's high reputation and positions in the business community and the wide circulation of the defamatory statements calculated to destroy that reputation, as well as the strong likelihood that the publishing of defamatory statements against the plaintiff will continue and the real possibility that the plaintiff will not actually be compensated by the payment of damages.

[50]   A permanent injunction was granted.  The Court said in paragraph 35:

Accordingly, I order a permanent injunction to issue against the defendant, J. Robert Verdun, restraining him from disseminating, posting on the Internet or publishing, in any manner whatsoever, directly or indirectly, any statements or comments about the plaintiff, Robert M. Astley.

[51]   He also granted a mandatory injunction.  He said in paragraph 36:

There will also be a mandatory injunction requiring the defendant to forthwith remove his blog postings dated April 29, 2011 and May 2, 2011 from the Internet, and any similar postings that refer to the plaintiff, directly or indirectly.

[52]    In *Mina Mar Group Inc. v. Divine*, 2011 ONSC 1172 (CanLII),
Justice Perell also quoted *Barrick Gold*.  He granted an injunction
issuing out of an Ontario Court against a defendant in New Jersey.  He
simply said in paragraph 28:

> In accordance with the above authorities, I also grant a permanent
> injunction restraining the Defendants from disseminating, posting on the
> Internet or publishing further defamatory statements concerning the
> plaintiffs.

## Invasion of Privacy

[53]    Mr. Leary provided to the Court the recent decision, dated
January 18th, 2012, of the Ontario Court of Appeal in *Jones v. Tsige* in
which the Court concluded there is, at least in Ontario, a tort of
intrusion of seclusion, otherwise called "invasion of privacy", which is
claimed by the individual plaintiffs in this matter.

[54]    The facts in that case are very different from those in this case.
The defendant accessed the plaintiff's personal banking information on
174 occasions over a period of four years.  However, she did not publish
or distribute it but used it for her own purposes in a dispute with the
plaintiff's partner, the former husband of the defendant.  She apologized
for her actions and the Court concluded she was embarrassed and
contrite.  The plaintiff claimed $70,000 in damages for invasion of
privacy and exemplary damages of $20,000.  The Court said the range
of damages for this claim is up to $20,000 and awarded $10,000.

[55]    I am satisfied that in an appropriate case in Nova Scotia there can
be an award for invasion of privacy or as the Ontario Court of Appeal
called it, "the intrusion upon seclusion".  I must determine if, in this
case, it is warranted considering the principles set out in *Jones*.  In
*Jones* there was no accompanying claim for defamation and there was
no publication of defamatory statements about the plaintiff.

[56]    In *Nitsopoulos v. Wong*, 2008 CanLII 45407 (ON SC), 2008
CanLII 45407, 298 D.L.R. (4th) 265 (Ont.S.C.), the action was for deceit
and invasion of privacy.  The action concerned gaining entry to the
plaintiff's home and publishing information gained while there.  The
action was brought outside the time limits for a defamation action.

[57]   The facts in this case are that Mr. Handshoe on his blog disclosed Mr. Leary's business and home address and his location when he was visiting Spain.  With respect to Mr. Perret he said that he had abandoned his mother when he left Louisiana for Canada.  Mr. Perret said he was traumatized by this statement.

[58]   Mr. Handshoe made extremely derogatory and homophobic comments of the most outrageous kind about Mr. Leary and Mr. Perret and their sexual orientation, including posting what I would refer to as "doctored photographs" of a sexual nature depicting them.

[59]   Invasion of privacy in the *Jones* case was private and personal, banking information having been looked at many, many times.  That sort of financial and banking information is not usually disclosed by people even to their closest friends.  Yet another bank employee, who was not known to the plaintiff, looked at her private financial information on numerous occasions.

[60]   In *Nitsopoulos* the defendant posed as a maid for a Toronto cleaning service so she could write a series of articles for the *Globe and Mail* entitled "Maid for a Month".  She gained access to the plaintiffs' home and her experiences are profiled in the second of these articles.  The article published private details about the life of the plaintiffs that she gained while in their home.  The plaintiffs alleged that they would not have permitted the reporter into their home had she not fraudulently misrepresented herself to them.

[61]   They claimed that they suffered "harm to their dignity interests and personal autonomy", "their personal and home security", and their mental well-being".  The Court refused to grant summary judgment to the defendants, which they had sought on the basis that there was no cause of action for invasion of privacy.

[62]   In the *Jones* case the Ontario Court of Appeal dealt with the issue of whether Ontario law recognized a cause of action for invasion of privacy.  Justice Sharpe, writing for the Court said in paragraph 15:

> Aspects of privacy have long been protected by causes of actions such as breach of confidence, defamation breach of copyright, nuisance, and various property rights.  Although the individual's privacy interest is a fundamental value underlying such claims, the recognition of a distinct right of action for breach of privacy remains uncertain.

[63]    Justice Sharpe referred to an article by William L. Prosser entitled "Privacy", (1960), 48 Ca. L. R. 383. Professor Prosser said there were four torts which Sharpe, J.A. summarized in paragraph 18:

> 1. Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs.
>
> 2. Public disclosure of embarrassing private facts about the plaintiff.
>
> 3. Publicity which places the plaintiff in a false light in the public eye.
>
> 4. Appropriation, for the defendant's advantage, of the plaintiff's name or likeness.

[64]    He said the most relevant is the intrusion upon seclusion. He quoted in paragraph 19 its definition from the Restatement (Second) of Torts 2010 (from s. 652B) as follows:

> One who intentionally intrudes, physically or otherwise, upon the seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the invasion would be highly offensive to a reasonable person.

[65]    He continued in paragraph 20.

> The comment section of the Restatement elaborates this position and explains that the tort includes physical intrusions into private places as well as listening or looking, with or without mechanical aids, into the plaintiff's private affairs. Of particular relevance to this appeal, is the observation that other non−physical forms of investigation or examination into private concerns may be actionable. These include opening private or personal mail or examining a private bank account; even though there is no publication or other use of any kind of the information obtained.

[66]    The decisions he then canvassed dealt largely with the collection of personal data.

[67]    Charter jurisprudence dealing with privacy have focused on search and seizure in the criminal law context. Justice Sharpe said in paragraph 41 that there are three distinct privacy interests, the third being the relevant one in Jones. That is informational privacy. He

quoted from the decision of R. v. Tessling, 2004 SCC 67 (CanLII), in paragraph 41 where Binnie, J. said at paragraph 23:

> Beyond our bodies and the places where we live and work, however, lies the thorny question of how much *information* about ourselves and activities we are entitled to shield from the curious eyes of the state... This includes commercial information locked in a safe kept in a restaurant owned by the accused... Informational privacy has been defined as 'the claim of individuals, groups, or institutions to determine for themselves when, how, and to what extent information about them is communicated to others.'... Its protection is predicated on the assumption that all information about a person is, in a fundamental way, his own for him to communicate or retain... as he sees fit.

[68]   Sharpe, J.A. in paragraph 44 referred to the *Universal Declaration of Human Rights*, G. A. Res. 271 (III), UNAGOR, 3d Sess., Supp. No. 13, UN Doc. A/810(1948) 71, which provides:

> [n]o one shall be subjected to arbitrary interference with his privacy, home or correspondence

[69]   It also proclaims:

> [e]veryone has the right to the protection of the law against such interference or attacks.

[70]   Justice Sharpe said in paragraph 45:

> While the *Charter* does not apply to common law disputes between private individuals, the Supreme Court has acted on several occasions to develop the common law in a manner consistent with *Charter* values.

[71]   He then reviewed privacy legislation in Canada and the development of privacy law in other jurisdictions.  He said in paragraph 67:

> For over one hundred years, technological change has motivated the legal protection of the individual's right to privacy.  In modern times, the pace of technological change has accelerated exponentially.  Legal scholars such as Peter Burns have written of "the oppressing need to preserve 'privacy', which is being threatened by science and technology to the point of surrender"...  The internet and digital technology have brought an enormous change in the way we communicate and in our capacity to capture, store and retrieve information.  As this facts of this case indicate, routinely kept electronic data bases render our most personal financial

information vulnerable.  Sensitive information as to our health is
similarly available, as our records of the books we have borrowed or
bought, the movies we have rented or downloaded, where we have
shopped, where we have travelled, and the nature of our communications
by cell phone, e-mail or text message.

[72]   He then deals with law as it applied to the case before the Court.
He said in paragraph 71:

The key features of this cause of action are, first, that the defendant's
conduct must be intentional, within which I would include reckless;
second that the defendant must have invaded, without lawful justification,
the plaintiff's private affairs or concerns; and third, that a reasonable
person would regard the invasion as highly offensive causing distress,
humiliation or anguish.  However, proof of harm to a recognized
economic interest is not an element of the cause of action.  I return below
to the question of damages, but state here that I believe it is important to
emphasize that given the intangible nature of the interest protected,
damages for intrusion upon seclusion will ordinarily be measured by a
modest conventional sum.

[73]   He continued in paragraph 72:

These elements make it clear that recognizing this cause of action will not
open the floodgates.  A claim for intrusion upon seclusion will arise only
for deliberate and significant invasions of personal privacy.  Claims from
individuals who are sensitive or unusually concerned about their privacy
are excluded: it is only intrusions into matters such as one's financial or
health records, sexual practices and orientation, employment, diary or
private correspondence that, viewed objectively on the reasonable person
standard, can be described as highly offensive.

[74]   He then referred to the competing claims of freedom of
expression and freedom of the press.  He said in paragraph 73:

Suffice it to say, no right to privacy can be absolute and many claims for
the protection of privacy will have to be reconciled with, or even yield to,
such competing claims.

[75]   In paragraph 87 Justice Sharpe set out the considerations in
determining damages when intrusion on seclusion has been found to
exist.

[76]   In *Jones* there was no issue about freedom of expression or
freedom of the press.  The Ontario Court of Appeal, therefore, did not

have to consider the balance to be struck between those rights and privacy rights. Justice Sharpe specifically mentioned intrusion into matters involving a person's sexual practices and orientation as being possible subjects for a claim of intrusion upon seclusion. However, he said these intrusions must be viewed objectively and be viewed as highly offensive. Weighed against this is freedom of persons to express their opinions.

[77]   Certainly the comments made by Mr. Handshoe deal with Mr. Leary's and Mr. Perret's sexual orientation. The comments are anti-gay and homophobic. There were very upsetting to both, as were the doctored-up photographs. They are highly offensive.

[78]   However, the issue of weighing the effect of the intrusion on seclusion against the issue of freedom of expression was not argued before me. In such circumstances, I conclude this is not an appropriate case for an award of damages for intrusion on seclusion.

[79]   In this regard, I note, as well, the comments of Justice Cory in *Hill* where he said with respect to defamation: "reputation is intimately related to the right to privacy which has been accorded constitutional protection." This passage was also quoted by Justice Sharpe in paragraph 43 of the *Jones* decision.

[80]   Because this is also a defamation action, I conclude this is a further reason to leave the issue of a cause of action for intrusion on seclusion for another day in another proceeding.

## Damages

## Trout Point Lodge

[81]   With respect to the corporate plaintiff, it is clear that a corporation can be defamed. Damages were awarded to Barrick Gold Corporation and to Dover Investments Limited. In the latter decision, *Dover Investments Limited v. Transpacific Petroleum Corp.*, 2009 BCSC 1620 (CanLII), the Court set out the principles in awarding damages to a corporate plaintiff.

[82]   Loo, J. said in paragraph 19:

1) Damages for a corporate plaintiff are to compensate for the harm to its goodwill and business reputation. 2) The factors to be considered in assessing damages include the defendant's conduct, his position and standing, the nature of the defamation, the absence of an apology or refusal to apologize and his conduct throughout, up to and including at trial. 3) In addition to general damages for defamation, a corporate plaintiff may be entitled to special damages for specific economic loss. 4) In addition to general damages for defamation, in exceptional cases, a corporate plaintiff may be entitled to an award of punitive damages for malicious, oppressive and high-handed conduct. Punitive damages are intended to punish a defendant rather than compensate a plaintiff. 5) Compensatory damages, if substantial, may also be considered punishment, and should be taken into account when determining whether an award of punitive damages is warranted.

[83]   Trout Point Lodge has been stated to have been funded by money illegally obtained through Mr. Broussard and through the dishonest actions of Mr. Leary and Mr. Perret in getting money from ACOA and other investors. It has been said to be on the verge of bankruptcy. These are things which would cause potential guests to decide not to come to Trout Point Lodge. The defamation, in my view, has harmed the goodwill of the business and its business reputation. It casts an unfavourable light on the business which has otherwise received extremely positive reviews in the *Globe and Mail*, the *National Post*, *USA Today* and the *National Geographic Traveler*, to mention just a few. It has also been commended by well-known publications such as Fodors Guide to Atlantic Canada and Forbes Traveler, to name a few. It has also been recognized as a top ten finalist in the National Geographic Society's 2009 Geo-tourism challenge. Some of this information is included at Tab 5 of the evidence submitted at the hearing.

[84]   Mr. Leary points out in paragraph 8 of his affidavit:

> 8.      In addition to its membership in the prestigious hotel & restaurant association, Relais and Chateaux, Trout Point has always maintained a 4 ½ star rating from Canada Select, is the only hotel in Atlantic Canada inspected and recommended by Conde Nast Johansens' guide and earned a five Green Key rating from the Hotel Association of Canada.

[85]   The defendant has persisted in his statements that Trout Point Lodge is somewhat connected to the Jefferson Parish corruption scandal and has benefitted financially from funds illegally obtained. The defendant knows that the original story linking Mr. Broussard with Trout Point Lodge has been retracted and an apology published. In the

face of this, the defamatory comments continued. Mr. Handshoe has refused to apologize or retract and, in fact, has republished the original statements and says they are true.

[86]  In addition, he has alleged that the business is on the verge of bankruptcy and has received funds in Canada improperly. All this has been done through the Internet, which has the potential to reach untold numbers of potential guests of Trout Point Lodge throughout the world. The defamation has gone on now for two years and there is no indication that the defendant intends to stop. The defendant's conduct throughout has been to attempt to destroy the reputation of the business.

[87]  In my view, it may be very difficult to change the perception of Trout Point Lodge caused by the defamation and its reputation as a world class resort has been damaged. I conclude that the appropriate award of damages for the defamation of Trout Point Lodge is $75,000.

## The individual plaintiffs

[88]  The individual plaintiffs have been called dishonest, part of a money laundering scheme involving Mr. Broussard and part of a political corruption scandal involving Mr. Broussard, which is now the subject of FBI investigation. They are said to have lied and misled ACOA and the Court in the ACOA action. Mr. Leary is said to have perjured himself in that litigation. They are said to have misused the justice system in Nova Scotia for their own purposes. They are referred to as participating in nefarious schemes; being bag holders for Mr. Broussard; being unsuccessful businessmen who have had a series of failed business; and being con men.

[89]  Mr. Leary says they have changed their patterns of running errands to avoid running into people who may ask them about the Internet information published about them. They are embarrassed and stressed by the defamation.

[90]  The paraphrase the Supreme Court of Canada decision in *Hill*, they will never know who, as a result of the defamation, still has a lingering suspicion that they are dishonest, schemers and con men and were involved with Aaron Broussard in the political corruption of which he is accused. They will never know who might believe that they are without integrity and were involved in criminal activity.

[91]   These unfounded statements about the character, business dealings and financial acumen of these businessmen merit an award of damages for each in the amount of $100,000.

**Aggravated Damages**

[92]   Aggravated damages are beyond the damages already awarded, which are given when the injuries to a plaintiff are aggravated.  As Gatley on Libel and Slander described it, they reflect "the natural indignation of the Court of the injury inflicted."  As Justice Cory said in *Hill*, they take into account the additional harm caused to the plaintiff's feelings by the defendant's outrageous and malicious conduct.

[93]   Justice Cory in *Hill*considered the factors in that case which the Court believed made such an award by the jury in that case a reasonable one.  I conclude that the following factors in this case call for such an award here.  The original story was retracted by the *Times Picayune* in New Orleans; nevertheless, Mr. Handshoe continued to spread the defamation.  He then came up with additional statements concerning events in Nova Scotia, which defamed the defendants beyond the original defamation.  He commented on other business ventures of the plaintiffs and other legal matters in which they were involved, misrepresenting facts and attacking their reputations with statements that they were dishonest, fraudsters and liars.

[94]   The widespread defamatory comments continued to the date of this hearing in a medium well suited to spreading the defamatory comments far and wide to a vast number of Internet users.  Furthermore, there was conduct by the defendant in trying to stop the plaintiffs from continuing their against him.  He threatened to release dossiers of information he had about the plaintiffs and other unnamed people unless the action was discontinued.  All of this is outrageous conduct in the face of true facts about the plaintiffs.

[95]   Malice is an essential element of an award of aggravated damages.  In this case malice is alleged in the statement of claim (in paragraph 93 and other places) and is, therefore, deemed admitted by virtue of the default judgment.

[96]   I, therefore, award an additional $50,000 to each, to Mr. Leary and Mr. Perret, in aggravated damages to express the indignation of the Court.

## Punitive Damages

[97]   As the Supreme Court of Canada said in *Hill*, punitive damages are not compensatory in nature but are meant to punish the defendant. There must a rational purpose in awarding punitive damages.  In *Hill*, the Supreme Court of Canada considered the actions of the Church of Scientology and its officers during the course of the litigation and focused on its oppressive and high-handed conduct and the malice with which it acted throughout.

[98]   The defendant in this case continued his defamation after the newspaper printed a retraction of its story lining Trout Point Lodge, Mr. Leary and Mr. Perret with Aaron Broussard and the serious criminal allegations against him.  He redoubled his efforts after being sued and continued his defamation after judgment had been entered against him. He repeated the original defamatory statements.  Just prior to the hearing about damages, there were further defamatory statements.

[99]   Mr. Handshoe has stated that because of legislation in the United States it will be impossible for the plaintiffs to recover judgment against him.  This is a factor in awarding punitive damages.  I conclude there is in this case a rational reason for awarding punitive damages for the defendant's egregious misconduct, which offends the Court's sense of decency.  It is to act as a deterrent, not only to Mr. Handshoe, but also to others who might be inclined to defame someone in this fashion.

[100]  With respect to Trout Point Lodge, I conclude that the defamation award itself is an appropriate award to punish the defendant for his defamation of the corporate plaintiff.  With respect to Mr. Leary and Mr. Perret, I conclude that there is a need for additional punishment of the defendant because the defamation of them goes beyond what has been said about the company.

[101]  In my view, the award of general and aggravated damages to Charles Leary and Vaughn Perret is insufficient to properly denounce the actions of Mr. Handshoe and serve the goal of deterrence.  I, therefore, conclude that there should be an additional $25,000 awarded

to each of Charles Leary and Vaughn Perret as punitive damages against Mr. Handshoe.

## Injunction

[102]  I am satisfied that an injunction should issue.  The principles for granting of injunctions in defamation cases were set out in *Astley*. *Barrick Gold* made it clear that injunctions are available in cases of defamation.  In *Astley* Justice Chapnik said in paragraph 21:

> Permanent injunctions have consistently been ordered after findings of defamation where either:  1) there is a likelihood that the defendant will continue to publish defamatory statements despite the finding that he is liable to the plaintiff for defamation; or 2) there is a real possibility that the plaintiff will not receive any compensation, given that enforcement against the defendant of any damage award may not be possible...

[103]  Applying these factors to this case, I look at the conduct of the defendant, which from the beginning was defamatory and continued with more fervor after a retraction was published.  It became stronger and more malicious and derogatory as the action was commenced and as it proceeded to this assessment of damages.  There has been no retraction or apology but a continued campaign of defamation against these plaintiffs and homophobic comments about their sexual preference.

[104]  It is clear from the evidence before me that Mr. Handshoe will continue to publish the defamatory material.  He says he is protected from foreign defamation judgments such as the default judgment in this proceeding by legislation in the United States.  It also may be difficult, if not impossible, for the plaintiffs to recover on their judgment.  It is not known what assets Mr. Handshoe has or whether enforcement in the U.S. on the monetary judgment will be possible.  I, therefore, conclude that an injunction should issue.

[105]  Mr. Handshoe is, therefore, enjoined from dissemination, posting on the Internet, distributing or publishing in any manner whatsoever, directly or indirectly, statements or comments about Trout Point Lodge, Charles Leary and Vaughn Perret.  This includes statements or comments which refer to the three plaintiffs by name, depiction or description.

[106]  A mandatory injunction shall also issue requiring Douglas Handshoe to remove the defamatory comments, statements and depictions from any Internet site on which he has posted them and any links to those sites.

## Costs

[107]  The plaintiffs seek solicitor/client costs of these proceedings. However, they have not retained the services of counsel but have represented themselves throughout.  It is true that Vaughn Perret is a law graduate and has practiced law, however, he has non-practicing status now and has never been approved to practice law in Nova Scotia. I therefore cannot conclude that solicitor/client costs are warranted. That is not to say that self-represented parties are not entitled to their costs.  In Nova Scotia it has been said that costs can be awarded to self-represented parties beginning with the decision in *McBeth v. Dalhousie College and University*, [1986] N.S.J. No. 159 (C.A.), and more recently in the Court of Appeal decision in *Crewe v. Crewe*, 2008 NSCA 115 (CanLII), awarded costs in the modest amount of $4,000 to self-represented parties in *Salman v. Al-Sheikh Ali*, 2011 NSSC 30 (CanLII).  In that case the self-represented parties took part in multi-party litigation and were well prepared and did not cause any delays in the trial of five and one-half days.

[108]  I conclude that in the circumstances of this case there should be a modest costs award to reflect the time spent on this matter by the individual plaintiffs.  They brought the matter on to court and obtained default judgment.  They were well prepared for the one-half day hearing to assess damages, but it was unopposed.  I, therefore, award them costs in the total amount of $2,000.

[109]  The self-represented parties in the *Salman* matter were also entitled to their disbursements, as are the plaintiffs in this case.  They, however, have not provided me with their disbursements.  If they wish to provide that information I will consider their out-of-pocket costs and render a further brief decision.

Hood, J.

by LEXUM  for the  Federation of Law Societies of Canada

Scope of Databases
Tools
Terms of Use
Privacy
Help
Contact Us
About



# Trout Point Lodge Ltd. v. Handshoe, 2014 NSSC 62 (CanLII)

Date:    2014-02-14
Docket: Halifax No. 411345
Citation:Trout Point Lodge Ltd. v. Handshoe, 2014 NSSC 62 (CanLII),
         <http://canlii.ca/t/g344w> retrieved on 2015-03-23

---

### SUPREME COURT OF NOVA SCOTIA

**Citation:** *Trout Point Lodge Ltd. v.Handshoe*, 2014 NSSC 62

**Date:** 2014-02-14
**Docket:** Halifax No. 411345
**Registry:** Halifax

**Between:**

Trout Point Lodge Limited, a Nova Scotia Limited Company,
Charles Leary and Vaughn Perret

Applicants

v.

Douglas Handshoe

Respondent

---

## DECISION

---

**Judge:**         The Honourable Justice Kevin Coady

**Heard:**         December 17 and 18, 2013 in Halifax, Nova Scotia

**Written Decision:**

February 14, 2014

Counsel:                    Applicants: Trout Point Lodge, self-represented
                                     Charles Leary, self-represented
                                     Vaughn Perret, self-represented

                            Respondent: Douglas Handshoe, not appearing

**By the Court:**

[1]      This is an application for an assessment of damages pursuant to
*Civil Procedure Rule* 70.04.  The applicants requested damages are
rooted in defamation, copyright infringement and misappropriation of
personality.  An Amended Statement of Claim was served on Mr.
Handshoe at his address in Wiggins, Mississippi.  Instead of filing a
defence Mr. Handshoe filed a Demand for Notice pursuant to *Civil
Procedure Rule* 4.06 which states as follows:

> A defendant who does not have a defence to an action, or does not
> choose to defend an action, may demand notice of all steps in the
> proceeding.

[2]      The filing of this notice by Mr. Handshoe triggered *Civil
Procedure*

*Rule* 31.12(4) which states:

> A party who does not file a notice of defence when required is
> taken to have admitted, for the purposes of the action, the claims
> made against the party, and the party making the claim may move
> for judgment under Rule 8 - Default Judgment.

[3]      *Civil Procedure Rule* 8.03 states as follows:

> A judge may grant default judgment in any action on any claim, if
> the party against whom judgment is sought is notified in
> accordance with Rule 31- Notice, the time for filing a defence is
> expired, and no defence is filed.

Justice Moir of this Court case managed this file prior to the assessment of damages. In correspondence to the parties dated October 25, 2013, Justice Moir stated as follows:

> My order of September was made on the assumption that Mr. Handshoe wanted to defend the converted action, as he had defended the application. Instead, he chose not to defend and to file a demand for notice, which is his right. Subject only to the issue of attornment, Rules 31.12(4) and 8.03 are in operation. There is no need for a formal order of default when, instead of a defence, a demand for notice is filed.

In the same correspondence dates for the assessment of damages were scheduled.

[4]     The applicants filed a motion for an assessment of damages and arranged service on Mr.Handshoe. A review of the file indicates that Mr. Handshoe acknowledged service. In fact on December 12, 2013 he attempted to file a summary judgment application and in his documents he stated he was aware of the dates set for the assessment of damages hearing. Mr. Handshoe did not participate in this motion.

[5]     This proceeding represents the second round of litigation between these parties. In the first proceeding (2012 NSSC 245 (CanLII)) these applicants obtained default judgment against Mr. Handshoe in an action filed in 2011. That action sought damages for defamation, invasion of privacy, injurious falsehood, intentional interference with contractual relations, intentional interference with economic relations, intentional infliction of emotional and mental distress and assault. An assessment of damages followed. Mr. Handshoe did not participate.

[6]     The former and present actions are similar in that they are a response to Mr. Handshoe's defamatory actions conducted through the Internet. Justice Hood summarized Mr. Handshoe's activities at paragraphs 5 to 8 of the first proceeding:

> [5]     The defamatory comments originated with a news story which was published in the *Times Picayune* newspaper in Louisiana about Jefferson Parish President, Aaron Broussard, being involved in a political corruption scandal. The plaintiffs were erroneously identified as being connected with Mr. Broussard in a business venture and Mr. Broussard was named in

error as owning Trout Point Lodge. The allegations against him are kickback schemes, money laundering and fraud while in his office as Parish President.

[6]     The defamatory comments later included claims that Trout Point Lodge, Mr. Leary and Mr. Perret, had misled ACOA and that Mr. Leary committed perjury in litigation with ACOA. The defamation continued with statements that Trout Point Lodge was losing business or going bankrupt because of the investigation of Mr. Broussard and his inability to continue to support it.

[7]     Also, there were claims that Charles Leary and Vaughn Perret had been involved in a series of businesses which failed and are con men. The statements also contained anti-gay rhetoric and homophobic comments.

[8]     After the original story was retracted by the Louisiana newspaper that published it, Mr. Handshoe made statements that Mr. Leary and Mr. Perret had improperly influenced it to retract the story. He also said that Mr. Leary and Mr. Perret were improperly using the legal system by commencing the defamation action.


[7]     Justice Hood also reviewed the some of Mr. Leary's evidence that addressed the impact of Mr. Handshoe's actions. I will repeat that evidence here as it arose in this application as well.

- I am seriously concerned about Slabbed hurting the Lodge's business, which Mr. Perret and I rely on as our primary source of income. In 2011, occupancy rates at Trout Point were 3% lower than in 2010. This represents a value of at least $15,000.00.

- Mr. Handshoe's Internet publications have added a great deal of stress to our lives, including with physical manifestations.

- I have also felt genuinely afraid of his published threats and of the existence of the Slabbed Nation and members of that group being in Nova Scotia. I now keep my doors locked at night, whereas

previously I never feared for my safety in my own home.

- I have told my personal physicians in Spain and Nova Scotia about stress and sleeplessness related to the Handshoe publications. My physician, Dr. Fernandez-Noguera has prescribed medication to help me sleep after the Slabbed publications commenced and to help control my anxiety. I have also experienced embarrassment, humiliation, and irritability. It was hard to get through work in 2011 knowing that nearly every day a new source of embarrassment and business disruption might be published by Handshoe. I have been embarrassed that friends and acquaintances in Yarmouth might confront me about the Slabbed allegations. I can never be sure that members of the local community might secretly harbour a belief in the truth of the blog's allegations.

- Due to the publications on Slabbed and by Mr. Handshoe elsewhere on the Internet I have a very real fear that anyone performing due diligence on us as businesspeople or innkeepers will discover and believe Mr. Handshoe's publications.

- I have felt embarrassed in my local community. Mr. Perret and I have at times changed our usual shopping patterns in Yarmouth in order to avoid persons we consider friends who may have read the Slabbed publications.

- In April, 2011, at the time when Mr. Handshoe's publications about us became threatening and homophobic, I experienced tightened shoulder & neck muscles, sleeplessness, and developed a severe outbreak of fever blisters for which I had to take Zovirax, an antiviral medication. Previously, I always slept very well, never waking up early. Since April, 2011, I have experienced regular sleeplessness, particularly waking up early in the morning worrying about Slabbed and its effect on our business.

[8]     In the first assessment of damages the Court awarded the following:

Defamation – Trout Point Lodge – $75,000
Defamation – Mr. Leary – $100,000

Defamation – Mr. Perret – $100,000
Aggravated Damages – Mr. Leary – $50,000
Aggravated Damages – Mr. Perret – $50,000
Punitive Damages – Mr. Leary – $25,000
Punitive Damages – Mr. Perret – $25,000

In addition Justice Hood awarded $2000 in costs.  The applicants have not been able to realize on any of these awards due to the exigencies of Mississippi legislation and notwithstanding applications to an appellate level.

[9]     In addition to damages Justice Hood granted an injunction against Mr.

Handshoe.  She states at paragraphs 105 and 106:

[105]     Mr. Handshoe is, therefore, enjoined from dissemination, posting on the Internet, distributing or publishing in any manner whatsoever, directly or indirectly, statements or comments about Trout Point Lodge, Charles Leary and Vaughn Perret.  This includes statements or comments which refer to the three plaintiffs by name, depiction or description.

[106]     A mandatory injunction shall also issue requiring Douglas Handshoe to remove the defamatory comments, statements and depictions from any Internet site on which he has posted them and any links to those sites.

The evidence on this application satisfies me that Mr. Handshoe has continued to defame the applicants notwithstanding the injunction.  Furthermore it is abundantly clear that Mr. Handshoe feels entirely immune from the orders of this Court.  In fact it is not an overstatement to say that Mr. Handshoe "snubs his nose" at all judicial officers and institutions of Nova Scotia.

**Defamation Damages:**

[10]   The evidence presented establishes that Mr.Handshoe's defamatory actions have continued unabated since Justice Hood's order.  This is supported by the statement of claim which I must accept as proven.  The following is but a taste of the defamation plead:

- Mr. Handshoe has continued to repeatedly publish words referring to the personal plaintiffs as "girls", "bitches", "bottom boys", "wives", "perverted" and "queer fag scum."

- Mr. Handshoe has continued to publish that the applicants were long term recipients of criminal proceeds from the Broussard criminal scheme.

- Trout Point Lodge was described by Mr. Handshoe as a shell company used for the purposes of a criminal conspiracy including money laundering.

- The applicants were part of an international criminal conspiracy designed to silence the investigation of their own criminal wrongdoing. Also that their Nova Scotia legal proceedings were criminally motivated and fraudulent.

- The plaintiffs and Mr. Boussard illegally influenced the presiding Justice of the Supreme Court in Yarmouth to deprive Mr. Handshoe of his civil rights and due process.

- Mr. Handshoe published that the applicants intentionally misled Justice Hood and therefore committed perjury.

- The applicants were members of a Louisiana company involved in criminal activities alleged by American prosecutors.

- Mr. Handshoe republished the following: "I'll add here, in case it is not self-evident, that I built complete dossiers on all the players in this social group and I intend through time to roll out each and every one in excruciating detail as long as the lawsuit in Canada is an outstanding issue for Slabbed. The reason for this is that this band of gay men act as a unit that will also scatter like cockroaches when the heat is applied."

- Mr. Handshoe created a video that was published on *YouTube*. The content created the implication that the applicants were part of the Aaron Boussard criminal scandal, were involved in criminal activities with Broussard such as those alleged to have been conducted

> using Nova Scotia Enterprises, LLC, and that Trout Point
> Lodge was recipient of criminal monies and a place of
> criminal activity. Handshoe referred to and pictured
> Broussard as the "Goatherder in Chief" and the Plaintiff's
> as "the goatherders."

The evidence on this application satisfies me that Mr. Handshoe was not
deterred by Justice Hood's decision. There is little difference between
his actions pre and post January 31, 2012 when the first assessment of
damages was initiated.

[11]   The actions and words of Mr. Handshoe since the first application
are clearly defamatory. Furthermore they have no relationship to fact or
truth. They amount to nothing more than a misguided attempt to
destroy Mr. Leary, Mr. Perret and Trout Point Lodge.

[12]   In *Grant v. Torstar Corp.*, 2009 SCC 61 (CanLII), [2009] 3
S.C.R. 640 the Supreme Court of Canada discussed damages for
defamation as follows at paragraph 28 and 29:

> [28]   A plaintiff in a defamation action is required to prove
> three things to obtain judgment and an award of damages: (1) that
> the impugned words were defamatory, in the sense that they
> would tend to lower the plaintiff's reputation in the eyes of a
> reasonable person; (2) that the words in fact referred to the
> plaintiff; and (3) that the words were published, meaning that they
> were communicated to at least one person other than the plaintiff.
> If these elements are established on a balance of probabilities,
> falsity and damage are presumed... The plaintiff is not required to
> show that the defendant intended to do harm, or even that the
> defendant was careless. The tort is thus one of strict liability.
> [29]   If the plaintiff proves the required elements, the onus then
> shifts to the defendant to advance a defence in order to escape
> liability.

[13]   I am satisfied that the applicants are entitled to additional
damages as a

result of Mr. Handshoe's defamation. In *Mina Mar Group Inc. v.
Devine*, 2001

ONSC 1172 the Court discussed general damages for Internet
defamation at

paragraphs 10 and 11:

> [10]  In *Barrick Gold Corp. v. Lopehandi* 2004 CanLII 12938
> (ON CA), (2004), 71 O.R. (3d) 416 (C.A.), the defendant used
> postings on Internet sites to disparage the business practices of
> and to defame the plaintiff corporation by among other things
> accusing it of a long list of criminal misconduct. The postings
> were numerous and were part of a prolonged campaign on the part
> of the defendant designed to embarrass the plaintiff and injure its
> reputation. The Court of Appeal awarded general damages of
> $75,000, punitive damages of $50,000, and a permanent
> injunction. The *Barrick* case is the leading case about damages in
> Internet defamation cases and about whether and when the
> remedy of injunctive relief should be available against defendants
> who do not reside in Ontario.

> [11]  The factors to consider in determining general damages
> include: (a) the plaintiff's position and standing; (b) the nature
> and seriousness of the defamatory statements; (c) the mode and
> extent of the publication; (d) the absence or refusal to retract the
> libel or to apologize for it; (e) the conduct and motive of the
> defendant; (f) the presence of aggravating or mitigating
> circumstances: *Barrick Gold Corp. v. Lopehandi,supra* at para.
> 29; *Hill v. Church of Scientology of Toronto*, 1995 CanLII 59
> (SCC), [1995] 2 S.C.R. 1130 at p. 1203;

I am satisfied that these factors have been established by the applicants,
both individual and corporate.  Justice Hood was satisfied that at law a
corporate defendant can be defamed (paragraphs 81-83).  She awarded
Trout Point Lodge $75,000 in general damages.  I award Trout Point
Lodge a further $35,000 in general damages.

[14]  I am also satisfied that Mr. Leary and Mr. Perret are entitled to
additional damages.  Justice Hood awarded each $100,000 in general
damages, $50,000 in aggravated damages and $25,000 in punitive
damages.  The applicants have not realized on these awards.  I am
awarding Mr. Leary and Mr. Perret each an additional $50,000 in
general damages.

[15]  The individual applicants seek additional aggravated damages.  In
*Hill v. Church of Scientology of Toronto*, 1995 CanLII 59 (SCC),

[1995] 2 S.C.R. 1130 Cory J. discussed aggravated damages at paragraph 188 and 189:

> 188.   Aggravated damages may be awarded in circumstances where the defendants' conduct has been particularly high-handed or oppressive, thereby increasing the plaintiff's humiliation and anxiety arising from the libellous statement. The nature of these damages was aptly described by Robins J.A. in *Walker v. CFTO Ltd.*, *supra*, in these words at p. 111:
>
> > Where the defendant is guilty of insulting, high-handed, spiteful, malicious or oppressive conduct which increases the mental distress -- the humiliation, indignation, anxiety, grief, fear and the like --suffered by the plaintiff as a result of being defamed, the plaintiff may be entitled to what has come to be known as "aggravated damages".
>
> 189.   These damages take into account the additional harm caused to the plaintiff's feelings by the defendant's outrageous and malicious conduct. Like general or special damages, they are compensatory in nature. Their assessment requires consideration by the jury of the entire conduct of the defendant prior to the publication of the libel and continuing through to the conclusion of the trial. They represent the expression of natural indignation of right-thinking people arising from the malicious conduct of the defendant.

I am amply satisfied that Mr. Handshoe's conduct meets the test for additional aggravated damages. I award Mr. Leary and Mr. Perret each $30,000 in aggravated damages.

[16]   The individual applicants seek additional punitive damages. Cory J.

discussed when to apply these damages at paragraph 196 of the *Hill* decision:

> Punitive damages may be awarded in situations where the defendant's misconduct is so malicious, oppressive and high-handed that it offends the court's sense of decency. Punitive damages bear no relation to what the plaintiff should receive by way of compensation. Their aim is not to compensate the plaintiff, but rather to punish the defendant. It is the means by

which the jury or judge expresses its outrage at the egregious
conduct of the defendant. They are in the nature of a fine which is
meant to act as a deterrent to the defendant and to others from
acting in this manner. It is important to emphasize that punitive
damages should only be awarded in those circumstances where
the combined award of general and aggravated damages would be
insufficient to achieve the goal of punishment and deterrence.

I am satisfied that Mr.Handshoe's conduct meets this criteria. I award
Mr. Leary and Mr. Perret each an additional $25,000 in punitive
damages.

**Copyright Damages:**

[17]   The individual applicants seek damages for copyright
infringement in relation to four (4) photographs disseminated on the
Internet by Mr. Handshoe for commercial purposes. These
infringements were plead in the Amended Statement of Claim, and as
Mr. Handshoe has not filed a defence, these infringements are deemed
admitted. These applicants have elected to request statutory damages
instead of general damages.

[18]   Section 38.1(1) of the *Copyright Act,* R.S.C. 1985, c. C-42 allows
for the

above referenced election. It states as follows:

> Subject to this section, a copyright owner may elect, at any time
> before final judgment is rendered, to recover, instead of damages
> and profits referred to in subsection 35(1), an award of statutory
> damages for which any one infringer is liable individually, or for
> which any two or more infringers are liable jointly and severally,
> (*a*) in a sum of not less than $500 and not more than $20,000 that
> the court considers just, with respect to all infringements involved
> in the proceedings for each work or other subject-matter, if the
> infringements are for commercial purposes.

There is ample evidence that Mr. Handshoe disseminated the four (4)
photographs for commercial purposes. His principle activity is
blogging and his materials attract many followers. I am satisfied that
"Slabbed" is a commercial operation. The evidence as a whole
establishes that Mr. Handshoe was using these photographs to destroy
the business interests of Trout Point Lodge, Charles Leary and Vaughn

Perret and in doing so enhance "Slabbed's" credibility as an investigative organization. In addition the applicants plead at paragraph 8 that "Handshoe uses his website as a commercial enterprise." On the basis of *E. Sands and Associates v. Dextras Engineering & Construction Ltd.*, 2009 BSSC 42 I must accept this assertion as proven.

[19]   Section 38.1(5) of the *Act* lists the factors to consider when a plaintiff elects

to recover statutory damages. It states:

> In exercising its discretion under subsections (1) to (4), the court shall consider all relevant factors, including
>> (*a*) the good faith or bad faith of the defendant;
>
>> (*b*) the conduct of the parties before and during the proceedings;
>
>> (*c*) the need to deter other infringements of the copyright in question.

[20]   Section 38.1(7) allows the awarding of exemplary and punitive damages in

addition to statutory damages. It states:

> An election under subsection (1) does not affect any right that the copyright owner may have to exemplary and punitive damages.

[21]   The first photo depicts Mr. Leary and Mr. Perret. It initially appeared in the website of an organization called "Ashoka." On that website the individual applicants were described as change makers and social entrepreneurs. Mr. Handshoe placed this picture on his blog on five (5) occasions. He has never removed it and it appears alongside defamatory script. I have in evidence a copyright assignment dated December 13, 2012 between "Ashoka" and Charles Leary.

[22]   The second photo depicts Trout Point Lodge and was taken by Mr. Perret. It was used extensively to promote Trout Point Lodge. Mr. Handshoe put it on his blog alongside defamatory script. Mr. Perret never relinquished his interest in this photo and Mr. Handshoe has not removed it from his blog.

[23]   The third photo depicts Mr. Leary, Mr. Perret and their associate Mr. Abel.  It was taken by one Marilyn Smulders and was extensively used to promote Trout Point Lodge.  **Mr. Handshoe placed it on his blog on seven (7) occasions alongside defamatory script.**  I have in evidence an Assignment of Copyright dated August 21, 2013 between Marilyn Smulders and Trout Point Lodge.  Mr. Handshoe has not removed this image from his blog.

[24]   **The fourth photo depicts Mr. Leary and Mr. Perret standing in front of Trout Point Lodge with their dog.**  The *Toronto Star* took this photograph for a story they were writing on Trout Point Lodge.  It was placed on their website where it was accessed by Mr. Handshoe.  **It was used by Mr. Handshoe alongside defamatory script.**  I have in evidence a Certificate of Registration Copyright dated July 8, 2013 in the name of Trout Point Lodge Ltd.

[25]   The evidence satisfies me that these infringements occurred between the time of Justice Hood's decision and the start of this application.  The evidence also satisfies me that all of the photographs were the property of the applicants when utilized by Mr. Handshoe.  I am also satisfied that the individual applicants complained to Mr. Handshoewho ignored their concerns and their rights in the photographs.  It should not be forgotten that these infringements offended the 2012 injunction issued by Justice Hood.  Their misuse amounted to an ongoing campaign to damage, harass and embarrass the applicants.

[26]   In *Microsoft Corporation v. PC Village Co. Ltd.,* 2009 FC 401 (CanLII) the Federal Court awarded generous statutory damages based on bad faith and the need for deterrence.  Justice Harrington state at paragraph 39:

> [39]   I conclude that the amount of statutory damages must reflect not only the bad faith of the Defendants and their disregard for the rights of the Plaintiff.  It must also deter the Defendants from continuing their course of action.  In my view, the amount for statutory copyright damages must be sufficiently high to serve a salutary message and deter future infringements on the part of the named Defendants and other parties.

The Court also addressed exemplary and punitive damages at paragraph 42:

[42]     The law with respect to the award of punitive and exemplary damages was summarized by Justice Boyd in *Louis Vuitton Malletier S.A. v. 486353 B.C. Ltd.*, 2008 BCSC 799 (CanLII), 2008 BCSC 799 at paras. 84 to 86.  After reviewing general principles Justice Boyd stated:

> [86]     Punitive and exemplary damages have been awarded in cases of trade-mark and copyright infringement, where, for example, the conduct of the defendants was "outrageous" or "highly reprehensible", or where the defendant's actions constituted a callous disregard for the rights of the plaintiff or for injunctions granted by the Court. Similarly, in determining whether punitive and exemplary damages ought to be awarded, the Court will consider whether the defendant has little regard for the legal process, thus requiring the plaintiff to expend additional time and money in enforcing its rights.

The Plaintiff submits that it is appropriate to award punitive damages of at least $50,000.  Given the conduct of the Defendants it is appropriate that that conduct be condemned by means of a significant punitive damage award.

I find that Mr. Handshoe's conduct towards the applicants over the past few years amounts to "outrageous and highly reprehensible" conduct. The four (4) infringements herein must be viewed on top of the defamation that continues to this date in the face of Justice Hood's injunction.  This is a case for generous statutory damages as well as punitive damages.

[27]   I award the following statutory damages:

- In relation to the first photograph (Ashoka), I award Charles Leary $20,000.

- In relation to the second photograph (the Lodge), I award Mr. Perret $20,000.

- In relation to the third photograph (Smulders), I award Trout Point Lodge Ltd. $20,000.

- In relation to the fourth photograph, I award Trout Point Lodge Ltd. $20,000.

[28]   In addition to these statutory damages I award the applicants punitive damages of $100,000.

## Wrongful Appropriation of Personality Damages:

[29]   There are limited cases where this tort has been discussed.  In *Joseph v.*

*Daniels*, 1986 CanLII 1106 (BC SC), 1986 CanLII 1106 (BCSC) Wallace J. referenced the decision of Estey

J.A. in *Krouse v. Chrysler Canada Ltd.,* 1973 CanLII 574 (ON CA), [1974] 1 O.R. (2d) 225 wherein he stated

at page 238:

> I therefore, conclude from the foregoing examination of the authorities in the several fields of tort related to the allegations made herein that the common law does contemplate a concept in the law of torts which may be broadly classified as an appropriation of one's personality.

Wallace J. also referenced the decision of Henry J. in*Athans v. Canadian*

*Adventure Camps Ltd.,*(1977), 1977 CanLII 1255 (ON SC), 17 O.R. (2d) 425 at page 434:

> I turn now to the second head of claim, namely, wrongful appropriation of the plaintiff's personality.  I say at once that, on the basis of recent authority, it is clear that Mr. Athans has a proprietary right in the exclusive marketing for gain of his personality, image and name, and that law entitles him to protect that right, if it is invaded.

[30]   Wallace J. discussed the element of such a claim at paragraph 14:

> [14]     From my review of the authorities I have concluded that it is the unauthorized use of a name or likeness of a person as a symbol of his identity that constitutes the essential element of the cause of action.  The cause of action is proprietary in nature and

> the interest protected is that of the individual in the exclusive use
> of his identity insofar as it is represented by his name, reputation,
> likeness or other value.  For the defendant to found liable, he must
> be taking advantage of the name, reputation, likeness or some
> other component of the plaintiff's individuality or personality
> which the viewer associates or identifies with the plaintiff.

These authorities establish that this tort may be the foundation for a viable claim.  In *Joseph v. Daniels, supra,* the plaintiff was unsuccessful because the specific image did not identify him.

[31]   This tort was extensively discussed in *Poirier v. Wal-Mart Canada Corporation,* 2006 BCSC 1138 (CanLII).  Arnold-Bailey J. reviewed the caselaw where damages were denied.  A principle that emerges is that compensation for the appropriation of one's personality should be used sparingly (*Racine v. C.J.R.C. Radio Capitale Ltee,* (1977) 1977 CanLII 1203 (ON SC), 17 O.R. (2d) 370). Damages in most successful actions were nominal.

[32]   After a review of the authorities I decline to award damages for this tort.  If this was a stand alone claim I might be inclined to decide otherwise.  I am of the view that the damages for copyright infringement adequately address the conduct of Mr. Handshoe.


Coady, J.

by LEXUM   for the   Federation of Law Societies of Canada

Scope of Databases
Tools
Terms of Use
Privacy
Help
Contact Us
About