# Douglas Handshoe

**Page 1**

```
 1    IN THE CIRCUIT COURT OF HANCOCK COUNTY, MISSISSIPPI
 2
 3
 4  TROUT POINT LODGE, LTD.,
    VAUGHN PERRET, and
 5  CHARLES LEARY                          PLAINTIFFS
 6  VS.                      CAUSE NO.  15-0458
 7  DOUGLAS K. HANDSHOE                     DEFENDANT
 8
 9
10          JUDGMENT DEBTOR EXAMINATION
11                  OF
12            DOUGLAS K. HANDSHOE
13          MONDAY, AUGUST 14, 2017
14            1:28 P.M. TO 3:32 P.M.
15
16      Taken at the Stone County Courthouse
                323 Cavers Avenue
17              Wiggins, Mississippi
18
19
20
21
22  REPORTED BY:  ELENA C. JAMES, CSR#1682
                COURT REPORTER
23
24
25
```

**Page 3**

```
 1  APPEARANCES:
 2      Representing Plaintiffs:
 3          GARY D. THRASH, ESQ.
            SINGLETARY & THRASH-JACKSON, P.A.
 4          Post Office Box 587
            Jackson, Mississippi 39205
 5          601.353.1070
 6
    Representing Defendant:
 7
 8          G. GERALD CRUTHIRD, ESQ.
            121 Fourth Street
 9          Post Office Box 1056
            Picayune, Mississippi 39466
10          601.798.0220
            picayunebarrister@cruthirdlaw.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 2**

```
 1                   I N D E X
 2              DOUGLAS K. HANDSHOE
 3                                        Page
 4
 5
 6  Caption                                1
 7  Appearances                            3
 8  Agreement of Counsel                   4
 9  Examination
10      Mr. Gary Thrash                    5
11  Errata Sheet                          62
12  Reporter's Certificate                63
13              * * * * *
14  EXHIBITS:
15  1 - Notice of Deposition               5
16  2 - Copy of Mr. Handshoe's Driver's License
17  3 - Assignment of Rights and Claims
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              S T I P U L A T I O N S
 2          It is hereby stipulated and agreed by and
 3  between the parties hereto, through their respective
 4  attorneys of record, that this Judgment Debtor
 5  Examination may be taken at the time and place herein
 6  before set forth, by Elena C. James, Court Reporter
 7  and Notary Public, pursuant to the Mississippi Rules
 8  of Civil Procedure;
 9          That the formality of READING AND SIGNING is
10  specifically RESERVED;
11          That all objections, except as to the form of
12  the questions and the responsiveness of the answers,
13  are reserved until such time as this deposition, or
14  any part thereof, may be used or is sought to be used
15  in evidence.
16
17
18
19
20
21
22
23
24
25
```

**Patsy Ainsworth Reporting**
**601.582.2582**



# Douglas Handshoe

5

1             DOUGLAS K. HANDSHOE,
2  CALLED AS A WITNESS, HAVING BEEN FIRST DULY SWORN,
3  DEPOSED AS FOLLOWS:
4             (EXHIBIT 1 PRE-MARKED)
5                  EXAMINATION
6  BY MR. THRASH:
7      Q.  Mr. Handshoe, do you have your driver's
8  license with you?
9      A.  I do.
10     Q.  May I see it?  I'm going to want to make a
11  copy of it, so I'm going to let her keep it.
12         MR. CRUTHIRD:  That's fine.
13     Q.  And we'll get it back before you leave here
14  today.
15     A.  All right.
16         (EXHIBIT 2 ENTERED)
17     Q.  Mr. Handshoe, where are you employed?
18     A.  I am employed at Douglas K. Handshoe, CPA,
19  PLLC and Slabbed New Media, LLC.
20     Q.  Are those the only two places you are
21  employed?
22     A.  Yes.
23     Q.  Involved in any other businesses that you
24  have ownership interest in that are --
25     A.  No.  Just those two.  The second business is

6

1  PLLC, not LLC.
2      Q.  What is your ownership interest in Slabbed
3  Media?
4      A.  100 percent.
5      Q.  And is it in good standing with the Secretary
6  of State?
7      A.  Yes.
8      Q.  What kind of salary do you draw from that
9  company?
10     A.  I don't draw a regular salary.  I own the
11  company.
12     Q.  How do you get compensated out of Slabbed
13  Media?
14     A.  Periodic distributions if there is money
15  around to do that.
16     Q.  With whom does Slabbed Media bank?
17     A.  Hancock.
18     Q.  Does it bank with any other companies?
19     A.  No.
20     Q.  What does Slabbed Media do?
21     A.  Owns an Internet website and has intangible
22  property in the form of registered copyrights.
23     Q.  Explain to me how it works.  Do you have a
24  media outlet?
25     A.  Yes. I have a web host.

7

1      Q.  And how does it generate money?
2      A.  Mainly through reader donations, sometimes
3  advertising, especially in the political seasons get
4  some advertising revenue from some of the candidates.
5      Q.  What assets does Slabbed Media own?  Do you
6  have their tax return here with you?
7      A.  The website.  I brought my personal tax
8  returns which would have a Schedule C for Slabbed New
9  Media since it's a disregarded entity.  For IRS
10  purposes it's considered a disregarded entity.  Single
11  owner LLCs just file a Schedule C like you were
12  self-employed.
13     Q.  It's taxed just like a self-employed like you
14  are a sole owner of the business?
15     A.  That's right.
16     Q.  And whatever profits or losses fall through
17  to your tax return?
18     A.  That's right.
19     Q.  May I see your tax returns?
20     A.  Yes.
21     Q.  I believe I asked for three years.
22     A.  You asked for '15, '14 and '16.  '16 is on
23  extension.  Here is '14, '15 as filed and '15 amended.
24     Q.  Are these my copies?
25     A.  Yes, they are.

8

1      Q.  On your tax return you show wages, salaries.
2      A.  That would be my wife.
3      Q.  That's your wife's?
4      A.  Yes.
5      Q.  On your business income it shows a $60,000
6  profit in '15.
7      A.  Yes. That would be right.  There was a big
8  loss in Slabbed New Media that year and a pretty good
9  sized income in the CPA practice.
10     Q.  You show a capital gain in '15 of a loss of
11  $1500.
12     A.  15 a piece, yes.  3000.  That's called a
13  capital loss carryover.
14     Q.  What constitutes that loss?
15     A.  Some real estate that was sold and some
16  stocks that were sold back after the financial crisis
17  in 2010, 2009, something like that.
18     Q.  That was shown on Schedule D?
19     A.  Yes.
20     Q.  Have you made any tax deposits during the
21  year '16?
22     A.  Are you talking about estimated tax payments?
23     Q.  Yes.
24     A.  Yes. There was estimated tax payments made
25  for '16.

# Douglas Handshoe

9

1  Q.  Do you have the records of those?
2  A.  Not with me. There would have been quarterly
3  estimates of I think maybe 3000 federal, maybe 500
4  state and we sent the money in with the extension.
5  Q.  What does your wife do for a salary?
6  A.  She is the office manager for a non-profit
7  agency down on the coast.
8  Q.  What non --
9  A.  And she also draws her full Mississippi State
10 Retirement.
11 Q.  What is the non-profit on the coast?
12      MR. CRUTHIRD:  That's fine.
13 A.  If it ends on the Internet people are going
14 to get sued.
15 Q.  I'm not going to be on the Internet.
16      MR. CRUTHIRD:  Let's understand that,
17      Gary, because it's not a personal thing, but
18      your clients have engaged in what my client
19      believes or asserts is defamatory type
20      comments on the Internet. So anything
21      revealed in this deposition should be just
22      for purposes of collecting that judgment and
23      if it shows up out here with ha-ha or
24      whatever their purposes are, he is going to
25      file suit.

10

1  Q.  Okay. I don't blame him. When he tells me
2  who the non-profit is, don't put it in. Is that good?
3      MR. CRUTHIRD:  That's fair enough.
4      Because his wife really is not the judgment
5      debtor anyway.
6  A.  They threatened her on the Internet.
7  (Employer deleted from the record.)
8      MR. CRUTHIRD:  Do you want to tell him
9      what that is?
10 A.  They provide -- she retired from the State
11 Department of Health. She worked in a program that
12 served developmentally delayed children up to age 5.
13 And the program where she is working now is the agency
14 that actually provides the physical therapists, the
15 teachers, everything that that age group would need to
16 help get them ready to go to kindergarten.
17 Q.  That really doesn't identify anything, does
18 it?
19 A.  No.
20 Q.  You show in '15 legal and professional
21 services $16,888. What were those legal services
22 rendered for?
23 A.  A Chapter 11 Bankruptcy filing for Slabbed
24 New Media, LLC.
25 Q.  That was Craig Geno?

11

1  A.  Yes.
2  Q.  Did you complete that Chapter 11 Bankruptcy?
3  A.  No. It was dismissed.
4  Q.  Why was it dismissed?
5  A.  The nature of the major assets and
6  liabilities dealt with the LLC's indemnity of me
7  personally for my official acts. Your clients have a
8  habit of suing me personally over content on that
9  Slabbed New Media website. They just go ahead and
10 disregard it. So we tried to take Chapter 11 as a way
11 to reorganize the business affairs and unfortunately
12 because of the pervasiveness of the related party got,
13 the judge didn't feel like she could grant the
14 discharge.
15 Q.  What did you list as assets of Slabbed New
16 Media in that bankruptcy?
17 A.  A judgment receivable for $48,000 in attorney
18 fees from the federal court. A payable related to
19 that for the attorney fees for $48,000. The value of
20 the website, which was about $4500. And we had a
21 little bit of cash.
22 Q.  You are speaking of a judgment that was given
23 in federal court; is that correct?
24 A.  Correct.
25 Q.  Who owns that judgment now?

12

1  A.  That judgment has been filed in Slabbed New
2  Media, LLC.
3  Q.  Give me the history of who all has owned that
4  judgment.
5  A.  Well, on March 5, 2014 I signed the rights
6  and claims on that judgment to Jack Etherton Truitt
7  who is a lawyer on that case who I owed $48,000 to.
8  Q.  He was from Louisiana?
9  A.  Yes.
10 Q.  Did he enroll that judgment in Louisiana?
11 A.  Oh, no. They don't have anything in
12 Louisiana. He tried to go up to Nova Scotia to
13 collect it. And then on October 8, 2014 we cancelled
14 that assignment and we sought some enforcement here in
15 Mississippi with the federal court.
16 Q.  You cancelled that assignment. What do you
17 mean by cancelled it?
18 A.  I talked to Bobby on the phone and I wrote
19 him an email that said, "Per our discussions regarding
20 the assignment of attorney fees to effect the
21 collection of the outstanding Trout Point judgment,
22 please be advised I agree to rescind the prior
23 assignment in order that you can pursue collection
24 efforts on my behalf here in Mississippi." This is on
25 Pacer.

## Douglas Handshoe

**13**

1    Q.   So what consideration did he receive for that
2  transfer of the judgment from him back to you?
3    A.   Consideration?
4    Q.   Yes.
5    A.   The ability to collect the judgment here in
6  Mississippi for one thing.  My promise to cooperate
7  with him in collecting that judgment for another
8  thing.
9    Q.   Did he own the judgment?
10   A.   No.  It was an assignment.
11   Q.   What did the assignment say?
12   A.   The original assignment?
13   Q.   Yes.
14         MR. CRUTHIRD:  Have you got a copy
15              there?
16   A.   I do.  Straight off the Pacer.  We've already
17  been down this road with Leary and Perret trying to
18  get discipline on my attorney that did not work.  "I
19  Douglas K. Handshoe, do hereby assign, convey and
20  transfer to Jack E. Truitt and The Truitt Law Firm,
21  LLC any and all rights, claims, or title in any claim,
22  action or lawsuit I may have against Charles Leary,
23  Vaughn Perret, and/or Trout Point Lodge, Limited for
24  the collection of attorney's fees, costs, or any other
25  element of damages or interest which was awarded to me

**14**

1  in connection with the litigation which was formerly
2  pending in the U.S. District Court.  Jack E. Truitt
3  and The Truitt Law Firm shall have the full right to
4  institute any and all actions for collection of
5  attorney's fees, costs, or other damages in the United
6  States or Canada as if instituted by me.  This
7  assignment of rights and claims has been made by me in
8  exchange for good and valuable consideration."
9    Q.   What was that consideration?
10   A.   I don't have to live in Canada and him
11  agreeing to incur additional costs to pursue it.
12   Q.   So you transferred all of your interest to
13  him --
14   A.   So that he could pursue collection up in
15  Canada.
16   Q.   May I finish?
17   A.   Yes.
18   Q.   In exchange for him agreeing to pursue this
19  matter in Canada?
20   A.   Correct.
21   Q.   That was the consideration?
22   A.   That's right.
23   Q.   Did you give him all your right, title and
24  interest?
25   A.   Any and all rights, claims and title.

**15**

1    Q.   So that was an absolute conveyance to that
2  gentleman?
3    A.   Yes.  At that time, that's correct.
4    Q.   So as an absolute conveyance.  Now let's move
5  forward.  You reclaimed it.
6    A.   No.  He flipped it back to me.
7    Q.   What did he get in consideration for flipping
8  it back to you?
9    A.   We were going to enforce it in the United
10  States against their merchant vendor accounts.
11   Q.   Do you have a document showing the transfer
12  of that judgment?
13   A.   Absolutely.
14   Q.   Mr. Handshoe, please let me finish my
15  question, finish talking.  I'll do the same for you.
16   A.   Okay.
17   Q.   What document do you have that shows he
18  transferred that interest back to you?
19   A.   The email that we referenced.  A court filing
20  that included that email.
21   Q.   May I see the document you are talking about
22  as far as the court filing?
23   A.   Sure.  And we have a Bates number up here.
24  Because I just made a copy of the exhibit.  And
25  Exhibit 1 to that was the original assignment.  And

**16**

1  then also attached is where I signed it Slabbed New
2  Media in 2015.
3    Q.   Do you have any document from Mr. Truitt
4  where he assigned that judgment back to you?
5    A.   The email which confirmed our conversation
6  and the pleading that he submitted to the federal
7  court.  I don't have that with me.
8    Q.   What pleading are you talking about?
9    A.   If you want to talk to Judge Giraud you are
10  welcome to.
11   Q.   What pleading are you talking about?
12   A.   Pardon me?
13   Q.   What pleading are you talking about?
14   A.   Your clients filed after they lost the case
15  and they lost their appeal, then they filed a Motion
16  for Discipline against Mr. Cruthird and my attorney
17  Mr. Truitt.  I can't really explain to you why that
18  was, but we had to respond to that.  And that was part
19  of that response.  They have a Bates number at the top
20  of that.  You are welcome to go dig into that case and
21  get that whole series of documents.  Not that
22  assignment.  That assignment has never been filed.
23  But those two documents behind it, that was Exhibit 1
24  and Exhibit 2 to his response.
25   Q.   It says page 1 of 1.

# Douglas Handshoe

17

1     A.   Look at the bottom and you will see the
2   exhibit stickers.
3     Q.   I see the stickers.  You said at the top it
4   was Bates stamped.
5     A.   Right.  It will tell you what document it is.
6          MR. CRUTHIRD:  Which should be
7                obtainable on Pacer, yes, from the U.S.
8                District Court.
9     Q.   This is both documents show being page 1 of
10  1.
11    A.   Yes.  If you look at the Bates stamp there
12  will be probably a number dash 1.  The Bates stamp is
13  at the top, sir.
14    Q.   I see the case number and the document
15  number.
16    A.   What's that document number?  You have my
17  paperwork there.
18    Q.   Yes.  I see two document numbers consecutive.
19  Are you saying these were attached to another
20  document?
21    A.   Correct.
22    Q.   Do you know the docket number of that?
23    A.   Sure.  Can I see that, please?
24    Q.   Yes.
25    A.   The docket number of that would be 65-0.  You

18

1   have 65-1 and 65-2 in front of you.
2     Q.   Are you saying Mr. Truitt filed a document in
3   federal court that says he is conveying title to that
4   judgment back to you?
5     A.   That's correct.
6     Q.   Okay.
7     A.   And an email with the exhibit to demonstrate
8   it.
9     Q.   Are these my copies?
10    A.   Yes, they are.
11    Q.   We'll make these the next exhibit.
12         (EXHIBIT 3 ENTERED)
13    A.   Your clients aren't going to be able to get
14  out of that contempt real easy.
15         MR. CRUTHIRD:  Let me point out too in
16               the judgment that I gave you the copy of for
17               the $48,000, that has the correct case
18               number.
19    A.   It does.  12CV90.
20         MR. CRUTHIRD:  That's the case your
21               clients appealed.
22    A.   Twice.
23         MR. CRUTHIRD:  To the 5th Circuit,
24               right?
25    A.   Yes.  Filed for discipline against you and

19

1   Bobby.  Sued me five more times.  Sued my lawyers.
2     Q.   You show a long-term capital loss of $50,849
3   on your tax return.
4     A.   Yes.
5     Q.   Tell me what makes that up.
6     A.   That was from maybe 2011, 2012 selling
7   securities that all had lost a lot of value after the
8   financial crash.
9     Q.   Do you own any securities now?
10    A.   No.
11    Q.   Did you get out of the market when you sold
12  these stocks and you lost the $50,000?
13    A.   Yes, sure did.
14    Q.   But you have had no stock transactions since
15  2015?
16    A.   It was probably before that.  That account
17  was gone no later than 2013, but I'm thinking it was
18  more like 2011, 2010.
19    Q.   Who was the account with?
20    A.   TD Ameritrade.
21    Q.   Do you have a local broker you dealt with?
22    A.   Oh, no.  TD Ameritrade you do it yourself.
23    Q.   I'm kind of confused.  Because on your tax
24  return you show that $50,849 to have been caused by
25  the sale of a piece of property in Waveland.

20

1     A.   There are two amounts on there.  There is a
2   carryover of a capital loss and then there is a sale
3   of real estate.  I mentioned both of them.  That I
4   sold securities and I sold a lot at a loss.  So now
5   the capital loss carryover is $100,000.
6     Q.   So when you were telling me about your long-
7   term capital loss in 2015 --
8     A.   The carry forward, that's right.
9     Q.   You were mistaken to say it was caused by
10  stocks; is that correct?
11    A.   The carry forward was caused by the sale of
12  stocks.  Two amounts.  And then I reported a
13  transaction for the sale of land.  Those two losses
14  added together equals a total carryover.
15    Q.   I was talking about the loss you show for
16  $50,849.
17    A.   Okay.  That is the sale of real estate.
18    Q.   In 2015.
19    A.   That's correct.
20    Q.   Who did you sell that property to?
21    A.   I don't even know who brought it, to be
22  honest with you.  We sold it through a realtor.  It
23  was nobody related.
24    Q.   Excuse me.  I'm more confused now.  You are
25  positive it wasn't anybody you are related to, but you

# Douglas Handshoe

**21**

1  don't know who you sold it to?
2      A.   I don't know.  I can tell you it wasn't
3  anybody related to me.  I took a bull whipping on that
4  deal.
5      Q.   What was at 135 Farrar Lane?
6      A.   Just a piece of land.
7      Q.   What did you pay for it?
8      A.   It's on there.  $65,000.
9           MR. CRUTHIRD:  What's the address?
10     A.   135 Farrar Lane.  F-a-r-r-a-r.
11     Q.   What caused the decrease in value in that
12  property?
13     A.   The real estate subprime mortgage crash, the
14  fact that it's 13 feet above sea level about half a
15  block away from the Gulf.  It doesn't hurt things.  I
16  mean it doesn't help things.
17     Q.   Who was the realtor you went through to make
18  this sale?
19     A.   O'Dwyer Realty.
20     Q.   Were there any improvements on this property?
21     A.   No.
22     Q.   What caused you to sell it?
23     A.   We needed the money.
24     Q.   Did you pay 65,000 and change in cash when
25  you purchased it?

**22**

1      A.   I sure did.  I think I bought it three months
2  before the subprime crash.
3      Q.   The crash we'll agree occurred in about 2008;
4  is that correct?
5      A.   That's right.
6      Q.   Has this property been developed since you
7  sold it?
8      A.   Not to my knowledge, but I haven't been down
9  there in a while, so --
10     Q.   I'm looking at your --
11     A.   That's the as filed original 2015.
12     Q.   I understand that.  What did you change with
13  the amendment?
14     A.   The fact that I had forgotten to report or
15  probably didn't want to think about it, that capital
16  gain or actually in this case major capital loss, and
17  the fact that on the original return I had included
18  only a portion of Slabbed New Media's transactions
19  that were just before the creation of the bankruptcy
20  trust in 2015.  The judge before I filed that return
21  dismissed it in 2016, which makes it the bankruptcy
22  trust became a nullity, so I had to include all the
23  transactions that happened after the filing date in
24  2015 on my return.  So I had to amend that Schedule C
25  to do that.

**23**

1      Q.   Did the amended return contain the profit or
2  loss from business for Douglas K. Handshoe, CPA?
3      A.   Nothing changed with that, so you don't
4  attach schedules that don't change on the returns.
5  You only attach the ones that change.
6      Q.   On the profit or loss from business for the
7  accounting firm, what were the legal and professional
8  expenses for it?
9      A.   Well, I maintained Gerald on a retainer just
10  to have an attorney on retainer.  I also have to
11  engage other CPAs to come in and do what's called a
12  peer review on my practice.  I'm not sure what's in
13  there specifically, but it's not unusual to have 2, 3,
14  4, $5000 legal fees show up on a Schedule C every
15  year.
16     Q.   Were these lawsuits against the company?
17     A.   No.
18     Q.   On the first return did you report the loss
19  from the sale of the property?
20     A.   I inadvertently omitted it.  That is one of
21  the reasons we amended was to get that loss
22  established.
23     Q.   On your return I believe it's Form 4562 you
24  list that you chose to expense certain properties
25  rather than capitalize them and put them in for

**24**

1  depreciation.
2      A.   Yes, sir.
3      Q.   I believe you show that you spent about
4  $6327.
5      A.   That sounds about right.
6      Q.   What did you purchase?
7      A.   File servers.
8      Q.   What type of file servers?
9      A.   I believe it was a Dell 805, Dell 610.
10     Q.   805 and 610?
11     A.   805R, yes, and a 610R.  Likely in '15 we
12  bought what's called NAS or Network Attached Storage,
13  which would be another very specialized file server.
14     Q.   Am I correct in my review of Part 1 that that
15  does not report any kind of sales, but is merely a
16  determination of how much you could expense?
17     A.   Yes.  That was the R610 and that was the
18  elected cost.  Yes, we did write it off.
19     Q.   The top part just determines how much you
20  could write off.
21     A.   That's correct.
22     Q.   Before we got to what you actually did write
23  off.
24     A.   That's right.
25     Q.   You show on Schedule C line 16 an interest

# Douglas Handshoe

**25**

1  expense. What were you paid interest on? What kind of
2  debt and what bank?
3      A.   That was actually mortgage on 110 Hall
4  Street.
5      Q.   Is 110 Hall Street your home?
6      A.   It is now, yes.
7      Q.   Is now.
8      A.   It has been off and on since 2001. From 2010
9  through January to 2016 we were living in Bay St.
10 Louis and the business completely occupied the
11 dwelling.
12     Q.   At Hall Street?
13     A.   That's correct. And so the business paid all
14 the costs associated with that particular location.
15     Q.   What is the address of the property in Bay
16 St. Louis?
17     A.   We were renting down there and that was 214
18 Corinth Drive. We lived there from I want to say the
19 very end of 2012 until we moved and then we rented a
20 place on Carroll Avenue before that.
21     MR. CRUTHIRD:   And that's in Bay St.
22         Louis?
23     A.   That's right.
24     Q.   And when were you at the Carroll Avenue
25 address?

**26**

1      A.   From about 2010 to 2012.
2      Q.   And you were at the Corinth Drive address
3  from 2012 --
4      A.   To January 2016.
5      Q.   And who did you rent from?
6      A.   It was actually Stephen Ambrose's son-in-law.
7  We handled all that through O'Dwyer Realty.
8      Q.   So they would have the records on that?
9      A.   They would. The gentleman that owned it was
10 actually from up in New York.
11     Q.   I'm looking at the 2014 return now. Was
12 there any amendment filed to it?
13     A.   No.
14     Q.   So I'm looking at the final return; is that
15 correct?
16     A.   That's correct.
17     Q.   Now, I believe you said the official name of
18 your accounting business is Douglas K. Handshoe, CPA.
19     A.   PLLC. That's right.
20     Q.   PLLC. Okay. I'm going to ask you some
21 questions about that particular business and just want
22 us on the same page. I'm talking about your
23 accounting firm.
24     A.   Right.
25     Q.   Who owns that firm?

**27**

1      A.   I own 70 percent of it. Ms. Sheila Cruthird
2  who has been with me for over 20 years owns 30
3  percent.
4      Q.   When did she acquire her 30 percent?
5      A.   December 2016 she bought in.
6      Q.   Had she worked for you prior to that?
7      A.   Oh, about 20, 22 years.
8      Q.   What consideration did she pay for that 30
9  percent?
10     A.   $5000 cash in recognition of or for past
11 contributions to the firm.
12     Q.   In recognition of what?
13     A.   Her past contributions to the firm.
14     Q.   I thought you said past cash contributions.
15     A.   No. Well, she had done that a couple of
16 times, extended short-term credit for cash flow
17 purposes and we did that like I said in 2016 in
18 December.
19     Q.   What was the cause of that happening at that
20 time?
21     A.   There was no particular cause. Just that she
22 had been with me for an awful long time and we talked
23 about her taking an equity stake. We talked about her
24 actually acting like an owner instead of an employee.
25 So in December of '16 which is the very low point of

**28**

1  the business cycle for CPAs, she stepped up with $5000
2  to help make us through the month. She also advanced
3  the money to help buy that Dell file server. But that
4  was the year before that. And we paid her back for
5  that.
6      Q.   So she loaned the business that money; is
7  that correct?
8      A.   That's correct.
9      Q.   In 2014 were you paying her a salary?
10     A.   Yes.
11     Q.   How much was that salary?
12     A.   Oh, her base pay was like $36,000 for a long
13 time. She got a raise at some point in time in 2014
14 or 2015 that kicked her up closer to 43, $44,000.
15     Q.   I see in 2014 your legal expenses were
16 $11,760. Were there any type of lawsuits or other
17 things that caused that?
18     A.   That was a peer review year there, so I had
19 to pay an accounting firm out of the Delta to come
20 down and essentially audit my practice from top to
21 bottom. They probably got at least half of that
22 number for the peer review fee. And then like I said,
23 we normally run 2, 3, 4, $5000 on legal expenses every
24 year just out of consultations and that sort of thing.
25     Q.   Is Mrs. Cruthird related to your lawyer?

## Douglas Handshoe

**29**

1    A.   She is actually.  She's Gerald's
2  sister-in-law.  Many, many years ago I met Gerald
3  through her and her husband.
4    Q.   What is contracted services?
5    A.   That would be for per diem help.  We had
6  people coming in to clean the property since we were
7  using that for an office.  Some of that would have
8  been probably groundskeeping there.  Some of it would
9  be for actual what we would call per diem accounting.
10  Someone who would come in and do specific projects in
11  exchange for a straight fee instead of a payroll
12  check.
13    Q.   How much was the total of the long-term
14  capital loss you took that's allowing you to take over
15  $50,000 a year in a carryover?
16    A.   I'm not sure what your question is.  Can you
17  let me see what you are looking at?
18    Q.   What I'm asking is two years in a row I've
19  seen where you've taken a carryover of over $50,000.
20    A.   That's right.
21    Q.   The two of them together would total $110,000
22  roughly.
23    A.   Yes.  You can eat that up 3000 a year is what
24  they let you deduct.
25    Q.   How much was the initial long-term capital

**30**

1  loss that allowed this following?
2    A.   Lord.  Probably 65, $70,000.
3    Q.   Was that all in the stock market?
4    A.   That was all the stocks.  That's right.
5    Q.   I want to make sure I understand this
6  correct.  Do you own 100 percent of Slabbed New Media,
7  LLC?
8    A.   That's correct.
9    Q.   Are there any debts against Slabbed New
10  Media, LLC?
11    A.   Right now the major liability in Slabbed New
12  Media, LLC is the judgment, the attorney's fees
13  payable to Mr. Truitt.
14    Q.   And you are talking about Truitt's fees?
15    A.   That's right.
16    Q.   Not the judgment?
17    A.   Well, the judgment of the judgment receivable
18  on the books there.  So I've got a receivable for
19  $48,000 and I've got a payable for $48,000.
20    Q.   I was asking you just about payables.  But
21  I'll take that answer.
22    A.   That was on the operating reports for the
23  bankruptcy court.  They are all out there on Pacer.
24    Q.   Now, who does the CPA firm bank with?
25    A.   We bank with three different banks.

**31**

1    Q.   Who are they?
2    A.   Hancock, The First, and Bank of Wiggins.
3    Q.   Is that the third one?
4    A.   Yes.
5    Q.   Where is The First located?
6    A.   Their main branch is up in Hattiesburg, but
7  they have a branch right here in town.
8    Q.   I just never heard of them.
9        MR. CRUTHIRD:  I think they started in
10        Laurel.  But he's probably right.  Their
11        primary branch is probably Hattiesburg.  And
12        there was a bank here that they bought that
13        got liquidated called First National Bank of
14        Picayune.  No.  First National Bank of
15        Wiggins they bought.  And I guess are they
16        in that building here?
17    A.   They are.  And they got a bunch of branches
18  from Hancock Whitney when they had to divest
19  themselves of their surplus branches after they
20  merged.  So they are a pretty good sized bank down
21  here.
22    Q.   The First.  Is it written out The First or is
23  it with a number?
24    A.   No.  The First.
25    Q.   Which bank do you deposit your revenue that

**32**

1  you derive from the practice into?
2    A.   It could go into all three, but primarily
3  right now I think we use The First.
4    Q.   Now, I probably asked this, but what kind of
5  salary do you draw from the accounting firm?
6    A.   We just take distributions.  I don't have a
7  salary at this point.  I've taken a regular draw of
8  like $3000 a month as kind of like a base.  Been doing
9  that for many, many, many years.
10    Q.   Where have you been employed during the last
11  10 years?
12    A.   I've worked for myself since 1993.
13    Q.   And when you say for yourself --
14    A.   CPA.
15    Q.   You are talking about Douglas K. Handshoe,
16  CPA, PLLC?
17    A.   The PLLC didn't form until '14 or '15.
18  Before that I did it just as a sole proprietor.
19    Q.   Between the period of 2010 and the present,
20  excluding your investment in the stock market, have
21  you invested in any other kinds of businesses,
22  securities, et cetera?
23    A.   No.
24    Q.   Other than the bankruptcy and this
25  proceeding, have you been involved in any other suits

# Douglas Handshoe

**33**

1 or administrative proceedings, had any executions,
2 garnishments, et cetera?
3     A.    No execution. Your clients have sued me six
4 times in Canada and in Louisiana. Those would be the
5 only lawsuits I've ever been involved in.
6     Q.    Aren't you presently involved in two or three
7 lawsuits against them?
8     A.    Yes. I have sued them in federal court and I
9 have a dormant suit in state court.
10    Q.    Tell me about the basis of the dormant suit
11 in state court.
12    A.    That's racketeering against them and the
13 former disgraced president of Jefferson Parish, Aaron
14 Broussard.
15    Q.    Do you own personally that lawsuit?
16    A.    Yes.
17    Q.    Now, I believe you have a federal court
18 lawsuit pending against them?
19    A.    Yes. Leary and Perret. That's right.
20    Q.    What is the basis of that federal court
21 lawsuit?
22    A.    Violations of Section 512F of the Copyright
23 Code. One count Speech Act 2010 for declaratory
24 relief. And one or two declaratory relief counts
25 against them for copyright issues.

**34**

1     Q.    What is the status of that lawsuit at the
2 present time?
3     A.    We are waiting on procedural rulings from
4 Judge Overden.
5     Q.    When you say procedural rulings, what do you
6 mean?
7     A.    They filed for 12B Motion to Dismiss.
8 Slabbed New Media had filed a Motion to Intervene.
9 And I guess by -- she's going to try them all at once.
10 So that's where we are sitting. Everything has been
11 briefed. We're just waiting for the judge.
12    Q.    Which judge do you have?
13    A.    Overden.
14    Q.    When was that lawsuit filed?
15    A.    November 2015 I believe.
16    Q.    I believe you said out of that lawsuit you
17 have been awarded $50,000 roughly?
18    A.    It's a different lawsuit.
19    Q.    Wrong lawsuit?
20    A.    Yes.
21    Q.    Okay.
22    A.    The $48,000 relates to the suit that's been
23 assigned.
24    Q.    The second suit is styled what?
25    A.    Douglas Handshoe versus Trout Point Lodge,

**35**

1 Charles Leary, Vaughn Perret, Marilyn Smolders,
2 Progress Media. National Geographic was formerly a
3 defendant. They settled. The Toronto Star was
4 formerly a defendant. They were dismissed from the
5 case.
6     Q.    And who did you say came after Marilyn
7 Smolders?
8     A.    Progress Media.
9     Q.    Who owns Progress Media?
10    A.    Good question. They are up in Canada.
11    Q.    What did you receive from National
12 Geographic?
13    A.    It's subject to a confidentiality agreement.
14    Q.    So I've got to go to the court to get to it?
15    A.    Probably so. I agreed I couldn't divulge it,
16 nor could I disparage them.
17    Q.    If I am familiar with those type of
18 agreements, they exclude from the confidentiality
19 court orders to appear and give information. That's
20 what you got here.
21          MR. CRUTHIRD: I haven't read the
22          agreement, so we'll have to get back with
23          you on that.
24          MR. THRASH: But do you agree with my
25          statement about the general status of most

**36**

1          --
2          MR. CRUTHIRD: No, sir. Not
3          necessarily. I'm going to have to look at
4          the -- and I've never seen it before. I've
5          not represented Mr. Handshoe in all of his
6          different matters. Primarily this case.
7          But I'll have to review the agreement before
8          we can answer or respond.
9     Q.    Okay.
10    A.    If Gerald advises me that I should do that,
11 then I will do that. And if the judge makes me, I
12 guess I have to cross that bridge when he orders me
13 to.
14          MR. CRUTHIRD: He could I guess divulge
15          when you received it in terms of how
16          relevant it is to this.
17    A.    That's correct. We settled that back in
18 September or October of 2016, somewhere in there.
19          MR. CRUTHIRD: We can review within 14
20          days and get back to you.
21          MR. THRASH: Okay. And we'll reconvene
22          if necessary.
23          MR. CRUTHIRD: Yes, sir. You can move
24          to recess.
25          MR. THRASH: I'll move to recess subject

# Douglas Handshoe

37

1  to reconvening if that becomes relevant.
2  MR. CRUTHIRD: Yes, sir.
3  Q. You named another party that you had settled
4  with.
5  A. No. National Geographic was the only one.
6  To the Toronto Star was dismissed. They filed a 12B
7  motion and actually I let them out by not opposing it.
8  They gave me an affidavit that greatly helped my case
9  against your clients.
10  Q. That was dismissed without compensation?
11  A. That's correct.
12  Q. Okay. Then you were talking about a third
13  lawsuit that involved the $50,000 judgment.
14  A. The $48,000 in attorney's fees?
15  Q. I rounded it up. I'm sorry. The $48,000 in
16  attorney's fees. What case did that come out of?
17  A. The case number 12CV90. All the assignments
18  I gave you earlier on that case.
19  MR. CRUTHIRD: You have the case number,
20  right?
21  A. Yes. 12CV90.
22  MR. CRUTHIRD: That's the one I actually
23  forwarded you a copy of the judgment and
24  then also it somehow was filed in this court
25  file by the clerk here, but it's been when

38

1  it was enrolled.
2  A. That's right.
3  MR. CRUTHIRD: In Stone County. But now
4  has an independent miscellaneous cause
5  number in this county.
6  MR. THRASH: In Stone County.
7  MR. CRUTHIRD: Yes, sir.
8  Q. So 12CV90, what is the basis of that lawsuit?
9  A. Well, first suit was filed in the United
10  States wherein Perret sued me for defamation up in
11  Canada. Got a defamation judgment. Tried to enroll
12  it down here in a practice called liable tourism. We
13  removed it to federal court and the judge did not --
14  declared the Canadian judgment to be unenforceable in
15  the United States and awarded me attorney fees.
16  Q. That was Giraud?
17  A. Yes. And it's very likely that when the next
18  order comes out I'm going to have sanctions payable to
19  me by the day.
20  Q. And what was the basis of that? His was a
21  slander action in Canada enforcing a judgment?
22  A. That's right.
23  Q. Have you had any repossessions or
24  foreclosures --
25  A. No.

39

1  Q. -- in the last three years?
2  A. No.
3  Q. Other than the judgment we have spoken about,
4  have you done any assignments of property to any
5  person in the last three years?
6  A. Yes. We redeeded two pieces of real property
7  in Harrison County to my wife in I guess that would
8  have been March, February or March of 2015.
9  Q. What kind of real property was it?
10  A. Two lots.
11  Q. Vacant?
12  A. Vacant. Undeveloped.
13  Q. You said undeveloped; is that correct?
14  A. That's correct.
15  Q. And what was the reason for conveying those
16  pieces of property to your wife?
17  A. They are two-fold. We were doing some asset
18  protection planning and we were doing some estate
19  planning.
20  Q. What do you mean by asset protection
21  planning?
22  A. Well, your clients have sued me six times
23  over the past six years. We thought it would be best
24  if we divided assets. And I was heavy in my column
25  with the CPA practice and those sorts of things. So

40

1  she got title to two pieces of real property.
2  Actually three. The Farrar Street lot as well that we
3  sold.
4  Q. Where were these two pieces of property
5  located? I know you said Harrison County, but where
6  in Harrison County?
7  A. One of them is in the Robinwood Subdivision
8  on I believe Dogwood Lane. The other one is on Hardy
9  Avenue.
10  Q. Does your wife still own those?
11  A. She does.
12  Q. What is the value of them?
13  A. We tried to sell the Robinwood property for
14  what we paid for it back in 1999 which was oh, about
15  $20,000 and we couldn't sell it for that. So I'm
16  guessing somewhere way under $20,000. The lot on
17  Hardy Avenue is worth somewhere between $35,000,
18  $30,000, something like that. At one time after the
19  hurricane but before the financial crash it was worth
20  $85,000 according to the appraisal.
21  Q. What did you pay for it?
22  A. Well, we bought a house and land on Hardy
23  Avenue. We paid -- we had about 170 in it altogether.
24  Q. Have you sold that house on Hardy Avenue?
25  A. Hurricane Katrina took that house on Hardy

# Douglas Handshoe

**41**

1  Avenue.
2  Q.   I have no idea where it is.  Do you still own
3  that lot or is this the lot we are talking about?
4  A.   That's the lot we are talking about.
5  Q.   Had a house on it, got blown away and you
6  ended up with just the land?
7  A.   Correct.  Got some insurance money.  That's
8  right.
9  Q.   How much insurance money did you get?
10  A.   After the hurricane 150 on flood, 100,000 on
11  wind, another 40 for flood contents.
12  Q.   Do you still have that money?
13  A.   No.
14  Q.   Speaking of money, let's start with that.
15  What personal bank accounts do you have?
16  A.   Just one with Hancock.  It's a joint account
17  with my wife.
18  Q.   Is it a savings, checking or --
19  A.   It's a checking account.
20  Q.   Are all your other checking accounts held in
21  the name of your businesses?
22  A.   Yes.
23  Q.   How many accounts do you have?  You've told
24  me you had three for the CPA.
25  A.   Three for the CPA, one for Slabbed and my

**42**

1  personal.  That would be a total of five.
2  Q.   Who is the Slabbed account with?
3  A.   Hancock Bank.
4  Q.   Do you do most of your banking with Hancock?
5  A.   I had personal banking with them for a long
6  time.  They are real convenient for up here, which is
7  why we maintain the other ones.
8  Q.   What consideration did your wife pay for
9  those two lots?
10  A.   What do you mean paid?  She didn't pay me
11  anything.  When we did the asset protection planning,
12  the house on Hardy Avenue, we bought it and fixed it
13  up and had a mortgage.  I think we paid like $130,000
14  for it and spent about another 40.  The lot that's in
15  Robinwood we paid about $20,250 for it way back in the
16  '90s.
17  Q.   Is it developed?
18  A.   No.  It is the worst of them that needs to be
19  cleared.
20  Q.   You said the Hardy Avenue lot.  You've gone
21  through what you have paid for it and all that.
22  A.   That's right.
23  Q.   Did you receive anything from your wife for
24  the transfer of that Hardy Street property to her?
25  A.   No.  Just husband and wife equalizing their

**43**

1  estates.
2  Q.   So if I'm understanding what you are saying,
3  you and your wife decided in 2016; is that correct?
4  A.   2015.  Early 2015, yes.
5  Q.   For you to give her certain of your assets so
6  that she would have the same amount of property as you
7  do; is that correct?
8  A.   Well, yes.  The first step in dealing with
9  estate planning is husbands and wives each have their
10  own gift allowances and things like that.  The first
11  thing you do is try to equalize the estate values.
12  That's the easy thing you can do.  That's really step
13  one.
14  Q.   And I'm not sure you answered my question.
15  Do you agree with me that you gave property to your
16  wife?
17  A.   Without a doubt.
18  Q.   Without any return consideration?
19  A.   Oh, yes.  Without a doubt.
20  Q.   I just wanted to get us on the same page.
21  Did you make any gifts to any other person?
22  A.   No.
23  Q.   If you didn't call it a gift and called it a
24  transfer, were there any transfers of property from
25  you to any other person?

**44**

1  A.   No.  Now I want to be clear here though.  I
2  had to recapitalize Slabbed New Media, so there were
3  capital contributions made there in 2015 and 2016.
4  After the bankruptcy filing those were all disclosed
5  of course to the court.  But those weren't gifts.
6  Those were actually capital contributions.
7  Q.   The people that made capital contributions,
8  do they have any ownership interest in Slabbed New
9  Media?
10  A.   I did.  I was the guy that put that money in
11  and I owned it, yes.
12  Q.   So it was your money?
13  A.   Yes.
14  Q.   Have you closed any bank accounts in the last
15  three years?
16  A.   No.
17  Q.   Do you own a safe deposit box?
18  A.   I do not.  My business does.
19  Q.   What's contained in that safety deposit box?
20  A.   Absolutely nothing at this point.
21  Q.   You didn't put hundreds of thousands of
22  dollars in there?
23  A.   No.  Afraid not.
24  Q.   Does anyone hold title to any property for
25  your benefit?

# Douglas Handshoe

```
                                                         45
1        A.   No.
2        Q.   Have you given any financial statements to
3    any of the lending institutions you've mentioned?
4        A.   No.  There were financial statements prepared
5    for Slabbed New Media that were sent to the bankruptcy
6    court.  That's on Pacer.  Those would be the only
7    ones.
8        Q.   Am I correct in saying you are the only
9    officer, director or member of Slabbed New Media?
10       A.   That's correct.
11       Q.   Same question for Douglas K. Handshoe, CPA,
12   PLLC.
13       A.   Sheila Cruthird is a member there as we
14   discussed earlier.
15       Q.   70/30?
16       A.   That's correct.
17       Q.   Are there any former partners of either of
18   those businesses?
19       A.   No, sir.
20       Q.   Do you have any CDs?
21       A.   No, sir.
22       Q.   You know what I mean by that CD?
23       A.   Yes.
24       Q.   Certificate of Deposit.  Do you have any life
25   insurance with a cash value?
```

```
                                                         46
1        A.   No.  I have term insurance only.
2        Q.   What other documents did you bring today in
3    response to the subpoena?
4        A.   I brought bank records here for the joint
5    account that I have with my wife.
6        Q.   May I look at them?
7             MR. CRUTHIRD:  While you are looking
8             at them, I'm going to walk to the bathroom.
9                    (OFF THE RECORD)
10       Q.   Earlier you made the statement your wife
11   opened her own bank account.
12       A.   That's correct.
13       Q.   Would that have occurred about the first of
14   the year?
15       A.   No.  Actually that happened back in 2015, but
16   after the first of the year is when she got serious
17   about segregating her money out.  So yes, she receives
18   her paychecks and her retirement check going into that
19   account.
20       Q.   What is the amount of her retirement check;
21   do you know?
22       A.   A little over $1700.  Her paycheck is
23   somewhere around 1000.
24       Q.   I'm looking at your bank statement ending in
25   February 20th.  Can you identify what those deposits
```

```
                                                         47
1    are on there?
2        A.   The 1500, that would be my draw check I would
3    imagine.  The 3250, I may have taken extra draw out of
4    my business.  Let's see.  No.  Actually I'll tell you
5    exactly what those are.  Those are draws on home
6    equity line of credit. And we used that money to pay a
7    gentleman by the name of Danny Fore who did some metal
8    work for us on Hall Street.  Paid Mr. Silva who was a
9    carpenter to fix a roof leak 750.  Paid him 750 twice.
10   Those would have all been draws on our credit line.
11       Q.   Now, on your December 21 to 1-23 bank
12   statement I believe it shows 1026 from Coastal Plains.
13   Is that your wife's retirement?
14       A.   That's her employer.
15       Q.   Salary?
16       A.   That's right.
17       Q.   Then it shows $1700.29 as retirement pay
18   Mississippi PERS.  Is that what we've been talking
19   about?
20       A.   That's correct.
21       Q.   Now, on your October 21, '16 to 11-21 of '16
22   you show deposits of over $25,000.
23       A.   Yes. Those would likely be draws off the
24   credit line.  Probably checks written for about that
25   amount too.
```

```
                                                         48
1        Q.   Were you doing some improvements to the
2    homestead?
3        A.   That's right.  A lot of concrete work during
4    that time period.  A lot of concrete work.  Plus a
5    shed was falling completely apart so we had to
6    construct a new shed.  You will see some checks to the
7    concrete company and Percy Tims.
8        Q.   I see a $1500 check written to Ms. Handshoe.
9    Do you know what that was for?
10       A.   No, not right off the top of my head.
11       Q.   I don't see anything down in the -- are these
12   my copies?
13       A.   Yes, sir.
14       Q.   How many times per month is your wife paid?
15       A.   She gets paid bi-weekly.
16       Q.   So basically twice a month?
17       A.   Yes.  Two months out of the year she will get
18   three checks.
19       Q.   I'll finish going through these at a later
20   time.  I'm not going to make these exhibits.  I have
21   been informed that your mother died recently and I'm
22   sorry to hear that.  Is that correct information?
23       A.   She died in October of 2016.  I take that
24   back.  2015.
25       Q.   Did she have an estate?
```

# Douglas Handshoe

49

1  A.  My share of her insurance proceeds was $6000
2  and that was all that I got.
3      MR. CRUTHIRD:  A life insurance?
4  A.  Life insurance policy.  That's right.
5  Q.  Did you open an estate for her?
6  A.  No.  We were all named co-beneficiaries on
7  her life insurance policy and when they paid out, they
8  paid us.
9  Q.  Now, earlier I believe you said something
10  along the lines that Slabbed New Media had indemnified
11  you for the $48,000?
12  A.  It indemnified me for all of my official
13  acts.
14  Q.  Which included incurring the $48,000 in
15  attorney's fees?
16  A.  Correct.
17  Q.  Do you do any accounting work outside of your
18  PLLC?
19  A.  No.  That would be outside of my professional
20  liability policy if I did that.
21  Q.  Do you have a retirement plan?
22  A.  Yes.  Through the business.  A SEP plan.  SEP
23  IRA.
24  Q.  How much money do you have in that?
25  A.  About 110, $115,000 give or take.

50

1  Q.  Did you liquidate it?
2  A.  No.
3  Q.  Do you still have that SEP plan?
4  A.  Yes, sir.
5      MR. CRUTHIRD:  What is the acronym
6      again?  I'm just curious.
7  A.  SEP stands for Self-Employed Plan.
8      MR. CRUTHIRD:  It's SEP?
9  A.  SEP.  It's actually Self-Employed Plan
10  Individual Retirement Account is why they call it a
11  SEP IRA.
12  Q.  Are you still eligible to put money in the
13  SEP plan even though are now employed by a PLLC?
14  A.  Oh, yes.  It's actually designed for small
15  businesses like that.  You don't have to make a
16  contribution to it.  The employee can make their own
17  contribution.  The employer can make its own.
18  Completely discretionary.
19  Q.  But there is no problem with eligibility due
20  to being a PLLC?
21  A.  No.
22  Q.  At the present time do you claim any personal
23  ownership interest in that judgment?
24  A.  The 48,000?
25  Q.  Yes.

51

1  A.  No.
2  Q.  It's all to the property of Slabbed Media?
3  A.  Correct.
4  Q.  It looks like somebody made me multiple
5  copies of this.  I believe earlier I asked you some
6  questions about litigation you were involved in.  I'm
7  looking at a lawsuit in Louisiana that's styled Chris
8  E. Yount versus Douglas K. Handshoe, Slabbed.org,
9  Slabbed New Media, LLC and Jack E. Bobby Truitt.
10  A.  Yes, sir.
11  Q.  What do you know about that?
12  A.  Well, that suit was filed under shield by Mr.
13  Yount.
14  Q.  Who is Mr. Yount?
15  A.  Mr. Yount is a close associate of Leary and
16  Perret up in Canada.  And that suit was actually not
17  doing too bad for Mr. Yount right up to the point
18  where they wouldn't shield documents over here to the
19  federal court trying to get disciple on Gerald and
20  Bobby.  And when they broke their own shield, they
21  seemed they lost their ardor to prosecute that
22  case.  And that case has now been essentially dormant
23  for two plus years.  Since we're talking about the
24  Louisiana suits, Mr. Danny Able, who is also an
25  associate of Leary and Perret, has sued me, Mr.

52

1  Truitt, a lady by the name of Ann Vandenweghe, Scott
2  Sternberg, Barry Glenn, Paul Vance.  Those are my
3  attorneys for defamation.  He lost his ardor to pursue
4  that lawsuit when he had to sit for a deposition.  He
5  just didn't show up.
6  Q.  I think now we've accounted for three or four
7  of the suits, lawsuits that you were talking about.
8  A.  That's correct.
9  Q.  What is case number 15-5096-KMS?
10  A.  Oh, that would have been the Slabbed
11  bankruptcy.  Slabbed New Media bankruptcy.
12  Q.  That says bankruptcy.  It has a listing of
13  the suits and Yount is the first one and the second
14  one was Handshoe versus Perret, Leary, Trout Point
15  Lodge, National Geographic.  We talked about that one
16  earlier, didn't we?
17  A.  Yes, sir.
18  Q.  And then the third case mentioned here is
19  Vaughn Perret versus Handshoe.
20  A.  That would be this one that we're here on
21  right now, right?
22  Q.  I don't know.  And then it says the fourth
23  case mentioned here is Handshoe versus Broussard.
24  A.  Yes, sir.  That's the racketeering suit.
25  Q.  That goes back a long way.

# Douglas Handshoe

**53**

1             MR. CRUTHIRD:  It's a dormant case filed
2        in Hancock County, State Court, Circuit
3        Court.
4    Q.   I've received a lot of questions they want
5 asked.  Earlier you said you have a mortgage on the
6 house you are presently occupying.
7    A.   That's right.  A homestead at 110 Hall
8 Street.  That's correct.
9    Q.   What is the amount of that mortgage?
10    A.   The main mortgage is about $58,000.  The
11 equity line is at $29,000.
12    Q.   What's the value of that house?
13    A.   When we had it appraised for the equity line
14 it appraised out at like $115,000.  We got dinged for
15 things like not having covered parking, which we did
16 add with the redo.  I would imagine it is probably --
17 I'm not an appraiser.  Just knowing how much he
18 documented for the lack of covered parking and the bad
19 driveway, it's probably worth $125,000 right now
20 gross.
21    Q.   Do you claim that as your homestead?
22    A.   Yes.
23    Q.   How long have you owned that house?
24    A.   I bought that house in August of 2001.
25    Q.   And is it correct that while you were living

**54**

1 in Bay St. Louis you maintained the house here as an
2 office?
3    A.   That's correct.
4    Q.   Who is your first mortgage to?
5    A.   Hancock.
6    Q.   Who is your second mortgage to?
7    A.   Hancock.
8    Q.   What is at 322 Vine Street?  Are you familiar
9 with that address?
10    A.   I am.  I think it should be 323 Vine Street.
11    Q.   It is.  I couldn't read.
12    A.   And that would be my partner's residence.
13    Q.   Who is your partner?  Ms. Cruthird?
14    A.   Ms. Cruthird.  She has her own office over
15 there.
16    Q.   What is 604 Hardy Avenue, Gulfport?
17    A.   That's the vacant lot that we talked about
18 earlier.
19    Q.   And Corinth Drive?
20    A.   That's where we rented.  That's correct.
21    Q.   What about 101 Ralph Drive in Gulfport?
22    A.   That was a residence that I had I sold back
23 in like 2008.
24    Q.   408 Bay Street.  That looks like an
25 apartment.  Did you have an apartment on Bay Street in

**55**

1 Hattiesburg?
2    A.   When I was in college, yes.
3    Q.   232 Pine Ridge Drive, Waveland, Mississippi.
4    A.   That was a house that I grew up in that my
5 parents owned.
6    Q.   105 Pine Street, Waveland, Mississippi.  What
7 was that?
8    A.   That was a rental.
9    Q.   Have you ever gone by any name other than
10 Douglas K. Handshoe?
11    A.   No.
12    Q.   Did you have a business called Interstate
13 Management at one time?
14    A.   No, I didn't own that.
15    Q.   Who owned it?
16    A.   The Goodson family out of St. Tammany Parish.
17    Q.   Were you an officer or director or agent of
18 process for that?
19    A.   Probably with the agent for service of
20 process.  But the Goodsons had businesses that spanned
21 the state line from Mississippi and Louisiana and they
22 created a central entity to hold the profits so they
23 didn't have to report multi-state.
24             MR. CRUTHIRD:  Are they still a client?
25    A.   Yes.

**56**

1    Q.   Do you own any motor vehicles?
2    A.   Yes.
3    Q.   What do you own?
4    A.   Half interest in a 2016 Toyota Rav 4 worth
5 about $22,000.  We owe about 24 on it.  I have a 2008
6 Honda Silverwing, one-half interest.  It's a scooter.
7 And I believe that's it.  I may have a half interest in
8 a trailer.  I think my wife may own the trailer.
9    Q.   Who is the Rav 4 titled to?
10    A.   Jennifer Handshoe and Douglas Handshoe.
11    Q.   How many trailers do you own?
12    A.   It would just be one utility trailer.
13    Q.   What do you use it to haul?
14    A.   Just whatever.  We used to have to haul a
15 lawnmower to cut all those vacant lots that we had.
16 That was the main thing I used it for.
17    Q.   Do you still own a 2002 Toyota Tundra?
18    A.   No.  Hurricane Katrina ate that along with
19 the Ford Explorer.
20             MR. CRUTHIRD:  Mr. Handshoe had an
21        interesting experience in Katrina.  Is that
22        the truck, that vehicle that flooded?  He
23        had to get up on the roof of his house to
24        escape the storm.
25    Q.   You didn't leave, huh?

## Douglas Handshoe

57

1    A.   No.
2    Q.   My idiot law partner stayed and was up in the
3  garage at the Imperial Palace.
4         MR. CRUTHIRD:  Two blocks from US 90,
5         right?  And these chicken cargo containers
6         down there came loose and they banged his
7         house down.  That's the Hardy Avenue.
8         Banged it down along with a lot of other
9         houses.
10   A.   We lost the whole neighborhood pretty much.
11 Finally started to build back a little bit there.
12        MR. CRUTHIRD:  There is not much along
13        the coastline.  Condos mostly.
14   Q.   Did you serve as an officer at some of your
15 clients' corporations, LLCs, et cetera?
16   A.   It only would have been one client, and they
17 all would have been related to Mr. Goodson.  Worked a
18 little criminal defense engagement with him.  He ended
19 up having to go to jail for a while.  It involved a
20 criminal forfeiture.  So I had to assume a management
21 role in certain businesses in order to liquidate those
22 businesses and give the money to the marshal service.
23   Q.   Do you recall what businesses those were?
24   A.   Slidell Motel would have been one of them.
25 It could very well be Slidell 76 Truck Stop.

58

1  Interstate Management Company may have been one.
2  Interstate Personnel could have been another one.
3  There was a cluster of about three or four of them
4  that I had to take over while Mr. Goodson was in jail.
5    Q.   Did you have any actual ownership interest in
6  them?
7    A.   No.
8    Q.   I think we're just about through.  Other than
9  the two businesses we have discussed, do you have any
10 ownership interest in any other businesses?
11   A.   No, sir.
12   Q.   Other than the bank accounts we have
13 discussed, do you have any ownership in any other bank
14 accounts or have any money deposited in any other
15 financial institutions other than the ones we've
16 discussed?
17   A.   I may have $100 in that TD Ameritrade
18 account.  That would be just what you have to have to
19 keep it open.
20   Q.   Are you currently trading in the market?
21   A.   No.  I haven't in probably five, six years.
22   Q.   Why would you keep the TD Ameritrade account
23 open?
24   A.   It would give me an option if I terminated
25 the SEP plan.  They offer self-directed IRAs, things

59

1  like that.  And I may at some point in time get back
2  into the stock market.  But I don't have the money for
3  that at this point in time.
4    Q.   Now, other than the scooter and the Rav 4,
5  did you say you owned another vehicle?
6    A.   I have a scooter and the Rav 4.  My wife
7  purchased for my son another Toyota Rav 4.  She
8  financed that in her own name and made the purchase in
9  her own name.
10   Q.   So the family has two Rav 4s.  What does your
11 wife drive?
12   A.   She has a pickup truck.
13   Q.   Is that in her name also?
14   A.   In her name, that's correct.
15   Q.   Did she purchase it originally or did you
16 give it to her?
17   A.   No.  That was something -- she had that thing
18 retitled 2014, 2015.  She drove the truck.  I always
19 drove the SUV.  Although it normally doesn't work like
20 that, that's the way we've always done it.
21   Q.   You say she retitled in 2014, 2015.  Was it
22 in anticipation of the outcome of the lawsuit?
23   A.   No.  Not particularly.  But she wanted some
24 security for herself.
25   Q.   Was there a lawsuit ongoing between you and

60

1  my clients at that time?
2    A.   We've had lawsuits going pretty much
3  continuously since 2011.  Either them suing me or me
4  suing them back.
5    Q.   I believe the judgment they obtained was in
6  February of 2014; is that correct?
7    A.   That sounds right.  It would have been after
8  that, but before it was properly before the court down
9  here.
10   Q.   Who did you say the SEP plan was with?
11   A.   T. Rowe Price.
12        MR. THRASH:  I think I'm through.
13        MR. CRUTHIRD:  I don't have any
14        questions.
15   (JUDGMENT DEBTOR EXAMINATION RECESSED AT 3:32 P.M.)
16
17
18
19
20
21
22
23
24
25

## Patsy Ainsworth Reporting
## 601.582.2582

# Douglas Handshoe

61

```
1              E R R A T A   S H E E T
2       I, DOUGLAS K. HANDSHOE, deponent in this
3  deposition, hereby certify that I have examined the
4  foregoing pages and find them to contain a full, true
5  and accurate transcription of the testimony as given
6  on August 14, 2017, in Wiggins, Mississippi, with the
7  exception of the changes noted below, if any:
8  Page    Line      Correction
9  ____    ____    _____
10 ____    ____    _____
11 ____    ____    _____
12 ____    ____    _____
13 ____    ____    _____
14 ____    ____    _____
15    This the _____ day of _____, 2017.
16                        _____
                            DOUGLAS K. HANDSHOE
17
   State of _____
18
   County of _____
19
        Sworn to and subscribed before me, this the
20
   _____ day of _____, 2017.
21
22                        _____
                              NOTARY PUBLIC
23
   MY COMMISSION EXPIRES_____
24
25
```

62

```
1  STATE OF MISSISSIPPI
2  COUNTY OF PEARL RIVER
3                CERTIFICATE
4        I, Elena C. James, Certified Shorthand
5  Reporter, do hereby certify there came before me the
6  deponent, who was by me duly sworn to testify to the
7  truth and nothing but the truth concerning the matters
8  in this cause.
9        I further certify that the foregoing
10 transcript is a true and correct transcript of my
11 original stenographic notes.
12       I further certify that I am neither attorney
13 or counsel for, nor related to or employed by any of
14 the parties to the action in which this deposition is
15 taken; and furthermore, that I am not a relative or
16 employee of any attorney or counsel employed by the
17 parties hereto or financially interested in the
18 action.
19       I do further certify that my certificate
20 annexed hereto applies only to the original and the
21 certified transcript.
22       WITNESS MY SIGNATURE on this the 25th day
23 of August, 2017.
24                        _____
25                            ELENA C. JAMES, CSR #1682
```

IN THE CIRCUIT COURT OF HANCOCK COUNTY, MISSISSIPPI

TROUT POINT LODGE, LTD., VAUGHN
PERRET, and CHARLES LEARY                                        **PLAINTIFFS**

VS.                                                              **CAUSE NO. 15-0458**

DOUGLAS K. HANDSHOE                                              **DEFENDANT**

FILED

AUG 0 7 2017

KAREN LADNER RUHR
CIRCUIT CLERK, HANCOCK CO.
BY_____D.C

## AMENDED NOTICE OF JUDGMENT-DEBTOR EXAMINATION

TO:     Douglas K. Hanshoe
        %G. Gerald Cruthird, Esq.
        P.O. Box 1056
        Picayune, MS 39466

      PLEASE TAKE NOTICE that Plaintiffs will conduct a Judgment Debtor Examination

of Defendant, DOUGLAS K. HANDSHOE, on the 14th day of August, 2017 at 1:30 p.m. at the

Stone County Courthouse, 323 Cavers Avenue, Wiggins, Mississippi.  Please produce all items

listed on Exhibit A attached hereto.

                                    TROUT POINT LODGE, LTD., VAUGHN
                                      PERRET, and CHARLES LEARY, Plaintiffs,

                                BY_____
                                  SINGLETARY & THRASH-JACKSON, P.A.
                                  Their Attorneys

GARY D. THRASH, MSB# 8205
ADAM F. THRASH, MSB# 104357
SINGLETARY & THRASH-JACKSON, P.A.
P.O. BOX 587
JACKSON, MS 39205
(601) 353-1070



## CERTIFICATE OF SERVICE

I, ADAM F. THRASH, do hereby certify that I have this day mailed by United States mail, postage prepaid, a true and correct copy of the above and foregoing Amended Notice of Judgment-Debtor Examination to Defendant as follows:

G. Gerald Cruthird, Esq.
P.O. Box 1056
Picayune, MS 39466

THIS the _3rd_ day of August, 2017.

BY _____
ADAM F. THRASH

GARY D. THRASH, MSB# 8205
ADAM F. THRASH, MSB# 104357
SINGLETARY & THRASH-JACKSON, P.A.
P.O. BOX 587
JACKSON, MS 39205
(601) 353-1070

## EXHIBIT A

1.   Tax Returns for Douglas K. Handshoe for 2014, 2015, and 2016.

2.   Tax Returns filed on behalf of any company owned by Douglas K. Handshoe or in which he had any interest during the years 2014, 2015, and 2016. These returns are to specifically include, but shall not be limited to:

      a. Slabbed New Media, LLC;
      b. Douglas K. Handshoe, CPA, LLC; and
      c. Any and all businesses owned by Mr. Handshoe or in which he owned an interest during the past three (3) years.

3.   Copies of all banking records for any and all bank accounts in the name of Douglas K. Handshoe, or used by, or used in the operation of any business described hereinabove in Number 2.

4.   Employment history of Douglas K. Handshoe for the last ten (10) years.

5.   Records of employment by and/or operation of any business described hereinabove in Number 2.

6.   Payments to creditors of Douglas K. Handshoe and/or any business described hereinabove in Number 2 for the past three (3) years.

7.   Any suits and administrative proceedings, executions of garnishments, and other attachments.

8.   Any repossessions, foreclosures, and/or returns involving Douglas K. Handshoe and/or any business described hereinabove in Number 2 for the last three (3) years.

9.   Any assignments and receiverships involving Douglas K. Handshoe and/or any business described hereinabove in Number 2 for the last three (3) years.

10.   Any gifts from Douglas K. Handshoe and/or any business described hereinabove in Number 2 to any person or entity during the last three (3) years.

11.   Any other transfers to or from Douglas K. Handshoe and/or any business described hereinabove in Number 2 during the last three (3) years.

12.   Any closed financial accounts of Douglas K. Handshoe and/or any business described hereinabove in Number 2 for the last three (3) years.

13.   Any safe deposit boxes or cash held in the name of Douglas K. Handshoe and/or any business described hereinabove in Number 2 during the last three (3) years.

14.     Any property held for another person by Douglas K. Handshoe and/or any business described hereinabove in Number 2 during the last three (3) years.

15.     Any books, records, and financial statements of Douglas K. Handshoe and/or any business described hereinabove in Number 2 for the last three (3) years.

16.     All inventories of Douglas K. Handshoe and/or any business described hereinabove in Number 2 during the last three (3) years.

17.     Current Partners, Officers, Directors, or Shareholders for Slabbed New Media, LLC.

18.     Current Partners, Officers, Directors, or Shareholders for Douglas K. Handshoe, CPA, LLC.

19.     All former Partners, Officers, Directors, or Shareholders for Slabbed New Media, LLC.

20.     All former Partners, Officers, Directors, or Shareholders for Douglas K. Handshoe, CPA, LLC.

21.     Any cash on hand in the possession of Douglas K. Handshoe and/or any business described hereinabove in Number 2 at this time.

22.     All checking, savings, or other financial accounts, certificates of deposit, or shares in banks, savings and loan, credit unions, brokerage houses, or cooperatives. These bank records shall include, but not be limited to, copies of all banking records for any and all banks accounts in the name of Douglas K. Handshoe and/or any business described hereinabove in Number 2 during the last three (3) years.

23.     Any security deposits with public utilities, telephone companies, landlords, and others for Douglas K. Handshoe and/or any business described hereinabove in Number 2.

24.     Interest in insurance policies for Douglas K. Handshoe and/or any business described hereinabove in Number 2.

25.     Annuities for Douglas K. Handshoe and/or any business described hereinabove in Number 2.

26.     Stock and interests in incorporated and unincorporated businesses held in the name of Douglas K. Handshoe and/or any business described hereinabove in Number 2.

27.     Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of Douglas K. Handshoe and/or any business described hereinabove in Number 2.

28.     Any patents, copyrights, and other intellectual property for Douglas K. Handshoe and/or

any business described hereinabove in Number 2.

29. Any licenses, franchises, and other general intangibles held by Douglas K. Handshoe and/or any business described hereinabove in Number 2.

30. Any automobiles, trucks, trailers, and other vehicles and accessories held in the name of Douglas K. Handshoe and/or any business described hereinabove in Number 2.

31. Any boats, motors, and accessories held in the name of Douglas K. Handshoe and/or any business described hereinabove in Number 2.

32. Any aircraft and accessories owned by Douglas K. Handshoe and/or any business described hereinabove in Number 2, or held in the name of Douglas K. Handshoe and/or any business described hereinabove in Number 2.

33. Any business equipment, furnishings, and supplies owned by Douglas K. Handshoe and/or any business described hereinabove in Number 2 during the last three (3) years.

34. Any machinery, fixtures, equipment, and supplies owned by Douglas K. Handshoe and/or any business described hereinabove in Number 2 during the last three (3) years.

35. Any business inventory owned by Douglas K. Handshoe and/or any business described hereinabove in Number 2.

36. Any other personal or real property held in the name of Douglas K. Handshoe and/or any business described hereinabove in Number 2 during the past three (3) years.

37. Any income from any employment or operation of any businesses owned by Douglas K. Handshoe and/or any business described hereinabove in Number 2.

38. The nature, location, and name of any business in which Douglas K. Handshoe owns or owned an interest in during the past three (3) years.





MDPS web address: http://www.dps.state.ms.us

Class: R - Regular Operators License

Endorsements: E - Motorcycle

Restrictions: None

Medical: No Medical Restriction



/                                                                        /

## Assignment of Rights and Claims

I, Douglas Handshoe, in exchange for good and valuable consideration, do hereby assign, convey and transfer to Slabbed New Media, LLC the following:

- The judgment of the United States District Court dated December 11, 2013 in the civil actions styled *Trout Point Lodge, Limited et al v Handshoe*, cause Number 1:12CV90LG-JMR in the amount of Forty-Eight Thousand Dollars ($48,000), which was awarded to me to pay statutory attorney's fees.

The purpose of this assignment is to match Slabbed New Media, LLC's indemnity for the managing members official acts with the related potential recovery on judgment. The assignor hereby promises to assist Slabbed New Media, LLC in all tasks necessary to effectuate collection of the above described judgment.

Slabbed New Media, LLC and its managing member shall have full rights to institute any and all actions for the collection of attorney's fees, costs or other damages in the United States or Canada as if instituted by me.

Dated this the 6th of January, 2015.

**Agreed and accepted:**

_____
Douglas Handshoe in his individual capacity


_____
Douglas Handshoe, Managing Member
Slabbed New Media, LLC



## ASSIGNMENT OF RIGHTS AND CLAIMS

**STATE OF LOUISIANA**

**PARISH OF ST. TAMMANY**

I, Douglas K. Handshoe, do hereby assign, convey and transfer to Jack E. Truitt and The Truitt Law Firm, LLC any and all rights, claims, or title in any claim, action or lawsuit I may have against Charles Leary, Vaughn Perret, and/or Trout Point Lodge, Limited for the collection of attorney's fees, costs, or any other element of damages or interest which was awarded to me in connection with the litigation which was formerly pending in the United States District Court for the Southern District of Mississippi and the United States Fifth Circuit Court of Appeal between myself and the aforesaid parties.

Jack E. Truitt and The Truitt Law Firm, LLC shall have the full right to institute any and all actions for collection of attorney's fees, costs, or other damages in the United States or Canada as if instituted by me. This assignment of rights and claims has been made by me in exchange for good and valuable consideration.

SWORN TO AND SUBSCRIBED

THIS 5TH DAY OF MARCH, 2014

_____

_____
NOTARY PUBLIC

State of Mississippi, County of Hancock
Personally appeared before me, the undersigned
authority in and for the said county and state,
on this 5ᵗʰ day of March 20 14, within
my jurisdiction, the within named Douglas K. Handshoe
who acknowledged that He executed the
above and foregoing instrument.

Timothy A. Kellar
Chancery Clerk
By: _____

My Commission Expires Dec. 31 2016



EXHIBIT
1

Case 1:12-cv-00090-LG-JMR   Document 65-2   Filed 05/27/15   Page 1 of 1

**Bobby Truitt**

| | |
|---|---|
| **From:** | Doug Handshoe <earning04@gmail.com> |
| **Sent:** | Thursday, October 09, 2014 8:23 AM |
| **To:** | Bobby Truitt |
| **Subject:** | Attorney Fee Assignment |

Per our discussions regarding the assignment of attorney fees to effect the collection of the outstanding Trout Point Judgment, please be advised that I agree to rescind the prior assignment in order that you can pursue collection efforts on my behalf here in Mississippi.

Please advise of you need anything further.

Doug
**Doug Handshoe**
**Slabbed New Media LLC**
Post Office Box 788
Wiggins, MS 39577-0788
Phone: (228) 284-0004
Fax: (601) 928-5129
www.slabbed.org



**EXHIBIT**
**2**

1