IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

DOUGLAS HANDSHOE

PLAINTIFF/DEFENDANT BY COUNTERCLAIM

VS.

CIVIL ACTION NO. 1:15cv382HSO-JCG

VAUGHN PERRET, CHARLES LEARY &
DANIEL ABEL, D/B/A TROUT
POINT LODGE LTD OF NOVA SCOTIA
& IN THEIR INDIVIDUAL CAPACITIES
PROGRESS MEDIA GROUP LIMITED,
MARILYN SMULDERS, TORSTAR
CORPORATION, NATIONAL
GEOGRAPHIC SOCIETY, ASHOKA, XYZ
FOUNDATION & JOHN DOES 1-50

DEFENDANT/PLAINTIFF BY COUNTERCLAIM

AND VS.

JENNIFER HANDSHOE, STONE COUNTY
CIRCUIT COURT, JEFFERY O'NEAL,
G. GERALD CRUTHIRD, and STONE
COUNTY SHERIFF

COUNTERCLAIM DEFENDANTS

EXHIBIT

DRAFT

**CHARLES LEARY'S AMENDED COUNTERCOMPLAINT AS WELL
AS ANSWER & DEFENSES TO DOUGLAS HANDSHOE'S THIRD AMENDED
COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

Defendant Charles L. Leary ("Leary"), appearing *pro se*, responds to Plaintiff's Third Amended

Complaint for Damages, Declaratory and Injunctive Relief ("Complaint"), as follows, and also submits

this Counterclaim against Douglas Handshoe ("Handshoe") as follows. Dr. Leary also counterlclaims

against Stone County Circuit Court, Jeffery O'Neal, Jennifer Handshoe, and G. Gerald Cruthird. As all

remaining counts against Leary except for Count 5 have been dismissed, Defendant and Plaintiff by

Counterclaim Leary will only address facts and allegations Douglas Handshoe claims are relevant to

1

Count 5.

**Answer & Defence**

**General Answers & Denials**

1. Defendant and Plaintiff by Counterclaim Leary denies any involvement in libel terrorism or any attempt to suppress reporting on any matter of public interest, including an alleged "massive political corruption scandal" involving the former President of Jefferson Parish. Leary denies being an "unindicted criminal co-conspirator" in any criminal activity or any conspiracy as claimed by Handshoe. Leary says such allegations are irrelevant to any causes of action claimed by Handshoe and that these inflammatory allegations were placed in the Third Amended Complaint and all previous complaints to embarrass and prejudice the Defendants, including prominently Leary.

2. Leary denies Handshoe is a journalist, journalistic editor or publisher, or is engaged in any legitimate journalistic endeavor with respect to Leary and his business interests.

3. On the contrary, two appellate courts in Louisiana have found Handshoe's blog Slabbed to have been engaged in related blogging activities that are not on matters of public interest, including blogging about a now-dismissed defendant in this case and Leary's former civil process server Chris Yount. This included Handshoe having published and distributed private information and a pornographic drawing from Yount's family court files as "clickbait" on the internet in a manner that defamed or invaded the privacy of others, according to the Louisiana court, a decision Handshoe did not appeal.

4. Handshoe has also been found by this Court to have engaged in an "internet campaign" to damage Leary and his business, after Advance Publications caused the takedown of his web site in April, 2011, when a DMCA notice was served by lawyers for Advance Publications with his

2

web host, which event related to Handshoe's alleged infringing use of copyrighted material belonging to Advance Publications's newspaper the *Times-Picayune* on his blog Slabbed. Handshoe has been on his campaign to damage ever since.

5. Leary denies being an intellectual property expert, a lawyer, or to having used a lawyer to submit notices of copyright infringement under the Digital Millennium Copyright Act ("DMCA"), as claimed by Handshoe.

6. Charles Leary denies being domiciled at Trout Point Lodge, 189 Trout Point Road, but admits to being a United States citizen living in Nova Scotia, Canada. Charles Leary is an author, former asst. professor of history at Tulane University who received his doctorate from Cornell University.

7. Leary denies to "doing business as" Trout Point Lodge, and to the extent that any of Handshoe's allegations or causes of action in this case rely on Leary "doing business as" Trout Point Lodge those allegations have no legal foundation.

8. Heretofore, the Plaintiff has published his allegations, including his false and unsubstantiated allegations of criminal conduct, contained in the original Complaint in this case to third parties outside the context of this legal proceeding, and heretofore this Court has found Handshoe has published material on his blog about Leary that is mean spirited, sexist, and homophobic, and the United States Court of Appeals for the Fifth Circuit has described anti-homosexual statements published by Handshoe as grotesque, this indicates his personal animus against Leary, who is gay, and other persons whom he also claimed were homosexuals, whom he has publicly described collectively as "cockroaches," "cowards," and "girls." Such statements and unsubstantiated criminal allegations on the public record of this District Court, and published

3

via a press release and on the Internet, bespeak both a general and a specific animus and malice

on the part of Plaintiff Handshoe based on irreal and irrational thoughts, beliefs, and biases.

## Specific Answers, Defences, and Affirmative Defences

9. In serving Leary, including Leary d/b/a/ Trout Point Lodge, the Plaintiff has not complied with

   the process requirements of the treaty law extant between the Commonwealth of Canada and

   the United States of America, more particularly *The Convention on the Service Abroad of*

   *Judicial and Extrajudicial Documents in Civil or Commercial Matters*. All process which

   Plaintiff attempted in Nova Scotia was not authorized and was invalid.

10. The allegations in paragraph 67 of the 3rd Amended Complaint are denied. Defendant Leary,

    acting solely as a director and officer of Trout Point Lodge, Limited, used a uniform YouTube

    webform made available by YouTube for use internationally, including in Canada, to complain

    of copyright infringement violating Canadian law, specifically the Canadian *Copyright Act*,

    which is territorial in nature. The webform was not identified by YouTube as a notification

    under 17 U.S.C. 512 nor did it refer to American law. Handshoe has admitted the complaint was

    by webform.

11. The submission to YouTube on February 15, 2014, did not include any attachments such as a

    Canadian injunction. This is denied.

12. Leary specifically indicated on the webform that the jurisdiction involved was Canada. In

    addition, the infringement notice did not "claim ownership of a parody created and owned by

    Slabbed New Media" as claimed by Plaintiff. Leary denies claiming ownership of the video in

    any DMCA notice.

13. The notice identified precisely, using time measures in units of seconds, where in the video the

4

infringing copyrighted work(s) appeared and did not refer to the entire video. That is "time stamps: 2:34 to 2:39," 5 seconds. This was identification of the material that was claimed to be infringing and that was to be removed or access to which was to be disabled, in conformity with 17 U.S.C. 512 (c)(3), and if the entire video was removed that was not the fault of Leary but of YouTube or Handshoe himself. Handshoe has sued the wrong parties.

14. The notice was submitted one day after Nova Scotia Supreme Court found the defendants Leary, Perret, and Trout Point Lodge possessed valid copyright in the creative works used and published without permission by the Plaintiff in the commercial video he posted to YouTube. This formed a basis for Leary's good faith belief that Handshoe was infringing.

15. The allegations in paragraph 68 of the Third Amended Complaint are denied. YouTube did not rely on the uniform webform notice or any DMCA notice, but rather relied on subsequent communication with Leary and Trout Point Lodge as well as Canadian law in deciding what to do with the video.

16. To the extent that Handshoe has claimed he disabled the YouTube video, as stated in the Third Amended Complaint at paragraph 145, Leary says this is not actionable under 17 U.S.C. § 512. Under that statute a § 512(f) plaintiff's damages must be proximately caused by the misrepresentation to the service provider and the service provider's reliance on the misrepresentation. The statute is unambiguous in only entitling an alleged infringer to damages caused "as the result of the service provider ... removing or disabling access to the material...." 17 U.S.C. § 512(c).

17. Leary also denies any removal of the video under United States law or jurisdiction. According to YouTube's response involving Handshoe's deceitful counter notification, access to the

5

YouTube video was not disabled in the United States, but only in Canada.

18. Handshoe's claim is not allowed under the principle of extraterritoriality, and the territorial nature of copyright law.

19. The allegations in Count 5 of the 3rd Amended Complaint are denied. In particular, the video created by Plaintiff infringed copyrights in creative works (photographs) not belonging to Plaintiff and which he had no permission to use.

20. Leary denies that any use of the copyrighted material by Handshoe constituted fair use. Plaintiff's use was commercial, for the benefit and profit of Slabbed New Media, LLC. The video used the entirety of the creative work. Plaintiff was not parodying the work being infringed, and it is the law of the United States under *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 577, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) that fair use parody must have a transformative effect on the original work. Handshoe did not transform the infringed work at all. If the video itself constitutes a parody, which is denied, then the parody was of third persons, not of the original creative work.

21. Defendant Leary, acting solely as director and officer of Trout Point Lodge, Limited, had a subjective, good faith belief that the use of the material by Plaintiff constituted copyright infringement at the moment he filled out the uniform YouTube webform and sent it to YouTube from Canada. This good faith belief included reliance on a judicial decision of Nova Scotia Supreme Court and Leary's belief the video was commercial and did not transform the original work in any way, shape, or form.

22. Leary denies that either Leary or Trout Point Lodge knowingly misrepresented that the material commercially used in its entirety in the video created by Plaintiff violated copyright or United

6

States copyright laws. Foreign works are protected under United States copyright laws. 17 U.S.C. § 411; *Berne Convention for the Protection of Literary and Artistic Works; Berne Convention Implementation Act* of 1988.

23. The allegations in paragraph 145 of the Third Amended Complaint are denied. United States courts have never found the permanent injunction from Nova Scotia Supreme Court unenforceable as that issue has never been before United States courts. In addition, the injunction was never supplied to YouTube on February 15, 2014, as claimed by Handshoe. The Defendant also denies that Plaintiff suffered any damages as a result of Leary filling out the uniform international YouTube webform. In addition, neither Defendant Leary nor the entity he was acting for is a state actor and therefore cannot violate Plaintiff's First Amendment rights.

24. Plaintiff Handshoe states contradictory facts in the Third Amended Complaint, and thus fails to state a claim on which relief can be granted. It cannot be simultaneously true that YouTube required Plaintiff to disable access to the video and that YouTube disabled the posts containing the media identified in the notice. In addition it cannot be simultaneously true that United States courts had found a Nova Scotia Supreme Court injunction unenforceable as stated in paragraph 145 of the Third Amended Complaint and that "Trout Point does not seek to enforce the injunction" as stated in paragraph 62, quoting the decision of the U.S. Court of Appeals for the Fifth Circuit.

25. The United States Court of Appeals has now so ruled in No. 13-60002 that this District Court may take judicial notice of this Plaintiff's website's content and of juridical filings by Plaintiff in this and other jurisdictions in the context of proceedings upon, inter alia, the First Defense. Plaintiff is estopped to deny the contents of any of same.

26. Plaintiff has sustained no cognizable or non-cognizable direct loss or injury to himself.

27. No such "injury" as Handshoe alleged is cognizable in the context Plaintiff has alleged.

28. Any alleged injury or loss which the Plaintiff claims he has sustained from having to respond to a copyright infringement notice falls within the ambit of the doctrine of *de minimus non curat lex*.

29. Plaintiff has failed to mitigate, or avoid entirely, any alleged direct loss or injury he has claimed conclusorily.

30. The injuries and damages, if any, sustained by Plaintiff resulted in whole or in part from his own culpable conduct, intentional acts, contributory or comparative negligence, assumption of risk and want of care. Accordingly, any damages recovered should be reduced and/or barred in accordance with the applicable law.

31. Defendant avers that this action was filed *pro se* and filed in violation of Fed. R. Civ. P. 11 and that it is also violative of the Mississippi Litigation Accountability Act. Moreover, the filing and the maintenance of this civil action was intended to vex the Defendant and Plaintiff's actions since the filing of it unlawfully multiplied these proceedings.

32. Leary asserts the provisions of all applicable statutory caps on damages of any sort, including compensatory, punitive, non-economic or exemplary damages, under applicable regulations and/or laws.

33. The Complaint fails to plead a claim or claims with requisite specificity against Leary.

34. Leary reserves the right to amend his Answer and Defenses to assert additional defenses, cross-claims, counterclaims and other claims and defenses as deemed appropriate.

35. In response to Plaintiff's "Prayer for Relief," Leary denies that Plaintiff is entitled to any recovery or any form of relief.

## COUNTERCLAIMS OF CHARLES LEARY AGAINST DOUGLAS HANDSHOE, STONE COUNTY CIRCUIT COURT, JEFFERY O'NEAL, JENNIFER HANDSHOE, AND G. GERALD CRUTHIRD

**Facts Underlying Abuse of Process, RICO violations, Defamation, Fraud, Fraud on the Court, Malicious Prosecution, Bankruptcy Stay Violation, Violaion of Due Process Under Color of Law, and Intentional Misrepresentation or Deceit**

1. The following chronological facts are relevant to fraud, willful violation of a bankruptcy stay, malicious prosecution, civil RICO, defamation, copyright infringement, harassment, violation of Leary's due process rights under color of law, and abuse of process. These were acts and omissions of Douglas K. Handshoe.

2. Leary also claims against Stone County Circuit Court and Jeffery O'Neal for due process violations. Leary claims against Jennifer Handshoe for RICO violations; and against G. Gerald Cruthird for violating Leary's right to due process under color of law and for RICO violations.

3. This dispute centers around the blog Slabbed, which has always published the writings of anonymous persons with personal motivations and vendettas. According to Slabbed, Slabbed began as the Insurance Issues Forum, a thread on the **Clarion Ledger's** *Story Chat* and grew to 35 pages of information and over 38,000 page views before becoming a blog. Actually, Slabbed began when two residents of Hurricane Katrina Ground Zero –"Topbanana"and "Coastal Cowboy"– survived the extraordinary experience of having their homes reduced to slabs by the natural disaster. When it became evident Katrina Ground Zero was also Ground Zero for the Insurance Industry, they called on their longtime friend, a construction specialized CPA by trade – otherwise known as "**Sop81_1**" on 3800 or so blog posts to the Yahoo Finance boards. Sop a.k.a. Douglas Handshoe became the front man for

9

the *Mississippi Insurance Forum* blog and eventually the sole author and publisher of Slabbed.

4.  In mid 2009, Handshoe met certain Louisiana lawyers at a seminar for Mississippi attorneys given by Richard Trahant on the Mississippi Gulf Coast. The seminar was related to post-Katrina insurance litigation. Trahant had previously worked closely with attorney Daniel G. Abel, who was a business associate of Leary and Vaughn Perret, founders of Trout Point Lodge of Nova Scotia. Trahant promoted the Slabbed blog to Abel. The two later had a falling out. Trahant would subsequently post using pseudonym(s) on the Slabbed blog.

5.  In January, 2010, Handshoe very suddenly shifted the blog's focus from post-Katrina insurance issues in Mississippi to a political corruption scandal in Louisiana involving Jefferson Parish President Aaron Broussard. Handshoe commenced publishing about Leary and his business in January, 2010. Leary did not know Handshoe.

6.  Aaron Broussard resigned from office in January, 2010.

7.  Throughout 2010 and 2011, largely based on the hot topic of the Broussard scandal, Douglas Handshoe endeavored to make Slabbed into a commercial enterprise similar to other online blogging sites like the Huffington Post. He actively attempted to recruit bloggers to the site, including commenters using pseudonyms. He was financially supported in this enterprise by Jennifer Handshoe, without whose assistance he could not have continued the enterprise. He referred to the cohort of persons supporting his blogging activities as The Slabbed Nation. At one point in time Handshoe also announced the formation of a Nova Scotia chapter of The Slabbed Nation, whose members included disgruntled former employees or contractors of Trout Point Lodge contacted across international boundaries via social media.

8.  In his new publishing efforts focused on alleged corruption in Louisiana, Handshoe acted in

concert with third parties including Louisiana lawyers he had recently met, including a former Jefferson Parish councilwoman who was at that time an assistant Jefferson Parish attorney. They worked to create a public social media campaign with targeted attacks on Aaron Broussard and his administration. Though he had resigned, Broussard was still under active investigation by the United States Department of Justice and the Louisiana Board of Ethics, as well as mainstream media journalists, for alleged corruption.

9.  The Parish attorney in question was a gatekeeper, responsible for providing public records of Jefferson Parish government to federal investigators, to federal Grand Juries, the U.S. Attorney's Office, to journalists, and to bloggers. These online attacks included numerous anonymous comment posts on web sites, including prominently nola.com, slabbed.wordpress.com, and slabbed.org. Techniques employed by Handshoe and others included "sock puppetry" or the use of multiple online aliases by one person to achieve a certain goal or outcome, including molding or changing public opinion and attempting to put purported public pressure on investigatory & prosecutorial agencies. This sock puppetry coincided in time and location with similar use of online aliases on public web sites, including nola.com, by persons related to the Broussard investigation. A major target of the federal investigation was the awarding of a waste disposal contract to the River Birch Landfill by Jefferson Parish while Mr. Broussard was president. The contract was allegedly worth in excess of 400 million dollars.

10. The online sock-puppetry was coordinated by Vandenweghe and Handshoe with mainstream media coverage of Broussard's administration in early January, 2010, including a "gotcha" interview of Broussard by journalist Val Bracy on the New Orleans Fox television affiliate, and front-page news stories by the New Orleans *Times-Picayune* newspaper, which was owned by Advance Publications. Such news coverage included the false revelation that public servant

Broussard owned Trout Point Lodge in Nova Scotia, Canada—a 14,000 square foot, riverside, luxury lodge. This was fake news based on purportedly anonymous tips given to the Metropolitan Crime Commission in New Orleans, which in turn filed a complaint with the Louisiana Ethics Board regarding Broussard's alleged property activities in Nova Scotia. The television and newspaper news stories ran the same day the ethics complaint was sent by post, that is before it was actually received by the Ethics Board. There was extensive communication between the Fox News reporter and the Crime Commission leading up to the gotcha Broussard interview.

11. In fact, since about 2001, Broussard had owned a small vacation home near and on the same river system as Trout Point Lodge. He did not own or have any interest in Trout Point Lodge, Limited.

12. Both the Fox News affiliate and the Times-Picayune later retracted and apologized for reporting any implication that Broussard owned Trout Point Lodge, or that the Lodge and its proprietors were involved in alleged political corruption.

13. Handshoe used the Broussard scandal and information provided by the Jefferson Parish attorney among other members of The Slabbed Nation to attract the audience he believed necessary to pursue his commercial ambitions for the web site Slabbed, i.e. increase its audience via tabloid-style publications and allegations, including sensational clickbait about an international corruption and money laundering scheme, which was false.

14. In April, 2011, in furtherance of the commercial ambitions, Douglas and Jennifer Handshoe created Slabbed New Media, LLC, a Mississippi limited liability company, to engage in commercial publishing of the Slabbed blog. Jennifer Handshoe witnessed the corporate creation

documents that Douglas Handshoe signed. Douglas Handshoe negotiated the takeover and control of the web site from a person known online as Nowdoucit. Handshoe personally also purchased the URLs slabbed.org and slabbed.com as homes for the web site through service provider GoDaddy!. Jennifer Handshoe provided financial support for Douglas Handshoe's publishing activities and also acted at times as an officer and agent of Slabbed New Media.

15. Vandenweghe supported the endeavor through thousands of sockpuppet posts on the web site and also had substantial social contacts with Handshoe. Slabbed Nation members filled the web site with racist and homophobic rhetoric and conspiracy theories, for example frequent offensive posts by Vandenweghe and disbarred Louisiana attorney Ashton O'Dwyer. The Slabbed Nation received substantial legal help from Vandenweghe's attorney Jack E. Truitt and Handshoe's attorney and friend G. Gerald Cruthird.

16. Douglas Handshoe, Jennifer Handshoe, Slabbed New Media, LLC, and the others constituted an enterprise, which shall be referred to as The Slabbed Nation or The Slabbed Nation enterprise. Each of these persons or juridical entities was distinct from the enterprise as a whole. This enterprise was greater than Slabbed New Media, LLC, but Slabbed New Media, Douglas Handshoe, and Jennifer Handshoe worked in concert in operating the enterprise, which pursued acts of criminal copyright infringement, impersonation, fraud, unauthorized access to computer systems, and money laundering over an extended period of time from April, 2011, to the present. At times, other persons joined the Slabbed Nation enterprise, including providing support for its illegal activities, which included thwarting third parties—including Leary-- in their attempts to follow civil process to halt copyright infringement and receipt and transmission of proceeds from copyright infringement. These persons included Anne-Marie Vandeweghe, Jack E. Truitt, and G. Gerald Cruthird. Actions taken included the creation of

13

fake news via online sockpuppetry in an effort to gain financially not only from clickbait, but also from civil lawsuits that paralleled state and federal ethics and criminal investigations and prosecutions which were the targets of the false online commentary.

17. Copyright infringement was always part of The Slabbed Nation's plan for financial enrichment. This impetus to infringe copyright was at least in part motivated by a common The Slabbed Nation ideology relating to purported totally-unfettered free speech rights, which recognized no boundaries, including stealing, copying, and distributing the creative works of third parties and then hiding behind misrepresented legitimizing labels such as "Creative Commons" licenses.

18. As part of its Trout Point Lodge-related retraction efforts, in April, 2011, lawyers for the *Times-Picayune*'s parent company, Advance Publications, sent a copyright infringement notice to the new web host of slabbed.org—GoDaddy! Slabbed was at that time publishing in its entirety without permission a retracted, but copyrighted *Times-Picayune* news story about Trout Point Lodge. Upon receiving the letter from Advance Publications' attorneys, instead of removing the infringing material from publication, GoDaddy! cut off Slabbed hosting services entirely.

19. In reaction to having his web site shut down due to copyright infringement, which he viewed as an insult to what he claimed as his free speech rights, Handshoe began an internet campaign to damage Trout Point Lodge and its proprietors, including plaintiff by counterclaim Leary. Handshoe piggy-backed on the retracted *Times-Picayune* stories linking Trout Point Lodge with alleged corruption in Jefferson Parish. Under the guise of investigative blogging" Handshoe and The Slabbed Nation created and published a false conspiracy theory in which Trout Point Lodge and its founders were involved in criminal collusion with Broussard to launder money and funnel kickbacks. Handshoe did not launch a similar attack on his web host or the Times-Picayune, the entities proximately responsible for removing his web hosting services. The same

14

kind of online sock puppetry used against Broussard was also used against Trout Point Lodge and Leary.

20. Handshoe was served with a notice to cease and desist his false publications relating to Trout Point Lodge in the spring of 2011, which only cause him to redouble his efforts to publish damaging falsehoods about Leary and his businesses.

21. Concurrent with state and federal investigations of Broussard, civil lawsuits had been filed in Louisiana that paralleled or were factually inter-related with the federal criminal pursuit of Broussard. One was filed by Waste Remediation of Plaquemines—a rival waste disposal company to River Birch Landfill—and one by close Handshoe associate Anne-Marie Vandenweghe, the one-time Jefferson Parish attorney in charge of Pubic Record Requests. Waste Remediation was owned and controlled by the Lauricella family of Jefferson Parish. Vandenweghe in turn had close personal ties to the Lauricella family. Vandenweghe was represented by Handshoe's Louisiana attorney Jack E. "Bobby" Truitt, who also became Handshoe's attorney. Waste Remediation was represented by the Smith & Fawer law firm. At the time of the Slabbed blog coverage of the Broussard scandal and of the Trout Point Lodge conspiracy theory, the blog attracted a large viewership and was operated for purposes of commercial advantage and private financial gain as defined by 17 USC § 101. In addition, the publishing of conspiracy theories and the use of sock puppetry on Slabbed and on other web sites like nola.com was directly related to efforts by Vandenweghe and the Lauricellas to gain financially via their civil lawsuits. Attempting to sway public opinion was part of this effort.

22. In May, 2010, Steve Theriot, the interim president of Jefferson Parish filed lawsuit seeking the identities behind 11 user accounts of posters on the nola.com and Slabbed web sites. Theriot and the parish government were plaintiffs. The suit claimed that the posters put up false and

15

defamatory messages. Theriot also accused Vandenweghe of posting to these two web sites. The suit was later withdrawn.

23. All monies earned by Slabbed New Media were distributed on a regular basis to the Handshoes personally.

24. In his publishing, Handshoe routinely referred to Leary, as well as Vaughn Perret and Daniel Abel (the three founders of Trout Point Lodge, the Inn at Coyote Mountain, Chicory Farm of Louisiana, and the Chicory Farm Cafe) as "the girls," in reference to his perception of the three men's sexual orientation. At some point in 2012, Handshoe stopped referring to the three as "the girls" and began referring to them as "the goatherders," in an apparent reference to the fact that Chicory Farm of Louisiana produced farmstead goat cheeses. He also used blog "tags" for posts referring to Leary, consistently using the tag "goatherders" in posts about Leary.

25. In these "goatherder" publications, Handshoe continued the conspiracy theory that Leary was involved in (a) political corruption in Louisiana involving Aaron Broussard (b) money laundering, including holding positions within Nova Scotia Enteprises, LLC, which federal prosecutors had publicly identified as involved in an alleged Broussard bribery, "pay to play" and kickback scheme, (c) international money laundering, including involving Trout Point Lodge, and (d) misuse of the court processes in Nova Scotia and elsewhere, including perjury. All of these allegations of felonious criminal conduct are false. This series of publications weaving the false conspiracy theory included hundreds of posts and comments between January, 2010, and the present day. All remain in publication as of today.

26. In 2011 and 2012, Handshoe and Slabbed New Media, LLC began illegally downloading, copying, storing, and distributing copyrighted commercial photographs belonging to Trout

16

Point Lodge, Vaughn Perret, and Charles Leary. At least 5 photographs were illegally

appropriated by Handshoe and Slabbed New Media, LLC, and such works had a value of over

$5000.00. Handshoe and Slabbed New Media *willfully* infringed copyright, as they knew

copyright did not belong to them. In addition, the infringing activities were engaged in for profit;

proceeds from Slabbed publications eventually found their way into Douglas Handshoe's

pockets after having been passed through the purportedly legitimate publishing activities of

Slabbed New Media, LLC.

27. Each photograph was taken from a protected computer, which were all computers that were

   used in or affecting interstate or foreign commerce or communication and all of which had

   restrictions on their use according to terms or service, terms of use, or conditions that Handshoe

   agreed to when accessing the photographs. 18 U.S.C. § 1030(e)(2)(B). The law applies to

   accessing and downloading the photographs regardless of a lack of technological barriers.

   Handshoe, as a computer user, knew or reasonably should have known that he exceeded

   authorized access those computers, and that the photographs obtainable from that access was in

   furtherance of or to perpetrate a crime. When Handshoe used his access to these computer

   systems for the purpose of copyright infringement, or unauthorized downloading of third party

   creative works, he exceeded authorized access in each instance.

28. In particular, Handshoe admitted in his brief supporting a Motion to Dismiss filed on June 6,

   2018, that for the benefit of the Slabbed enterprise he illegally copied, downloaded, and

   distributed four copyrighted photographs, one on each the following dates: September 8, 2011;

   January 29, 2012; October 5, 2012; and December 4, 2012. All remain in infringing publication

   today.

29. Those copyrighted photographs were illegally downloaded by accessing third party computer

systems. In particular, there was access that exceeded authorized access under 18 U.S.C. §

1030(a)(2) of Ashoka's computer service for downloading the photograph of Charles Leary and

Vaughn Perret while as delegates to the 2010 National Geographic Society Geotourism Summit

in Washington, D.C. In particular, the following provision was violated by the downloading of

the Ashoka photograph from its changemakers.com web site for commercial use by The

Slabbed Nation: "You acknowledge that the Service, the Content and photos displayed on the

Service and any underlying technology or software used in connection with the Service contain

Changemakers' proprietary information. You may not commercially exploit any part of the

Service, including photographs, except as expressly permitted by Changemakers." No such

permission was given by Ashoka or Changemakers.

30. Furthermore, there was access that exceeded authorized access under 18 U.S.C. § 1030(a)(2) of

Expedia, Inc.'s computer service for downloading the photograph of Trout Point Lodge

authored by Vaughn Perret, which was licensed to Expedia, Inc. for purposes of commercial

promotion by Expedia as an online travel agent. In particular, the following provisions were

violated by the downloading of the Trout Point Lodge photograph from the Expedia web site

for commercial use by The Slabbed Nation: "While you may make limited copies of your travel

itinerary (and related documents) for travel or services booked through this Website, you agree

not to otherwise modify, copy, distribute, transmit, display, perform, reproduce, publish,

license, create derivative works from, transfer, or sell or re-sell any information, software,

products, or services obtained from or through this Website. Additionally, you agree not to:

> (i) use this Website or its contents for any commercial purpose;
>
> [. . .]
>
> (iii) access, monitor or copy any content or information of this Website using any robot,
> spider, scraper or other automated means or any manual process for any purpose without
> our express written permission;

[. . .]

(vi) deep-link to any portion of this Website (including, without limitation, the purchase path for any travel services) for any purpose without our express written permission; or

(vii) "frame", "mirror" or otherwise incorporate any part of this Website into any other website without our prior written authorization.

There was no authorization or permission from Expedia to Handshoe or The Slabbed Nation.

31. Furthermore, there was access that exceeded authorized access under 18 U.S.C. § 1030(a)(2) of Torstar's computer service for downloading the photograph of Charles Leary & Vaughan Perret with their dog, which was licensed to the Toronto Star by Trout Point Lodge, Limited. In particular, the following provisions were violated by the downloading of the Trout Point Lodge photograph from the Toronto Star web site for commercial use by The Slabbed Nation: "The Toronto Star Properties, Services, and Paid Services and all content made available thereon ("**Content**") are the property of the Toronto Star or its licensors and are protected, without limitation, pursuant to Canadian and foreign copyright, trademark and other laws. [. . .] Other than as explicitly set forth in these Terms and Conditions, nothing will be construed as granting any license or right to use any Content in any manner without the prior written consent of the Toronto Star or such third party that may own the Content displayed on the Toronto Star Property, Service or Paid Service. Any unauthorized use of any of the Content is strictly prohibited.  Except as provided herein, you agree not to reproduce, sell, republish, broadcast, distribute, make derivative works of or otherwise make available any Content, including without limitation by framing, caching or other similar means, without the prior written consent of the copyright owner of such Content." Handshoe and The Slabbed Nation had no authorization or permission from Torstar to download the copyrighted photograph.

32. Furthermore, there was access that exceeded authorized access under 18 U.S.C. § 1030(a)(2) of Progress Media's computer service for downloading the photograph of Daniel Abel, Charles

Leary, & Vaughan Perret authored by Marilyn Smulders, which was licensed to Progress Media by Smulders. In particular, the following provision was violated by the downloading of the Abel, Perret, and Leary photograph from the Progress Media web site for commercial use by The Slabbed Nation: "Information, documents and photos (i.e., 'content') on this website are the property of *Progress Media Group*. Content may not be reproduced or used without *Progress Media Group's* permission, with the exception of certain items that are labeled for public use." Handshoe and The Slabbed Nation had no authorization or permission from Progress Media or Smulders to download the copyrighted photograph.

33. In pleadings, Handshoe has admitted these photographs were "taken from the servers" of Expedia, the *Toronto Star*, Progress Media, and Ashoka, among other places. Handshoe had no permission to copy, store, and distribute these photographs, and intentionally took them knowing the works were copyrighted or with negligent disregard for whether his actions violated copyright. He did so for personal financial gain and commercial advantage.

34. At the time these photographs were illegally published at www.slabbed.org, that web site was registered in Handshoe's personal name. Handshoe only changed the registration of the web site to Slabbed New Media, LLC late in the pendancy of the Slabbed New Media bankruptcy proceeding in 2016 after Leary and other creditors pointed out to the Court that the web site was not an asset of Slabbed New Media, LLC but rather was Handshoe's personal property.

35. These acts of copying and distribution constituted violations of 17 U.S. Code § 506(a)(1)(A), which violation is ongoing since 2011. To be particular, on September 8, 2011 the Slabbed Nation enterprise engaged in infringing publication of an illegally copied and illegally downloaded creative work on a commercial web site. On January 29, 2012, the Slabbed Nation enterprise engaged in infringing publication of a second illegally copied and illegally

20

downloaded creative work on a commercial web site.  On October 5, 2012, the Slabbed Nation

enterprise engaged in infringing publication of a third illegally copied and illegally downloaded

creative work on a commercial web site. On December 4, 2012, the Slabbed Nation enterprise

engaged in infringing publication of a fourth illegally copied and illegally downloaded creative

work on a commercial web site. Each publication occurred for the purpose of commercial

advantage or private financial gain. Each publication is ongoing.

36. In addition, the works at issue were legally published on web sites that contained copyright

notices indicating content on the site was copyrighted. Each instance in which the Slabbed

Nation enterprise republished these works absent proper copyright notice was a violation of 17

U.S.C. Section 506(d), that is the removal of a notice of copyright. Handshoe working for the

Slabbed Nation enterprise would subsequently file with web hosts including YouTube, Amazon

Web Services, and DreamHost, intentionally misrepresented Digital Millennium Copyright Act

counternotifications in response to notices of infringement about these works, meeting the

requirement of fraudulent intent described in 17 U.S. Code § 506(d).

37. In addition, the Slabbed Nation enterprise placed on the Slabbed commercial web site a notice

of copyright, which, with regards to the creative works at issue here, was a violation of 17

U.S.C. Section 506(c). At the time the copyright notice was placed on the Slabbed commercial

web site, Handshoe and Slabbed New Media, LLC knew that purporting to copyright the

creative works for their own financial gain was false. This was the placing on the photographs a

notice of copyright or words of the same purport, that Handshoe and Slabbed New Media, LLC

knew to be false. In addition the Slabbed Nation enterprise was, with fraudulent intent, publicly

distributing photographs bearing such notice or words of the same purport that they knew to be

false.

38. The Slabbed Nation enterprise went to extraordinary lengths to be able to continue to infringe copyright in the creative works, including purporting to hold copyright in the works, and the filing of false counternotifications, under penalty of perjury, with DreamHost; with HostGator; with YouTube; and with Amazon Web Services. Each time the Slabbed Nation enterprise misrepresented to the computer service that removal of copyrighted material was done in error, when the opposite was true. Each false counternotification was filed under penalty of perjury.

39. In addition, in early 2017, the Slabbed Nation enterprise registered copyright in a commercial writing published on the Slabbed blog that features a copyrighted creative work the United States rights to which belong to Leary. Handshoe and Slabbed New Media intentionally misrepresented to the United States Copyright Office that all material in the publication belonged to Slabbed New Media, LLC, which they knew to be false at the time. This was a false representation of a material fact in the application for copyright registration and a violation of 17 U.S.C. Section 506(e).

40. Leary has been assigned the United States rights in the foreign photographs at issue, including the right to action.

41. These photographs appeared on the Slabbed blog as part of commercial publishing activities, in return for which the Slabbed enterprise received monies from outside of Mississippi. In addition, via the Internet, the stolen photographs were transmitted and transferred in interstate and foreign commerce. The infringing activities of Handshoe and Slabbed New Media, LLC constituted an enterprise engaged in interstate and foreign commerce via the Internet, and included receiving monies from outside of Mississippi via PayPal and check.

42. These were acts of deliberate unlawful copying that are no less an unlawful taking of property

22

than garden-variety theft. See, *e. g.,* 18 U. S. C. § 2319 (criminal copyright infringement); § 1961(1)(B) (copyright infringement can be a predicate act under the Racketeer Influenced and Corrupt Organizations Act). In addition, The Slabbed Nation enterprise received proceeds from copyright infringement in violation of § 1956(c)(7)(D).

43. In addition, after Handshoe was successfully sued for defamation, injurious falsehood, civil harassment, and other causes of action in Nova Scotia Supreme Court in 2012, Handshoe and Slabbed New Media published words and images on Slabbed.org aimed at the extraction of the valuable money judgment against Handshoe from Leary and his fellow plaintiffs by threatening and placing Leary and his fellow judgment creditors in fear of personal injury. This included the threat published in September, 2011, at http://slabbed.org/2011/09/14/misfire-slabbed-catches-up-with-aaron-broussard-as-he-and-trout-point-owner-danny-abel-sue-the-author-of-the-literary-flop-outgunned-a-legal-jackassery-update/#comment-3705

44. In May, 2011, after considering affidavit evidence and live testimony, Nova Scotia Supreme Court found evidence of an insider connection between anonymous persons publishing on the Slabbed blog and the Fox News affiliate in New Orleans. This insider connection actually existed and involved Vandeweghe who had contact with journalists as part of her duties managing public record requests for Jefferson Parish. The Court ordered that the Slabbed web host, Automattic, Inc., provide identifying information regarding the anonymous publishers, who were some of the same sock puppets engaged in commentary on the Broussard scandal and the Trout Point Lodge conspiracy theory.

45. From Louisiana, Jack E. Truitt posted on the Slabbed blog, paid monies to support The Slabbed Nation blogging activities on or around September 19, 2013, and publicly encouraged others to contribute monies, including in early February, 2014.

23

46. In the Fall of 2012, the U.S. District Court for the Southern District of Mississippi was considering blocking enforcement of Leary, Vaughn Perret, and Trout Point Lodge's Canadian money judgment against Handshoe under the SPEECH Act of 2010. Handshoe was represented by G. Gerald Cruthird and Jack E. Truitt. The judge in that case perused the Slabbed blog after the close of submissions by the parties, specifically in October, 2012, as evidenced in the court's decision on cross motions for summary judgment.

47. At the same time, Waste Remediation of Plaquemines amended its civil lawsuit to include Trout Point Lodge and Aaron Broussard as alleged co-conspirators in the alleged effort to deprive Waste Remediation of a waste disposal contract and to allegedly cover up the wrongdoing. Both Slabbed and nola.com obtained the same PDF copy of the amended complaint within hours of it being filed in Louisiana. The PDF was created in the offices of Smith & Fawer. Both Slabbed and nola.com published the amended complaint to the Internet that day. The case was later removed to U.S. district court, at which point Trout Point Lodge and Broussard were both mistakenly listed on the docket as defendants, an error that was not corrected until 2013. Neither were actually ever defendants in that litigation.

48. In October, 2012, Handshoe and The Slabbed Nation sock puppets also began publishing the falsehood that Leary's former business partner, and Trout Point co-founder, Daniel Abel and Aaron Broussard were law partners. This false statement of facts was intended to falsely closely link the financial and business interests of Broussard with that of Trout Point Lodge and its founders.

49. In December, 2012, the U.S. district court rendered its decision and relied, in part, on the false facts that Daniel Abel was Aaron Broussard's law partner and that Trout Point Lodge and Broussard were co-defendants in the Waste Remediation of Plaquemines lawsuit, and were

24

alleged to have engaged in a racketeering enterprise.

50. During 2013, Handshoe made general appearances in case no. 411345 in the Supreme Court of Nova Scotia, originally filed as an Application in Court for copyright infringement in January of that year. In court papers Handshoe flatly denied having any contact with attorneys for Waste Remediation of Plaquemines at the Smith & Fawer law firm. Yet, later, in an affidavit filed in connection with a motion for an anti-suit injunction filed with this district court, Handshoe said he received the amended complaint directly from attorney Stephen Gelee of Smith & Fawer. The two signed statements are contradictory.

51. On May 17, 2013, Handshoe filed suit in defamation in Hancock County Circuit Court cause No. 13-0175 against Michael Coyle, a Nova Scotia attorney and legal commentator who had published legal commentary on a judicial decision, Trout Point Lodge Ltd. v. Handshoe, 2012 NSSC 245. Handshoe subsequently had Coyle noted in default.

52. After Handshoe tried to file a motion with the Canadian court in case 411345 using the Federal Rules of Civil Procedure of the United States district courts, in April, 2013, that court instructed Handshoe to file a proper motion under the *Nova Scotia Civil Procedure Rules* by an extended deadline of May 24, 2013.

53. On May 21, 2013, Handshoe filed suit in Hancock County Circuit Court cause number 13-0186, against Leary, Vaughn Perret, Daniel Abel, Aaron Broussard, Chris Yount, Trout Point Lodge, and Nova Scotia Enterprises, LLC. That case was then removed by all defendants to the U.S. District Court for the Southern District of Mississippi. Handshoe had Broussard noted in default.

54. In affidavits filed in U.S. district court one month after removal of the case, Handshoe stated

25

that his damages totalled $25,000. (No. 1: 13CV251-LG-JMR, ECF Nos. 19-1, 20-1, 24-1). In his brief concerning subject matter jurisdiction, Handshoe itemized those damages and specifically stated that the damages he sought at the time of removal totalled $25,000. He also submitted an affidavit in which he specifically disavowed his right to recover any damages in excess of $74,999.99 in that lawsuit.

55. On September 23, 2013, that case was remanded by this court to state court based on Handshoe's representations and sworn evidence.

56. On November 26, 2013, Handshoe filed a motion for summary judgment with Nova Scotia Supreme Court in case 411345.

57. On December 11, 2013, the United States District Court for the Southern District of Mississippi in case no. 1:2012-cv-00090 granted Handshoe's motion for attorney's fees under the SPEECH Act, awarding Handshoe $48,000 to be paid by Leary, Vaughn Perret, and Trout Point Lodge, Limited. Papers had been filed that showed Handshoe owed Truitt and the Truitt Law Firm over $55,000 in attorney's fees and legal costs. This act would begin an odyssey of fraud regarding the continuing ownership of that judgment debt and who, at any point in time, was the judgment creditor.

58. In late 2013, Handshoe published a series of online posts completing his false conspiracy theory regarding "the goatherders" and money laundering, corruption, perjury, and involvement in a criminal shell company.

59. On February 14, 2014, Nova Scotia Supreme Court awarded damages of $180,000 for copyright infringement and $210,000 for defamation against Handshoe in favor of Leary, Vaughn Perret, and Trout Point Lodge. In late February, 2014, Handshoe learned the Plaintiffs in that case were

26

seeking to enroll the copyright infringement judgment in Mississippi.

60. On March 5, 2014, Handshoe transferred ownership in the $48,000 attorney's fee judgment debt to his Louisiana attorney Jack "Bobby" Truitt, who had appeared in the case *pro hac vice*. The transfer was done by instrument notarized in Mississippi and subsequently relied upon by Truitt in court pleadings in Louisiana.

61. On April 10, 2014, Handshoe filed suit in this district court against Daniel Abel and Chris Yount. Yount was the civil process server used by Leary to serve Handshoe with civil process. Case no. 1:14-cv-00159-KS-MTP.

62. On October 8, 2014, Handshoe filed with this court a motion for writ of garnishment in case 1:2012-cv-00090 and falsely represented to the court that he, not Truitt, owned the $48,000 attorney's fee judgment.

63. On October 9, 2014, Handshoe purportedly emailed Truitt to purportedly "rescind" the previous transfer of the debt to Truitt with no indication of valuable consideration.

64. On October 31, 2014, Handshoe filed an amended complaint in cause no. 13-0186 in Hancock County Circuit Court, against Leary, Daniel Abel, Vaughn Perret, Trout Point Lodge, Limited, Chris Yount, Aaron Broussard, and Nova Scotia Enterprises, L.L.C., and caused process to issue, in which he claimed damages of $2,451,000.00. This contradicted his representations and sworn promises to this court regarding the amount in controversy, as reported in *Handshoe v. Broussard*, Cause No. 1: 13CV251-LG-JMR (S.D. Miss. Sept. 23, 2013).

65. On January 6, 2015, Handshoe executed an Assignment of Rights & Claims in which he conveyed and transferred the entirety of the $48,000 attorney's fees judgment debt to Slabbed New Media, LLC.

27

66. On February 13, 2015, Handshoe filed a defamation suit in Hancock County Circuit Court agains the *Halifax Chronicle-Herald* newspaper, case no. 15-0062, over an article the newspaper had published about the Canadian judicial decision Trout Point Lodge Ltd. v. Handshoe, 2014 NSSC 62. That case was removed to this court, case 1:15-cv-00106-LG-RHW and resolved out of court.

67. On February 23, 2015, Handshoe filed a defamation suit in Hancock County Circuit Court, case no. 15-0072, against the *Toronto Star* newspaper and journalist Peter Edwards, who had published about the judicial decision Trout Point Lodge Ltd. v. Handshoe, 2014 NSSC 62. That case was removed to this court, Case 1:15-cv-00113-KS-RHW, and ultimately dismissed.

68. On March 13, 2015, Handshoe filed an amended complaint naming not only Abel and Yount, but also attorney and law clinic director Ramona Fernandez, law student Janey Lamar, and the Stuart Smith Law Clinic of Loyola University of New Orleans in this court, case no1:14-cv-00159-KS-MTP. The Law Clinic was representing process server Chris Yount's minor child in a court proceeding into which Handshoe interjected himself.

69. On June 16, 2015, Louisiana Court of Appeals for the Fifth Circuit denied Handshoe's motion for a rehearing of its decision *Yount v. Handshoe,* 171 So.3d 381, 387 (La.App. 5 Cir. 2015), which obligated Handshoe to pay mandatory attorney's fees under the Louisiana anti-SLAPP statute (La CCP 971). That same day, via counsel Handshoe placed Slabbed New Media, LLC, a company of which he was the managing member, into Chapter 11 bankruptcy in the U.S. Bankruptcy Court for the Southern District of Mississippi. Handshoe signed and filed papers stating that the same $48,000 attorney's fee judgment debt was owned by Slabbed New Media, LLC, and was subject to the bankruptcy court's jurisdiction.

70. A bankruptcy case concerning Slabbed New Media, LLC was filed under Chapter 11 of the United States Bankruptcy Code, entered on 06/16/2015 at 2:46 PM and filed on 06/16/2015. The filing of the bankruptcy case automatically stayed collection and other actions against the debtor and the debtor's property, and Handshoe was aware of the stay. Process was issued to Leary, Vaughn Perret, Trout Point Lodge, Daniel Abel, Chris Yount, and Jack E. Truitt as alleged creditors. That bankruptcy case was dismissed on September 16, 2016 and closed on October 18, 2016.

71. Nearly simultaneously to filing the bankruptcy, Handshoe caused Slabbed New Media, LLC to file a reconventional demand in Louisiana's 24th Judicial District Court, Yount v Handshoe, case no. 736-680, stating that it had indemnified Handshoe for the $48,000 in attorney's fees, and that it owned the judgment debt, which it somehow claimed a right to recovery in that lawsuit involving Chris Yount. Handshoe filed a "suggestion of bankruptcy" motion staying that case.

72. On November 13, 2015, Hancock County Circuit Court dismissed *without prejudice* Leary, Vaughn Perret, and Trout Point Lodge's first enrolment of the Canadian Order for money damages for copyright infringement against Handshoe.

73. On November 16, 2015, Handshoe initiated the instant action, causing process to issue. On November 20, 2015, Handshoe issued a press release about this action and sent it along with a copy of the original Complaint in this case to, on information and belief, hundreds of persons, including mainstream media outlets in the United States and Canada. The press release and complaint were actually published publicly on the "Jackson Jambalaya" web site in Mississippi as well as at URL http://documents.tips/documents/slabbed-press-release.html as late as July 16, 2016.

29

74. On January 6, 2016, Handshoe filed an amended complaint and caused process to issue in the U.S. District Court for the Southern District of Mississippi case no 1:14-cv-00159-KS-MTP Handshoe v. Abel. A summons was issued for Leary and Vaughn Perret. That amended complaint was dismissed *sua sponte* by the court.

75. On August 17, 2016, Defendant by counterclaim Handshoe and his attorney Jack "Bobby" Truitt filed a motion with the United States District Court for the Southern District of Mississippi in case no. 1:2012-cv-00090 without giving notice to the Plaintiffs in that case, including Leary, of the motion. Truitt appeared *pro hac vice* and yet the motion was not signed by any supervising attorney and the case was closed, which had ended Truitt's *pro hac vice* admission. Attorney of record for Leary and Trout Point Lodge, M. Judith Barnett subsequently told Leary in writing that she never received any notices or process in that case. The motion commenced a post-judgment supplementary proceeding in which process issued. This was during the pendency of the Slabbed bankruptcy. Handshoe filed the motion for the judgment debtor examination in his personal name, but did not inform this district court of the transfer of the debt to Slabbed New Media, the bankruptcy proceeding, any indemnification, and the automatic stay. Failure to disclose a material fact may constitute a knowing misrepresentation.

76. Handshoe's motion was for an order scheduling a judgment debtor examination in Gulfport, Mississippi, for the Plaintiffs in that case, including Leary. The lack of notice to the Plaintiffs, including Leary, was intentional. At that time, Leary was on the docket of that case as *pro se* with his Canadian address on file. Handshoe and his attorney knew how to contact Leary in Canada and were in communication with him by telephone and email at that time regarding an appeal filed July 22, 2016, in that case with the United States Court of Appeals for the Fifth Circuit.

77. Despite the fact that no notice was given to Leary and his fellow Plaintiff Perret, who were on the docket as *pro se*, Defendant by counterclaim Handshoe through his attorney Truitt filed a false certificate of service for that motion. This was fraud or intentional misrepresentation that injured Leary.

78. After the start of the supplementary proceeding in aid of execution of which Leary and his fellow plaintiffs had no authorized or proper notice, Leary communicated with the court to inform the court of what had occurred and copied that correspondence to Handshoe. The court responded to tell Leary how to order a transcript of the judgment debtor examination hearing.

79. On January 5, 2017, in Mississippi state court, Leary and his fellow plaintiffs prevailed over Handshoe's objections to the second enrolment and execution on the judgment of Nova Scotia Supreme Court against him for copyright infringement in Hancock County Circuit Court cause number 15-0458. All the time, Handshoe has continued to commercially publish the photographs belonging to Leary, Perret, and Trout Point Lodge in violation of United States and Canadian copyright law.

80. On May 15, 2017, Handshoe was personally served with a state court writ of execution relating to the copyright infringement judgment.

81. On May 16, 2017, Handshoe filed a motion in case 12-cv-90 for contempt and for a show cause order as to why the plaintiffs should not be held in contempt based on Leary and his fellow plaintiffs not appearing for the fraudulently- and illegally-obtained supplementary proceeding and judgment debtor examination in 2016.

82. Handshoe caused process to issue related to the show cause order.

83. On July 28, 2017, Handshoe filed a motion for a writ of execution in this court in case 12-cv-90

based on the $48,000 attorney's fee judgment, however Handshoe was no longer the judgment creditor.

84. On August 7, 2017, Handshoe in concert with G. Gerald Cruthird intentionally represented to the Clerk of Stone County Circuit Court, Mississippi that he was the judgment creditor for the $48,000 attorney's fee judgment from this Court. It is possible Slabbed New Media, LLC was the judgement credit or it is possible Jack E. Truitt and the Truitt Law Firm were the judgment creditors; however Handshoe was no longer the judgment creditor.

85. Stone County as well as Clerk Jeffrey O'Neal participated in violating Leary's substantive due process rights by not following Mississippi law regarding foreign judgments, including the judgments of Mississippi U.S. district courts. They also violated Leary's substantive due process rights by not assuring proper notice under the law. As a result of Stone County Circuit Court as well as Jeffrey O'Neal's actions, Leary was deprived of property without due process and without the most basic notice; that property was his money judgment against Douglas Handshoe.

86. Handshoe and Cruthird also represented to the Clerk's office that "Don Acker" was a licensed civil constable in the Province of Nova Scotia and that Mississippi law allowed Don Acker to serve a Writ of Execution in Nova Scotia, Canada. Don Acker was not a licensed civil constable, and no law in Mississippi allows service of a Writ of Execution from Stone County Circuit Court in Nova Scotia, Canada, in the way purportedly accomplished by Douglas Handshoe, Cruthird, Stone County, and Jeffrey O'Neal. Nonetheless, the Writ of Execution was process issued not for its intended purpose and it was subsequently abused by Handshoe. This was an abuse of process.

87. The U.S. district court attorney's fee judgment is covered by Miss. Code Sec. 11-7-301.

Handshoe and Cruthird did not make the enrolment of the judgment in Stone County returnable

to this U.S. district court, as required by law. That fact deprived Stone County of jurisdiction,

making the execution on the judgment *void ab initio* and a nullity.

88. Nonetheless, despite the fact that there was no proof of adequate service of any writ or process,

on October 11, 2017, Stone County authorized an illegal deprivation of Leary of his property by

Sheriff's sale under writ of execution of the judgment debt owned by Leary, Perret, and Trout

Point against Douglas Handshoe. In fact, no service of the Writ of Execution or notice of the

sheriff's sale was effected on Leary or the others. The county sheriff in question was the Stone

County Sheriff.

89. Under Miss. Code Sec 11-7-195 this U.S. district court had sole jurisdiction to have enforced

the Writ, not Stone County Circuit Court. Miss. Code also requires personal service of a Writ of

Execution. In this case, service occurred in Canada, making it subject to the Hague Convention

on the Service of Judicial and Extra-judicial Documents Abroad, i.e. a judicial document

transmitted abroad. In addition, Miss. Code does not grant authority to effect service of a Writ

in a foreign country, and no court authorized "Don Acker" to serve such process. The clerk

simply issued the Writ that was handed to her under false pretenses and color of law by

Handshoe and Cruthird.

90. Handshoe did not use the Canadian Central Authority as authorized by the Hague Convention.

The Hague Service Convention also allows "the freedom of judicial officers, officials or other

competent persons of the State of origin to effect service of judicial documents directly through

the judicial officers, officials or other competent persons of the State of destination." However

Don Acker was not a licensed civil constable in Nova Scotia and in addition, by Mr. Acker's

33

own admission, he never served Leary as required. That is, Acker's own affidavit of service used by Handshoe states *prima facie* that Leary was not served with the Writ.

91. In other words, not only did Handshoe, Cruthird, Stone County Circuit Court, and O'Neal violate Mississippi law, they also violated the law of the land, an international treaty ratified by the United State of America and Canada. This was conduct that violated clearly established statutory and constitutional rights of which a reasonable person would have known.

92. There was a deprivation of Leary's property without due process under the Fourteenth Amendment by the sheriff's sale conducted by the Stone County Sheriff, authorized by Stone County Circuit Court at the insistence of Douglas Handshoe and G. Gerald Cruthird. This was a violation of procedural due process. There was also violation of substantive due process. There was no consistent application of the law; actions taken were arbitrary and capricious, singling Leary out with no protections equal to others in Mississippi; and Leary was afforded no notice and no opportunity to be heard due to the actions of O'Neal, Stone County, Cruthird, and Douglas Handshoe. Leary was denied use of established adjudicatory procedures, and the actions taken denied Leary an opportunity to be heard upon his claimed rights.

93. On August 14, 2017, Handshoe was deposed. In that deposition Handshoe admitted under oath to being indemnified for the $48,000 in attorney's fees and that Slabbed New Media, LLC had owned the judgment debt since January 6, 2015, up to the day of the deposition.

94. On October 30, 2017, Douglas Handshoe purchased Leary, Perret, and Trout Point's $180,000 CAD judgment, which had been properly enrolled in Mississippi, at the sheriff's sale for $100.00. This was accomplished through fraudulent misrepresentations about the ownership of the debt made to the Stone County clerk's office, and to a total misapplication of the law and

34

due process by Stone County.

95. In May, 2018, Douglas Handshoe, on information and belief with the aid of G. Gerald Cruthird, obtained a second writ of execution based on the fraudulently transferred money judgment of this district court, however this time for intellectual property that was clearly not located in Stone County, Mississippi. This included the United States rights to photographs at issue in this case as well as the copyright to *The Trout Point Lodge Cookbook* published by Random House in 2004. In fact, the copyright in *The Trout Point Lodge Cookbook* does not belong to Leary, solely or in part. Handshoe also sought to execute on Leary's counterclaims in this case, a property not located in Stone County. Again, procedure was used that did not grant Stone County authority over the execution procedures; rather that authority lay with the U.S. district court.

96. At all times, this district court, and not the state court, had authority over execution procedures relating to Its own judgment.

97. Stone County issued a Writ of Execution despite the fact that the property to be executed upon was clearly not located in Stone County. Mr. Handshoe then attempted service of the writ at 189 Trout Point Road in East Kemptville, Nova Scotia, an address Mr. Handshoe knew was not the address of Leary. This was a further attempt to execute on a judgment that was not his with no notice to Leary.

98. Leary's civil rights were violated by these actions under color of law initiated by Handshoe and Cruthird but also involving the acts and omissions of Stone County Circuit Court, O'Neal, and the Stone County Sheriff.

99. On December 5, 2017, Handshoe published on slabbed.org about the "goatherders"and the

35

"slaughter" of goats on October 30, 2017, the day of the sheriff's sale. Handshoe had also earlier that year made reference to "the goatherders" on slabbed.org, resulting in fresh publications and a new edition of Slabbed goatherder publications.

**Claim Under 42 USC § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201(a) with Regards to G. Gerald Cruthird, Douglas Handshoe, Stone County Circuit Court of Mississippi, the Stone County Sheriff, and Jeffrey O'Neal**

100.     The facts recited above constitute a violation of Leary's rights to both substantive and procedural due process under 42 USC § 1983.

101.     Though not public officials, Cruthird and Handshoe acted under color of law in obtaining a Writ of Execution and executing upon such writ. Jeffrey O'Neal acted *ultra vires* and there was clear absence of all jurisdiction. In addition, Mr. O'Neal and Stone County did not perform their required duties to ensure that all requirements of Mississippi Code regarding execution were properly carried out, including service provisions and the fact that under Mississippi Code this district court, as a foreign court that had issued the judgment, had jurisdiction, not Stone County. In fact, O'Neal and Stone County had *prima facie* evidence before them that procedures were not properly carried out, in yet still authorized a sheriff's sale, thus injuring Leary by depriving him of his lawful property without an opportunity to be heard.

102.     The actions of Stone County Circuit Court, O'Neal, and the Stone County Sheriff was conduct resulting in constitutional deprivation that was fairly traceable to that conduct, and Leary's injury was fairly traceable to that conduct, whether ministerial or not.

103.     Stone County Circuit Court never had authority or jurisdiction over the execution proceedings once an abstract of a U.S. district court judgment was enrolled in Stone County. MS Code § 13-3-155 (2013).

36

104.     Stone County and O'Neal took no action to correct the situation despite receiving written notice from Leary in December, 2017, and in fact violated Leary's civil rights again in May, 2018.

105.     Leary seeks all damages allowed by law, attorney's fees, costs, and injunctive relief. Leary also seeks as declaration under the Declaratory Judgment Act, 28 U.S.C. § 2201 that the sheriff's sale of his chose-in-action was null and void due to fault of authority. Leary requests an order invalidating and declaring void the sale of Leary's money judgment on the steps of the Stone County Courthouse to Douglas Handshoe on October 30, 2017, as well as an injunction directed to Stone County Circuit Court and the Stone County Sheriff to cease any execution proceedings based on a judgment of this or any other U.S. district court.

**Claim Under 18 U.S. Code Chapter 96 with Regards to Douglas Handshoe, G. Gerald Cruthird, and Jennifer Handshoe**

106.     Douglas Handshoe, Jennifer Handshoe, G. Gerald Cruthird, Jack E. Truitt, Slabbed New Media, LLC, and Anne-Marie Vandenweghe are all persons under the RICO statute. They formed a group of individuals associated in fact although not a legal entity, which association is known as The Slabbed Nation.

107.     The racketeering activity engaged in by The Slabbed Nation, as described above, included past and ongoing criminal copyright infringement under section 2319 as well as money laundering, 18 U.S. Code § 1956, from the receipt and handling of proceeds resulting from the specified unlawful activity of copyright infringement. § 1956(c)(7)(D). It also includes an enterprise dedicated to ensuring continued infringement via the use of fraud and fraudulent transfers of judgment debt, and frivolous litigation, to thwart legitimate attempts to recover for

this copyright infringement in civil court using civil process. That is, multiple persons became engaged in an enterprise to illegally stop Leary (and his fellow plaintiffs in Nova Scotia Supreme Court) from collecting on a properly granted and properly enrolled civil money judgment. That effort is ongoing.

108.    None of this illegal activity could have been possible without the financial support and engagement of Jennifer Handshoe, who made critical fiscal injections into Handshoe's publishing activities at points where without that support The Slabbed Nation would have dissolved.

109.    The Slabbed Nation is an ongoing organization demonstrating a high level of coordination in accomplishing particular goals, the various associated persons functioned as a continuing unit, and The Slabbed Nations exists separate and apart from the pattern of racketeering activity it engages in. Goals included a public disinformation campaign or campaigns involving sockpuppetry and clickbait that in turn involved the intentional, criminal use of copyrighted photographs as additional clickbait for the disinformation campaigns. The Slabbed Nation is a group of persons associated together for a common purpose of engaging in a course of conduct that includes criminal copyright infringement and handling of monetary proceeds from such publication efforts.

110.    The Slabbed Nation is united both socially and ideologically. The Slabbed Nation ideology includes prominently a fervent belief in purported free speech rights completely unfettered by any restraints or constraints, including those articulated in *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) and *RAV v. St. Paul,* 505 U.S. 377, 112 S. Ct. 2538, 120 L. Ed. 2D 305 (1992). This ideology and the activities based upon it is not in any manner in conformity with established United States law. This includes not only

38

copyright infringement but also the publication and distribution of child-authored pornography as well, as found in Yount v. Handshoe, 171 So. 3d 381 (La. Ct. App. 2015) (applying anti-SLAPP (Strategic Lawsuit Against Public Participation) protections to permit a father to file suit for defamation, invasion of privacy, and cyberstalking after Douglas Handshoe repeatedly posted the minor son's pornographic drawing online, a drawing which had been filed with the court in a divorce proceeding). Also: *Yount v. Handshoe*, 179 So. 3d 856 (La. Ct. App. 2015); *Yount v. Handshoe*, 187 So. 3d 462 (La. 2016).

111.     This common ideology, supported by social networking and social media, also includes a fervent belief that blogging is deserving of legal and other protections routinely granted to journalists, and also extends to a belief that long-established copyright protections are illegitimate.

112.     There were at least two predicate acts of criminal copyright infringement: first, on or around September 8, 2011, when The Slabbed Nation illegally took (downloaded) a copyrighted photograph from a Progress Media publication about Trout Point Lodge and then published that photograph for financial gain on the Slabbed web site; second, on or around January 29, 2012, when The Slabbed Nation illegally took (downloaded) a copyrighted photograph of Trout Point Lodge and then published that photograph for financial gain on the Slabbed web site. Both acts are admitted to in the brief supporting Douglas Handshoe's Motion to Dismiss filed with this district court on June 6, 2018. However, there are many more than two predicate acts: there are multiple instances of copying and distribution of each of the five creative works, and that infringement is ongoing. Moreover, the intentional misrepresentations about the ownership of the $48,000 attorney's fee judgment in multiple courts is also ongoing.

113.     The Slabbed Nation has changed web hosts multiple times, each time illegally copying

the five creative works again for publication from a new computer service. This occurred most recently in 2016, with a change to Amazon Web Services. Each change resulted in new instances of intentional infringement.

### Claim Under *11 U.S.C. § 362* With Regards to Douglas Handshoe

114. This Court has original jurisdiction over this claim under 11 U.S.C. § 362(k) under 28 U.S. Code § 1334(a).

115. During August, 2016, under 11 U.S.C. § 362(a) the U.S. Bankruptcy Court had in place a stay, applicable to all entities, including Douglas Handshoe, of any act to obtain possession of property of the estate, or of property from the estate, or to exercise control over property of the estate of Slabbed New Media, LLC.

116. Leary was a creditor in that bankruptcy proceeding. Handshoe was also the debtor-in-possession and a creditor in that proceeding.

117. On August 17, 2016, both Handshoe and attorney Jack E. Truitt were aware of the § 362(a) stay. Truitt was a creditor in that proceeding. The case was not dismissed until September 16, 2016.

118. Handshoe's action that day in commencing a supplementary proceeding to execute on the $48,000 judgment debt belonging to Slabbed New Media, part of the estate, willfully violated that stay. Moreover, such willful violation of the stay was motivated by malice and was done in bad faith; it was egregious, oppressive, and high-handed, including the intentional omission of information to this district court and the use of a false certificate of service to accomplish an intentional act.

119. Leary suffered actual damages including damage to his entrepreneurial goodwill,

40

sleeping problems, anxiety, and physical symptoms of stress as well as actual costs, tremendous lost time, and legal costs including PACER fees. Leary prays for actual damages and attorney's fees. Leary also requests punitive damages in an amount to be determined by the trier of fact for Handshoe's egregious conduct.

120.     In addition, Leary prays that any and all orders of this Court resulting from Handshoe's willful violation of the stay, are found void *ab initio*, or in the alternative are voidable and must be voided, and such orders illegally obtained have injured Leary.

**Malicious Prosecution**

121.     Douglas Handshoe filed four (4) complaints in this case, and it was at his insistence that Slabbed New Media filed a motion to intervene in this case. Slabbed and Handshoe share the same legal counsel, G. Gerald Cruthird. Plaintiff is a member or manager of, and operates, Slabbed, with the aid and assistance of The Slabbed Nation. Handshoe has known or reasonably should have known of his lack of true interest in this case since the dates the takedown notices were sent, or certainly by the date the original Complaint was filed on November 16, 2015.

122.     Handshoe's motivation was malicious in that he had no foundation for bringing the action in his personal name, as evidenced by the Slabbed intervention, the fact that he never had standing, and his futile amendments over one year and a half, which damaged Leary substantially. His true purpose in the institution of this judicial proceeding, and the motion to intervene, was to coerce and inflict injury and embarrassment, and to vex Leary and his fellow defendants. Leary incurred tens of thousands of dollars in attorney's fees and legal costs. Handshoe had no probable cause to bring the lawsuit, as stated above.

123.     Leary prevailed on all counts in this case save Count Five. Each of these counts was an

instance of malicious prosecution by Handshoe.

**Fraud Including Fraud Upon the Court**

124.     The fraudulent transfers of the $48,000 attorney's fee judgment debt caused injury to

Leary, including the costs of appearing in the bankruptcy proceeding when in fact Leary was

not a judgment creditor of Slabbed New Media, LLC and the costs associated with extricating

himself from the improperly obtained show cause order and the prior compulsory process,

including attorney's fees and legal costs. Handshoe fraudulently represented to this court that he

was still the judgment creditor when he knew that he was not the judgment creditor anymore,

and had in fact been indemnified and had no injury. Handshoe knew he had no standing to

commence the supplementary proceeding in case 12-cv-90 when he did so.

125.     As of February 14, 2014, Handshoe was a debtor of Leary. Handshoe made at least one

transfer on  March 5, 2014, with actual intent to hinder, delay or defraud Leary out of the just

collection of the debt, or at least a part of the debt.  Handshoe made a transfer to Jack E. Truitt

and the Truitt Law Firm; Leary was at that time a creditor of Douglas Handshoe; Handshoe

made the transfer and incurred obligations with actual intent to hinder, delay or defraud Leary

and his capacity to collect the legitimate debt.

126.     At the time of the subsequent transfer of the debt to Slabbed New Media Leary was still

a creditor of Douglas Handshoe; Handshoe made the transfer and incurred obligations with

actual intent to hinder, delay or defraud Leary and his capacity to collect the legitimate debt.

127.     Leary acted to his detriment and incurred liability as a result of Handshoe's

misrepresentations regarding ownership of a judgment debt ordered by this Court. Handshoe

made false representations of material facts with knowledge of their falsity for the purpose of

inducing the plaintiff and the court to act thereon. Handshoe intented that the falsehood that he owned the judgment debt should be acted on by the hearers—including Leary & the Court--and in the manner reasonably contemplated. Leary and the Court were ignorant of this falsity. Leary and the court relied upon Handshoe's representations as true and acted upon them to Leary's damage. This included false certificates of service and acts of fraudulent omission in intentionally not informing this court of the true ownership of the $48,000 judgment debt and the bankruptcy.

128.   There were instances of fraud in the bankruptcy court, in this court in case no. 1: 13-CV-251, and case no 1:12-cv-90.

129.   There are numerous badges of fraud relating to Handshoe's transfers, including: the transfers were to an insider; Handshoe retained control of the property transferred after the transfer; the transfer was disclosed or concealed; before the transfer was made Handshoe had been sued or threatened with suit, including the judgment enforcement action(s) in Mississippi; the transfer was of a substantial portion of the debtor's assets; the value of the consideration received by Handshoe was not reasonably equivalent to the value of the asset transferred; the transfer(s) occurred shortly before or shortly after a substantial debt was incurred.

**Defamation (Douglas and Jennifer Handshoe)**

130.   Douglas Handshoe brutally defamed Leary by falsely and publicly alleging that he was involved in felonious conduct, including public corruption, perjury, money laundering including international money laundering, the use of shell corporations for criminal ends, and conspiracy. Jennifer Handshoe was the joint publisher of Slabbed, and without her financial support the blogging activities of Douglas Handshoe could not have occurred at various points from

43

January, 2010 to the present.

131.     These publications referred to Leary directly by name and also by reference as one of "the girls" or one of "the goatherders."

132.     These were false allegations of felonious criminal conduct and moral turpitude by Leary and are thus actionable *per se*.

133.     These false publications were distributed in Mississippi and also worldwide to tens of thousands of persons via the Internet.

134.     Handshoe's conduct was malicious in that he knew the allegations were false when he made them, including having knowledge of retractions published by mainstream media.

135.     Handshoe continued to publish these false and defamatory allegations as broadly as possible, and he undertook special efforts to ensure that his falsehoods would be read by the broadest audience possible.

136.     Leary suffered damage including public humiliation and ridicule, damage to his professional reputation as an academic and author. Handshoe falsely accused Leary of acts of moral turpitude.

137.     All of Douglas Handshoe's false publications remain in notorious publication as of today's date, and new editions of these publications were openly posted to the Internet at various times, including in late 2017.

**Abuse of Process**

138.     Plaintiff, Defendant by Counterclaim, Douglas K. Handshoe used process issued in the State of Mississippi to coerce Defendant, Plaintiff by Counterclaim Leary to cease his

44

legitimate efforts to sue Handshoe for defamation and copyright infringement. Handshoe subsequently used such process for the improper and collateral purpose of blackmailing or coercing Leary into stopping his enrollment and execution upon a copyright infringement judgment of Nova Scotia Supreme Court rendered on February 14, 2014. Finally, Handshoe used the process that issued to delay Leary's enforcement efforts regarding the Canadian copyright infringement judgment so that he could illegally transfer assets out of Leary's reach, which was not an intended purpose of the process that issued.

139.     In particular, Handshoe caused process to issue in a way that was an abuse of process in the following ongoing cases: (a) Handshoe v. Broussard, et. al. (Hancock County Circuit Court), which case is ongoing or has not been dismissed; (b) Trout Point Lodge, et. al. v. Handshoe (U.S. District Court for the Southern District of Mississippi, compulsory process issued in 2016 and 2017); (c) In re: Slabbed New Media, LLC (U.S Bankruptcy Court, case dismissed September 16, 2016); and (d) the instant case, including its various amendments. Being subject to these lawsuits Leary suffered damage not only from the initial complaint but from the cumulative costs of defense and the reputational harm caused by the unresolved claims as well as the issuance of additional process, such as order(s) to show cause and orders mandating compulsory process.

140.     Handshoe published the original complaint in this case along with a purported press release shortly after he filed the original complaint. Such publication was unprivileged. The complaint and press release were sent to hundreds of persons on Handshoe's email list, including in Mississippi and in Nova Scotia, with the intent of impugning Leary's reputation and character. This was not the intended purpose when process was issued in this case.

141.     Handshoe fraudulently obtained and used the post-judgment discovery process and the

use of contempt powers in a way not contemplated by law. The use of a motion for contempt as a negotiating tool, or to threaten and intimidate, constitutes an abuse of the process of this court which should not be tolerated.

142.     Handshoe's various Mississippi lawsuits against Torstar, parent of the *Toronto Star*, the Halifax *Chronicle-Herald*, the National Geographic Society, Progress Media, Marilyn Smulders, Michael Coyle, Ashoka, and Chris Yount were designed to cause injury to organizations and persons with whom Leary had established and favourable relationships. Most had given awards or positive publicity to Leary. The issuance of process in these lawsuits did cause injury to Leary by ruining his relationship to those entities and persons—many of whom had published very positively about Leary and his business—before such process issued.

**Misrepresentation under 17 USC 512(f)**

143.     Handshoe filed DMCA counter notifications in which he swore under penalty of perjury that he had a good faith belief that his use of Leary's copyrighted images did not constitute copyright infringement.

144.     Handshoe did so with YouTube on July 14, 2014, and he did so with AWS (Amazon Web Services) in late January, 2016, *after* Nova Scotia Supreme Court found him liable for copyright infringement, and finding Leary and his fellow Plaintiffs owned the copyright in the images that were the subject of the DMCA counter notifications.

145.     Handshoe knew when he took and published the works not belonging to him that he was infringing copyright in foreign works. Handshoe is personally liable for copyright infringement under the law regardless of whether the copyrighted works were published on a web site owned by his sole-proprietorship limited liability company.

146.     The works about which Handshoe issued counter notifications were registered with the Intellectual Property Office in Canada. He had no good faith belief they belonged to him or that he could put them on the commercial web site Slabbed. He knew that any notices of infringement served on his web hosts and any subsequent removals of the infringing works were not done in error when he served the counter notifications on his web hosts.

147.     Leary was damaged in having to research and respond to all of Handshoe's counter notifications, and in having his copyrighted works continue to be used in an infringing manner by Handshoe. Handshoe circumvented and perverted a process that was intended by Congress to provide an efficient, inexpensive, extra-judicial means of resolving copyright disputes.

**Copyright Infringement**

148.     Leary is the owner of the United States rights, including the right to action, of the foreign copyrighted photographic works at the heart of this case. That is: (a) a photograph of Charles Leary and Vaughn Perret at the Geotourism Summit of the National Geographic Society once used in an article published by Ashoka about Leary and Perret as social entrepreneurs; (b) a photograph of Trout Point Lodge taken by Vaughn Perret and used extensively to promote Leary's business interests; (c) a photograph of Leary and Perret with their dog used with permission by the *Toronto Star* in an article about their legal victory against Handshoe in 2012;  (d) a photograph of Leary, Perret, and Daniel Abel taken by Marilyn Smulders and used in a positive business article by Progress Magazine, and subsequently used to promote Leary's business interests; and (e) a photograph of Trout Point Lodge with its firepit taken by a professional photographer.  All five works are registered with the Intellectual Property Office in Canada.  They do not and did not belong to Handshoe and he had no right to copy, distribute, or publish the five works.

149.    Handshoe created illegal copies of those photographs and caused the photographs to be published on the Slabbed commercial web site in violation of copyright. All five photographs are still in illegal publication on today's date—that is there has been continuous infringing publication of all five works.

150.    Leary seeks an order that Handshoe immediately remove the photographs from publication, that he destroy all copies of the works, and that he be enjoined from possessing or publishing the works in the future.

## Tortious Interference with Contractual Relations and with Business Relations, Harassment

151.    In apparent efforts to locate Leary and Vaughn Perret not only to serve them with process but also as part of his plan to intimidate them, Defendant by Counterclaim Handshoe engaged a person ("MK") purportedly located in British Columbia, Canada, to falsely claim interest in purchasing Trout Point Lodge starting on February 2, 2017 and continuing for several months thereafter.

152.    These falsehoods, which Leary relied upon, caused Leary to loose business opportunities and interfered with Leary's contractual relations with other persons interested in purchasing Trout Point Lodge. This included the fraudulent engagement in a contract of purchase and sale with Handshoe's agent MK. The value of the lost or fraudulent contract is $2,750,000 Canadian dollars.

153.    Acting on information provided to him by MK, Handshoe caused a person whose name was purportedly "Bob Watson" to check into Trout Point Lodge on September 16, 2017, disrupt normal business operations, threaten violence, and impugn Leary and his goodwill in the eyes of Trout Point Lodge employees. "Bob Watson," who arrived dressed like a biker gang

member, was hired by bailiff service owner Stephen Kennedy of Halifax, Nova Scotia, who was hired by Handshoe. Handshoe also caused earlier incidents where purported process servers intentionally disrupted business operations and harmed goodwill.

**Prayer for Relief**

154.    NOW, HAVING ANSWERED, Leary prays that Plaintiff's Third Amended Complaint be dismissed on its merits with prejudice and with all costs and fees assessed against Plaintiff Handshoe, together with such other relief as the Court may deem just and proper.

155.    IN ADDITION, Leary prays for the following relief for his counterclaims: damages for abuse of process, malicious prosecution, fraud, tortious interference & harassment; relief under the Copyright Act, including an injunction ordering Handshoe, whether as the sole member of Slabbed New Media or personally, to immediately cease publication of any and all of Leary's copyrighted photographs as well as damages and attorney's fees for misrepresentation under the DMCA; that the show cause order and compulsory process issued in case 12-cv-90 be declared void due to Handshoe's lack of standing and fraud on the court; for the relief prayed for in paragraphs 70 and 71 above, and for any and all other relief the court deems just, including but not limited to appropriate punitive damages.

This the _____ day of June, 2018.

Respectfully submitted,
DEFENDANT (PLAINTIFF BY COUNTERCLAIM)
DR. CHARLES L. LEARY


appearing pro se

Charles L. Leary
308 5th Ave E
Vancouver, BC V5T 1H4

49

Canada

(902) 482-8360
foodvacation@gmail.com