# EXHIBIT 2

In the Matter of:

DOUGLAS HANDSHOE

vs

VAUGHN PERRET ETAL

Deposition

**Charles Leary**

July 27, 2018



**Ainsworth Reporting**

**Post Office Box 1102**

**Hattiesburg, MS  39403-1102**

*ainsworthreporting@gmail.com*

*ainsworthproduction@gmail.com*

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                   SOUTHERN DIVISION

 3

    DOUGLAS HANDSHOE
 4
    v.             CIVIL ACTION NO. 1:15cv382-HSO-JCG
 5
    VAUGHN PERRET, CHARLES LEARY &
 6  DANIEL ABEL, D/B/A TROUT POINT
    LODGE LTD OF NOVA SCOTIA & IN
 7  THEIR INDIVIDUAL CAPACITIES
    PROGRESS MEDIA GROUP LIMITED,
 8  MARILYN SMULDERS, & ASHOKA

 9

10    ****************************************

11     TELEPHONIC DEPOSITION OF CHARLES LEARY

12    ****************************************

13                   Taken at
             Doug Handshoe Home Office
14               110 Hall Street
              Wiggins, Mississippi 39577
15            on Friday, July 27th, 2018
          beginning at approximately 10:00 a.m.
16

17

18

19

20    *********************************

21              ANGELI ENGLISH
           Shorthand Reporter #1897
22              Notary Public

23

24

25
```

**Charles Leary**
**July 27, 2018**

```
                                                          Page 2
 1                A P P E A R A N C E S

 2

     For the Plaintiff:
 3
         DOUGLAS HANDSHOE, PRO SE
 4       110 Hall Street
         Wiggins, Mississippi 39577
 5       228.284.0004
         earning04@gmail.com
 6

 7

 8   For the Defendants:
     (Mr. Charles Leary)
 9
         VAUGHN PERRET, ESQUIRE (VIA TELEPHONE)
10       140 Trout Point Road,
         E. Kemptville,
11       Nova Scotia,  B5A 5X9 Canada

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Charles Leary
July 27, 2018

Page 3

1          TABLE OF CONTENTS
                                          PAGE
2

3    Title Page................................... 1

4    Appearance Page............................. 2

5    Table of Contents........................... 3

6

7

     EXAMINATION OF CHARLES LEARY
8
         By Mr. Handshoe....................... 4
9

10

     Certificate Page........................... 82
11
     Errata Sheet............................... 83
12

13

14                  E X H I B I T S

15   Exhibit 1, Text Only Order of Judge
     Gargiulo................................... 4
16
     Exhibit 2, Letter of 1/25/16 from Slabbed
17   New Media.................................. 51

18

19

20

21

22

23

24

25

**Charles Leary**
**July 27, 2018**

Page 4

1     THE WITNESS:  I also, however, want to

2   restate my objections which have already been

3   filed with the Court that, under Federal

4   Rules of Civil Procedure 30, a deposition

5   takes place where the deponent is.  I haven't

6   stipulated to anything, other than the rules

7   applying, and I'm not being sworn or deposed

8   here where I am.  So I believe that's a

9   contradiction of the Rule 30.

10     MR. HANDSHOE:  Okay.  We appreciate

11   that, Mr. Leary.  Ms. English was furnished

12   with Magistrate Judge Gargiulo's Text Only

13   Order, authorizing her to administer the

14   oath.  Your objection is on the record.

15     THE WITNESS:  Okay.

16     MR. HANDSHOE:  All right.  Thank you.

17         (EXHIBIT 1 MARKED.)

18         CHARLES LEARY

19       having been first duly sworn,

20     was examined and testified as follows:

21         EXAMINATION

22 BY MR. HANDSHOE:

23     Q.   Where I would like to start with is

24 we're going to talk about Count 5 of the third

25 amended complaint which is the misrepresentation

Charles Leary
July 27, 2018

Page 5

1    alleged under 17 U.S. Code 512(f) regarding the
2    takedown notice that you sent to YouTube.  The
3    first thing I would like to --
4        A.   I object.  I didn't send a takedown
5    notice -- to the form of the question.
6        Q.   On behalf of Trout Point Lodge you did.
7        A.   No.  It was not a takedown notice.
8        Q.   I'm sorry, Mr. Leary.  Can I get you to
9    repeat that.
10       A.   It was not a takedown notice and I'm
11   being deposed in my personal capacity.
12       Q.   Okay.  All right.  If it was not a
13   takedown notice, Mr. Leary, exactly what was it?
14       A.   I didn't personally send the takedown
15   notice or anything else.
16       Q.   Okay.  And you did not submit a
17   takedown notice on behalf of Trout Point Lodge?
18       A.   As an officer of Trout Point Lodge.
19       Q.   Okay.  As an officer of Trout Point
20   Lodge, did you submit a takedown notice to
21   YouTube?
22       A.   I'm not deposing on behalf of Trout
23   Point Lodge.
24       Q.   Okay.  All right.  So what you're
25   saying is you didn't send a takedown notice, and

**Charles Leary**
**July 27, 2018**

1  you're not going to answer the question on what

2  you did on behalf of Trout Point despite the fact

3  that Trout Point is a defendant in this matter?

4     A.   You just told me that I was back then

5  on behalf of Trout Point Lodge and I agree with

6  that.

7     Q.   Okay.  So you do agree that you were

8  acting on behalf of Trout Point Lodge.  And what

9  did you --

10    A.   No.

11    Q.   Okay.

12    A.   That was not with the takedown notice.

13    Q.   Okay.  So you deny that you sent, using

14  the web form provided by YouTube, a takedown

15  notice on February 14th, 2014 to YouTube?

16    A.   Any action was taken on behalf of Trout

17  Point Lodge.

18    Q.   So you did send a takedown notice on

19  behalf of Trout Point Lodge, correct?

20    A.   I'm not here to testify for Trout Point

21  Lodge.

22    Q.   Okay.  All right.  Let's talk a little

23  bit about the process that was used for you to

24  submit the takedown notice.  YouTube had a web

25  form that was filled out.  Can you tell me what

**Charles Leary**
**July 27, 2018**

1  your expectation was after the web form was

2  filled out and submitted to YouTube?

3      A.   I thought it might prompt you to quit

4  stealing my property or Trout Point Lodge's

5  property.

6      Q.   Okay.  And what did you expect YouTube

7  to do in response to the web form?

8      A.   That's a very open-ended question.  I

9  can't really recall.

10      Q.   Okay.  Let me ask you this:  Did

11  YouTube cause the video to be disabled?  Was the

12  video removed from publication as a result of the

13  communications between you and YouTube?

14          Mr. Leary?

15      A.   My goal was to stop you from continuing

16  to violate my copyright -- or the copyright of

17  Trout Point Lodge.

18      Q.   Okay.  All right.  And what was your

19  expectation when you sent the web form to

20  YouTube, what did you expect YouTube to do in

21  response to your complaint?

22      A.   Well, I wasn't sure.

23      Q.   Okay.  All right.  Is it true that

24  acting on behalf of Trout Point Lodge --

25      A.   (Inaudible) -- at this point I

Page 8

1   specified very specifically, as you know, the

2   seconds in the video in which the copyrighted

3   material appears.  And, I mean, it was up to you

4   to do what you wanted with that information.

5       Q.   All right.  We'll talk about the video

6   itself if you would.  The video contained

7   photographs that were published to a website

8   called Slabbed; is that not correct?

9       A.   I don't know.

10      Q.   You don't know.

11           Is it true that you sued Handshoe in

12  Canada for defamation over publications to the

13  Slabbed website in 2010, 2011 and 2012?

14      A.   No.

15      Q.   You did not sue Handshoe for defamation

16  in Canada over publications to the Slabbed

17  website in 2010, 2011 and 2012?

18      A.   No.  I don't understand the question.

19      Q.   Did you --

20      A.   I was the plaintiff in a lawsuit

21  against Douglas Handshoe in Nova Scotia Supreme

22  Court on two occasions.

23      Q.   Okay.  Now, the first occasion, what

24  did you sue -- what tort did you allege?

25      A.   Various torts.

Charles Leary
July 27, 2018

Page 9

1    Q.    The tort of defamation; was it not?

2    A.    I don't see the relevance in that.

3    Q.    I just asked you about publications to

4    the Slabbed New Media website in 2010, 2011 and

5    2012.  You indicated --

6    A.    (Inaudible.)

7    Q.    You indicated, on the record, that you

8    didn't know about these publications.  So I'm

9    asking you:  If you sued for defamation over

10   these publications I'm asking about?

11   A.    I'm sorry.  I just don't see the

12   relevance.  And you're conflating various

13   different issues.  There's no -- the 2010 action

14   has no relevance to this.

15   Q.    Well, Mr. Leary, the photograph that

16   you complained of that infringed your copyrights,

17   isn't that true that they were published to the

18   Slabbed New Media website on September 8th, 2011;

19   January 29th, 2012; December 4th, 2012; and

20   October 5th, 2012?

21   A.    I'm not sure of any dates.  I don't

22   have any documents in front of me.

23   Q.    Okay.  All right.  And it's your

24   contention that you don't know if those

25   publications exist?

Charles Leary
July 27, 2018

Page 10

1    A.    And I need to note something for the

2  record.   Whenever -- and honestly I'm not trying

3  to speak over you, but there seems to be a little

4  bit of delay, and when you're speaking and I

5  speak, it just goes to nothing.   I can't hear

6  you.   It's garbled.

7    Q.    Okay.   I --

8    A.    But I would like that noted, on the

9  record, and I'll try not to speak while you're

10  speaking.

11   Q.    Okay.   Thank you, Mr. Leary, and I'll

12  try to be cognizant of the delay on this end, as

13  well.

14        Going back to the photographs that were

15  contained in the YouTube video that you said

16  violated your copyrights.   Can you tell me at all

17  when you think they were published to the Slabbed

18  New Media website originally?

19   A.    I don't recall.

20   Q.    Okay.   You don't recall.   Okay.   So, if

21  I were to tell you, as a matter of fact, that the

22  first picture was published on September the 8th,

23  2011, in a post called:   Slabbed solves the

24  mystery on the shores of the Tusket River in Nova

25  Scotia as we reveal the Trout Point connection to

Page 11

1   the Jefferson Parish political corruption

2   scandal --

3           MR. PERRET:  Irrelevant.  I would like

4       to note that's irrelevant.

5       A.   I'll concede, Mr. Handshoe, that you

6   stole photos that belonged to Vaughn Perret,

7   myself and Trout Point Lodge and you used them on

8   your commercial website.  And you did that to

9   advance your campaign to damage us and also for

10  the commercial success of your website.

11  BY MR. HANDSHOE:

12      Q.   Now, Mr. Leary, is it not true that in

13  your counterclaims you listed every one of these

14  photographs?

15      A.   I've listed four photographs in my

16  counterclaim.

17      Q.   That's right.  And these are the

18  photographs that I'm asking you about, that they

19  were published in your counterclaims you actually

20  specifically plead these facts from 2010, 2011

21  and 2012.  Now you're telling me that it's not

22  relevant and yet you pled them yourself in your

23  counterclaims?

24      A.   Well, I'm telling you that the 2010

25  action in Nova Scotia has no relevancy, and I

Charles Leary
July 27, 2018

Page 12

1    don't know why you're bringing it up.

2        Q.    Because -- and I'll explain it to you,

3    Mr. Leary.  We need to establish the exact dates

4    that these photographs that you complained about

5    first appeared on the Slabbed New Media website.

6    Now, I understand --

7        A.    Mr. Handshoe --

8        Q.    -- that you blame me --

9             (SPEAKERS SIMULTANEOUSLY.)

10   BY MR. HANDSHOE:

11       Q.    Mr. Leary, I understand you blame me

12   but these photographs appeared on a website owned

13   by another party; did they not?

14       A.    I don't know, Mr. Handshoe.  I don't

15   understand your question.

16       Q.    Here's the question, Mr. Leary.  These

17   videos that you complain about that has your

18   pictures and the pictures themselves appeared on

19   a website called Slabbed; is that correct?

20             MR. PERRET:  Excuse me, Mr. Handshoe.

21       Are you saying that, because you stole

22       photographs and published them, somehow you

23       have a right to continue to steal Mr. Leary's

24       property?

25             MR. HANDSHOE:  Is this Mr. Leary?

**Charles Leary**
**July 27, 2018**

Page 13

```
 1          MR. PERRET:  It's Mr. Perret, his

 2     attorney, speaking.

 3          MR. HANDSHOE:  Okay.  Now,

 4     Mr. Perret --

 5          MR. PERRET:  So I'm asking you --

 6          MR. HANDSHOE:  -- you are not enrolled

 7     in this case and you are not taking part in

 8     this deposition.

 9          MR. PERRET:  I'm asking you to clarify

10     your question so that Mr. Leary can answer.

11          MR. HANDSHOE:  Okay.

12 BY MR. HANDSHOE:

13     Q.   The photographs that you complain that

14 you own the copyright on, is it true that they

15 were first published on a website called Slabbed?

16     A.   No.  They were first published

17 elsewhere.

18     Q.   Okay.  And then you claim that I,

19 Handshoe, stole those pictures and published them

20 on a website called Slabbed; is that not correct?

21     A.   Correct.

22     Q.   Okay.  All right.  Thank you.  And is

23 it not true that Slabbed is owned by Slabbed New

24 Media, LLC?

25     A.   That would call for me to speculate.
```

**Charles Leary**
**July 27, 2018**

Page 14

1    Q.   Mr. Leary, on the sidebar on the
2  website, is there not an ISSN declaration with
3  the Library of Congress which shows the copyright
4  of the website belongs to Slabbed New Media, LLC?
5           (SPEAKERS SIMULTANEOUSLY.)
6           MR. PERRET:  -- Mr. Handshoe, he's
7      already answered that.
8           THE WITNESS:  I've already answered.
9           MR. PERRET:  Asked and answered.
10           THE WITNESS:  Asked and answered.  I've
11      already said that.
12           COURT REPORTER:  Okay.  I need for
13      y'all to speak one at a time, please,
14      otherwise I can't take it down.
15           THE WITNESS:  I object to the form of
16      the question.  I've already -- I don't know
17      about the Slabbed website.
18           MR. PERRET:  The question has been
19      asked and answered.  And Mr. Leary should not
20      be badgered anymore.
21           MR. HANDSHOE:  Mr. Perret, you're not
22      authorized to take part in this deposition,
23      and I would ask that you please --
24           MR. PERRET:  You're telling me that
25      Mr. Leary does not have a right to have an

**Charles Leary**
**July 27, 2018**

Page 15

1    attorney?

2         MR. HANDSHOE:  You are not enrolled in

3    this case, Mr. Perret, and you are --

4         MR. PERRET:  I don't have to be --

5         MR. HANDSHOE: -- practicing law in

6    Mississippi without a license.

7         MR. PERRET:  I don't have to be.

8    Mr. Leary is not in Mississippi.

9         MR. HANDSHOE:  This court case is,

10   Mr. Perret.

11        THE WITNESS:  But it's part of the

12   problem that I have with this deposition

13   under Rule 30.  The deposition is supposed to

14   be taking place here and it's not.

15        MR. HANDSHOE:  All right.  Let's

16   talk --

17        THE WITNESS:  The rule of Spain governs

18   this here.

19   BY MR. HANDSHOE:

20   Q.   Let's talk about these photographs,

21   Mr. Leary, the photographs that appeared on:

22   Slabbed solves the mystery on the shores of the

23   Tusket River.  Is it not true that that post was

24   included in your first Canadian defamation case

25   against Handshoe?

Charles Leary
July 27, 2018

Page 16

1      A.    I don't know.

2      Q.    Okay.  All right.  Thank you.  Is it

3   true that --

4      A.    Mr. Handshoe, if you're going to keep

5   talking about defamation when we're talking about

6   your claim in Count 5 --

7      Q.    And what I'm trying to establish is the

8   date that these photographs were first published

9   to the Slabbed New Media website.  And I'm

10  trying -- you tell me you don't know and yet you

11  sued me, Handshoe, in Canada for defamation over

12  these posts that you now claim to be unfamiliar

13  with?

14         MR. PERRET:  What is your point,

15      Mr. Handshoe?

16         COURT REPORTER:  Okay.  I need y'all to

17      identify yourselves who is speaking.

18         MR. PERRET:  Vaughn Perret, speaking on

19      behalf of Mr. Leary.

20         What is your point, Mr. Handshoe?

21         MR. HANDSHOE:  Mr. Perret, if you

22      continue to insist on practicing law in a

23      Mississippi case, I'm going to refer you to

24      the Mississippi Supreme Court.

25         MR. PERRET:  Go ahead, Mr. Handshoe.

Charles Leary
July 27, 2018

Page 17

1        MR. HANDSHOE:  All right.

2        MR. PERRET:  I'm going to refer you to

3    the Mississippi Supreme Court, as well, for

4    practicing law without a license, claiming to

5    represent Slabbed New Media in multiple

6    litigations when you're not an attorney and

7    have no right to represent a corporation or a

8    partnership or any other kind of business

9    entity in Mississippi.

10        MR. HANDSHOE:  That's fine.

11        THE WITNESS:  And, I'm sorry.  Could

12    you restate the question because --

13 BY MR. HANDSHOE:

14    Q.   Well, again, once again, the

15 photographs that you complain about, and I'm

16 trying to establish when you first learned that

17 these photographs were on the Slabbed New Media

18 website?

19    A.   I don't recall.

20    Q.   You just don't recall.  And you don't

21 recall that you ever sued for defamation over any

22 of the posts that contain these photographs in

23 Canada?

24    A.   Well, the photographs weren't an issue.

25    Q.   That's correct.  But they --

Charles Leary
July 27, 2018

Page 18

1         (SPEAKERS SIMULTANEOUSLY.)

2     A.    -- harassment --

3   BY MR. HANDSHOE:

4     Q.    But they were contained --

5     A.    -- falsehood, defamation.   There were

6   several different causative actions as I recall.

7   Copyright is not defamation.

8     Q.    Okay.

9     A.    And we're dealing with copyright as far

10  as I can tell.

11    Q.    Okay.   Even though you didn't sue for

12  copyright infringement in that first suit,

13  Mr. Leary, is it not true the photographs were on

14  that post, the post that you sued over at that

15  time?

16    A.    It doesn't change my copyright or the

17  copyright of anyone else.

18    Q.    The photographs that you complain of

19  that were taken by Marilyn Smulders that were

20  contained in Nova Scotia Open to the World

21  magazine was published on September the 8th,

22  2011, to the Slabbed New Media website.

23         When did you learn that that photograph

24  taken by Ms. Smulders was published to the

25  Slabbed New Media website?

Charles Leary
July 27, 2018

Page 19

1      A.   I have no idea.  I don't remember.

2      Q.   Okay.  Let me ask you this, Mr. Leary:

3  What date did you get the assignment for

4  Ms. Smulders on that particular photograph --

5      A.   I don't know.

6      Q.   -- of you -- you don't recall?

7           (SPEAKERS SIMULTANEOUSLY.)

8      A.   -- need documents (inaudible) --

9  BY MR. HANDSHOE:

10     Q.   Was it in 2011?

11     A.   I don't recall.

12     Q.   Was it in 2012?

13     A.   I don't recall, Mr. Handshoe.  What's

14 important is that the rights were transferred

15 including the right to action.

16     Q.   Well, I would disagree with that,

17 Mr. Leary, because --

18     A.   (Inaudible.)

19     Q.   Let me ask you this:  When the

20 photographs were published to the Slabbed New

21 Media website, had you already received an

22 assignment on a photograph from the various

23 creators?

24     A.   It's irrelevant and I don't remember.

25     Q.   Okay.

**Charles Leary**
**July 27, 2018**

Page 20

1      A.    And, as I recall, and, again, you're

2   asking to testify on behalf of Trout Point Lodge.

3   I'm not here to do that.  To my knowledge, the

4   rights were transferred including the right to

5   action.  Therefore, anyone who has rights to

6   action in a copyright can pursue prior

7   infringement, ongoing infringement, future

8   infringement.

9      Q.    That's not what I'm questioning,

10  Mr. Leary.  I'm just trying to establish dates.

11  The date that you received the assignment versus

12  the date that it was originally published to the

13  Slabbed website.

14      A.    (Inaudible.  Speaking at the same time

15  as Mr. Handshoe.)

16           As you know, there are a lot of facts

17  out there and I do not remember.  You're asking

18  me to confirm specific dates that you're putting

19  out there and I can't do that.

20      Q.    So you don't remember any of the dates

21  is what you're telling me.  You don't remember

22  the date that you got the assignment, and you

23  don't remember the date that these photographs

24  first appeared on the Slabbed New Media website?

25      A.    No, I don't.

Charles Leary
July 27, 2018

Page 21

1    Q.    Okay.  All right.  Thank you.

2    A.    And it's irrelevant.

3    Q.    The Court will be the judge of that,

4    Mr. Leary.

5    A.    Mr. Handshoe, I wish you would refrain

6    from making these authoritative legal assertions.

7          COURT REPORTER:  I'm sorry.  Who is

8    speaking?

9          THE WITNESS:  Charles Leary.

10         COURT REPORTER:  Okay.  Thank you.

11   BY MR. HANDSHOE:

12   Q.    All right.  Mr. Leary, the video that

13   you claim infringes on your copyright, is it

14   registered --

15   A.    It's not my copyright.

16   Q.    Is it registered in the United States

17   Copyright Office?

18   A.    You're asking me to testify for Trout

19   Point Lodge, Mr. Handshoe.

20   Q.    No.  I'm actually asking you to testify

21   on your own behalf, Mr. Leary.

22         Now is it not true that the assignment

23   that you received you received in July of 2013?

24   A.    Mr. Handshoe, you're referring to

25   assignments, plural, and I have no idea what

**Charles Leary**
**July 27, 2018**

Page 22

1    you're talking about.  As far as I know, in

2    Count 5 there's one photograph at issue and again

3    I'm not Trout Point Lodge Limited.

4         Q.    No.  But you're suing for copyright

5    infringement, Mr. Leary, in your own name, over

6    these photographs that you now claim not to

7    remember anything about.

8         A.    Are we dealing with Count 5 here,

9    Mr. Handshoe?

10        Q.    Okay.  On your counterclaims,

11   Mr. Leary, paragraph 11, you --

12        A.    I'm sorry.  Are we now switching to the

13   counterclaims?

14        Q.    We are going to talk about these dates.

15   You say it's not relevant but I'm going to

16   explain to you how it is.  Is it not true that in

17   paragraph 11 of your counterclaims you wrote:

18   The submission to YouTube on February 15th, 2014,

19   did not include any attachment such as a Canadian

20   injunction.  This is denied.

21            Now, this isn't Trout Point Lodge, this

22   is Charles Leary's counterclaims.

23        A.    I'm sorry.  Which number are you

24   referring to?

25        Q.    The submission to YouTube on

**Charles Leary**
**July 27, 2018**

Page 23

```
1    paragraph 11.  This is what you wrote on
2    February 15th:  With the submission to YouTube on
3    February 15th, 2014, did not include any
4    attachment such as a Canadian injunction.  This
5    is denied.
6         A.   I'm sorry.  These are my defenses, is
7    that right, not my counterclaim?
8         Q.   No.  This -- Charles Leary's
9    counterclaims, as well as answering defenses to
10   Douglas Handshoe's third amended complaint for
11   damages, bears Bates Document Number 233, filed
12   on May the 16th, 2018.  This filing bears your
13   signature on it.  It's not Trout Point Lodge.
14   It's you.
15        A.   And, I'm sorry, what page number?
16        Q.   Page Number 4, paragraph 11.
17        A.   So that's my defenses.
18        Q.   Yes.
19        A.   Okay.  Because you said counterclaims.
20        Q.   It's contained in your answer and
21   counterclaims.  That's all on one document.  They
22   are not two documents, Mr. Leary.
23        A.   What was the question?
24        Q.   Well --
25        A.   And you have to understand, in my
```

Charles Leary
July 27, 2018

Page 24

1   defense, Mr. Handshoe, I'm responding to claims

2   that you have made.

3       Q.    Okay.  In paragraph 20 of your answer

4   and counterclaims on Page 14, you wrote:  At the

5   same time in 2011 and 2012, Handshoe and Slabbed

6   New Media began illegally downloading, copying,

7   storing and distributing copyrighted commercial

8   photographs belonging to Trout Point Lodge,

9   Vaughn Perret and Charles Leary.  All right.

10          I had asked you earlier about the posts

11  that they were contained in.  And you said that

12  wasn't relevant and yet you pled in your amended

13  complaint specific dates that you now claim not

14  to know anything about.  And I'm just trying to

15  figure out and establish direct dates, Mr. Leary.

16      A.    Okay.  I'm sorry.  What page and

17  paragraph number?

18      Q.    Paragraph 20.

19      A.    And what was your question?

20      Q.    First question:  When did you receive

21  the assignment to the copyrights?

22      A.    I don't recall.

23      Q.    Was it in July 2013?

24      A.    I don't recall.

25      Q.    You just don't recall.  Have you

Page 25

1    submitted these assignments, did you give it

2    previously to the Court?

3        A.    That's possible.  Jason Purvis

4    (phonetic) may have, but I still fail to see the

5    relevancy of it.  But go ahead and ask your

6    question.

7        Q.    Well, I'll explain the relevancy to

8    you, Mr. Leary.  In your counterclaims you say

9    that Handshoe and Slabbed New Media illegally

10   downloaded, copied and stored copyrighted

11   commercial photographs belonging to Trout Point

12   Lodge, Vaughn Perret and Charles Leary.

13           Did Marilyn Smulders' photograph belong

14   to Trout Point Lodge, Vaughn Perret and Charles

15   Leary in 2011?

16       A.    I don't recall.  I don't recall what

17   date the transfer was.

18       Q.    Did they belong to Charles Leary,

19   Vaughn Perret and Trout Point Lodge in 2012?

20       A.    They didn't belong to all three.

21       Q.    Okay.

22       A.    Mr. Handshoe, you can keep asking me

23   about the dates and you've asked me that many,

24   many times now.  I don't remember the exact

25   dates.  I'm traveling.  I don't have those

Charles Leary
July 27, 2018

1   documents with me.

2       Q.   Okay.

3       A.   But what I put into my defense and

4   counterclaims was what I believed was accurate at

5   the time I wrote that.

6       Q.   Is it true, Mr. Leary, that you

7   received the assignment to these photographs

8   after they were first published to the Slabbed

9   New Media website?

10      A.   I have no idea.  And it doesn't matter

11  because the right to action is the right to

12  action for previous infringements of copyright.

13  And, Mr. Handshoe, you're still publishing all of

14  these images on -- and you have still -- you're

15  still actively every day stealing this

16  intellectual property from third parties.  The

17  property doesn't belong to you so it's ongoing.

18      Q.   Well, Mr. Leary, would it surprise you

19  to understand or to find out that in order to

20  meet the copying requirement for copyright

21  infringement --

22      A.   I'm not here to discuss the law and

23  you're raising legal conclusions.

24           MR. PERRET:  And you're not qualified

25      as a lawyer, Mr. Handshoe.

Charles Leary
July 27, 2018

Page 27

1          MR. HANDSHOE:  Okay.  That's fine.
2          THE WITNESS:  And there's not enough
3     time for us to get into a legal argument.
4  BY MR. HANDSHOE:
5     Q.   Okay.  Let's shift gears a little bit
6  and talk about your counterclaim under
7  11 U.S. Code 362.  And this is on Page 23 of your
8  amended counterclaims.  In paragraph 67, you
9  plead -- where you were the creditor on that
10 bankruptcy proceeding:  Handshoe was also the
11 debtor in possession and a creditor in that
12 proceeding.
13          You were a creditor in that proceeding
14 and received notice in that proceeding; did you
15 not, Mr. Leary?
16    A.   I don't recall.  I recall there was an
17 issue with proper notice but on that I believe we
18 brought to the Court's attention.
19    Q.   Okay.
20    A.   As always is the case with you,
21 Mr. Handshoe, there were problems with notice.
22    Q.   Okay.  What was the name of that
23 bankruptcy case, Mr. Leary?  Was it:  In Re:
24 Handshoe, or was it In Re:  Slabbed New Media,
25 LLC?

**Charles Leary**
**July 27, 2018**

Page 28

```
 1      A.    Slabbed New Media was the entity going
 2  bankrupt.
 3      Q.    Okay.  So Slabbed New Media was the
 4  debtor in possession, correct?
 5      A.    I don't know.  I believe you were.
 6      Q.    The bankruptcy was In Re:  Slabbed New
 7  Media, LLC.  You just mentioned that and I agree
 8  with that, Mr. Leary.  The debtor in possession
 9  would therefore be Slabbed New Media, LLC,
10  correct?
11      A.    You're asking me to make legal
12  conclusions.
13      Q.    No.  That's not a legal conclusion.
14  The debtor in possession is the person who filed
15  bankruptcy.  You pled that Handshoe was also
16  debtor in possession.  Handshoe did not declare
17  bankruptcy, did he?
18      A.    Mr. Handshoe, from my perspective, the
19  entire thing was a fraud, and I have never been
20  able to quite figure out what you were doing.
21  But it was some way for you to try to avoid us
22  enforcing our Canadian judgment against you.  I
23  don't quite understand what your strategy was,
24  but, no, it's my recollection that at some point
25  in time you became the debtor in possession.
```

Charles Leary
July 27, 2018

1    But, again, I don't have anything of that in

2    front of me.  I know that, you know, this

3    judgment debt that you were awarded changed hands

4    so many times it's hard to keep track of.  That's

5    one of the things I'm trying to establish in this

6    case.

7         Q.   Okay.  All right.  And paragraph 69 and

8    68, you plead that on August the 17th, 2016, both

9    Handshoe and attorney, Jackie Truitt, were aware

10   of the 362A stay.  Truitt was a creditor in that

11   proceeding.  The case was not dismissed until

12   September the 16th.

13        In the next paragraph which is

14   paragraph 69 on Page 24, you further write:

15   Handshoe's actions that day -- speaking,

16   referring to -- you're referring back to August

17   the 17th, 2016 -- in commencing a supplementary

18   proceeding to execute on the $48,000 debt

19   belonging to Slabbed New Media's part of the

20   estate willfully violated the stay.

21        Now, Mr. Leary, we agree and you

22   mention the assignment that the judgment was

23   assigned to Slabbed New Media, LLC in what you

24   contend as a fraudulent transaction, correct?

25        A.   There were so many transactions,

Charles Leary
July 27, 2018

Page 30

 1    Mr. Handshoe, it's hard to say.

 2         Q.    Okay.  Now explain to me how the

 3    managing member of an LLC trying to collect

 4    judgment debt belonging to the LLC violates the

 5    bankruptcy stay?

 6              MR. PERRET:  Excuse me, Mr. Handshoe.

 7         This is Vaughn Perret speaking.  You're

 8         talking about corporate law of which you know

 9         not much about evidently.  You don't have the

10         right to act on behalf of your client.  Your

11         lawyer does, of your company, only your

12         lawyer does.

13              MR. HANDSHOE:  These counterclaims are

14         against me, Mr. Perret, they're not against

15         the company.  These claims are against me,

16         not the company, Mr. Perret.  And, again, I

17         would ask you to refrain from practicing law

18         without a license.

19              MR. PERRET:  Mr. Handshoe, you

20         represented to the bankruptcy court that it

21         was yours.  That it was Slabbed New Media's

22         and now you are saying -- and you have

23         represented before Judge Gargiulo that it's

24         yours.  And the contempt order that you

25         received, you lied to Judge Gargiulo about

Charles Leary
July 27, 2018

Page 31

1  the true ownership of it, so it's very hard

2  to know exactly what you're saying and hoping

3  to get because there have been so many

4  transfers.   There have been so many transfers

5  without consideration.   There have been so

6  many transfers and you've used the ownership

7  when it was to your advantage.   As

8  Mr. Handshoe, you've used the ownership for

9  Slabbed New Media when you thought it was an

10  advantage.   So there's almost no way to even

11  know how to answer you.

12        THE WITNESS:  Yes.   It's very

13  confusing.

14        MR. HANDSHOE:  Mr. Perret, this is not

15  your deposition and you're not the deponent.

16  I would again ask that you refrain --

17        MR. PERRET:  You're asking him for a

18  legal conclusion --

19        MR. HANDSHOE:  -- from interrupting.

20        MR. PERRET:  -- Mr. Handshoe.   You're

21  asking him to tell you what he can -- what

22  he's allowed under business enterprise law.

23        THE WITNESS:  I'm not --

24        MR. HANDSHOE:  I'm asking about the

25  counterclaim against me under

**Charles Leary**
**July 27, 2018**

Page 32

```
 1      11 U.S. Code 362, is what I'm asking about.
 2      And this isn't a claim --
 3          MR. PERRET:  Object to the form of the
 4      question.
 5          MR. HANDSHOE: -- against Slabbed New
 6      Media.  This is a claim against me personally
 7      that Mr. Leary personally has levied.
 8          THE WITNESS:  I object to the form of
 9      the question.  You're asking me to make a
10      legal determination.
11  BY MR. HANDSHOE:
12      Q.  Well, Mr. Leary, is it not true that
13  11 U.S. Code 362, the stay in a Chapter 11
14  bankruptcy case works to the benefit of the
15  debtor in possession?
16      A.  You're asking me to make a legal
17  conclusion.
18          MR. PERRET:  Excuse me a second.  I'm
19      going to assert some things, a legal
20      conclusion.  The stay, in fact, proves to
21      everybody, not just the debtor in possession,
22      but all those people who potentially might be
23      made whole from the proceeding that was
24      enacted.
25          THE WITNESS:  That's right.  That
```

Charles Leary
July 27, 2018

Page 33

1    includes the other creditors.

2  BY MR. HANDSHOE:

3    Q.   Okay.  So let me ask you:  How does

4  Slabbed New Media collecting a $48,000 judgment

5  hurt the creditors?  Does it not enhance the

6  bankruptcy estate, collecting money to

7  distribute?

8    A.   That's your position and, again, you're

9  asking me to make legal conclusions.

10   Q.   Okay.  All right.  On paragraph 76,

11 Page 25 of your amended counterclaims, Mr. Leary,

12 you state that, as of February the 14th, 2014,

13 Handshoe was a debtor of Leary.  Handshoe made at

14 least one transfer on March 5th, 2014, with the

15 actual intent to hinder, delay or defraud Leary

16 out of the just collection of the debt or at

17 least part of the debt.  Handshoe made the

18 transfer to Jack E. Truitt and the Truitt law

19 firm.

20        In reference to that paragraph,

21 Mr. Leary, where you alleged the fraudulent

22 transfer, did you ever file suit in state court

23 to have the transfer set aside?

24   A.   Can you restate the question in a

25 simple form, yes-or-no answer?

Page 34

1    Q.    Okay.  Sure.  You alleged that I made a

2  fraudulent transfer on March the 5th, 2014, with

3  the intent to hinder, delay or defraud you out of

4  your just collection of your debt or at least

5  part of the debt.  Did you ever file suit in

6  state court to have the transfer set aside?

7    A.    No.

8    Q.    Okay.  Thank you.

9    A.    But I don't recall when I became aware

10  of the transfer and what was occurring.

11    Q.    Okay.  I just wanted to know if you

12  ever filed suit in state court to have it set

13  aside.  All right.  Now in paragraph 80 --

14    A.    I did bring it, as I recall, to the

15  attention of the U.S. District Court.

16    Q.    That's correct.  But, again, you never

17  did file suit in state court.

18          Did you seek enforcement of your

19  judgment in federal court, Mr. Leary?

20    A.    Which judgment?

21    Q.    The February 2014 judgment.

22    A.    In federal court, no, Mr. Handshoe.  It

23  was ruled in state court.

24    Q.    State court.  Okay.  So any transfers

25  that you alleged were fraudulent transfers would

Charles Leary
July 27, 2018

Page 35

1  they not, too, belong in state court?

2      A.   You're asking me to be a lawyer,

3  Mr. Handshoe.

4      Q.   Okay.  Just asking you.  All right.

5  Now --

6      A.   We moved it to federal court and it was

7  sent back.

8      Q.   Okay.  That's true.  But you didn't

9  seek the enforcement in federal court, you sought

10  the enforcement in state court, correct?

11     A.   Asked and answered.

12     Q.   Yes.  Okay.

13     A.   I already answered that question.

14     Q.   All right.  Now on Page 27 of your

15  counterclaim for abuse of process, paragraph 81.

16  You claim that Douglas Handshoe used process

17  issues in the state of Mississippi to coerce the

18  defendant, plaintiff by counterclaim, Leary, to

19  cease his legitimate efforts to sue Handshoe for

20  defamation and copyright infringement.  Handshoe

21  subsequently processed for the improper and

22  collateral purpose of blackmailing or coercing

23  Leary into stopping his enrollment in the

24  execution upon a copyright infringement judgment

25  of the Nova Scotia Supreme Court rendered on

**Charles Leary**
**July 27, 2018**

Page 36

```
 1    February the 14th, 2014.
 2              Mr. Leary, is it true that you are a
 3    judgment debtor of Handshoe from a judgment
 4    issued by the United States District Court in
 5    2013?
 6              MR. PERRET:  You can answer that
 7        (inaudible).
 8        A.    I don't know because I don't know when
 9    you made these various transfers, Mr. Handshoe,
10    so it's very hard to say who the judgment
11    creditor was at that time.  That's part of what
12    I'm hoping we can figure out in this --
13    BY MR. HANDSHOE:
14        Q.    Did the federal court issue a
15    judgment --
16        A.    -- I'm assuming that your abuse of
17    process on various occasions by having process
18    issue, not in an effort to do what the process
19    was intended to do, but as a way to coerce me
20    into stop pursuit of my Canadian judgment of
21    $180,000 Canadian against you.
22        Q.    Okay.  Mr. Leary, is it true that a
23    federal court judgment issued in 2013 made you a
24    judgment debtor of Handshoe?
25        A.    Yes.
```

Page 37

1      Q.   Okay.  Thank you.  Now in trying --

2      A.   But, Mr. Handshoe, (inaudible) offset

3   is an issue here.

4      Q.   All right.  I appreciate that.

5      A.   I've been robbed of any opportunity for

6   offset by your abuse of process.

7      Q.   Okay.  Mr. Leary, in reference to that

8   judgment and your complaint that it's an abuse of

9   process, would a judgment -- collecting on a

10  judgment debt is abuse of process?

11     A.   I'm sorry.  Can you repeat the

12  question.

13     Q.   Okay.  Is collecting on a judgment debt

14  an abuse of process?

15     A.   That's a legal conclusion,

16  Mr. Handshoe.

17     Q.   Okay.  All right.  Now --

18     A.   Yes.  The way -- I have a judgment

19  along with Trout Point Lodge and Vaughn Perret

20  for $180,000 Canadian and more with judicial

21  interest.  That is superior to $48,000 Canadian

22  and has been at all times.

23     Q.   Okay.  Now actually, with regard to

24  your abuse of process complaints, in paragraph 55

25  on Page 21, you mention the August the 17th,

Charles Leary
July 27, 2018

Page 38

1    2016, motion with the U.S. District Court for a

2    judgment debtor exam, and you specifically plead

3    that there was no notice given to the plaintiffs

4    in that case, including Leary, of the motion.  Is

5    it not true that you had an attorney enrolled in

6    the case at that time?

7        A.   Can I just take a break for one second?

8        Q.   Sure.

9        A.   I'm just trying to find what you're

10   talking about.

11       Q.   Paragraph 55, Page 21.

12       A.   Okay.  And what was the question?

13       Q.   At the time the motion was filed on

14   August the 17th, 2016, was there not an attorney

15   enrolled in this case on your behalf?

16       A.   As far as I knew, no.

17       Q.   Okay.  You plead that the lawyer told

18   you in writing that she never received any notice

19   of process in that case; is that true?

20       A.   Yes.

21       Q.   Okay.  Now your lawyer, Ms. Barnett, I

22   believe, in that case, when did she officially

23   withdraw from this matter, from 12-cv-90, that

24   you plead in that paragraph?

25       A.   Sometime in late last year.

Charles Leary
July 27, 2018

Page 39

1    Q.   That's right, October of 2017, for the
2  month and the year, so it's true that there was
3  an attorney enrolled in this case.  And let me
4  ask you this, Mr. Leary:  In the electronic case
5  filing system --
6    A.   No, no --
7    Q.   -- the attorneys are noticed when the
8  pleading is filed; is that not correct?
9    A.   No.
10   Q.   They're not?
11   A.   No.  Ms. Barnett enrolled in error.
12  She had repeatedly requested to withdraw.  We
13  thought she had withdrawn and I made an
14  appearance pro se.  And you know that and you
15  knew my address.
16   Q.   But your testimony was that
17  Ms. Barnett --
18   A.   You --
19   Q.   -- did not withdraw until, quote,
20  unquote, late last year.
21   A.   In a pattern, you continue to try to
22  serve me in places where I'm not and you know
23  that I'm not.
24   Q.   Okay.
25   A.   And that was one of those instances.

Charles Leary
July 27, 2018

Page 40

1  Q. You also pled that Ms. Barnett said she

2 received no -- never received any notices of the

3 process in that case.  Ms. Barnett was

4 electronically noticed when the motion was filed

5 according to the --

6  A. I have no --

7  Q. -- court record; is that not correct?

8  A. I'm not Ms. Barnett.

9  Q. Okay.  All right.  You claim in

10 paragraph 56 that the lack of notice that you

11 complain about was intentional, but you've also

12 admitted that you had an attorney enrolled at the

13 time?

14  A. It was not our attorney and I was on

15 the record as pro se.

16  Q. Okay.  All right.

17  A. With an address on the bottom.

18  Q. All right.

19  A. That speaks for itself.

20  Q. It does.  Okay.  I agree.

21  A. I believe Mr. Perret's was, as well.

22  Q. So despite that, though, did the Court

23 not find you in contempt?

24  A. I don't know.

25  Q. You don't know if you are currently in

**Charles Leary**
**July 27, 2018**

Page 41

```
 1   contempt of the United States District Court?
 2        A.    You made that assertion on various
 3   occasions and various pleadings and filings, but
 4   I've gotten no notice of that.
 5        Q.    Did you not request a transcript to
 6   those hearings?
 7        A.    Yes.
 8        Q.    You did.  Okay.  And in the transcripts
 9   did it not say that you were found to be in
10   contempt?
11        A.    I don't recall the transcripts very
12   well.
13        Q.    Okay.  Thank you.
14        A.    Mr. Handshoe, I've never received
15   notice from you of anything in that case in, I
16   think, all of 2016, all of 2017.  The last
17   time -- and I didn't even receive notice of when
18   you filed a writ of garnishment motion.  I got no
19   notice of that whatsoever.  I don't know whether
20   Ms. Barnett did or not but, if so, she never
21   passed it on to us.
22             And I was astounded actually when Judge
23   Gargiulo issued an order in that case on the same
24   day as he was responding to my motion for
25   original discipline.  I was flabbergasted and
```

Charles Leary
July 27, 2018

Page 42

1    this pattern of not receiving notice has just

2    continued since then.

3        Q.    Okay.  Now we're going to move back to

4    your copyright infringement counterclaims against

5    me, Mr. Leary.  On paragraph 91 which starts on

6    the bottom of Page 29 and continues on Page 30,

7    it ends with an assertion:  That they do not and

8    did not belong to Handshoe and he had no right to

9    copy, distribute, or publish these four works.

10            Is it not true that these works were

11   actually published to Slabbed New Media's

12   website?

13       A.    It's irrelevant and --

14       Q.    No.  This is relevant.

15       A.    -- I don't understand the question.

16       Q.    You've accused -- you've counterclaimed

17   Handshoe for copyright infringement.  We're

18   trying to figure out -- you've also maintained in

19   your filings that I'm alternatively that I'm

20   vicariously liable for copyright infringement.

21   I'm just trying to establish whether or not you

22   ever sued Slabbed New Media for primary

23   infringement?

24       A.    You're the publisher.

25       Q.    That may be so, Mr. Leary, but that's

Page 43

1    not the question.  Did you ever sue Slabbed New

2    Media for primary copyright infringement?

3        A.   I sued you because you were the person

4    infringing the copyright.

5        Q.   Again, that's not responsive to the

6    question I'm asking.  I'm asking whether or not

7    you ever sued Slabbed New Media?

8        A.   No.  I have never sued Slabbed New

9    Media.

10       Q.   Okay.  Thank you, Mr. Leary.  All

11   right.  Now we're going to move on to Page 30

12   of -- and it's on the same page as paragraph 94

13   under your claims for tortious interference with

14   contractual relations.

15           You write in paragraph 94 that in an

16   effort to locate Leary and Vaughn Perret, not

17   only to serve them with process, but, also, as

18   part of his plan to intimidate them, defendant by

19   counterclaim, Handshoe, engaged a person, known

20   as MK, purportedly located in British Columbia,

21   Canada to falsely claim interest in purchasing

22   Trout Point Lodge on February the 2nd, 2017, and

23   continuing for several months thereafter.

24           Who is this person, MK?  What do those

25   initials stand for, Mr. Leary?

Charles Leary
July 27, 2018

Page 44

```
 1        A.    (Inaudible.)
 2              COURT REPORTER:  I'm sorry?
 3   BY MR. HANDSHOE:
 4        Q.    I'm sorry.  We did not understand.
 5        A.    (Inaudible.)
 6              COURT REPORTER:  Can you spell that,
 7        please.
 8              THE WITNESS:  I believe it's M-i-l-a-n.
 9        I'm not sure of the spelling of the last
10        name.  I think it's K-u-b-i-k.
11              COURT REPORTER:  Thank you.
12   BY MR. HANDSHOE:
13        Q.    Okay.  Now explain to me the connection
14   between Handshoe and MK.  It says -- you
15   specifically pleaded that Handshoe engaged this
16   person.  Exactly what proof do you have that
17   Handshoe engaged MK?
18        A.    The timing of what was occurring.
19        Q.    Okay.  The timing.  Is there anything
20   else?
21        A.    And I believe there was a connection
22   with a Slabbed nation member living in Pugwash,
23   as well.
24        Q.    Okay.  All right.  And you're saying
25   that that person is MK?
```

Charles Leary
July 27, 2018

Page 45

1    A.    No.   I'm saying there's a connection
2  between MK and that person.
3    Q.    Okay.  All right.  So, other than
4  claiming a connection between a person in
5  Pugwash, Nova Scotia and MK, there is no other
6  connection between Handshoe and MK?
7    A.    There's specific instances of the
8  timing of events that made me believe you were
9  behind Mr. MK's action.
10    Q.    Which event would those be, Mr. Leary?
11    A.    I'm sorry.  Could you repeat that.
12    Q.    Which events.  You said the timing of
13  certain events.
14    A.    The timing of people showing up at
15  Trout Point Lodge that were hired by you or by
16  others and also an attempt to discover, not
17  through court process, the assets of Trout Point
18  Lodge which -- while you were in pursuit of
19  enforcing your judgment and trying to stop us
20  from enforcing our judgment or having it set off.
21    Q.    Okay.
22    A.    And you were also -- you seemed to be
23  very upset recently about us selling our
24  business, and I believe there was also some
25  attempt to interfere with that.

**Charles Leary**
**July 27, 2018**

Page 46

```
1    Q.   With MK?
2    A.   Yes.
3    Q.   Okay.
4    A.   And in other ways.
5    Q.   All right.  Is it possible that MK was
6  just someone interested in purchasing the lodge
7  that decided not to?
8    A.   No.  The story behind MK is far too
9  bizarre to be just "pomperstance".
10   Q.   Okay.  All right.  Now --
11   A.   It's similar to things you've written
12 on print websites like Ripped Off Report.  Any
13 way you can find to try to damage our business,
14 Mr. Handshoe, you've tried to do it.
15   Q.   Okay.
16   A.   And MK was part of that.
17   Q.   Okay.  Now in paragraph 95, just
18 underneath, it says that the falsehoods that MK
19 told you caused you to lose business
20 opportunities.  Which business opportunities did
21 you lose?
22   A.   Other potential buyers.
23   Q.   Did MK ever give you any earnest money
24 for Trout Point Lodge?
25   A.   MK was constantly promising earnest
```

Page 47

1    money, providing proof of earnest money.  This

2    went on for weeks and it became less and less

3    credible as time went on, and then there were

4    attempts to find our whereabouts, other things.

5    It just happened to be at the same time you, I

6    think, were trying to serve us with some abuse of

7    process.

8        Q.    Okay.  Did MK ever make an offer in

9    writing to purchase Trout Point Lodge?

10       A.    Yes.

11       Q.    Okay.  With no earnest money?

12       A.    Earnest money was promised.

13       Q.    It was promised but it was never

14   delivered?

15       A.    That's right.

16       Q.    Okay.  All right.  Thank you.  And that

17   offer that contained no earnest money caused you

18   to stop negotiating with other parties; is that

19   your contention, Mr. Leary?

20       A.    Yes.  And to stop -- to turn away other

21   interested parties and to not to accept lower

22   offers.

23       Q.    Okay.  Now paragraph 96 talks about Bob

24   Watson who checked into Trout Point Lodge, it

25   looks like on September the 16th, 2017, to

**Charles Leary**
**July 27, 2018**

Page 48

1   disrupt normal business operations, threatened

2   violence, and impugned Leary in his goodwill in

3   the eyes of the employees.

4           Exactly what violence did Mr. Watson

5   threaten?

6       A.   His appearance and behavior.

7       Q.   Can you elaborate?

8       A.   Just the way he was dressed in black

9   leather like a biker.  He refused to identify

10  himself, provide ID, provide credit card, and

11  caused a huge scene and we had to call the

12  Mounties.

13      Q.   Okay.  Nonetheless this Bob Watson was

14  allowed to check into the lodge; was he not?

15      A.   No.  No check-in process was never

16  completed.  That's part of the problem.  He

17  refused to provide ID or credit card which, by

18  Nova Scotia law, has to be furnished.  He then --

19  when he was questioned again, he simply left,

20  fled.

21      Q.   Okay.  Did Mr. Watson try to arrange

22  for a birthday party for a larger group when he

23  was at Trout Point Lodge?

24      A.   No.

25      Q.   No.  Okay.  Now you contend that

**Charles Leary**
**July 27, 2018**

1  Mr. Watson, who was dressed like a biker gang

2  member, was hired by a bailiff service owner

3  named Steven Kennedy of Halifax, Nova Scotia?

4      A.    That's who made the original

5  reservation.

6      Q.    Okay.  All right.  And is it possible

7  that Bob Watson --

8      A.    (Inaudible.)

9      Q.    Is it possible that Bob Watson is

10  actually Steven Kennedy?

11      A.    I have no idea.

12      Q.    When Mr. Watson checked into the lodge

13  on September the 15th, 2017, were you at the

14  lodge, Mr. Leary?

15      A.    No.

16      Q.    Okay.  Is it true that you were in the

17  United States at that time, Mr. Leary?

18      A.    No.

19      Q.    Okay.  Thank you.  All right.  We're

20  going to move back now, Mr. Leary, to Count 5,

21  and we're going to try to get this put to bed.

22  Now -- I apologize.  I've got another question

23  regarding your counterclaims, and I apologize for

24  that, Mr. Leary.

25      A.    Uh-huh.

**Charles Leary**
**July 27, 2018**

Page 50

1       Q.    In your counterclaims for

2   misrepresentation under 17 U.S. Code 512(f), in

3   relation to the Amazon web services counter

4   notification, you -- and bear with me one second

5   while I get to that part of your complaint.  Here

6   we go.  Okay.  And we're on Pages 28 and 29.  In

7   paragraph 86 you state:  Handshoe filed DMCA

8   counter notifications under which he swore under

9   the penalty of perjury that he had a good faith

10  belief that his use of Leary's copyright images

11  did not constitute copyright infringement.

12          Now specifically you said Handshoe

13  filed takedown notices.  Have you seen the

14  counter notification upon which you're suing?

15      A.    I think I saw one of them possibly but

16  I can't recall clearly.

17      Q.    Okay.  Did the counter notifications

18  come from Handshoe personally or were they

19  submitted on behalf of Slabbed New Media, LLC?

20      A.    I don't know.

21      Q.    Okay.  Mr. Leary, I'm going to

22  introduce --

23      A.    I don't recall right now.

24      Q.    Okay.

25      A.    I would have to investigate it.

**Charles Leary**
**July 27, 2018**

1      (EXHIBIT 2 MARKED.)

2  BY MR. HANDSHOE:

3      Q.   Okay.  I appreciate that, Mr. Leary.

4  I'm going to introduce as Exhibit 2 a copy of a

5  letter dated January 25th, 2016, on Slabbed New

6  Media's letterhead --

7      A.   I object to the introduction of this

8  item.  I'm not where you are and you're not where

9  I am.  I don't see how exhibits can be

10 introduced.

11     Q.   It's the counter notification,

12 Mr. Leary, upon which you're suing.

13     A.   Okay.  But I'm not there, Mr. Handshoe.

14 I object.

15     Q.   Okay.  If -- I would provide you with

16 copies of these exhibits and, if these aren't the

17 exact things that you have, Mr. Leary, I count on

18 you to let me know that.

19     A.   And, Mr. Handshoe, are you saying that

20 Slabbed New Media is really the culpable party

21 here and I have sued the wrong person, and yet

22 you sue me for the actions of Trout Point Lodge.

23 Can you explain that?

24     Q.   Mr. Leary, you're taking the deposition

25 here.  I'm just asking you about the counter

Charles Leary
July 27, 2018

Page 52

1    notification that you're suing me on.  And I just

2    asked you if it was submitted by Handshoe

3    personally or by Slabbed New Media?  You claim

4    not to know or you don't recall it.  And I

5    appreciate that.  There's a lot here, a lot of

6    detail.  What I would like to do is introduce

7    into evidence the actual counter notification

8    which is on Slabbed New Media's letterhead.  I

9    believe these have previously been exhibited in

10   this --

11       A.    It was your dirty hands that typed up

12   the counter notification, Mr. Handshoe.

13       Q.    Okay.  I appreciate that.  Exhibit 2 is

14   the counter notification dated January 25th,

15   2016.

16       A.    I object to that exhibit, as well.

17       Q.    Okay.  All right.  You'll get a copy.

18       A.    Now, Mr. Handshoe, maybe if -- I don't

19   know, because I'm not a lawyer, but maybe if you

20   had wanted to give notice that you were going to

21   be introducing exhibits.  The judge specifically

22   said this was simply an oral deposition without

23   documents and you're introducing documents that

24   are in Mississippi and I'm not there.

25       Q.    I believe, Mr. Leary, your own exhibits

**Charles Leary**
**July 27, 2018**

Page 53

1    at ECF96 included this counter notification,

2    Mr. Leary.

3        A.    Okay.  I don't have access to that

4    right now, Mr. Handshoe.

5        Q.    Okay.  I understand that but I'm trying

6    to establish you plead that Handshoe did all this

7    I didn't see anything about Slabbed New Media and

8    yet the counter notification is on Slabbed New

9    Media's letterhead.  And I'm just trying to

10   understand what the claim is that you're making

11   against me.

12       A.    You're the publisher, Mr. Handshoe.

13   And, under my understanding of copyright law, if

14   you intentionally participated in the

15   counterclaim notification and knowingly did so,

16   then that's actionable.

17       Q.    Okay.  I appreciate that, Mr. Leary.

18   In reference to the takedown notices, is it

19   true --

20       A.    That's a joint liability and if maybe

21   you were in conspiracy with Slabbed New Media,

22   both of you would be culpable.

23       Q.    Okay.  Thank you, Mr. Leary.  Have you

24   ever solicited third parties to send takedown

25   notices involving content owned by the plaintiff

Page 54

1    here, Mr. Handshoe?

2        A.    No.

3        Q.    Never have.  Do you recall having

4    communications with a Mr. Dirk Van Loon on

5    October the 13th, 2011?

6        A.    No.

7        Q.    Okay.  All right.

8        A.    No.  I have no idea.

9        Q.    Okay.  Thank you.

10       A.    And, Mr. Handshoe, how is this relevant

11   to -- we're talking about the DMCA counter

12   notification?

13       Q.    Uh-huh.

14       A.    I don't understand what --

15       Q.    There have been several takedown

16   notices issued through time, Mr. Leary.  I was

17   just asking if you ever asked a third party to do

18   it?

19            MR. PERRET:  And in the context -- this

20        is Vaughn Perret speaking, I want the

21        question clarified.  Are you talking about

22        within the context of actions between you and

23        Mr. Leary, or actions Mr. Leary might have

24        had against other parties?

25            MR. HANDSHOE:  No.  This would be in

Page 55

 1    context of actions between me and Mr. Leary.

 2  BY MR. HANDSHOE:

 3    Q.   All right.  Let's talk about the video

 4  again.  We're going to go back to Count 5 of the

 5  third amended complaint against you, Mr. Leary.

 6  What do you remember about the video besides the

 7  fact that it contains a couple of what you claim

 8  were your copyrighted pictures?  Do you remember

 9  anything else about that video?

10    A.   Just that it was malicious video

11  published and made by you, once again, weaving

12  your false conspiracy theory about it.

13    Q.   Okay.  Does the video contain any --

14    A.   Part of a (inaudible) campaign to

15  damage as Judge Gargiulo found.

16    Q.   Okay.  Does the video anywhere in the

17  body of it indicate that it is a Slabbed New

18  Media, LLC production?

19    A.   I don't recall.

20    Q.   Okay.  You don't recall that.  Is it

21  true that Slabbed New Media has a registered

22  copyright on this video?

23    A.   I think you asserted that, yes, and I

24  think you did that telling the copyright office

25  that you owned 100 percent of the material in the

Charles Leary
July 27, 2018

Page 56

1   video which would not have been the case.

2       Q.    But still the question is:  Is it not

3   registered in the United States Copyright Office?

4       A.    I'm sorry.  Can you repeat the

5   question.

6       Q.    The video, upon which you complained,

7   is it true that it is registered in the United

8   States Copyright Office to Slabbed New Media,

9   LLC?

10      A.    It might fraudulently be so, yes.

11      Q.    Okay.  All right.  Thank you,

12  Mr. Leary.

13      A.    Even if it is, Mr. Handshoe, I

14  complained about your use of third party

15  intellectual property without permission in a

16  commercial video.  And it was very specific in a

17  complaint made under Canadian law from Canada to

18  YouTube about that video.  And it was very

19  specific, it was not made under the Digital

20  Millennium Copyright Act.  But, even if it was, I

21  had a good faith belief that you were infringing

22  copyright.

23      Q.    Okay.

24      A.    In fact, a judge had just determined

25  that you didn't own it, the image in question,

Charles Leary
July 27, 2018

Page 57

1    and that you were infringing copyrights.  So the

2    issue was due to content as far as I could tell.

3        Q.   So you --

4        A.   And certainly the judge's decision

5    upheld my good faith belief that you were

6    infringing copyright.  And the judge's decision

7    also makes it, in my eyes, unquestionable that

8    you knew you didn't own the image when you swore

9    out your counter notification.

10       Q.   Mr. Leary, if we could just back up to

11   your answer.  I need you to clarify something.

12   You said --

13       A.   (Inaudible) -- perjury.

14       Q.   You said that the judge found that

15   Handshoe did not own the video and committed

16   copyright infringement, correct?

17       A.   Yes.

18       Q.   Okay.  All right.  Now, if Handshoe did

19   not own the video, who did own the video?

20       A.   I'm sorry.  Wait.  Just to clarify, are

21   you talking about the video or the photograph in

22   the video?

23       Q.   I'm talking about the video, Mr. Leary.

24       A.   Except -- I don't understand.

25       Q.   Okay.  And maybe we've got our wires

**Charles Leary**
**July 27, 2018**

Page 58

```
 1   crossed.  But, again --
 2        A.    I was objecting to your use.  And I
 3   still object to your continued use of a
 4   copyrighted image that belonged to a third party
 5   that you had no permission to use that you put in
 6   the video.  And I was very specific in my
 7   complaint to YouTube and YouTube did as whatever
 8   YouTube does, they publish all over the world.
 9        Q.    Okay.  Is it not true --
10        A.    If you're making a video, I don't --
11   you know, I have no qualms with you producing
12   videos, even if they are objectionable to me, as
13   long as you don't defame me and make false
14   accusations of criminal conduct, as you always
15   do.  But you can't take the property of others
16   and use it for commercial purposes in your video.
17        Q.    All right.  What commercial purpose did
18   Handshoe use the video for?
19        A.    You're asking me to speculate.
20        Q.    No, sir.  You say --
21        A.    The video --
22        Q.    -- in your complaint that --
23        A.    -- when you said --
24        Q.    -- to counterpoint --
25        A.    -- that you put the video on YouTube
```

Charles Leary
July 27, 2018

Page 59

1    channel and you've also admitted to being the

2    person who made the video, so that it could then

3    be embedded on the commercial Slabbed website.

4         Q.   Okay.  The Slabbed -- commercial

5    Slabbed website that you talk about, does it not

6    have a Creative Commons license displayed on the

7    sidebar?

8         A.   I don't know.

9         Q.   Okay.  Would it surprise you to know

10   that the Slabbed New Media website Creative

11   Commons license is noncommercial, no derivatives?

12        A.   No.  And I don't see the relevance of

13   that.

14        Q.   You claim that the video was used

15   commercially, Mr. Leary.

16        A.   You keep asking me about this thing

17   that I've already said, I don't know, so it's

18   asked and answered.

19        Q.   I'm asking you, you claim in your

20   counterclaims and defense that the video was used

21   commercially.  I'm asking you to describe the

22   commercial activities that the video was used,

23   and you said that would cause you to speculate.

24   You don't have any concrete evidence --

25        A.   There was no doubt -- it was also found

**Charles Leary**
**July 27, 2018**

Page 60

1    by Nova Scotia Supreme Court that you were

2    engaging in commercial publishing.  You

3    personally put Slabbed New Media into a Chapter

4    11 bankruptcy.  You were in the (inaudible).

5         Q.    Again --

6         A.    (Inaudible) -- on the Slabbed website.

7    And then you changed the ownership of the website

8    to Slabbed New Media, LLC during the bankruptcy

9    proceeding, not before, not contained in the

10   judge's decision in the bankruptcy.

11        Q.    Mr. Leary, we're talking about

12   commercial activities; we're not talking about a

13   bankruptcy.  I'm asking you to describe how

14   Handshoe used the video --

15        A.    (Inaudible) -- as evidenced by the

16   bankruptcy.

17        Q.    Excuse me?

18        A.    Commercial activity as evidenced by the

19   bankruptcy, no policy, its commercial intent, and

20   you gained monies.

21        Q.    Explain --

22        A.    One day you thought you were going to

23   have an actual, you know, commercial enterprise

24   that made huge amounts of money.

25        Q.    What I need you to explain,

**Charles Leary**
**July 27, 2018**

Page 61

1   Mr. Leary --

2      A.   There was no need for ruining those --

3   you know, efforts, falsely but you should have

4   maybe gone after The Times-Picayune instead of

5   me.

6      Q.   Mr. Leary, again, and I'll ask this

7   question a different way.  You can't name a

8   single way that that video was used commercially

9   for profit, can you?

10     A.   Yes.   (Inaudible) its content is

11  commercial use.

12          COURT REPORTER:  I'm sorry?

13     A.   It's already been found by a judge in a

14  case in which Mr. Handshoe participated that the

15  use was commercial, the website is commercial.

16  And Mr. Handshoe has said that he put the video

17  on his YouTube channel so that it could be

18  published on Slabbed which is a commercial

19  website.

20  BY MR. HANDSHOE:

21     Q.   You're talking about the Slabbed New

22  Media, LLC website, correct?

23     A.   Yes.

24     Q.   Okay.  All right.

25     A.   You earn money by donations, you have a

Charles Leary
July 27, 2018

Page 62

1   Paypal account, you receive checks, you receive
2   money from Jack Truitt, you had people entreating
3   others to give you money for your publishing
4   efforts, you had advertising on your website for
5   various law firms so --
6        Q.   Can you give me a specific example --
7        A.   -- many various (inaudible) for
8   commercial activity occurring.
9        Q.   Okay.  Can you give me a specific
10  example where Slabbed New Media received a
11  donation for the video?
12       A.   That's -- in media, that's like asking
13  a subscriber to a newspaper whether they
14  subscribed to the newspaper to pay for one
15  photograph.  That's not the way it works.  But,
16  yes, people paid money for the content on Slabbed
17  New Media, and you gained money from those
18  publishing activities.  And I also believe people
19  paid or exchanged something of value to advertise
20  on your website.  And you had lots of traffic, as
21  I think you said at various times, you have lots
22  of traffic to the website.
23       Q.   I did --
24       A.   It may have gone up and down.
25       Q.   What I'm trying to do is I'm trying to

**Charles Leary**
**July 27, 2018**

Page 63

1    establish a direct causation between making money

2    and the video.  And what you're describing to me

3    are general activities not specifically related

4    to any particular posting or video; is that not

5    true?

6         A.   Mr. Handshoe, you have no right to take

7    the intellectual property of others and make a

8    video with it and then publish it to YouTube.

9    And, in this case, it was specifically, you said,

10   so that Slabbed could or it could appear on

11   Slabbed.org which is a commercial website and to

12   drive traffic to the website.

13        Q.   Do you have any evidence, Mr. Leary,

14   that Handshoe sold the video to any third

15   parties?

16        A.   I'm sorry?

17        Q.   Do you have any evidence that Handshoe

18   sold the video to any third parties?

19        A.   Yes.  And you sold to people who

20   donated money to Slabbed.

21        Q.   A donation, you know --

22        A.   To drive traffic to the website.

23        Q.   -- is a voluntary activity; is it not?

24        A.   Advertising, Mr. Handshoe.

25        Q.   Specifically which advertising?

Charles Leary
July 27, 2018

Page 64

1     A.    You described your business plan to the
2  bankruptcy court.
3     Q.    Yeah.  But what I'm trying to do is I'm
4  trying to connect specific money to the video.
5  You're alleging that Slabbed is generally
6  commercial, and I won't necessarily disagree with
7  you.  But, in terms of copyright infringement,
8  Slabbed would have had to directly made money off
9  of your work, not in a general sense, but in a
10 specific sense.
11    A.    No.  Mr. Handshoe, when you stole the
12 photographic drawing done by Chris Yount's child,
13 that was found to be infringing copyright.  The
14 judge found you didn't understand copyright when
15 you -- as soon as a creative work is created, it
16 is copyrighted by the author whether it's
17 registered or not.  You have to register it, as I
18 understand it, to take certain legal actions but
19 copyright subsists in a creative work and
20 photographs are creative work.
21          The video made your website more
22 attractive to advertisers and subscribers and
23 donators and therefore earned money.
24    Q.    Okay.
25    A.    That's commercial.

Page 65

1    Q.   All right.   Thank you.

2    A.   I assume all the content that you put

3    on the Slabbed website you do so for commercial

4    purposes.

5    Q.   Okay.   All right.

6    A.   You don't have a nonprofit corporation

7    as far as I know.

8    Q.   No.

9    A.   And that nonprofit corporation

10   certainly isn't the publisher of the Slabbed

11   website.

12   Q.   Thank you, Mr. Leary.   Moving right

13   along, in February 2012, did you voluntarily give

14   a photograph taken by Kara Crowell to the Toronto

15   Star for use in a story about litigation you had

16   filed in Canada against Handshoe?

17   A.   Kara Crowell, as an employee of Trout

18   Point Lodge, took a photograph.

19   Q.   Correct.   Did you voluntarily give it

20   to the Toronto Star?

21   A.   I assigned the rights for it to be

22   published in an article.

23   Q.   Okay.   Have you ever produced the

24   assignment for --

25   A.   (Inaudible) -- with no authorization

Page 66

1   for any other parties to take and use that

2   photograph.  And, in fact, the Toronto Star's

3   website terms and conditions prohibit anyone from

4   taking content that might belong to third parties

5   from that website.  But that's what you did.

6       Q.   I would have to disagree with your

7   characterization of the Toronto Star's terms and

8   conditions.  It protects them, not third parties.

9       A.   And it says that any user, and that's

10  you, is not authorized to take any content from

11  the website including content that might be the

12  property of third parties.  That's what I recall.

13      Q.   Okay.  Did --

14      A.   Otherwise I wouldn't have assigned or

15  limited use of the photograph to the Toronto

16  Star.

17      Q.   Okay.  What is the date of the

18  assignment that you made to the Toronto Star?

19      A.   I don't recall.

20      Q.   Have you produced such an assignment

21  for the Court?

22      A.   I believe it was an email exchange.

23      Q.   That email that you submitted just had

24  the picture attached, there was no verbiage

25  associated with it.  Is there additional

**Charles Leary**
**July 27, 2018**

Page 67

1   documents related to that submission to the

2   Toronto Star?

3        A.    I think it was an oral agreement.

4   Again, I don't remember.  It was a long time ago.

5        Q.    It was an oral agreement?

6        A.    I believe so.

7        Q.    Okay.  All right.  Thank you.

8              With regard to the Smulders photograph,

9   was that photograph taken in 2006?

10       A.    I don't recall.

11       Q.    Okay.  Did it appear in a magazine

12   called, Nova Scotia Open to the World, in their

13   winter 2006 edition?

14       A.    It appeared in Open to the World.  I

15   don't remember the date.

16       Q.    Okay.  All right.  Again, do you

17   remember anything about the assignment that you

18   got, exactly when it was dated, from

19   Ms. Smulders?

20       A.    No.

21       Q.    Okay.  All right.  Thank you.

22             Now, with regard to the Ashoka

23   photograph, did you voluntarily allow yourself to

24   be photographed by Ashoka for use in the

25   Geotourism Summit?

**Charles Leary**
**July 27, 2018**

Page 68

1    A.   It was the limited purpose of an

2 article they were writing on the National

3 Geographic Geotourism Summit.

4    Q.   Okay.  Yes.  And that was in 2010?

5    A.   Not for use by anyone else.

6    Q.   Yes.  Okay.  And that was in 2010,

7 correct?

8    A.   The Geotourism Summit was in 2010.

9    Q.   Okay.  All right.  Thank you.

10    A.   And obviously I'm not giving permission

11 to the Toronto Star or Ashoka to use my image or

12 photographic material to be set side by side with

13 false injurious statements by you or anyone else.

14 There is very limited purpose.

15    Q.   Okay.  Now, with regard to these

16 photographs and your copyright, how much money

17 have y'all made selling those photographs?

18    A.   Those photographs were used for

19 promotion purposes.  And, again, you're asking me

20 to testify on behalf of Trout Point Lodge and I

21 object to that.

22    Q.   Mr. Leary, you're suing me personally

23 for copyright infringement.  I'm just trying to

24 get a handle on what the market was for these

25 photographs.

Charles Leary
July 27, 2018

Page 69

1      A.    They have tremendous value -- I mean,
2  the Ashoka article was tremendously valuable.
3  The other photographs at issue were also used in
4  equally valuable situations, and they developed
5  goodwill which is a property.
6      Q.    Okay.  All right.  I thank you for that
7  answer.
8      A.    You want to destroy the goodwill of us
9  and our business through the use of those
10  photographs in ways which they were not intended.
11  And that's what copyright is supposed to do,
12  allow a means for protecting creative works.
13      Q.    So, other than --
14      A.    And to express oneself freely, our
15  First Amendment rights.
16      Q.    Okay.  So am I correct in saying that
17  you never offered any of these photographs for
18  sale to third parties?
19      A.    No.
20      Q.    Okay.
21      A.    They were used for marketing and
22  promotion and for me to develop business and
23  bring in revenue.
24      Q.    Okay.  Did anyone ever -- talking about
25  goodwill, anybody ever check into your business

**Charles Leary**
**July 27, 2018**

1  because they had seen you -- specifically because

2  they had seen your photograph?

3      A.   Yes.  Goodwill, you know, in terms of

4  business, Mr. Handshoe, is extremely important

5  and it's a tremendous asset.

6      Q.   And that goodwill belonged to Trout

7  Point Lodge, wouldn't it; would it not?

8      A.   Yes.  But you keep questioning me about

9  Trout Point Lodge Limited.

10     Q.   I'm just trying to figure out who's

11 bringing the claims here, Mr. Leary.  Okay.

12     A.   Mr. Handshoe, I own the U.S. rights.

13     Q.   Now --

14     A.   And your underhanded attempt to have

15 those auctioned off to (inaudible) was

16 fortunately stayed by the Court, and we'll get

17 into those issues.

18     Q.   Let's talk a little bit more about the

19 photographs themselves.  Mr. Leary, do you

20 remember much about the time that Ms. Smulders

21 came to the lodge and took the picture of

22 yourself, Mr. Perret, and Mr. Abel?

23     A.   (Inaudible.)

24         COURT REPORTER:  I'm sorry?

25     A.   I thought you said that was 2006.

Page 71

1   BY MR. HANDSHOE:

2       Q.   Yeah.  It was a long time ago.  Is

3   there anything that -- so there's really nothing

4   that sticks out special to you about that day, in

5   terms of the amount of time and effort that y'all

6   had to take, in order to make the photograph?

7       A.   It was a rare occasion in which the

8   three of us were together and it appeared in Nova

9   Scotia Open to the World magazine as a

10  promotional piece about Trout Point Lodge and it

11  was very important.

12      Q.   Can you tell me how long it took

13  Ms. Smulders to take the photograph?

14      A.   Well, I'm not Ms. Smulders.

15      Q.   Okay.  Did you have to take multiple

16  photographs?  Did it last for several hours?  Can

17  you recall?

18      A.   That's irrelevant.  Copyright subsist

19  in the photograph whether it took her ten days or

20  10 minutes.

21      Q.   That's true, Mr. Leary --

22      A.   I don't need to --

23      Q.   -- but that's a legal conclusion.  I'm

24  just trying to establish facts here.  The

25  photograph that was used in the Toronto Star that

Charles Leary
July 27, 2018

Page 72

1    was taken by Ms. Crowell, as an agent for Trout

2    Point Lodge for hire, was there anything special

3    about that photograph in terms of the time it

4    took to make it?

5         A.    You're talking about Ms. Crowell?

6         Q.    The Toronto Star photograph that was

7    taken by Ms. Crowell.  Explain how long that

8    took.  Was it an all-day photo shoot or was it

9    just --

10        A.    I don't know Ms. Crowell.  Are you

11   referring to Kara Crowell?

12        Q.    Yes.  Is that how it is pronounced?

13        A.    It's Kara Crowell.

14        Q.    Okay.  Thank you for correcting me,

15   Mr. Leary.  Did that take all day to do or was it

16   a matter of she taking that snapshot?  Was it

17   done spur-of-the-moment?  Can you describe for me

18   that process that went behind making that

19   picture?

20        A.    No.  It wasn't spur-of-the-moment.  It

21   took quite a bit of time actually.

22        Q.    It took a lot of time.  All right.  The

23   Ashoka photograph, what do you remember about

24   that in terms of the amount of time it took to

25   make that photograph?

Charles Leary
July 27, 2018

1      A.    The Geotourism Summit was one of the

2   proudest moments in our lives as business people.

3   It was an extraordinary event.  Trout Point Lodge

4   had been selected, based on documents that we had

5   submitted to National Geographic in Ashoka, as

6   tourism businesses, sustainable tourism

7   businesses, and we were extremely proud to be

8   invited to Washington D.C. to the tourism summit

9   by the National Geographic Society and Ashoka.

10  It was the result of years and years of hard work

11  and recognition for that work.  So --

12      Q.    But the actual photograph itself --

13      A.    But the value of the photograph was,

14  for us, it was extremely valuable.

15      Q.    Okay.

16      A.    Even after the National Geographic

17  Summit at which I spoke, as a delegate, Ashoka

18  wanted to interview us about being social

19  entrepreneurs and the photograph was used

20  specifically and only with that article.

21      Q.    Okay.

22      A.    We were one of the top ten finalists in

23  the world selected from, I think, almost 700

24  applications from around the world by a panel of

25  judges including a Nobel Prize winner.  And you

**Charles Leary**
**July 27, 2018**

Page 74

1   have taken that photograph and sullied it by

2   placing it next to false criminal allegations in

3   your conspiracy theory.

4       Q.   Okay.  Again, it wasn't an all-day

5   photoshoot.  You appeared, y'all took the

6   picture, and then you moved on to the next

7   activity; would that be a fair description?

8       A.   No.

9       Q.   No.  Well, explain to me the process

10  that went behind the photograph itself.  And I

11  understand how proud y'all are of being in the

12  top ten finalists and y'all are to be

13  congratulated for that.  What I'm really

14  interested in is the process behind the

15  photograph itself, how that unfolded.

16      A.   It was an interview process that took

17  quite some time.

18      Q.   Okay.  Now we've described all four

19  photographs and you've indicated that they were

20  used for promotional stories for the lodge at

21  various times; is that not correct?

22      A.   Yes.

23      Q.   Okay.  Thank you.

24      A.   And, Mr. Handshoe, I just have to say

25  you told me an hour-and-a-half and I have another

**Charles Leary**
**July 27, 2018**

Page 75

1  meeting coming up shortly.

2     Q.   I appreciate that, Mr. Leary.   There's

3  also been a considerable amount of bickering by

4  Mr. Perret that's also delayed us some, but we

5  are coming to a conclusion.   And I'll do this as

6  expeditiously as I can.

7     A.   I don't agree with that.   You've asked

8  questions repetitively.

9     Q.   With regard to the video that the

10 photographs were used in, that video contained an

11 entire series of photographs; did it not?

12    A.   As I recall, you used the photographs

13 owned by The Times-Picayune and others but I

14 can't remember how many.

15    Q.   Okay.   Well, it was a series of

16 photographs?

17    A.   The photographs belonging to either me,

18 Trout Point Lodge or Vaughn Perret.

19    Q.   Okay.   And the --

20    A.   Without permission.

21    Q.   And the montage of photographs that

22 were used, they were set to music; was it not?

23    A.   I don't know what you mean by montage.

24    Q.   The series of photographs, they were

25 set to music, were they not?

Page 76

1    A.    I don't recall.

2    Q.    Okay.  All right.

3    A.    I'm limited -- I'm only concerned about

4  the photos that belonged to me, Vaughn Perret or

5  Trout Point Lodge.

6    Q.    Okay.  I appreciate that.  Thank you.

7  All right.

8    A.    I'm not even sure I watched the video

9  with the sound on.

10   Q.    Mr. Leary, just bear with me.  I'm

11 flipping through my notes so we can get these

12 last questions out of way.  Okay.

13         Can you give me an example of a

14 particular guest coming to stay at the lodge

15 specifically because of the photographs?

16   A.    Okay.  These photographs are not

17 specific.

18   Q.    So it was the photographs in

19 combination with the text in the story, the

20 advertisement, that's what really caused people

21 to come to the lodge.  It wasn't just the

22 photographs themselves, it was the photographs

23 that were attached?

24   A.    You're making a conclusion.

25   Q.    Okay.  All right.  Okay.  So can you

Page 77

1    give me an example where someone came to the

2    lodge specifically because they had seen your

3    photographs?

4        A.    I can't remember the names but there

5    absolutely were guests.   The Ashoka publication,

6    the National Geographic publicity, people

7    recognized me.   They are people I've never met

8    who come to the lodge.

9        Q.    But those --

10       A.    (Inaudible) -- you're Charles Leary,

11   I've seen your photo.

12       Q.    Those publications, Mr. Leary, contain

13   both picture and text; do they not?

14       A.    I don't know what publications you're

15   referring to.

16       Q.    The publications that contained your

17   pictures.

18       A.    There is -- in my pictures, there were

19   the picture of me published by Ashoka was

20   published on their Changemakers website in an

21   article.   I've already stated that.

22       Q.    Okay.   Thank you.   And that would be

23   true of Ms. Smulders' photograph, as well, would

24   it not?   That those pictures --

25       A.    I'm sorry.   Could you repeat that.   And

Charles Leary
July 27, 2018

Page 78

1   I just want to state again, for the record, that

2   the method that this deposition is being taken

3   by, there's various points at which your voice

4   drops and it's not necessarily when I'm speaking.

5   So I'm not sure that there's, you know, a clear

6   record being established here.  Could you repeat

7   the last question.

8       Q.   Sure.  Again, the photographs that

9   y'all took that were being used as your basis for

10  copyright infringement, the photographs

11  themselves were also accompanied by text to make

12  the advertisement, correct?  Did the Marilyn

13  Smulders photograph, was it accompanied by a

14  story which promoted the lodge?

15      A.   Asked and answered.  I object to the

16  form of the question.

17      Q.   Okay.  All right.

18      A.   When people arrive, those photographs

19  are important.  I don't necessarily like being

20  someone who is recognized but that's part of the

21  business.  And people like to know their

22  innkeepers.  It's very important.  People arrive,

23  see me and identify me, say, you're Charles

24  Leary.

25           They want to come to meet the owners

Charles Leary
July 27, 2018

Page 79

1   who published a cookbook, who do creative things,

2   who have been recognized.  People want to know

3   their innkeepers.  When we belonged to the Relais

4   and Chateaux Association, the motto was, the soul

5   of the innkeeper.  It's very important to meet

6   your guests, be known by your guests, and for

7   people to know that they were going to have that

8   kind of experience when they come to a place like

9   Trout Point Lodge.

10      Q.   Okay.  Thank you.  How many --

11      A.   And I'm a nice-looking man,

12  Mr. Handshoe, and I believe people come because

13  I'm a nice-looking man and they've seen my

14  photographs in places like the Ashoka

15  Changemakers website and the National Geographic

16  Society Flickr page.  That's another photograph

17  you took without permission.

18      Q.   Mr. Leary, do you own the copyrights to

19  that photograph or does National Geographic --

20      A.   National Geographic does but it's my

21  image.

22      Q.   Okay.  Well, National Geographic owns

23  those rights.  All right.  Mr. Leary, how many --

24      A.   That's my image, Mr. Handshoe.

25      Q.   Mr. Leary, how many people or persons

Charles Leary
July 27, 2018

Page 80

1    have offered to purchase the copyrights to those

2    photos?  Have you ever had --

3         A.   (Inaudible.)

4         Q.   I'm sorry, Mr. Leary.  I'll ask the

5    question more succinctly.  Have y'all ever had an

6    offer to purchase the copyrights in those

7    photographs?

8         A.   (Inaudible) --

9              COURT REPORTER:  I'm sorry?

10        A.   -- those photographs that are at issue

11   in the claim.  And, Mr. Handshoe, it's now 6:40

12   here and I really have to go.

13   BY MR. HANDSHOE:

14        Q.   Okay.  Mr. Leary, so no one has offered

15   to buy the -- purchase the copyrights of those

16   photographs?

17        A.   Asked and answered.  I object.

18        Q.   The court reporter did not understand

19   your answer, Mr. Leary.  Could you please repeat

20   it.

21        A.   I object to the form of the question.

22   It's asked and answered.  I've already answered

23   this question.

24              COURT REPORTER:  I did not hear your

25        prior answer.  Sorry.

**Charles Leary**
**July 27, 2018**

Page 81

1    THE WITNESS:  Okay.  Once again, he's

2    already asked this question.  It's asked and

3    answered.  And I object to the form of the

4    question.  I've already stated that they've

5    never been for sale.

6    MR. HANDSHOE:  Okay.  Thank you,

7    Mr. Leary.  Thank you.  We did not hear that.

8    THE WITNESS:  Okay.  And that's my

9    point with this communication, just saying.

10   MR. HANDSHOE:  All right, Mr. Leary.

11   If you'll give me just one second, I would

12   just like to run back through my notes.  I

13   think that's everything but I want to make

14   double sure.

15   All right.  I think that's all I have.

16   Mr. Leary, I appreciate you taking time out

17   of your day to conduct this deposition.

18   THE WITNESS:  Okay.

19   MR. HANDSHOE:  And, if you don't have

20   anything else, we'll go ahead and end it.

21   Thank you, sir.

22   THE WITNESS:  Okay.

23   (Deposition concluded at 11:42 a.m.)

24

25

1              CERTIFICATE OF COURT REPORTER

2          I, Angeli English, Court Reporter and

3 Notary Public in and for the County of Harrison,

4 State of Mississippi, hereby certify that the

5 foregoing pages, and including this page, contain

6 a true and correct transcript of the testimony of

7 the witness, as taken by me at the time and place

8 heretofore stated, and later reduced to

9 typewritten form by computer-aided transcription

10 under my supervision and to the best of my skill

11 and ability.

12          I further certify that the witness was

13 placed under oath to truthfully answer the

14 questions in this matter.

15          I further certify that I am not in the

16 employ of or related to any counsel or party in

17 this matter, and have no interest, monetary or

18 otherwise, in the final outcome of the

19 proceedings.

20          Witness my signature and seal this the

21 19 day of August , 2018.

22

23

24 _____
ANGELI T. ENGLISH

25 My Commission Expires May 28, 2019

## Douglas Handshoe

| | |
|---|---|
| **From:** | cmecfhelpdesk@mssd.uscourts.gov |
| **Sent:** | Tuesday, July 17, 2018 10:11 AM |
| **To:** | Courtmail@mssd.uscourts.gov |
| **Subject:** | Activity in Case 1:15-cv-00382-HSO-JCG Handshoe v. Perret et al Order on Motion for Miscellaneous Relief |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**U.S. District Court**

**Southern District of Mississippi**

## Notice of Electronic Filing

The following transaction was entered on 7/17/2018 at 10:10 AM CDT and filed on 7/17/2018
**Case Name:**      Handshoe v. Perret et al
**Case Number:**      1:15-cv-00382-HSO-JCG
**Filer:**
**Document Number:** No document attached

#### Docket Text:
**TEXT ONLY ORDER granting [269] Motion to Commission Patsy Ainsworth Reporting, Inc. to Telephonically Administer Oath and Take Defendant's Oral Testimony. The parties are ordered to conduct the deposition of Defendant Leary on or before August 10, 2018 by telephonic or other remote means. Patsy Ainsworth Reporting is commissioned to administer the oath and take the testimony telephonically or by other remote means. In light of this order, [260] Motion for an Order Directed to Douglas Handshoe Regarding Service Immunity is hereby found as moot. NO FURTHER WRITTEN ORDER WILL ISSUE. Signed by Magistrate Judge John C. Gargiulo on 7/17/2018 (AG)**


**1:15-cv-00382-HSO-JCG Notice has been electronically mailed to:**

Douglas Handshoe     earning04@gmail.com

**1:15-cv-00382-HSO-JCG Notice has been delivered by other means to:**

Charles Leary
308 5th Ave E
Vancouver, BC V5T 1H4 Canada



1

Vaughn Perret(Terminated)
140 Trout Point Road
E. Kemptville, NS B5A 5X9 Canada

SLABBED NEW MEDIA, LLC

The
Alternative
New Media
for the Gulf
South

**VIA EMAIL to copyright@amazon.com**

January 25, 2016

Amazon Web Services, Copyright Agent
Amazon.com Legal Department
410 Terry Avenue North
Seattle, WA 98109-5210

RE:     AMW Notice #17352696474
        Instance Id: i-02c4a7c7
        IP Address: 54.200.139.248
        DMCA Counter notification for mistaken removal

Dear Sir or Madam:

Please find attached to this letter a list of material removed pursuant to 17 U.S.C. Section 512. This material was removed or disabled in error as a result of misidentification of the material as infringing. I declare that this is true and accurate under penalty of perjury under the laws of the United States of America.

For the purposes of this matter, I consent to the jurisdiction of the Federal District Court for the judicial district in which I reside which is the United States District Court for the Southern District of Mississippi, Southern Division. I also consent to service of process by the person providing notification under Section 512(c)(1)(C) or that person's agent for any action brought in that jurisdiction related to this 17 U.S.C. Sec. 512(g)(3) counter notification.

However, by this letter, I do not waive any other rights, including the ability to pursue a legal action against Charles Leary and Torstar Corp. for the wrongful removal or disabling of access to this material.

Having complied with the requirements of Section 512(g)(3), I will replace the blocked or removed material and cease disabling access to it on February 9, 2016 unless I am notified Mr. Leary, Mr. Perret or Torstar Corp files an action under 17 U.S.C. Section 512 in the US District Court for the Southern District of Mississippi. I will confirm for you when the material in question has been restored.

I appreciate your prompt attention to this matter. If you have any questions about this notice, please do not hesitate to contact me.

Sincerely,

Douglas Handshoe
Slabbed New Media, LLC
Post Office Box 788
Wiggins, MS 39577
(601) 928-5380


EXHIBIT
2
C. LEARY

**AWS DMCA Notice #17352696474**
**DMCA COUNTER NOTIFICATION FOR MISTAKEN REMOVAL**
**LIST OF MATERIAL REMOVED FROM SLABBED NEW MEDIA WEBSITE UNTIL FEBRUARY 9, 2016**

Files:
http://slabbed.org/wp-content/uploads/2012/01/trout-point-lodge.jpg

Posts which contain an inline link to a Torstar Corp. image, on whose behalf Leary swore he was acting:

http://slabbed.org/2012/12/04/wash-rinse-repeat-aaron-broussards-former-property-managers-in-canada-again-sue-slabbed-for-defamation-in-nova-scotia/

Please note the following items listed as infringing on the Slabbed New Media website by Leary have never appeared on the website as follows:

http://slabbed.org/wp-content/uploads/2012/01/trout-point-lodge-350x198.jpg%2C

http://slabbed.org/wp-content/uploads/2012/01/trout-point-lodge-300x199.jpg%2C