**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**



DOUGLAS HANDSHOE                                                    PLAINTIFF

VS.                                          CIVIL ACTION NO. 1:15cv382HSO-JCG

VAUGHN PERRET, CHARLES LEARY &
DANIEL ABEL, D/B/A TROUT
POINT LODGE LTD OFNOVA SCOTIA
& IN THEIR INDIVIDUAL CAPACITIES
PROGRESS MEDIA GROUP LIMITED,
MARILYN SMULDERS, TORSTAR
CORPORATION, NATIONAL
GEOGRAPHIC SOCIETY, XYZ
FOUNDATION & JOHN DOES 1-50                              DEFENDANTS

---

**DEFENDANT CHARLES LEARY'S *PRO SE* BRIEF
ON HIS BRIEF ON MOTION FOR SANCTIONS UNDER THE *MISSISSIPPI LITIGATION
ACCONTABILITY ACT* AND THE COURT'S INHERENT AUTHORITY**

---

"Some cases should be won; some cases should be lost and some cases should never have been filed."
Vazzana v. City of Greenville, 2007 WL 465634, *4 (N.D. Miss. Feb. 8, 2007). This action by Douglas

Handshoe against a variety of defendants previously positively connected with Charles Leary and his

former business falls into the latter category.

   In January of this year, Mr. Handshoe publicly admitted that he filed this lawsuit in reaction to

Leary filing and then enforcing his Canadian copyright infringement lawsuit and money damages

award in Mississippi. Referring to "that Canadian copyright judgment" Handshoe stated on Slabbed he

decided almost three years ago to engage in a "bare knuckle bar room brawl" with Leary and the other

judgment creditors. "[S]o by God I grabbed them by the belt buckle, pulled them onto a level field of

battle here in Mississippi, and gave them exactly what they wanted, for the better part of three years in

fact." (Cf. Exhibit "E" to Leary declaration). Indeed, Mr. Handshoe warned in a blog post on February

1

8, 2013—soon after Leary's Nova Scotia Supreme Court copyright lawsuit was filed--that "the goats known as Leary and Perret will likely be seeing me at the Federal Courthouse in Gulfport in a painful hell of legal entanglement soon to come."[1] He was referring to a string of litigation he filed, including this case. Apparently also referring to the instant lawsuit in his January, 2018 publication, Mr. Handshoe continued to write of trying to learn "civil procedure, learn about things such as pattern jury instructions and buy law school books on the First Amendment and Copyright law." Mr. Handshoe made claims regarding the First Amendment and copyright law in the instant action, identifying this case as part of his "bar room brawl" strategy.

Mr. Handshoe has used this court case, *not* as a *civil* means of resolving legitimate disputes, but rather as a "bar room brawl" and "a painful hell of legal entanglement." This is conduct deserving of sanctions.

Dr. Charles Leary seeks sanctions based on the Mississippi Litigation Accountability Act and/or this Court's inherent authority. *Chambers v. Nasco, Inc.*, 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2D 27 (1991). Dr. Leary invokes this Court's inherent authority at least in part due to the fact this is a relatively unusual situation involving two *pro se* litigation opponents where one has made repeated unsubstantiated, prejudicial, inflammatory, and scandalous criminal allegations about the other in his civil law pleadings, which were eventually dismissed with prejudice or found groundless in their entirety.[2] These unnecessary criminal statements were absolutely irrelevant legally to the actual causes of action in the complaint and resulted in what is now apparently unnecessary harm.[3] Mr. Handshoe

---

1   Mr. Handshoe refers to Leary (along with Vaughn Perret and Daniel Abel) as both "the girls" and "the goatherders" in his online publications.

2   Although Dr. Leary has found cases of vexatious litigants, including what some courts refer to as "frequent fliers," he has not found, after substantial research, an equivalent case where baseless criminal and conspiratorial allegations were hurled at the defendant in pleadings and briefs.

3   Courts have described "[a] *scandalous* matter" in the Rule 12(f) context as one that "improperly casts a derogatory light on someone, usually a party." *Wilkerson v. Butler*, 229 F.R.D. 166, 170 (E.D. Cal. 2007) (formatting altered) (citing *Skadegaard v. Farrell*, 578 F.Supp. 1209, 1221 (D.N.J. 1984); *Gilbert*, 56 F.R.D. at 120 n.7; *Martin v. Hunt*, 28 F.R.D. 35 (D. Mass. 1961)). See also *Weng v. Solis*, 842 F.Supp.2d 147, 160 (D.D.C. 2012) (citation omitted) ("The word `scandalous' in Rule 12(f) generally refers to any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court.") (quoting *Pigford v.*

2

published the original complaint on the internet and via a press release (cf. Leary declaration Exhibit "F"). This Court's inherent authority possesses the flexibility necessary to apply to such a situation.

"The inherent powers of the federal courts are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Nat. Gas Pipeline Co. of Am.v. Energy Gathering, Inc.,* 2 F.3d 1397, 1406 (5th Cir. 1993) (quotation marks and citation omitted). That authority includes "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO,* supra. "However, courts must exercise this inherent power with `restraint and discretion.'" *City of Alexandria v. CLECO, Corp.,* 547 F. App'x 568, 569 (5th Cir. 2013) (*Chambers,* 501 U.S. at 44). "As a general rule, a court imposing sanctions `must use the least restrictive sanction necessary to deter thee inappropriate behavior.'" *In re Hermesmeyer,* 688 Fed. Appx. 300, 305 (5th Cir. May 2, 2017) (quoting *In re First City Bancorporation of Tex. Inc.,* 282 F.3d 864, 867 (5th Cir. 2002)). "To guide a court's discretion, we have determined that finding *bad faith* is a necessary predicate to issuing an inherent power sanction." *Id.* (citing *Chaves v. M/V Medina Star,* 47 F.3d 153, 156 (5th Cir. 1995) (emphasis added). "A party shows bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Ocean-Oil Expert Witness, Inc. v. O'Dwyer,* 451 F. App'x 324, 332 (5th Cir. 2011) (internal quotations and citation omitted). A party's "inconsistent statements and misrepresentations" to the court can also support a finding of bad faith. *Johnson v. Hankook Tire Am. Corp.,* 449 F. App'x 329, 334 (5th Cir. 2011).

A brief chronology of events leading up to filing of this lawsuit by Mr. Handshoe is necessary to lay an adequate foundation for analysis of the present motion.

For the past decade, Douglas Handshoe has embodied some prominent and troubling modern

---

*Veneman,* 215 F.R.D. 2, 4 (D.D.C. 2003)); *see also Consumer Sols. REO, LLC v. Hillery,* 658 F.Supp.2d 1002 (N.D. Cal. 2009) ("Scandalous matters are allegations `that unnecessary reflect[ ] on the moral character of an individual or state[ ] anything in repulsive language that detracts from the dignity of the court.'") (quoting *Cobell v. Norton,* 229 F.R.D. 5 (D.D.C. 2005)).

trends in social media, blogging, and the Internet. He was an early proponent and activist of using online blogs, comment sections, sock puppetry, and fake news to pursue personal goals and give voice to his personal beliefs, including a belief in completely unfettered "free speech" rights and a resulting tendency to violate third party copyrights. Handshoe's intentional ignorance of copyright protections extended from illegally publishing a minor child's drawing, taken from a family court file (see *Yount v. Handshoe*, 171 So. 3d 381 (La. Ct. App. 2015)), to publishing a Times-Picayune story in its entirety without permission (cf. admission in Handshoe defence, ECF 296), and finally to publishing Leary, Vaughn Perret, and Trout Point Lodge's copyrighted images without permission in online attacks upon them (cf. Handshoe admissions made in the Third Amended Complaint, defense, and motion to dismiss).

As background to Handshoe's pronounced animus, his Mississippi home was "slabbed," i.e. destroyed to the concrete slab foundation, in Hurricane Katrina. In 2010 he began targeting Louisiana politician Aaron Broussard with damaging online commentary. During Katrina, Broussard had evacuated more than 200 drainage pump operators north to Washington Parish. The pumps remained off for more than two days. Sections of the Jefferson, including Metairie and Kenner, experienced severe flooding as a result of rain water, backflow from Lake Ponchartrain, and flood waters from the broken 17th Street Canal.

Handshoe started publishing about Leary (as well as certain co-defendants) on his blog Slabbed in January, 2010 in the context of commenting on a political corruption scandal in Louisiana involving Broussard. In April, 2011, Handshoe incorporated Slabbed New Media, LLC as a commercial entity in order to shield himself from personal liability. This Court has previously found certain facts:

> According to the parties' briefs, Broussard had, or has, some ownership interest in property in Nova Scotia, Canada. The record demonstrates that in January 2010, the Times-Picayune, a New Orleans publication, published articles regarding the Broussard corruption scandal. Those articles mentioned Trout Point Lodge, and identified Broussard as having an ownership interest in Trout Point Lodge. Plaintiffs then contacted the Times-Picayune and "pointed out factual

4

errors in [its] reporting." (Leary Aff. 2, ECF No. 17). Subsequently, the Times-Picayune issued a retraction of its identification of Broussard as an owner of Trout Point Lodge, and apologized for publishing that material. (Leary Aff. Ex. 1, ECF No.17-1). Defendant Handshoe also began publishing on "Slabbed" about Broussard and his alleged connection to Trout Point Lodge, Perret, and Leary in or about January 2010. The time line is not entirely clear from the record, but it appears that after Plaintiffs demanded the retraction from the Times-Picayune, the "Slabbed" blog was taken offline by the Times-Picayune's corporate parent, Advance Publications. Handshoe, apparently in reaction to his blog being taken offline, then began an internet campaign to damage Perret and Leary. (Case 1:12-cv-00090-LG-JMR Document 35 Filed 12/19/12).

Leary and his co-plaintiffs were ultimately unsuccessful in enforcing a 2012 Canadian defamation, injurious falsehood, and civil harassment damages judgment against Handshoe in Mississippi due to the SPEECH Act of 2010. See: *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481 (5th Cir. 2013). Nonetheless, he publishes material about them that has been found to be "derogatory, mean spirited, sexist, and homophobic." He also confects and publishes conspiracy theory. *Id.* The U.S. Court of Appeals for the Fifth Circuit described as "grotesque" Handshoe's publications that "referred to Perret and Leary as "`girls,' `blow buddies,' `queer f-g scum,' and `b-tches,' his publi[cation of] more than one reference to a gay-themed movie, and [his] post[s of]video clips of movies and music videos commonly associated with gay stereotypes." Id. Handshoe's internet campaign to damage, however, did not end in 2013, and included using copyrighted photographic images of Leary and former co-defendants in Slabbed publications.

On February 14, 2014, Nova Scotia Supreme Court rendered judgment against Handshoe for copyright infringement in the amount of $180,000 plus 5% annual judicial interest.[4] On February 18, 2014, Handshoe published on Slabbed.org that "I hear Team Goatherder is trying, via listserv, to solicit representation for a redo of the SPEECH Act case Trout Point Lodge, Charles Leary and Vaughn Perret

---

4   It is established that Handshoe "litigated the Nova Scotia lawsuit beyond making a limited appearance to challenge that court's personal jurisdiction over him, including (a) a June 6, 2013 letter to Justice Muise of the Nova Scotia Supreme Court seeking the judge's recusal; (b) a June 24, 2013 reply to Applicant's [...] Motion to Strike and Summary Disposal, (c) a June 26, 2013 Motion to Quash Applicant's Request for Cross Examination; (d) an October 21, 2013 Demand for notice, and (e) a November 26, 2013 Motion for Summary Judgment." Trout Point Lodge v. Handshoe, Hancock County Circuit Court, January 5, 2017, available at https://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=2380&context=historical.

recently lost to me in a precedent setting decision." http://slabbed.org/2014/02/18/deadbeat-judgment-debtors-they-still-owe-me-for-the-first-try/#sthash.uirP7zNV.dpbs. In fact, in February, 2014, Leary and his fellow plaintiffs were indeed interviewing attorneys to effect enforcement of the 2014 Canadian judgment in Mississippi.

In January, 2015, Handshoe transferred ownership in an attorney's fee judgment from this Court in the 2012 SPEECH Act case to Slabbed New Media, LLC. In 2016, he placed Slabbed New Media, LLC in voluntary Chapter 11 bankruptcy and named Leary as a creditor. The judgment debt from this district court was the LLC's major asset in bankruptcy. See, generally, *In re Slabbed New Media, LLC*, 557 B.R. 911 (Bankr. S.D. Miss. 2016) including footnotes.[5]

With the institution of this lawsuit in late 2015, and other lawsuits in 2013 & 2014[6], Handshoe began articulating his unsupported, false, confused, but nonetheless damaging allegations of felonious conduct previously published online to his pleadings in this case and other cases filed in 2013 and 2014. Those pleadings are scandalous; they consist of pure conspiracy theory, apparently even involving the National Geographic Society in an alleged conspiracy to silence Handshoe's investigative blogging (cf. TAC). He has failed to justify his criminal allegations through any evidence and they are completely irrelevant to his statutory claims; a reasonable person would infer they were intended to injure and prejudice.

---

5  This did not stop Mr. Handshoe, however, from claiming the debt remained in his personal name in (mis)representations made to Judge Guirola in commencing a Rule 69 proceeding in case 12-cv-90 while the bankruptcy stay was in place.

6 Mr. Handshoe has admitted filing litigation starting in 2013 as part of creating a "bare knuckle bar room brawl" and "painful hell of legal entanglement" with Dr. Leary and persons or entities associated with him. Since 2013 Handshoe has initiated the following litigation:
- Handshoe v. Doe (cf. case no. 1:2013cv00254)
- Handshoe v. Michale Coyle (Hancock County Circuit Court) (attorney Michael Coyle published a legal summary of the judicial decision of Nova Scotia Supreme Court that resulted in the SPEECH Act case in this court)
- Handshoe v. Broussard (cf. case no. 1:13-cv-00251-LG-JMR)
- Handshoe v. Abel, Yount, Loyola University, etc (cf. 1:2014cv00159)
- Handshoe v. Torstar (cf. 1:2015cv00113)
- Handshoe v. Halifax Chronicle Herald (cf. 1:2015cv00106)
- Slabbed New Media bankruptcy
- 2 removals of state court judgment enrolments to federal court
- this case

It is important background that certain of Leary's co-defendants had published positive articles about Leary, or awarded accolades to him and his nature lodge business in the years leading up to the institution of Handshoe's instant lawsuit; those articles often included photographs of Leary and other co-defendants. This included, for example:

- Former defendant, the *Toronto Star*, owned by Torstar Corporation, which published a photograph of Leary, Vaughn Perret, and their dog in an article about a legal victory over Handshoe in 2012. The *Star* also published about Handshoe's Canadian legal defeat in 2014.
- Former defendant, The National Geographic Society (NGS), which itself commissioned a photographic portrait of Leary while he was a Delegate and speaker at the 2010 Geotourism Summit at National Geographic Headquarters; the Society later published that portrait online (as a copyrighted work) in connection with publicizing the Summit.
- *Nova Scotia Open to the World* magazine, published by defendant Progress Media, which published a photograph of Leary, Perret, and former defendant Daniel Abel within an article about Trout Point Lodge; the photograph was taken by journalist Marilyn Smulders, also a defendant. Progress Media also named Trout Point Lodge one of Atlantic Canada's "Fastest Growing Companies" in 2012 and presented it with an award.
- Former defendant Ashoka, a non-profit foundation, which published a photograph of Leary and Perret within an article on the Changemakers web site about the duo as social entrepreneurs and finalists in the NGS Geotourism Competition.
- The Halifax *Chronicle-Herald* newspaper, which published on Handshoe's legal defeats in Canada in 2014 and 2012.

Handshoe has published on Slabbed all of the photographs listed above, all apparently without permission of the owners of the photographs, including Leary and his business.

Since February, 2014, Handshoe has twice sued Torstar Corporation (1:2015cv00113), has sued the Chronicle-Herald in a separate lawsuit (1:2015cv00106), and has sued NGS, Ashoka, Leary, Perret, Trout Point Lodge, and Daniel Abel. He also separately sued Daniel Abel, process server Chris Yount, Loyola University (where Abel and Perret were students), the director of Loyola's legal clinic, and a Loyola law student (1:2014cv00159). He later also sued Leary & Perret in that case while the instant case was still active. All actions have now been dismissed, either by the Court or through settlement.

Handshoe also twice removed Leary (and fellow plaintiffs') attempts to enrol their 2014 Canadian judgment in Mississippi state court to this Court based on the SPEECH Act of 2010; each

time the case was remanded (1:2014cv00241 and 1:2016cv00007). In January, 2017, Hancock County Circuit Court ruled against all of Handshoe's objections to enrolment of the Canadian judgment, and, in effect, it became a judgment of this state.

In 2017, at Handshoe's insistence and using his personal attorney, Slabbed New Media, LLC, filed a motion to intervene in this case. The motion was denied. Handshoe has amended his allegations multiple times, once without permission of the court, each time after defendants had already filed motions to dismiss the previous complaint, included of hundreds of pages of briefs and legal argument.

In September, 2017, this Court dismissed all of Handshoe's counts against Leary save for Count 5. Handshoe filed a motion to certify one of the dismissed counts for immediate appeal, which was also treated by the court as a motion for reconsideration in the alternative. The motion was denied (ECF 221). In late 2017, Handshoe sent Requests for Admission and a notice of deposition to an address he knew *not* to be Leary's address of record. He later tried to use Leary's purported deemed admissions as evidence in support of his motion for partial summary judgment on Count 5. At the same time, he sought to have Leary be deemed to have admitted to felonies including criminal conspiracy. The Requests for Admission were quashed by the Court but only after Leary filed a motion seeking that effect. In September, 2018, this Court found in favor of Leary on cross motions for summary judgment relating to Count 5, eliminating *all* of Handshoe's claims.

Handshoe has consistently rejected all of Leary's attempts to settle this case—and all controversy between them--out of court, including non-monetary settlement (cf. Leary declaration).

These and other facts will demonstrate that Handshoe was not motivated by a good faith belief in his case, or by facts that could possibly—in any combination of circumstances—even slightly support his case. Instead, he was motivated by an attempt to harass the defendants (including Leary) into ceasing their efforts to enforce their copyright infringement judgment against him in Mississippi. This case was a hammer with which to beat Leary, not a search for justice or to right some actual

wrong. This included causing Leary and his co-defendants, including non-profit institutions like NGS and Ashoka, unnecessary costs, as well as hundreds of thousands of dollars in cumulative attorney's fees in this case. This was an improper purpose under the terms of the MLAA for the initiation of this lawsuit. An additional motivation was to delay the enforcement of the copyright infringement judgment by delaying progress in this case, and to publicly embarrass the defendants, including Leary, by publicizing irrelevant (false) criminal allegations in the complaint and then sending out a press release including the complaint, which was published at various places online. Finally, Handshoe sued Ashoka, the National Geographic Society, Torstar, Progress Media, Smulders, and others as punishment for them publicly supporting or praising Leary (as well as Perret, Abel, and Trout Point Lodge).

**The Mississippi Litigation Accountability Act (MLAA)**

It is well settled that a plaintiff's *pro se* status does not give him a "license to harass others, clog the judicial machinery with meritless litigation, and abuse already overloaded court dockets." Farguson v. MBank Houston, N.A., 808 F.2d 358, 359 (5th Cir. 1986); *Brown v. DuPONT*, Civil Action No. 3: 09CV333TSL-JCS (S.D. Miss. Feb. 2, 2010).

A defendant may recover reasonable attorneys' fees and costs under the MLAA if the action was brought "without substantial justification," for the purpose of delay or harassment, or if an attorney or party "unnecessarily expanded the proceedings by other improper conduct." Miss. Code Ann. § 11-55-5(1). The statute defines "without substantial justification" as "frivolous, groundless in fact or law, or vexatious." § 11-55-3(a).

> *Black's Law Dictionary* defines vexatious as "without reasonable or probable cause or excuse; harassing; annoying." 1701 (9th ed. 2009). It defines frivolous as "lacking a legal basis or legal merit; not serious; not reasonably purposeful," and it defines bad faith as "dishonesty of belief or purpose." *Id.* At 739 & 159.

*US v. Fazzio*, Criminal Action No. 11-157 (E.D. La. Mar. 5, 2013).

"A claim is frivolous when, objectively speaking, the pleader or movant has no hope of success."

Expro Americas, LLC v. Walters, 179 So. 3d 1010, 1021 (Miss. 2015).

Under well-established precedent, this Court applies the MLAA ("The Court is aware of several cases from the Southern and Northern Districts of Mississippi that have applied the Mississippi Litigation Accountability Act ("MLAA") . . ." *ALRADAI v. RIVERHILLS BANK*, Civil Action No. 5: 06cv66-DCB-JMR (S.D. Miss. July 5, 2007), collecting cases. "[T]he Fifth Circuit has affirmed an award of fees under the MLAA by a district court, *Wolfe v. LABMD, Inc.,* 483 F. App'x 893, 895 (5th Cir. 2012)" *Payne v. University of Southern Mississippi*, Civil Action No. 1: 12-CV-41-KS-MTP (S.D. Miss. June 5, 2015). See also *MIDWEST FEEDERS, INC. v. THE BANK OF FRANKLIN*, Civil Action No. 5: 14-cv-78-DCB-MTP (S.D. Miss. Mar. 22, 2017). In Payne, *supra*, the Court specifically denied the assertion that the MLAA cannot be applied in federal court, and differentiated MLAA sanctions from Rule 11 sanctions ("These statutes do not tie the Court's power to impose sanctions to the filing of a specific document, as the Fifth Circuit interpreted Rule 11. *Edwards,* 153 F.3d at 245. Rather, they empower the Court to award fees to the "prevailing party," where a party or attorney "unnecessarily expanded the proceedings by . . . improper conduct," or where an attorney or party "multiplies the proceedings . . . unreasonably and vexatiously. . . . " ). In Alradi, *supra*, the Court was considering federal causes of action,"Equal Credit Opportunity Act and the Consumer Credit Protection Act," and it was not a removed case. Midwest Feeders was a diversity case originally filed in federal district court.[7]

The weight of case law, therefore, demonstrates that the MLAA is applied in federal court in cases originally filed in that court under federal causes of action.

The MLAA is applied by motion and does not grant a cause of action. The motion should come after the Court can make a determination of the "extent to which the party prevailed with respect to the

---

7  In *Moore v. Oliver*, Civil Action No. 3: 17-CV-408-DPJ-FKB (S.D. Miss. Oct. 24, 2018), the Court was not fully briefed on the MLAA, finding cases "cite[d] never addressed whether the MLAA applies in federal court." The Court ultimately decided, "the key question seems to be whether the MLAA is substantive or procedural; "federal law, rather than state law, invariably governs procedural matters in federal courts."" Because neither side briefed that issue, the Court denied the motion *without prejudice*. However, the Court never considered Alradi, *supra*. The Court did consider *Bryant v. Military Dept. of State of Miss.*, 381 F. Supp. 2d 586 (S.D. Miss. 2005), which was also a case of original federal jurisdiction that applied the MLAA. However, the Moore Court found that in Bryant it was "impossible to tell whether this issue was presented to those courts."

amount of and number of claims." Miss. Code Ann. § 11-55-7.

When considering whether to grant an award under the MLAA, the Court is guided by a number of factors, including those enumerated within the statute:

(a) The extent to which any effort was made to determine the validity of any action, claim or defense before it was asserted, and the time remaining within which the claim or defense could be filed;

(b) The extent to which any effort was made after the commencement of an action to reduce the number of claims being asserted or to dismiss claims that have been found not yet to be valid;

(c) The availability of facts to assist in determining the validity of the action, claim or defense;

(d) Whether or not the action was prosecuted or defended, in whole or in part, in bad faith or for improper purpose;

(e) Whether or not issues of fact, determinative of the validity of a party's claim or defense, were reasonably in conflict;

(f) The extent to which the party prevailed with respect to the amount of and number of claims or defenses in the controversy;

(g) The extent to which any new action, claim or defense was asserted by an attorney or party in a good faith attempt to establish a new theory of law in the state, which purpose was made known to the court at the time of filing;

(h) The amount or conditions of any offer of judgment or settlement in relation to the amount or conditions of the ultimate relief granted by the court;

(i) The extent to which a reasonable effort was made to determine prior to the time of filing of an action or claim that all parties sued or joined were proper parties owing a legally defined duty to any party or parties asserting the claim or action;

(j) The extent of any effort made after the commencement of an action to reduce the number of parties in the action; and

(k) The period of time available to the attorney for the party asserting any defense before such defense was interposed.

Miss. Code Ann. § 11-55-7.

The MLAA is expressly made applicable to *pro se* litigants. The Act provides the following:
No party, except an attorney licensed to practice law in this state, who is appearing without

an attorney shall be assessed attorney's fees unless the court finds that the party clearly knew *or reasonably should have known* that such party's action, claim or defense or any part of it was without substantial justification.

Miss. Code Ann. § 11-55-5(4) (emphasis added).

Miss.Code Ann. § 11-55-3(a) defines the phrase "without substantial justification":

(a) "Without substantial justification," when used with reference to any action, claim, defense, or appeal, including without limitation any motion, means that it is frivolous, groundless in fact or in law, or vexatious, as determined by the court.

Mississippi courts have not hesitated to use the MLAA against *pro se* litigants. If a litigant "knew that his appeal was without substantial justification [...] an award of attorney's fees is appropriate even though [...] a pro se litigant." *Balius v. Gaines*, 95 So. 3d 730 (Miss. Ct. App. 2012). The Supreme Court of Mississippi "affirmed an award of attorneys' fees against a pro se litigant who had brought suit against a municipal judge, *despite advice from the judge's attorney that attorneys' fees would be sought if he pursued the suit. Wheeler v. Stewart,* 798 So.2d 386 (Miss.2001)." *Wilson v. Greyhound Bus Lines, Inc.*, 830 So. 2d 1151 (Miss. 2002) (emphasis added). "[T]he bizarre allegations set out in plaintiff's complaint, coupled with plaintiff's statement in her motion to voluntarily dismiss that she has no proof to support her charge, lead the court to conclude that at the time she filed this action, Brown clearly *knew or should have known* that she had no hope of success, and therefore, that the action is frivolous." *Brown v. DuPONT*, Civil Action No. 3: 09CV333TSL-JCS (S.D. Miss. Feb. 2, 2010) (emphasis added). Mr. Handshoe has been on notice that Leary planned to invoke the MLAA since Leary's first defence was filed. He subsequently made no efforts to amend his pleadings to reduce their vexatious and harassing nature.

A claim is properly found to have been asserted for delay or harassment where a "complaint was part of a harassing tactic aimed at exacting revenge," for example, on defendants

whom the plaintiff believed had "cheated him in some way." Vazzana, *supra*, citing Weisman v. Alleco, Inc. 925 F.2d 77, 80 (4th Cir. 1991). In Weisman, the Court of Appeals found that a harassing motive alone justified sanctions. Id. Where a plaintiff "at all times had access to information demonstrating the lack of factual foundation for his [. . .] claim," the sanctions under MLAA may apply. Vazzana, supra. The Court can look for facts "indicative of purposeful harassment" including if the claims "lacked substantial justification and were instead interposed to harass" the defendants. Id.  The MLAA imposes a duty of continuing inquiry, allowing sanctions where an action, claim, or defense is not voluntarily dismissed within a "reasonable time" after a party knows or reasonably should have known that he could not prevail on the claim. Miss. Code Ann. § 11-55-5(2) (Supp. 1994). *Leaf River Forest Products, Inc. v. Deakle*, 661 So. 2d 188 (Miss. 1995). In finding harassment and/or delay, the Court may consider facts supporting "an inference of improper motivations" such as the "suit was racially or politically motivated." *Jordan v. McAdams*, 85 So. 3d 932 (Miss. Ct. App. 2012). An objective standard is applied; *Payne v. University of Southern Mississippi*, Civil Action No. 1: 12-CV-41-KS-MTP (S.D. Miss. Mar. 31, 2015). Thus, in sum, improper motivations enter into the Court's analysis, including revenge based on subjective perceptions of the plaintiff, intention to harass, political motivations, or motivations based on factors like the defendant's race.

### Applying Factors A-K
**(a) The extent to which any effort was made to determine the validity of any action, claim or defense before it was asserted, and the time remaining within which the claim or defense could be filed**

As the motion to intervene of Slabbed New Media as well as Mr. Handshoe's own admissions have made plain, he knew from the outset that he had no standing to pursue the legal claims contained in the Complaint for Damages and each of its subsequent amendments. This Court has already found as much in its decision on Leary's Motion to Dismiss. "[A]ccording to the Third

13

Amended Complaint, "Plaintiff in his personal capacity had no connection to the illustrative use of the photographs in question." *Id.* At 29." *Handshoe v. Perret*, 270 F. Supp. 3d 915 (S.D. Miss. 2017). In speaking to Slabbed's motion to intervene, the Court found:

> Plaintiff is a member or manager of, and operates, Slabbed. Slabbed has known or reasonably should have known of its interest in the case since the takedown notices were sent, or certainly by the date the original Complaint [1] was filed on November 16, 2015.

(ECF 157)

The same knowledge may be imputed to Mr. Handshoe, Slabbed's sole member, i.e. the knowledge he had no standing from the outset of this case. In addition, Handshoe amended his complaint three times, and still the claims contained in the TAC were found to be so meritless the Court found it "futile" for him to amend again (ECF 105).

On Count 11, Handshoe asked the court for equitable relief regarding a copyright infringement judgment that this Court had already twice ruled was not affected by the SPEECH Act in ordering remand (cf. Case 1:16-cv-00007-LG-RHW Document 8 Filed 02/16/16 ("Based on the explicit language of the Canadian court Order, the underlying foreign judgment is for copyright infringement. [...] [A] judgment for copyright infringement is not within the purview of the SPEECH Act."; Case 1:14-cv-00241-LG-JCG Document 22 Filed 11/24/14 ("unlike the judgment at issue in the claim previously before the Fifth Circuit and this Court, the judgment at issue here does not involve allegations of false or damaging forms of speech at all. See generally Trout Point Lodge, 729 F.3d 481. Instead, the judgment concerns purported property rights in photographic images."). Notably Hancock County Circuit Court also found "[t]he judgment of the Nova Scotia Supreme Court is not repugnant to Mississippi Law" (order, Trout Point v. Handshoe, Hancock County Circuit Court, 1/7/17). Thus Handshoe sought to re-litigate an issue that was *res judicata* thrice over.

> As this Court determined in the earlier Enforcement Action, copyright infringement does not fall within the purview of the SPEECH Act. See Enforcement Action, Order [8] at 6. The copyright claim asserted in the Canadian case did not sound in defamation. Therefore, even if this claim were in fact ripe, as Plaintiff suggests, he has still not stated a claim in Count 11 upon which relief may be granted with respect to the Copyright Judgment. The Court properly dismissed the declaratory judgment claim in Count 11 as to the Copyright Judgment. (ECF 221, page 6).

Relitigation of *res judicata* issues is an abuse of this Court's process and deserving of sanctions in this instance.

In addition, with respect to Count 5, Mr. Handshoe knew, or reasonably should have known, he had illegally taken a photograph subject to copyright from the web page of the *Toronto Star* without permission when he filed this lawsuit. As the Court found: "Handshoe admits in his Memorandum [219] in support of his request for partial summary judgment that the Photograph was 'obtained by [him] for Slabbed New Media, LLC from the Toronto Star website,' but asserts that the Toronto Star owns the copyright." Handshoe purportedly relied on an affidavit from Torstar (ECF 64-4), however that affidavit says *nothing whatsoever* about Torstar claiming ownership of the photograph, which always belonged to Trout Point Lodge, Limited. Dr. Leary repeatedly provided evidence of this, but Mr. Handshoe determined to continue with the claim.

Indeed, Handshoe was repeatedly put on notice that the *Star* did not own the photograph, not only by Leary, but also by the Supreme Court of Nova Scotia in a decision that Handshoe attached as an exhibit to his original complaint. "It [the photograph] was placed on [the Star's] website where it was accessed by Mr. Handshoe. It was used by Mr. Handshoe alongside defamatory script. I have in evidence a Certificate of Registration Copyright dated July 8, 2013 in the name of Trout Point Lodge Ltd." Trout Point Lodge Ltd. v. Handshoe, 2014 NSSC 62 (CanLII), <http://canlii.ca/t/g344w>, retrieved on 2018-10-08. The Nova Scotia Court found Handshoe had infringed Trout Point's copyright; Mr. Handshoe not only ignored that judicial

finding but then initiated this vexatious lawsuit based on facts he knew were false. Comity

favored recognition of the Canadian judgment, and indeed it has been recognized as valid by a

Mississippi state court; cf. also *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685

(Bankr. S.D.N.Y. 2010) ("U.S. courts may give *res judicata* effect to foreign judgments on the

basis of comity."); *MASSI v. Holden*, Civil File No. 09-1821 (MJD/JJG) (D. Minn. Dec. 13,

2011). In fact, U.S. federal courts have found that they may enforce Canadian copyright law and

instance of copyright infringement under that foreign law against American defendants; *Frink*

*America v. Champion Road Machinery*, 961 F. Supp. 398 (N.D.N.Y. 1997); *London Film*

*Productions v. Intercontinental Comm.,* 580 F.Supp. 47, 49 (S.D.N.Y.1984).

This Honorable Court found, "Leary completed the online YouTube form only after

receiving notification that the Nova Scotia Supreme Court had resolved a copyright infringement

claim involving the Photograph in Trout Point's favor." As one legal commentator, Professor

Eric Goldman,  has observed: "the Nova Scotia court ruling seems to be as solid evidence of the

defendant's "good faith" as I can imagine seeing in a [17 USC] 512(f) case." See: "Another

512(f) case fails: Handshoe v. Perret, Technology & Marketing Law Blog, September 29, 2018,

https://blog.ericgoldman.org/archives/2018/09/another-512f-case-fails-handshoe-v-perrett.htm,

retrieved on October 8, 2018.

The same is true for the three other photographs that were at issue in this case. In each

case, Handshoe has admitted to downloading the photographs from third parties and then

publishing them on Slabbed. He has no legal basis for arguing he did not infringe copyright, and

that has been the case during the entire pendency of this lawsuit.

It would be much too generous to, at this time, to argue that Mr. Handshoe simply has "a

plain misunderstanding of copyright law" as was the case in 2015. *Handshoe v. Abel*, Civil Action No. 1: 14-CV-159-KS-MTP (S.D. Miss. Dec. 16, 2015). Handshoe's motion for partial summary judgment (ECF 219) and recently-filed defense contains numerous admissions of having illegally copied, downloaded, and published copyrighted photographs from protected web sites. In yet, Handshoe initiated this lawsuit and also submitted DMCA counter-notifications under penalty of perjury. As he has done previously (*Handshoe v. Abel*, Civil Action No. 1: 14-CV-159-KS-MTP (S.D. Miss. Jan. 8, 2016), Mr. Handshoe, in fact, used 17 USC § 512(f) as an avenue to initiate and conduct frivolous and vexatious litigation against his legal opponents from other contexts. He knew, or reasonably should have known, that his lawsuit was hopeless—the only reason it was started and maintained was to harass the defendants, judgment creditors, including prominently Dr. Leary.

Mr. Handshoe knew from the outset that his complaint in Count 5 under 17 USC § 512(f) was baseless as the impugned copyright infringement notice sent to YouTube came from Leary acting as agent of the copyright owner, Trout Point Lodge, Limited.

Finally, Mr. Handshoe has repeatedly tried to play disingenuous games using his personal liabilities and assets versus those of Slabbed New Media, LLC in various courts in this state. He has tried to use Slabbed as a shield against personal responsibility for his actions when it suits his purposes at some given moment. However, two federal courts have held that Handshoe and Slabbed are separate entities with separate assets and liabilities. *In re Slabbed New Media*, LLC, 557 B.R. 911, 916 (Bankr. S.D. Miss. 2016) ("Handshoe and Slabbed are separate entities with separate assets and liabilities."); *Handshoe v. Perret*, 270 F. Supp. 3d 915, 929 (S.D. Miss. 2017) ("[n]or is [Handshoe] pursuing his own legal rights and interests in these Counts.  Instead, [Handshoe] is asserting the legal rights and interests of Slabbed New Media, LLC. Plaintiff lacks

17

statutory standing to assert the claims [. . .] on his own, individual behalf, and these claims will be dismissed as to all Defendants."); *Trout Point Lodge Ltd. v. Handshoe*, 2012 U.S. Dist. LEXIS 193873, at *3 n.2 (S.D. Miss. Dec. 19, 2012) ("Handshoe's pleadings refer to "Slabbed New Media, LLC" as a defendant, but Doug Handshoe is the only named defendant. Slabbed New Media, LLC is not a party to this action.").  This determination is *res judicata*.

That fact was a glaringly obvious fact when Mr. Handshoe initiated this lawsuit in his personal name. So, not only did Handshoe not determine the validity of his claims; they were objectively frivolous due to lack of standing at the outset.

This factor weighs in favor of sanctions.

**(b) The extent to which any effort was made after the commencement of an action to reduce the number of claims being asserted or to dismiss claims that have been found not yet to be valid;**

Mr. Handshoe eliminated a conspiracy cause of action that was in the original complaint, however he made no effort to eliminate or dismiss numerous other causes of action that had no hope of success, and the language of his complaint and the facts asserted in the TAC still alleged a conspiracy. Thus perhaps this factor weighs slightly in Mr. Handshoe's favor, however in full retrospect it weighs in favor of sanctions.

**(c) The availability of facts to assist in determining the validity of the action, claim or defense;**

All claims against Leary in the TAC were based on federal statutes, however Handshoe continued throughout each complaint to allege criminal acts and conspiracy. To establish standing under a particular statute, a plaintiff must satisfy both constitutional and prudential requirements. *St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 539 (5th Cir. 2009). All

18

counts in the TAC against Leary, save Count 5, were dismissed on the basis of a Motion to

Dismiss. This was largely due to lack of standing, which Handshoe himself admitted was lacking

in the TAC, and this fact was amplified when Slabbed New Media sought to intervene at

Handshoe's direction. For example, regarding Counts 1, 2, & 6, referring to the TAC, this Court

found:

> At issue were "Slabbed New Media, LLC posts" that "were published to the Slabbed New
> Media website...." *Id.* at 42.
>
> Plaintiff alleges that each Slabbed New Media, LLC post is a "self-evident non-infringing fair
> use," *id.* at 33, 35, 42, and that he had no connection to these postings in his individual capacity,
> *id.* However, Plaintiff asserts that he incurred damages when the service providers terminated
> access to the Slabbed New Media, LLC, posts that were subject to these takedown notices. *Id.* at
> 34, 36, 43-44.

Regarding Counts 4, 7, & 8, this Court has found: "As to Counts 4 and 7, the Third Amended

Complaint states that "Plaintiff Handshoe had no connection to those postings in his individual

capacity." *Id.* At 39, 46."

Therefore, the conclusion of this Court was that all the above-listed counts had to be dismissed

at the pleading stage. In yet, Handshoe himself repeatedly admitted in the TAC his own lack of

statutory standing. These facts did not change in the various amendments to the lawsuit, commenced in

2015, nor did Handshoe's pleading.

> Plaintiff's personal or individual claims in Counts 1, 2, 4, 6, 7, and 8 do not arguably fall within
> the zone of interests protected by § 512(f), as the takedown notices related to those Counts were
> directed to a third party, Slabbed's, published posts, not to those of Plaintiff individually.
> Section 512(f) therefore does not "grant [Plaintiff] the cause of action that he asserts." *Bank of
> Am. Corp.,* 137 S.Ct. at 1302; *see also Logan,* 263 F.3d 447, 460 n.9. Nor is Plaintiff pursuing
> his own legal rights and interests in these Counts. Instead, Plaintiff is asserting the legal rights
> and interests of Slabbed New Media, LLC. *See Logan,* 263 F.3d 447, 460 n.9; *see also Superior
> MRI Services, Inc.,* 778 F.3d at 504. Plaintiff lacks statutory standing to assert the claims in
> Counts 1, 2, 4, 6, 7, and 8 on his own, individual behalf, and these claims will be dismissed as
> to all Defendants.

Indeed, tellingly, as late as this year, Handshoe's evasive responses to Leary's discovery requests

repeatedly refer to Slabbed New Media, LLC as the proper party to answer admissions, interrogatories, and requests for production, once again emphasizing Handshoe's subjective knowledge that he should have never initiated this lawsuit in his personal name (ECF 253-2).

There was never substantial justification for Handshoe to file suit in his personal name—except for the fact that he did not have to pay a Mississippi attorney substantial fees for representation in a case whose true motivation was harassment. At the time he filed this action, and in each subsequent amendment, Handshoe clearly knew or should have known that he had no standing, therefore no hope of success, and therefore, that the action was frivolous. *Brown v. DuPONT, supra.* In addition, he knew he did not have permission to use the photographs in question in this case, as that issue was already *res judicata* when the initial complaint was filed; Handshoe has admitted the decision of Nova Scotia Supreme Court has *res judicata* effect in numerous filings in this case.

This factor weighs in favor of Dr. Leary and sanctions.

### (d) Whether or not the action was prosecuted or defended, in whole or in part, in bad faith or for improper purpose;

This lawsuit was filed for an improper purpose in reaction to Leary's efforts to rightfully protect copyright and to seek enforcement of his valid money judgment in Mississippi. For years now, Mr. Handshoe has attempted to bask in the purported glory of being a free speech advocate, investigative blogger, and "legal affairs" commentator within the online social media and blogging community. His constant [disingenuous] refrain is that his judicial entanglements with Leary and others stem from his inveterate pursuit of the truth over allegations he invented about Leary's alleged involvement with a 2010 corruption scandal in Jefferson Parish, Louisiana. In Mr. Handshoe's world of conspiracy theories, Leary has pursued--using civil process--him as part of a vast, international coverup of criminal activity directed by Aaron Broussard. "[S]kinned criminals trying to preserve a facade by misusing the

processes contained in the Copyright Act to silence their critics" (ECF 219 page 18).

In fact, since 2014 at least, the litigation Mr. Handshoe was responsible for initiating has been designed from the outset to violently dissuade Leary from receiving the benefit of his copyrights and his legal money judgment against Handshoe, and this includes seeking reasonable offset of Handshoe's own attorney's fee judgment against Leary (that is, if it actually still belonged to Mr. Handshoe and not Slabbed New Media, LLC; cf. Re: Slabbed New Media, supra). Consider the fact of Mr. Handshoe's countless criminal allegations beside the fact that when he deposed Leary (ECF 306-2), he did not ask a single question seeking to justify his false allegations of felonious conduct. Instead, he mailed Requests for Admission to Leary to an address he knew at the time was not Leary's address, and then attempted to use the deemed Fed.R.Civ.P. 36(a)(3) admissions --including admissions of criminal conduct—in a motion for summary judgment. If it was Mr. Handshoe's true purpose in this litigation to get at the truth of his allegations, he would have not used underhanded tactics to have Dr. Leary admit to felonies. This is strong evidence that Mr. Handshoe made these allegations in bad faith, and solely with an intention to harass.

Indicia of this bad faith and bad motivation abound:

- Publishing the complaint for damages—replete with voluminous, scandalous and irrelevant criminal allegations—as part of a press release shortly after this lawsuit was filed; this was an obvious effort to embarrass and damage Leary and his fellow defendants in the public eye (cf. exhibit to Leary declaration).[8]

---

8  See, for example: *BRIGHT VIEW TRADING CO., INC. v. Park*, No. 03 Civ. 2330 (HB) (S.D.N.Y. Sept. 16, 2004) citing Williams v. Williams, 275 N.Y.S.2d 425, 426 (2d Dep't 1966) (allegations that the defendant filed suit for the sole purpose of ruining plaintiff's business reputation and accomplished that purpose by mailing copies of the complaint to trade members properly pleaded abuse of process); *Phillips v. Murchison* 383 F.2d 370 (2d Cir.1967), *cert. denied,* 390 U.S. 958, 88 S.Ct. 1050, 19 L.Ed.2d 1154 (1968) (stating that a complaint was filed "in furtherance of a conspiracy maliciously to use the process of this Court * * *" to injure the defendant" specifically when "the contents of the complaint were published to various news media by [the defendant]. [ . . .] As in *Williams,* there existed  "misuse of legal process to accomplish an improper, collateral purpose"); *National Football League Players Assoc. v. Office and Prof. Employees Intern. Union, Local 2,* 947 F.Supp. 540, 545 (D.D.C.1996) *aff'd,* 1997 WL 362761 (D.C. Cir. May 6, 1997) (distinguishing the case from Williams, *supra,* the court found that for there to be abuse of process it had to be a case where "defendants took affirmative actions to disseminate the story of their litigation" to third parties; accord:

- Suing Torstar, Ashoka, Progress Media, Marilyn Smulders, and the National Geographic Society in this action for the purely gratuitous purpose of injuring Leary's previously positive relationship with these persons or organizations. Torstar, for example, never once sent a DMCA "takedown" notice (cf. declaration submitted by Torstar, ECF 34-4). There was no reasonable basis for suing Torstar but to injure Leary's relationship with the Toronto Star. The National Geographic Society sent a DMCA notice because "a photograph clearly displaying NGS's copyright" was being published without permission on "Slabbed's website" (ECF 15). The only reasonable explanation for involving such defendants in this litigation was to a desire punish these entities for publicly praising Leary and other co-defendants in the past. It is a reasonable inference that Smulders, Torstar, Ashoka, and Progress Media were sued simply because they had published positively about Leary, and NGS was sued because it gave him and his business a prestigious award.

- Homophobia. Motivation based on the racial origin or arguably sexual orientation of a litigation opponent can be considered as an indication of a harassing motivation. *Jordan v. McAdams*, 85 So. 3d 932 (Miss. Ct. App. 2012). This Court has already found that Handshoe published material about Leary (and Perret) that is "derogatory, mean spirited, sexist and homophobic" (Case 1:12-cv-00090-LG-JMR Document 35 Filed 12/19/12). The U.S. Court of Appeals for the Fifth Circuit referred to such publications as "grotesque" and "offensive."[9] *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481 (5th Cir. 2013). These finding were based on Handshoe publications, still live on the Internet today, such as:

  1. "Those documents clearly indicated that despite Charles Leary's public statements to the contrary, he, his wife Vaughn Perret and their sugar daddy Danny Abel were intimately involved with Broussard, as his property managers and business agents with respect to the property he owned in Canada."

  2. "Folks all I can say is Leary and his wife Vaughn Perret, owners of the Trout Point Lodge in Nova Scotia and fiscal agents for Broussard's real estate holdings at the Trout Point development have actually threatened to do what I told them they had to do originally; namely if they wanted to sue me they had better come to the US. So girls, you've been living on Slabbed lately and talking lots of trash so this is my official answer to you and rest

---

*MacPherson v. Town of Southampton*, No. 07-CV-3497 (DRH)(AKT) (E.D.N.Y. Nov. 14, 2013): "Plaintiffs fail to assert any factual allegations to indicate that the Town Defendants abused process for the purpose of harming MacPherson's reputation"); *Davidson v. Cao*, 211 F. Supp. 2d 264 (D. Mass. 2002) (stating "the First Circuit "recognize[s] that the desire to injure a business or business reputation is an improper ulterior motive sufficient to state a claim for abuse of process" and finding, "the desire to damage the reputations is collateral to the allegations in plaintiffs' complaint. [ . . .] Solely for purposes of resolving the motion to dismiss, plaintiffs' threats to publicly embarrass Folkman and his colleagues and Abbott's motive of filing the lawsuit to damage the reputations and publicly humiliate the individual scientists and Children's Hospital constitute an ulterior purpose that is sufficiently collateral to maintain, at this stage, an abuse of process claim"); *General Electric Company v. Lyon*, 894 F.Supp. 544, 552 (D.Mass.1995) (denying Rule 12(b)(6) motion to dismiss abuse of process claim, stating "when BBMC's allegations are viewed as a whole, they assert that GE is using this suit improperly to injure BBMC and the business reputation of Lyons and Anthony"); *Poduska v. Ward*, 895 F.2d 854 (1st Cir. 1990) ("In both *Datacomm Interface, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 775, 489 N.E.2d 185 (1986), and *Neuman v. Vidal*, 710 F.2d 856, 860 (D.C.Cir.1983), the courts recognized an injury to business and business reputation as an improper ulterior motive and abuse of process.").

9   "The First Amended Statement of Claim complains that Handshoe referred to Perret and Leary as "'girls,' 'blow buddies,' 'queer f-g scum,' and 'b-tches,' published more than one reference to a gay-themed movie, and posted video clips of movies and music videos commonly associated with gay stereotypes."" Trout Point Lodge, supra.

assured I have a compete series of posts coming that will explore both Karen Parker's latest revelations and soooo much more."

3. "The investors down here have never seen a dime on their money and now must be watching in horror as Leary and his psychotic wife Perret burn the business to the ground."

4. "Since I am not sharing my sources and my webhost, Automattic, does not honor court orders issued by pinhead Canadian judges against American Citizens, Perret and his wife Charles Leary are at a legal dead-end."

While the U.S. Court of Appeals found that such commentary might not rise to the level of defamation in Mississippi, it evidences Handshoe's motivation in filing suit.

- The coincidence of Leary's continuing efforts to enforce the Canadian $180,000 money judgment with the filing of this suit and the Slabbed bankruptcy is unmistakable.

- The lack of any facts—either pleaded or actual-- to support Handshoe's allegations.

- Handshoe's use of underhanded tactics—such as knowingly sending a Requests for Admissions to a faulty address and then using those Fed.R.Civ.P. 36(a)(3) deemed admissions in his motion for partial summary judgment. Also unilaterally scheduling Leary's deposition in Wiggins, MS, and then filing a motion to compel, as well as refusing to provide Leary with electronic information in PDF or hard copy format as provided for in the Case Management Order. Instead, Handshoe told Leary to come to Wiggins, MS, in his discovery responses. Finally, when Handshoe deposed Leary he made no inquiry into his litany of criminal allegations, money laundering, conspiracy, bribery, etc. This is bad faith.

- Handshoe's January 16, 2018, published admission that "I will be litigating with them [Leary, Perret, Abel, and Trout Point Lodge] until I feel they are no longer a threat to this website." Apparently, pursuing protection copyright is a "threat" to Mr. Handshoe and Slabbed (cf. exhibit to Leary declaration).

This factor weighs heavily in favor of Dr. Leary and sanctions.

### (e) Whether or not issues of fact, determinative of the validity of a party's claim or defense, were reasonably in conflict;

The lack of issues of fact in conflict has made this case one where almost the entirety of Handshoe's complaint, save Count 5, was dismissed on the basis of a motion to dismiss at the pleading stage. In addition, the Court afforded Handshoe *numerous* chances to amend to correct factual deficiencies, causing the Court to *sua sponte* forbid Handshoe from amending again in

23

September, 2017. "Plaintiff was permitted three previous opportunities to amend his pleadings in an attempt to state claims against all Defendants, and he has been unable to do so to the extent the Court has found the pending Motions to Dismiss to be meritorious." *Handshoe v. Perret*, 270 F. Supp. 3d 915 (S.D. Miss. 2017).

Furthermore, Count 5 was dismissed on cross motions for summary judgment based on briefs and affidavit evidence. Not only did the Court find that "Handshoe has not carried his initial burden of showing that he is entitled to summary judgment on his claim," the Court also found that, in opposition to Leary's motion, "Handshoe has not shown that a genuine dispute of material fact remains for trial." The Court found: "Handshoe has not come forth with competent summary judgment evidence . . ." (ECF 289).

A reasonable person, and not someone out to fulfill a vendetta, would have found this outcome predictable from the outset of this lawsuit, as already stated. However, reason was not motivating Mr. Handshoe, rather malice and bad faith was.

This factor weighs in favor of Dr. Leary.

**(f) The extent to which the party prevailed with respect to the amount of and number of claims or defenses in the controversy;**

Leary prevailed on *all* claims made against him by Mr. Handshoe.

This factor weighs heavily in favor of Dr. Leary.

**(g) The extent to which any new action, claim or defense was asserted by an attorney or party in a good faith attempt to establish a new theory of law in the state, which purpose was made known to the court at the time of filing;**

There was no good faith attempt by Mr. Handshoe to establish a new theory of law. This factor weighs in favor of sanctions.

**(h) The amount or conditions of any offer of judgment or settlement in relation to the amount or conditions of the ultimate relief granted by the court;**

Dr. Leary made a settlement offer through his attorney Jason Purvis. This was rejected. Dr. Leary, acting *pro se*, also made a settlement offer on May 7, 2018, which was met with demands for money, including the following: "If you wish to offer Slabbed New Media money to remove posts and its creative works Slabbed New Media would do so for $425,000." ($425,000 was the amount of the 2012 Nova Scotia Supreme Court judgment against Handshoe).

Leary also indicated his openness to settlement on September13, 2018, which received the following response: "I will have a writ of execution ready for you when you appear [in Mississippi]" for a settlement conference (cf. Leary declaration).

To Dr. Leary's knowledge, Mr. Handshoe has never proactively offered to settle.

This factor weighs in Dr. Leary's favor.

**(i) The extent to which a reasonable effort was made to determine prior to the time of filing of an action or claim that all parties sued or joined were proper parties owing a legally defined duty to any party or parties asserting the claim or action;**

Mr. Handshoe never contacted Dr. Leary before suing him. Dr. Leary was never a proper party, and neither—with regards to most counts-- was Mr. Handshoe. In Count 5, Dr. Leary was only acting as an officer of Trout Point Lodge, Limited. If any juridical person should have been the plaintiff, it was Slabbed New Media. However, this lawsuit should never have occurred no matter who the plaintiff.

This factor weighs in Dr. Leary's favor.

**(j) The extent of any effort made after the commencement of an action to reduce the number of parties in the action;**

Mr. Handshoe never reduced the number of defendants. He reached an out-of-court settlement with NGS. In fact, he was responsible for the decision of Slabbed New Media to file its futile motion to intervene, further complicating the litigation, raising costs and fees, wasting judicial resources, and causing delay.

This factor weighs in Dr. Leary's favor.

**k. The period of time available to the attorney for the party asserting any defense before such defense was interposed.**

This last factor appears neutral in this case. Mr. Handshoe only recently filed a defence to Leary's counterclaims.

In sum, the MLAA factors weigh heavily in favor of imposing sanctions on Mr. Handshoe for initiating and continuing to conduct this litigation until all of his claims were dismissed or were decided on summary judgment.

Dr. Leary respectfully requests that this Court impose a reasonable sanction.

RESPECTFULLY SUBMITTED, this the _____ day of DECEMBER, 2018.

CHARLES LEARY, DEFENDANT

appearing *pro se*

308 5th Ave E
Vancouver, BC V5T 1H4
Canada

802-440-0213
foodvacation@gmail.com

26

## CERTIFICATE OF SERVICE

I hereby certify that, on ___Dec 20___, 2018, I caused a true and correct copy of the above and foregoing to be filed utilizing the Court's CM/ECF electronic document filing system, which caused notice of such filing to be delivered to all counsel of record and parties requesting notice, and by United States First Class Mail, postage prepaid, to the following non-ECF participants having appeared in this action:

[none]

_____
Charles L. Leary