

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

DOUGLAS HANDSHOE                                          PLAINTIFF

VS.                                    CIVIL ACTION NO. 1:15cv382HSO-JCG

VAUGHN PERRET, CHARLES LEARY &
DANIEL ABEL, D/B/A TROUT
POINT LODGE LTD OFNOVA SCOTIA
& IN THEIR INDIVIDUAL CAPACITIES
PROGRESS MEDIA GROUP LIMITED,
MARILYN SMULDERS, TORSTAR
CORPORATION, NATIONAL
GEOGRAPHIC SOCIETY, XYZ
FOUNDATION & JOHN DOES 1-50                               DEFENDANTS

---

## COUNTERCLAIMANT CHARLES LEARY'S BRIEF ON HIS MOTION FOR SUMMARY JUDGMENT

---

When boiled down to its core, this case is about an anonymous blogger--"Sop81_1" *aka* Douglas K. Handshoe—who was unmasked in 2011 as a copyright infringer and someone who published false and injurious content about third parties on his public blog. His next move was to take his web site commercial, and to attempt to make financial gain out of sensationalist clickbait. When the counterclaimant here tried to enforce his copyright infringement money judgment against Mr. Handshoe using civil process, what he received in return is documented below. Dr. Leary suffered as a result of Handshoe's copyright infringement, wilful misrepresentations, and malicious prosecution, as did this Court in terms of time and resources.

Counterclaimant Charles Leary respectfully submits this, his memorandum brief on his Motion for Summary Judgment, to the Court. The evidence will show that this Honorable Court should grant summary judgment in favor of Dr. Leary on all extant causes of action. There are no facts reasonably in dispute, in part due to Mr. Handshoe's abundant judicial admissions and sworn statements. This brief

1

will first address the Federal law causes of action related to copyright, and then address malicious prosecution.

**Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994). .

> When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.,* 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.,* 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little,* 37 F.3d at 1075.

*Nola Fine Art, Inc. v. Ducks Unlimited, Inc.*, 88 F. Supp. 3d 602 (E.D. La. 2015).

> When, as in this case, the movant will bear the burden of proof at trial, the movant can carry its burden under Rule 56(a) by demonstrating that the undisputed facts conclusively establish each essential element of its claim. Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986).

*CAPITAL ADVISORS, LLC v. LEISURE BAY INDUSTRIES, INC.*, No. 4: 10-CV-862-A (N.D. Tex. May 25, 2011).

Summary adjudication, or partial summary judgment "upon all or any part of a claim," is appropriate where there is no genuine issue of material fact as to that portion of the claim. Fed.R.Civ.P. 56(a), (b); *see also Lies v. Farrell Lines, Inc.,* 641 F.2d 765, 769 n. 3 (9th Cir.1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim....") (internal quotation marks omitted).

## FEDERAL LAW CLAIMS

### 17 USC § 505

Dr. Leary seeks attorney's fees and costs under 17 U.S. Code § 505 related to his federal claims, including the dismissal of Mr. Handshoe's Copyright Act claims against Dr. Leary. As stated below,

Dr. Leary respectfully requests to be heard at a later date on the quantum of damages.

**17 U.S.C. § 512(f)**

The *Digital Millennium Copyright Act* (DMCA) provides a mechanism, commonly referred to as a "counter notification," through which creators or publishers of an allegedly infringing work can effectively appeal a service provider's decision to remove or otherwise disable access to the work. Similar to a takedown notice, a counter notification must include, inter alia, "a statement under penalty of perjury that the subscriber has a good faith belief that the material was removed or disabled as a result of *mistake or misidentification of the material* to be removed or disabled." 17 U.S.C. § 512(g)(3) (C) (emphasis added). Relevant to the current action, the DMCA prohibits "knowingly materially misrepresent[ing] . . . (1) that material or activity is infringing, or (2) that material or activity was removed or disabled by mistake or misidentification[.]" 17 U.S.C. § 512(f).

> To avoid liability for disabling or removing content, the service provider must notify the user of the takedown. *Id.* § 512(g)(1)-(2). The user then has the option of restoring the content by sending a counter-notification, which *must* include a statement of "good faith belief that the material was removed or disabled as a result of mistake or misidentification...." *Id.* § 512(g)(3) (C).

*Lenz v. Universal Music Corp.,* 801 F.3d 1126, 1132-33 (9th Cir. 2015) (emphasis added)

> Mistake is defined as:
>
> > 1 **:** a wrong judgment **:** misunderstanding
> >
> > 2 **:** a wrong action or statement proceeding from faulty judgment, inadequate knowledge, or inattention

Cf. https://www.merriam-webster.com/dictionary/mistake

Misidentification is defined as "incorrect or false identification"; cf. https://www.merriam-webster.com/dictionary/misidentification.

Notably, on its face, the legislation states that the "mistake" is on the part of the person submitting the infringement notice. The "misidentification" is likewise an identification of the wrong work by the person claiming infringement, i.e. "misidentification of the material." As the Senate Report

3

emphasized, a counter-notice is a document "contesting the original take down on grounds of *mistake or misidentification of the material* and requesting ``put back'' of the material that the service provider has taken down" (S. Rept. 105-190).

On January 25, 2016, Douglas Handshoe chose to submit a counter-notification to AWS under the DMCA, stating:

> This material was removed or disabled in error as a result of misidentification of the material as infringing. I declare that this is true and accurate under penalty of perjury under the laws of the United States of America.

Leary declaration supporting summary judgment, Exhibit "A"

He then identified "Charles Leary and Torstar Corp." as the persons behind notifying AWS of material that was infringing and blamed them "for the wrongful removal or disabling access to this material."[1] Nowhere was there any expression of any "good faith belief" on the part of Handshoe, in contravention of 17 USC § 512(g)(3)(C). Nonetheless § 512(f) only requires specifically a knowing misrepresentation "that material or activity was removed or disabled by mistake or misidentification."

In 2014, Nova Scotia Supreme Court had found Mr. Handshoe had infringed copyright in four photographic works on the commercial web site Slabbed, including a photograph of Trout Point Lodge that was the topic of Handshoe's counter-notification to AWS.[2] See Order [9-1] at 2. This was a final judicial decision of a court of competent jurisdiction under the *Copyright Act* of Canada. Mr. Handshoe in his defense in this case admits to copyright infringement (see below) but argues he is not legally liable for such for a variety of reasons, including purported fair use.

In a removed case, Handshoe argued before this Court in 2014 that the Canadian final judgment should not be recognized as a valid judgment in Mississippi. On granting remand to state court, this

---

1   Torstar never submitted any DMCA takedown notices to AWS (cf. Torstar declaration on its motion to dismiss). Torstar also never owned the intellectual property rights to any images in question in this lawsuit. Mr. Handshoe appears to have been confused and sued Torstar without any justification.

2   "The evidence also satisfies me that all of the photographs were the property of the applicants when utilized by Mr. Handshoe. I am also satisfied that the individual applicants complained to Mr. Handshoe who ignored their concerns and their rights in the photographs." Nova Scotia court decision, Trout Point Lodge Ltd. v. Handshoe, 2014 NSSC 62.

Court found: "It will be for the Mississippi state court to decide whether the Canadian court had jurisdiction and whether its judgment is valid and enforceable in the United States in accordance with the principle of comity" (Case 1:14-cv-00241-LG-JCG Document 22 Filed 11/24/14 Page 6 of 7). Ultimately, in January, 2017, the Mississippi state court found the judgment was valid and enforceable, and that Handshoe had willingly submitted to the jurisdiction of Nova Scotia Supreme Court. Cf. Leary declaration.  Handshoe did not appeal that decision.

In January, 2016, Leary submitted a copyright infringement complaint to Slabbed's service provider AWS ("Amazon Web Services") under the Canada *Copyright Act* regarding the four works identified in that decision.[3] AWS acted to remove public access to the photographs. Instead of disabling public access, however, Handshoe moved the photographs to a new location online, http://slabbed.org/wp-content/uploads/2012/01/DMCA_SUSPENSE/. *Id.* When Leary drew AWS attention to the fact that the public access was not actually disabled, the photographs appear to have been briefly removed from publication. *Id.*

AWS soon told Leary there was "a valid *DMCA counter notice* obtained and forwarded along" (emphasis added). *Id.* The DMCA counter-notification described above was received by Leary. In that notice, Handshoe swore under penalty of perjury (17 USC 512(f)) that access had been disabled due to "misidentification" of the "material as infringing."

The U.S. Court of Appeals for the Ninth Circuit has decided that "fair use" must be considered as part of the "good faith belief" requirement of 17 USC 512(f) with regards to infringement notices, but not counter-notifications; Lenz, *supra.* The vast majority of 512(f) cases are not counter-notification cases, but rather cases of alleged misrepresentation in infringement notices. *Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34 (S.D.N.Y. 2017) was counter-notice case. The Court found: "It is clear to this Court that the same subjective standard should apply to the "good faith belief" requirement for

---

3   At ECF 245, p. 10 & 11, Handshoe admits Leary's notice was under the Canada Copyright Act.

counter notifications." However, in that case the required "good faith belief" was actually made.

As this Court has previously found in this case, the U.S. Court of Appeals for the Fifth Circuit has not spoken on the issue of 512(f) and fair use. Courts generally, including the United States Supreme Court, have emphasized that fair use is an affirmative defense, nothing more, i.e. it does not create positive rights. "Fair use is an affirmative defense" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 114 S. Ct. 1164, 127 L. Ed. 2D 500 (1994) at 590. "[B]inding Supreme Court authority requires us to treat fair use as an affirmative defense." *Latimer v. Roaring Toyz, Inc.*, *supra*. As such, "doubts about whether a given use is fair should *not* be resolved in favor of the *self-proclaimed*" infringer (Acuff-Rose, *supra*, at 599, concurring opinion, emphasis added).

A major distinction between misrepresentation in an infringement notice and a counter-notification is Congress' use of the phrase "mistake or misidentification" regarding counter-notifications. Another piece of legislation that uses the same phrase is Fed.R.Civ.P. 15(c). Relation back is allowed if there is an error by the plaintiff regarding the name or identity of the proper party.

> This rule "is meant to allow an amendment changing the name of a party to relate back to the original complaint only if the change is the result of an error, such as a misnomer or misidentification." *Jacobsen v. Osborne*, 133 F.3d 315, 320 (5th Cir. 1998) (quoting *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 469 (2d Cir. 1995)). However, when a plaintiff names "a `John Doe' defendant, there [is] no `mistake' in identifying the correct defendant; rather, the problem [is] not being able to identify that defendant." *Id.* at 321; *accord Whitt v. Stephens County*, 529 F.3d 278, 283 (5th Cir. 2008).

*BALLE v. Nueces County*, No. 16-40789 (5th Cir. June 15, 2017).

Mistake or misidentification has specifically to do with the *identity* of a particular creative work to which copyright attaches, just as it has to do with the identity of a named defendant in Fed.R.Civ.P. 15.

In this case, Handshoe admits infringement, but relies on fair use and a variety of other purported defenses. He also admits to being the "person" who submitted the counter-notification to AWS and recites purported defenses (ECF 296). Nowhere, however, does Handshoe's defense state that he had a "good faith belief" that the works identified as infringing were wrongly identified by Leary by

"mistake or misidentification." Thus there is no fact in contention under the law regarding a "good faith belief" based on his defense pleading or his counter-notification.[4]

The DMCA was created to help provide a safe harbor for service providers, not to protect infringers. *Perfect 10, Inc. v. Ccbill Llc*, 488 F.3d 1102 (9th Cir. 2007); *Viacom Intern. Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514 (S.D.N.Y. 2010); *Capitol Records, Inc. v. mp3tunes, LLC*, 821 F. Supp. 2d 627 (S.D.N.Y. 2011). Even for service providers, "statutes that provide exceptions to liability under the Copyright Act should be strictly and narrowly construed" *Id*, citing *Fame Publ'g Co. v. Ala. Custom Tape, Inc.*, 507 F.2d 667, 670 (5th Cir.1975). The DMCA is not a license to infringe.

There are at least two notable factual issues here: First, Handshoe never used the legislatively-required "good faith belief" phrase. Nonetheless access to the infringing material (photograph of Trout Point Lodge) was re-enabled after receiving Handshoe's notification, thus allowing infringement to continue. Second, Handshoe swore to a "misidentification of the material as infringing" not that the material was removed due to mistake or misidentification of the material. Nonetheless, *he swore under penalty of perjury that there was a misidentification, which directly caused the material to return to infringing publication. That made the (mis)representation "material."*

Handshoe has attempted to turn the DMCA on its head. Congress never intended for the DMCA to aid infringers in returning infringing material to illegal publication. Section 512 does not speak of "misidentification of the material as infringing"; it also does not mention "fair use" only "infringement." Even if the U.S. Court of Appeals for the Ninth Circuit is correct about subjective considerations of fair use when a person or entity files an notice of infringement (which is doubtful), cf. Lenz, *supra*, it is not the case that fair use entered into the equation regarding counter-notifications, like the one Handshoe submitted to AWS under penalty of perjury. The issue for counter-notifications is if the material alleged to be infringing was misidentified or subject to incorrect identification by mistake.

---

4  Handshoe's affirmative defense that he acted in good faith with regards to *all* of Leary's counterclaims (dismissed and non-dismissed) is not a pleading of "good faith belief" in works being identified by mistake or misidentification.

It is an irrefutable fact here that the material infringing was not misidentified. Thus Dr. Leary must prevail on summary judgment.

Even were that not that case, to paraphrase the Ninth Circuit, an infringer like Handshoe who pays mere lip service to the consideration of fair use by claiming he formed a good faith belief when there is evidence to the contrary is still subject to § 512(f) liability; Lenz, *supra*.

At a minimum, Handshoe was willfully blind to the fact that the material was infringing when he filed the counter-notification. In fact, he was not willfully blind, he was aware that (a) there was no misidentification of the material and (b) the use was infringing. Based on a bizarre misapplication of *Lenz*, Handshoe has tried very hard to insert the concept of fair use into the analysis in this case of a counter-notification. "Misidentification of the material as infringing," he wrote. This is, respectfully, hogwash. The material was *not* misidentified and the material *was* infringing, whether it was fair use or not. And, in addition, there was no fair use by Handshoe or Slabbed New Media (see below).

If it existed, Handshoe's good faith belief would, by the very plain terms of the legislation, be regarding "mistake or misidentification" of the copyrighted work or works being reported to the service provider as infringing. This is not like the subjective good faith belief of someone reporting copyright infringement to a service provider in a DMCA notice, as in Lenz, *supra*. Rather, this is someone saying "that is the incorrect work" that was identified as infringing; that is, as "result of an error, such as a misnomer or misidentification" or a "'mistake' in identifying the correct" work; cf. Nueces County, *supra*.

Handshoe's additional defenses to the 512(f) claim appears to be divided into the following: (a) Handshoe submitted the counter-notification as "publisher of Slabbed New Media"; (b) Nova Scotia Supreme Court lacked jurisdiction over Handshoe; (c) he denies "know[ing] he was infringing copyright in foreign works"; (d) the works identified as infringing were not registered with the Canada Intellectual Property Office when they were "initially published" by Handshoe on Slabbed; and (e)

8

Handshoe "successfully" counter-notified prior infringement notices, including by third parties Ashoka and National Geographic Society[5], and that this therefore "ratified the fair use of these images" because no one sued him for infringement (until this case) (ECF 296).

Dr. Leary will address these "defenses" in turn. Handshoe admits to serving counter-notifications on AWS resulting in re-publication of the identified works. *Id.* (A) Handshoe was therefore "any person who knowingly materially misrepresents under this section" whether or not he was the publisher of Slabbed; 17 USC § 512(f). Under the *Copyright Act*, "[d]irect liability is imposed on those who "trespass[] into [the copyright owner's] exclusive domain by using or *authorizing* the use of the copyrighted work...." *BWP MEDIA USA v. T & S SOFTWARE*, 852 F.3d 436 (5th Cir. 2017) (emphasis added), citing *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 433, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). That Handshoe purportedly only authorized Slabbed to submit the notice, or visa versa, is meaningless. He is liable and cannot hide behind his LLC. (B) This Court found it was up to the state court to determine if Nova Scotia Supreme Court had proper jurisdiction over Handshoe and the state court so decided in January, 2017; this issue is *res judiciata* and, really, irrelevant to § 512(f) liability. (C) By 2016, Mr. Handshoe knew he was infringing copyright in foreign works because a court of competent jurisdiction had found he was infringing copyright in the photographs in a final decision that he did not appeal. He himself has argued in his motion to dismiss that the decision is *res judicata*. (D) Registration of copyright is irrelevant to copyright's existence or infringement and doubly irrelevant with regards to "initial publication." 17 U.S.C. § 102(a)(5). In addition, the misrepresentation to AWS occurred in 2016, after the works *were* registered. (E) Not suing for infringement does not "ratify" fair use under the law.[6] "It is hardly incumbent on copyright

---

5   Handshoe repeatedly implies that the photographic portrait of Dr. Leary taken by the National Geographic Society in 2010 is at issue here. It is not. Dr. Leary has never claimed any intellectual property rights in the NGS photograph, which belong to NGS (cf. affidavit of NGS submitted on motion to dismiss). In addition, the photograph of Trout Point Lodge in the counter-notification never belonged to Ashoka or any other third party. The Ashoka photograph was one of Charles Leary and Vaughn Perret.

6   Dr. Leary searched in vain for any case using the phrase "ratify fair use."

owners [...] to challenge each and every actionable infringement." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 188 L. Ed. 2d 979, 572 U.S. (2014). Thus his additional "defenses" have no merit.

Mr. Handshoe did not defend or submit the counter-notification based on any purported "good faith belief." Nonetheless, Mr. Handshoe had no good faith belief that he was not infringing copyright in the photographs identified by Leary in January, 2016. He should have known--had he acted with reasonable care or diligence --that he was making a misrepresentation to AWS. Likewise, had he been acting in good faith, he would have known he was making a misrepresentation. A court had told him in 2014 he was infringing on the very web site—Slabbed--that was now hosted by AWS. The judgment of that court was found to be valid by a Mississippi state court, and Mr. Handshoe knew in January, 2016, that he had submitted to the general jurisdiction of the Nova Scotia court, including having filed a summary judgment motion in that case in late 2013.

Mr. Handshoe chose to invoke the DMCA counter-notification provisions, not Dr. Leary. He chose to swear under penalty of perjury "under the laws of the United States" that there was a "misidentification", which statement was patently false when he made it. He knew quite well the identity of the works he was publishing without permission. To say he did not know the identity of a photograph of Trout Point Lodge he downloaded from a protected third-party web site is absurd. "[K]nowingly means that a party actually knew, should have known if [he] acted with reasonable care or diligence, or would have had no substantial doubt had [he] been acting in good faith, that [he] was making misrepresentations." *Online Policy Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195 (N.D. Cal. 2004) at 1204 (citing Black's Law Dictionary (8th ed. 2004) (definitions of "knowledge," in particular, "actual" and "constructive" knowledge)). In effect, Handshoe was asserting to AWS his certainty—on the level of a statement made under penalty of perjury—that Leary had mistakenly identified or misidentified the works in question as published on Slabbed.

10

The misrepresentation by Handshoe "materially" affected AWS because AWS allowed the infringing works to be republished on its servers. That is, AWS "replac[ed] the removed material or ceas[ed] to disable access to it."

In addition, Dr. Leary was a "copyright owner or copyright owner's authorized licensee" and incurred damages.

The only other option appears to be that Handshoe was stating to AWS under penalty of perjury that there was a "misidentification of the material as infringing" because of fair use. But the legislation does not protect such a person from liability for misrepresentation. A "person who knowingly materially misrepresents [...] that material [...] was removed or disabled by misidentification" is liable for damages under 512(f). Handshoe is so liable. The material as published on Slabbed was infringing, whether it was fair use or not. Handshoe has admitted as much, and has never related any "good faith belief" otherwise. The usual analysis a court must undertake in the 512(f) context is if a defendant "knowingly misrepresented that it had formed a good faith belief." Lenz, *supra*. Here, good faith belief is out the window. The issue is: did Handshoe "knowingly materially misrepresent that the photograph was disabled by misidentification"? He knew exactly what he was doing in publishing the works in question and in counter-notifying AWS.

In all, Congress allowed for punishment for intentionally inducing a service provider, through a knowing misrepresentation under penalty of perjury, to once again facilitate copyright infringement, which could otherwise subject the service provider to liability as a contributory infringer. Such actions do substantial damage to the streamlined, *extra-judicial* mechanism established by Congress in the DMCA.

This is egregious conduct, when it occurs. It results in continuing copyright infringement based on a knowing misrepresentation, it involves perjury, and it causes unnecessary legal fees and costs, expense of judicial resources, wasted time, etc. It occurred in the case of Mr. Handshoe, who felt he

11

could act with impunity to infringe copyright, to make misrepresentations, and to ignore a final judicial

decision from a North American court that had jurisdiction over him. Respectfully, this Court must find

in favor of Dr. Leary regarding Mr. Handshoe's misrepresentation to AWS.

**Copyright Infringement in Four Photographs**

This Court has jurisdiction to adjudicate infringement of copyright in a foreign work. *Reed*

*Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 559 U.S. 154, 176 L. Ed. 2d 18 (2010).

> To establish an infringement of a copyright, a plaintiff must show both ownership of a
> copyright and that defendant copied the protected material without authorization. *See*
> *Weissmann v. Freeman*, 868 F.2d 1313, 1320 (2d Cir.), *cert. denied*, 493 U.S. 883, 110 S.Ct.
> 219, 107 L.Ed.2d 172 (1989). [. . .] Protection under the copyright statute extends to pictorial
> works, 17 U.S.C. § 102(a)(5). For more than a century photographs have been held to be
> copyrightable "writings" under Article I, § 8 of the Constitution. *Burrow-Giles Lithographic
> Co. v. Sarony*, 111 U.S. 53, 4 S.Ct. 279, 28 L.Ed. 349 (1884) (photograph of Oscar Wilde an
> original work of art).

*Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir.1992)

Each unauthorized "use[] of" a copyrighted work constitutes a distinct "instance of infringement."

*Iowa State University Research Found., Inc. v. American Broadcasting Cos.*, 621 F.2d 57, 60 (2d

Cir.1980). "Because particular photographs can be the subject of multiple instances of infringement,

the number of instances of alleged infringement does not correlate precisely with the number of images

at issue." *Lefkowitz v. McGRAW-HILL GLOBAL EDUC. HOLDINGS*, 23 F. Supp. 3d 344 (S.D.N.Y.

2014) at fn 4. Regarding infringement of a single photograph "a number of violations of [...] exclusive

rights granted by § 106" may occur "including infringement of [the] exclusive right of reproduction,

infringement of [the] exclusive right of public display, and infringement of [the] exclusive right to

distribute the copyrighted works." *Agence France Presse v. Morel*, 934 F. Supp. 2d 547 (S.D.N.Y.

2013). In addition it is infringement to "to prepare derivative works based upon the copyrighted work."

17 U.S.C. section 106(2), and it is infringement to violate the "making available" right, which is a

corollary to the rights enumerated in Section 106 of the Copyright Act. *VHT, INC. v. ZILLOW*

*GROUP, INC.*, No. C15-1096JLR (W.D. Wash. June 20, 2017).

When dealing with photographic works, "actual copying of [plaintiff's] photographs is undisputed" when defendant "distributed and published digital copies, which were indistinguishable from [plaintiff's] original photographs." In such a case "substantial similarity is not at issue." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224 (11th Cir. 2010). "[W]here substantial similarity is undisputed by the parties, non-infringement [or infringement] may be determined as a matter of law on a motion for summary judgment." *Id.* "According to a leading treatise on copyright law, no court has found that presentation of the copyrighted works to a court on which the infringement action is brought constitutes an instance of infringement. 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyrights*, § 13.05[D][2] (2003)." *Healthcare Advocates v. HARDING, EARLEY, FOLLMER*, 497 F. Supp. 2d 627 (E.D. Pa. 2007).[7]

> The Copyright Act provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). Generally, courts have permitted a civil *action* as long as one instance of infringement occurs within the three year statutory period. *See Bridgeport Music, Inc. v. Chrysalis Songs,* No. 3:01-0701 (M.D.Tenn. Dec. 2, 2002) (Higgins J.) ("A claim for copyright infringement . . . accrues at the time that the infringement upon which the suit is based occurred. If such infringement occurred within three years prior to the filing, the action will not be barred even if prior infringements by the same party as to the same work are barred because they occurred more than three years previously.")

*King Records, Inc. v. Bennett*, 438 F. Supp. 2d 812 (M.D. Tenn. 2006).

**Pattern of Infringement**

Handshoe has a demonstrated pattern of intentionally and admittedly infringing copyright. Handshoe's intentional ignorance of copyright protections extended from illegally publishing a minor child's drawing, taken from a family court file, as "clickbait" on Slabbed (see *Yount v. Handshoe*, 171 So. 3d 381 (La. Ct. App. 2015); also *Handshoe v. Abel*, Civil Action No. 1: 14-CV-159-KS-MTP (S.D.

---

7   Leary raises this issue since Slabbed New Media has stated in its motion to intervene in this case that Leary's showing of the impugned YouTube video to Nova Scotia Supreme Court during an evidentiary hearing constituted an instance of infringement by Leary. Leary fears being sued for presenting evidence to this Court.

Miss. Jan. 8, 2016) ("there is no dispute that the minor child drew the image, and therefore held a copyright in it under 17 U.S.C. § 102(a)(5), nor is there a dispute that Plaintiff posted the image without permission of the copyright owner or his agent")); to downloading and publishing a portrait of Charles Leary belonging to the National Geographic Society and marked as copyrighted (ECF 15); to publishing a *Times-Picayune* story in its entirety without permission causing Advance Publications to issue an infringement notice and a service provider to drop the web site Slabbed  (cf. admission in Handshoe defence, ECF 296); and finally to publishing Leary, Vaughn Perret, and Trout Point Lodge's copyrighted images without permission in online attacks upon them (cf. Handshoe admissions made in the TAC, defense, and motion to dismiss; also ECF 289). This history of willful infringement decreases the likelihood of any fair use by Handshoe.

**Instances of Infringement**

Handshoe infringed the display, reproduction, distribution, and make available rights in the four photographs in question. The display rights have been violated in an actionable manner on a continuing basis since October 10, 2014. Each photograph is and has been publicly displayed on Slabbed.org and in the derivative YouTube video at issue in Count 5 of the Third Amended Complaint (TAC). Publication of the YouTube video containing two of the copyrighted works is ongoing; Leary declaration.

Between October 10, 2014 and the current day, Slabbed.org has changed domain hosts at least three times. First on August 25, 2015, from HostGator to CloudFlare. Second, On August 26, 2015, from CloudFlare to DomainControl. Third, from DomainControl to CloudFlare on September 3, 2015. See Exhibit to Leary Declaration in Support of Summary Judgment, DomainTools Report. As CloudFlare is not a host, per se, and actually blocks monitoring of domain hosting changes, it is difficult to know if there have been other hosts since September 3, 2015. For instance, it is uncontroverted that AWS is or was a host since that date, but AWS's identity as host is concealed by

CloudFlare. Each time a hosting change occurred, the copyrighted image files were either reproduced, distributed, or both. In addition, the images are readily made available on Slabbed.org for downloading (reproducing) the images, violating the make available rights in the images.[8] In fact, in this case Handshoe has admitted more than once to granting a license to third parties to reproduce content found on Slabbed.org. Handshoe has also claimed copyright to all content on the web site in the name of Slabbed New Media, LLC, including registering copyright in a web page featuring one of the images.

Thus, there have been *multiple* instances of infringement since October 10, 2014; Morel, supra.

**Fair Use**

Fair Use has been described as "a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent." *Harper & Row, Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 549, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (quoting H. Ball, *Law of Copyright & Literary Property* 260 (1944)).

Section 107 of the Copyright Act codified the common law framework for identifying fair use:

In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include —

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

"The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the

---

8   The "making available" right is a corollary to the rights enumerated in Section 106 of the Copyright Act. *See generally U.S. Copyright Office, The Making Available Right in the U.S.* (2016), *available at* https://www.copyright.gov/docs/making_available/.

customary price."*Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 105 S. Ct. 2218,

85 L. Ed. 2D 588 (1985) at 562; *Worldwide Church of God v. Phila. Church of God, Inc.,* 227 F.3d

1110, 1117 (9th Cir.2000); *Weissmann v. Freeman,* 868 F.2d 1313, 1324 (2d Cir. 1989); *ESTATE OF*

*BARRÉ v. Carter*, Civil Action Case No. 17-1057 (E.D. La. July 25, 2017). "The issue is whether the

copying itself is part of a commercial enterprise. 17 U.S.C. § 106(1)."*American Institute of Physics v.*

*WINSTEAD PC AND JOHN DOES NOS. 1-10*, Civil Action No. 3: 12-CV-1230-M (N.D. Tex. Dec. 3,

2013). The Fifth Circuit has noted that "any commercial use tends to cut against a fair use defense."

*Triangle Publ'ns, Inc. v. Knight-Ridder Newspapers, Inc.,* 626 F.2d 1171, 1175 (5th Cir.1980).

Unauthorized use of a photograph on a website to promote business is a commercial use. *Straus v.*

*DVC Worldwide, Inc.,* 484 F. Supp. 2d 620, 642 (S.D. Tex. 2007)  ("unauthorized display of

[plaintiff's] photograph on [defendant's] website is outside the scope of the fair-use doctrine.").

"Fair use is an affirmative defense" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 114 S.

Ct. 1164, 127 L. Ed. 2D 500 (1994) at 590. In fact, "binding Supreme Court authority requires us to

treat fair use as an affirmative defense." *Latimer v. Roaring Toyz, Inc.*, *supra*. As such, "doubts about

whether a given use is fair should *not* be resolved in favor of the *self-proclaimed*" infringer (Acuff-

Rose, *supra*, at 599, concurring opinion, emphasis added). Because fair use is an affirmative defense to

copyright infringement, the defendant bears the burden of proving fair use. *Campbell,* 510 U.S. at 590,

114 S.Ct. 1164; *Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1158 (9th Cir.2007).

**Handshoe Admits Infringement**

Dr. Leary has provided evidence of infringement, including copying and publication of the

entirety of the photographs at issue (ECF 203-2, declaration and exhibits; declaration in support of

summary judgment). This Court has also previously found:

> This [infringement] notice related to a photograph depicting Leary and former Defendant
> Vaughn Perret ("Perret") standing with their dog in front of Trout Point Lodge (the

"Photograph"). Decl. of Charles L. Leary [228] at 1; see also Photograph [219-3] at 2. The Photograph was used by Handshoe in a YouTube video he produced on behalf of Slabbed New Media, but apparently without Trout Point Lodge's permission. See Decl. of Charles L. Leary [228] at 1-2.

(ECF 289, page 3)

Beyond this, Handshoe has made multiple judicial admissions of *prima facie* copyright infringement in his pleadings and briefs in this case, including past and ongoing infringement. Never and nowhere in the record does Handshoe assert he had permission or any authorization to use the photographs in question, and Leary establishes his ownership in the U.S. rights to the foreign works in the record (Leary declaration dated December 20, 2018). The unauthorized use was commercial (cf. Handshoe testimony in bankruptcy court). Handshoe continued to use the works in the face of notices of infringement, a final judgment for infringement from a Canadian trial court of competent jurisdiction in 2014, and claims for infringement in this case.

In his motion on dismissal, Handshoe argued that the three year Copyright Act limitations period had expired by the time Leary filed his compulsory counterclaims. Mr. Handshoe fails to state the obvious: the unauthorized use of the photographs is continuing, and admitted past instances of infringement occurred within three years the copyright statute of limitations. As this Court explained:

> The United States Supreme Court has explained that the "separate-accrual rule" applies to copyright claims, such that when a defendant commits successive copyright infringement violations, the statute of limitations runs separately from the date of each violation. Petrella v. Metro-Goldwyn-Mayer, Inc., 134 S. Ct. 1962, 1969 (2014). In other words, "[e]ach time an infringing work is reproduced or distributed, the infringer commits a new wrong. Each wrong gives rise to a discrete 'claim' that 'accrue[s]' at the time the wrong occurs." Id (ECF 293).

In his Motion to Dismiss, Document 245, Filed 06/06/18, Page 17 at footnotes 17-20, Handshoe admits to publishing the four photographs as of that date, referring the Court to live hyperlinks on the Slabbed site. In his defense pleading, Handshoe admits to downloading and publishing five photographs that belonged to others (paragraph 20: "those images belonged to third parties" and "all were subject of DMCA takedown notices"; paragraph 23: "neither the news stories or [sic] the

photographs accompanying them in question were ever monetized by Handshoe"); paragraph 59: "The last Slabbed New Media publication of the third-party photos for which Leary obtained after the fact assignment was on December 2, 2013";[9] paragraph 74: the photographs were "published by Slabbed New Media, LLC" and the "copyrights to several of the images resided in the United States with United States organizations upon their initial publication to slabbed.org." At paragraph 21, Handshoe only denies "the allegations regarding the ownership of the Slabbed New Media website." He thus admits "these photographs were illegally published at www.slabbed.org"; that is, all the photographs identified in paragraph 20 of Leary's counterclaims.

This makes this case similar to Nation Enterprises, *supra*, where the defendant "has admitted to" copying the work of another, but then resorts to the affirmative defense of Fair Use; Nation Enterprises at 548. It is also similar to Roaring Toyz, *supra*: "In the instant case, actual copying of [plaintiff's] photographs is undisputed. Defendant-appellees distributed and published digital copies, which were indistinguishable from [plaintiff]'s original photographs. As such, substantial similarity is not at issue."

In fact, at paragraph 23 of his defense Handshoe is explicit in resorting to "fair use in journalism in the public interest," an affirmative defense to admitted infringement.

Thus Handshoe intentionally infringed copyright in the photographs by downloading them without permission or license from third party web sites.

His apparent defenses to infringement are (a) that upon publication on slabbed.org "none [of the photographs] belonged to Trout Point Lodge, Vaughn Perret, or Charles Leary," that rather they "belonged to Ashoka, Progress Media, and the National Geographic Society"; (b) "none of these copyrights were registered at the time of publication"; (c) that he "successfully counter-notified" DMCA infringement notices sent by copyright owners; (d) "neither the news stories or [sic] the

---

9   As paragraph 74 of his defense makes clear, Handshoe admits to the last *initial* publication of one of the impugned photographs in December, 2013; however all photographs in question remain in publication as of the date of this filing.

photographs accompanying them were ever offered for sale or otherwise monetized" and "the public interest news stories available free of charge to the public is self evident" fair use; (e) "Leary received assignments from third parties in late spring and early summer of 2013, in certain instances over 2 years after the original publications" on slabbed.org.

He also admits he did so without authorization, but insists it was as "publisher" of Slabbed New Media, his Mississippi LLC.

Handshoe has made relevant admissions at other places as well. At footnotes 17-20 on page 17 of his brief on his Motion to Dismiss (ECF 188), Handshoe admits to current infringing publication of four copyrighted works, the United States rights in which belong to Leary. At fn 12 of the TAC, Handshoe admits that at the time he filed the TAC in January, 2017, slabbed.org was publishing two copyrighted photographs at issue here; "the images in question *are* located at" two slabbed.org URLs (emphasis added).

At paragraphs 66-68 of the TAC, Handshoe admits that a YouTube video contained "the media identified" in a copyright infringement notice sent to YouTube by Leary on February 15, 2014; that is the photograph of Leary & Perret with their dog. The video remains in publication on YouTube. In fact, that video also infringed other works, including the photograph of Leary, Perret, and Daniel Abel authored by journalist Marilyn Smulders. Remarkably, on January 31, 2017, Handshoe, on behalf of Slabbed New Media, registered copyright with the U.S. Copyright Office in the YouTube video, including claiming copyright in "all other cinematographic material, audiovisual material, text" contained therein, with the exception of "preexisting music." That is, Handshoe illegally claimed the U.S. copyright in the photographs at issue here; that registration misrepresented facts to the Copyright Office.

At paragraphs 89-90 of the TAC, Handshoe admits to publishing multiple photographic works

19

he was not authorized to publish, on or around January 18, 2016, including a promotional photograph of Trout Point Lodge. In sum, Handshoe has admitted to continuous and new unauthorized copying, public display, and public availability in five foreign works as well as unauthorized creation of a derivative work, the YouTube video.

Handshoe also admits to new infringing publications on Slabbed by copying files to new web hosts—including AWS-- throughout the TAC; each new reproduction, transfer, uploading, downloading, and publication of the protected works created new instances of infringement.

Handshoe claims it was his company that was actually the infringer and he should be held harmless. This is wrong as a matter of law. Handshoe was directly, jointly liable for any infringement allegedly undertaken by his sole-proprietorship limited liability company. He was also liable as the creator of the YouTube video, which is on his YouTube channel, and as its admitted first publisher as a means of allowing commercial republication on Slabbed.

> All participants in copyright infringement are jointly liable as tortfeasors. *See Screen Gems-Columbia Music, Inc. v. Metlis & Lebow Corp.,* 453 F.2d 552, 554 (2d Cir. 1972); *Charles Deitcher Productions, Inc. v. Milano Restaurant, Inc.,* 21 U.S.P.Q.2d 1877, 1879 (E.D.Tex.1991), *aff'd* 966 F.2d 1448, 24 U.S.P.Q.2d 1794 (5th Cir.1992). Liability for copyright infringement falls not only on the person who actually performed the copyrighted music, but also on persons who (1) had the right and ability to control the infringing activity and (2) had a direct financial interest in that activity. *Nelson-Salabes, Inc. v. Morningside Dev.,* 284 F.3d 505, 513 (4th Cir.2002) (noting business owner's liability for infringement under theory of vicarious liability); *Crabshaw Music v. K-Bob's of El Paso, Inc.,* 744 F.Supp. 763, 767-68 (W.D.Tex. 1990) (same).

*Controversy Music v. Down Under Pub Tyler, Inc.*, 488 F. Supp. 2d 572 (E.D. Tex. 2007).

Also: *Selchow & Righter Co. v. Goldex Corp.*, 612 F. Supp. 19 (S.D. Fla. 1985).

In sum, there is no dispute that Handshoe violated copyright in at least four photographic works on various occasions and in various instances of infringement, including copying, public display, distribution, public availability, and creation of a derivative work. He has admitted as much. Leary has

provided evidence of such substantiating his own declaration. Leary has carried his burden under Rule 56(a) by demonstrating that the undisputed facts conclusively establish each essential element of copyright infringement in the four works: ownership of a copyright and that defendant Handshoe copied and publicly displayed the protected material without authorization. On the issue of copyright infringement, this Court should find in favor Dr. Leary on summary judgment.

**Fair Use Defense**

Fair Use must be plead and proved by Mr. Handshoe. It has been clear throughout this case that Handshoe intends to assert fair use, though exactly how remains undetermined. Dr. Leary respectfully urges this Court to find that under no set of circumstances could Mr. Handshoe's use of the photographs in question be fair use.

In addition to operating tourism accommodations and restaurants, Dr. Leary is also an author and photographer. He is co-author of *The Trout Point Lodge Cookbook: Creole Cuisine from New Orleans to Nova Scotia*, published simultaneously by Random House in the United States and Canada. He was a regular columnist and photographer for a major Canadian daily newspaper, and has authored recipes in a number publications. His photography have appeared in numerous publications (including *The Small Luxury Hotels Cookbook,* the Toronto *Star,* the Fodor's travel guide web site, the *Times-Picayune*, and *Travel & Leisure* magazine), as have articles about him. Leary has also authored academic articles and articles about sustainable agriculture. Photographs of Dr. Leary have appeared in *Food & Wine* magazine, *A Taste of Relais & Chateaux* cookbook, *32 Inspirational Chefs*, Ashoka Changemakers, Canada's *Financial Post*, the Halifax *Chronicle-Herald*, *Nova Scotia Open to the World*, the Yarmouth *Vanguard*, the New Orleans *Times-Picayune*, and the Toronto *Star*. Often, Dr. Leary is called upon to provide photographs of himself to publications. In sum, ownership of intellectual property rights are not a minor or invaluable part of Dr. Leary's life and livelihood.

It appears that Handshoe raises the affirmative defense of Fair Use, though specifics are scant. In his defense pleadings, he claims fair use for "journalism in the public interest." Regarding the first factor, Handshoe's use was commercial and it was used to disparage and harass Leary by falsely accusing him of felonies in an online blog as commercial clickbait.[10] In his sworn testimony of June 2, 2016, in federal bankruptcy court, Mr. Handshoe admitted that in order to pursue "heavy fundraising pushes" for reader donations as part of Slabbed's business model, "my experience is to maximize reader donations, you have to roll the request for money out with a pretty good hard-hitting investigative series" (testimony transcript, p. 28, 15-25; 29, 1). He also characterized his publications linking Leary (along with TPL, Perret, and Abel) with the Aaron Broussard corruption scandal as important. "Q: Did you also -- or did Slabbed New Media also investigate the corruption scandals in Jefferson Parish, Louisiana? A: Oh, yes. In depth. We got a lot of press recognition regionally out of that. Slabbed dot org has been cited several times in the Times Picayune, the New Orleans Advocate. I was – I appeared on WVUE, Channel 8, and gave an interview in 2010. And we did a lot of work in that area." (9, 8-16).

Handshoe used the creative works for commercial gain. Commercial use of copyrighted material is "presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S. Ct. 774, 78 L. Ed. 2D 574 (1984). Notably, in his sworn bankruptcy court testimony on June 2, 2016, the following exchanges occurred:

Q Is Slabbed New Media a for-profit or a not-for-profit entity?
A A for-profit.

Q Was it your intent from the beginning to make money at Slabbed New Media?
A Yes. Yes. As an accountant I don't believe in loss leaders.

---

10 The clickbait about the Broussard scandal was similar to the clickbait of the child's pornographic drawing published alongside insinuations of child molestation; cf. Yount, *supra*.

Q Has Slabbed New Media always filed its own separate tax return?
A Well, since it was a sole-owned LLC, it filed as part of my personal tax filing, but it did file its own Schedule Cs, yes.
**(testimony transcript, page 7, 21-25).**

Q After Slabbed New Media was created and formed, Mr. Handshoe, have you personally worked for it?
A Yes. Yes.
Q Are you the principal and major employee of Slabbed New Media?
A Yes.
Q Has all of the investigative reporting work and blogging that you personally have performed since Slabbed New Media was incorporated and created, have been done and dedicated to the furtherance of the Slabbed New Media business?
A Correct. Yes, sir.
**(testimony transcript, p. 9, 17-25; 10, 1-5)**

Q And is it one of its purposes in filing bankruptcy to rid itself of some of these claims that are out there or threaten to be out there so it could start up its blogging and its investigative reporting business again?
A And more than that, to grow it.
**(Id, 21, 6-11)**

Q Do you believe in good faith that the business can grow and operate at a meaningful profit?
A Yes.
Q Has it satisfied the rules of the Internal Revenue Service to be a profitable business and not be deemed a hobby since it was created?
A Yes. Yes, it has.
**(Id, 24, 22-25; 25, 1-5)**

This is not fair use.

Regarding the second factor, photographs are original creative works.

[A] photograph need only exhibit a "dash" of originality in order to be protectible. *Rogers v. Koons,* 960 F.2d 301, 307 (2d Cir.), *cert. denied,* ___ U.S. ___, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *see also Jeweler's Circular Publishing Co. v. Keystone Publishing Co.,* 274 F. 932, 934 (S.D.N.Y.1921) (L. Hand, J.) ("[N]o photograph, however simple, can be unaffected by the personal influence of the author, and no two will be absolutely alike."), *aff'd,* 281 F. 83 (2d Cir.), *cert. denied,* 259 U.S. 581, 42 S.Ct. 464, 66 L.Ed. 1074 (1922). As the Second Circuit has explained: "Elements of originality in a photograph may include posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved." *Rogers,* 960 F.2d at 307.

This has lead courts to disfavor fair use defenses involving photographs. ""[C]reative" works are

deemed more deserving of protection than works that are "more of diligence than of originality or

inventiveness" (*i.e.,* indexes, catalogs, or other compilations)." *Ty, Inc. v. Publications Intern., Ltd.,*

333 F. Supp. 2d 705 (N.D. Ill. 2004).

23

Regarding the third factor, Mr. Handshoe used the entirety or substantial entirety of the works. Cf. Leary declaration. ECF 203-2. This is not fair use.  Regarding the fourth factor Handshoe argues he never "monetized" the photographs, in yet he put them on his commercial web site designed to earn a profit (see testimony above). Despite his protestations, Slabbed is not a non-profit. The issue is not necessarily how much Handshoe gained from using the work in commercial publication, or how much Leary lost in dollars, it is the fact that he did not pay any licensing fee. *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2D 588 (1985) at 562;  *Straus v. DVC Worldwide, Inc.,* 484 F. Supp. 2d 620, 642 (S.D. Tex. 2007)  ("unauthorized display of [plaintiff's] photograph on [defendant's] website is outside the scope of the fair-use doctrine.").

**Injunctive Relief**

Leary seeks injunctive relief. He wants the photographs removed from publication on Slabbed on in the YouTube video. "Permanent injunctions are available to plaintiffs in copyright infringement suits when the court deems an injunction reasonable in order to prevent the further infringement of the plaintiff's copyrights. 17 U.S.C. § 502." When a  defendant has been "infringing on Plaintiffs' copyrights over a period of many years" "despite extensive efforts by [plaintiff] to curb the infringement," and there is a "Defendant's refusal to cease" the infringing activity "a permanent injunction is appropriate to prevent Defendant from infringing in the future." *Broadcast Music, Inc. v. Bentley*, Civil Action No. SA-16-CV-394-XR (W.D. Tex. Feb. 28, 2017).

Leary has demonstrated precisely such conduct by Handshoe here, and a permanent injunction is warranted, as is an order that Handshoe turn over all digital copies of the photographic works. Dr. Leary hereby requests such relief as well as costs and attorney's fees.

**STATE LAW CLAIM**

**Malicious Prosecution in this Case**

Leary respectfully moves for summary judgment on the issue of malicious prosecution in this case. Malicious prosecution consists of:

> (1) the institution of a criminal [or civil] proceeding; (2) by, or at the instance of, the defendant; (3) the termination of such proceedings in plaintiff's [or counterclaimant's] favor; (4) malice in instituting the proceedings; (5) want of probable cause for the proceeding; and (6) the suffering of injury or damage as a result of prosecution.

*Noel v. Wal-Mart Stores, Inc.*, Civil Action No. 3: 17-CV-203-DPJ-FKB (S.D. Miss. Mar. 22, 2018).

Handshoe admits elements one and two. The Court has already determined, in ruling on Handshoe's Motion to Dismiss, that element three is satisfied. In addition, the docket shows that Leary prevailed on *all* counts against him in this lawsuit.

This leaves malice and probable cause. Damages will be addressed separately below.

Regarding probable cause:

> As to the fifth element, for purposes of a malicious prosecution action, probable cause requires a concurrence of an honest belief in the guilt of the person accused and reasonable grounds for such belief. *Royal Oil Co.,* 500 So.2d at 443. One is as essential as the other. *Benjamin* 568 So.2d at 1190. It is ordinarily necessary for the plaintiff to show circumstances from which absence of probable cause may be inferred. This Court has held that unfounded suspicion and conjecture are not proper bases for finding probable cause. *Id. To determine the existence of probable cause, courts look to (1) a subjective element — an honest belief in the guilt of the person accused, and (2) an objective element — reasonable grounds for such beliefs. Strong,* 580 So.2d at 1294. For example:
>
> > The existence of probable cause, which involves only the conduct of a reasonable man under the circumstances, and does not differ essentially from the determination of negligence, usually is taken out of the hands of the jury, and held to be a matter for decision by the court. That is to say, the court will determine whether upon the appearances presented to the defendant, a reasonable person would have instituted the proceeding.

*Nassar v. CONCORDIA ROD AND GUN CLUB*, 682 So. 2d 1035 (Miss. 1996), quoting *Page v. Wiggins,* 595 So.2d 1291, 1293 (Miss. 1992).

"Where a reasonable person would investigate further prior to instituting a proceeding, the failure to do so indicates a lack of probable cause." *Junior Food Stores Inc. v. Rice,* 671 So. 2d 67, 74

(Miss. 1996).

Regarding malice:

> In an effort to define malice, the supreme court has said that the term "malice" in the law
> of malicious prosecution is used in an artificial and legal sense and applied to prosecution
> instituted primarily for *some* purpose other than that of bringing an offender to justice.
> *Benjamin v. Hooper Elec. Supply Co.,* 568 So.2d 1182, 1191 (Miss. 1990); *Owens,* 430
> So.2d at 846. Malice in the artificial and legal sense does not refer to mean or evil intent
> as a layman might ordinarily think. The determination of malice is a question of fact to be
> determined by the jury unless only one conclusion may reasonably be drawn from the
> evidence. Malice may be and usually is shown by circumstantial evidence. *See Benjamin,*
> 568 So.2d at 1191; *see also Strong v. Nicholson,* 580 So.2d 1288, 1293 (Miss. 1991).
> Moreover, absence of probable cause for the prosecution is circumstantial evidence of
> malice. *Trilogy Commc'n Inc. v. Times Fiber Commc'n Inc.,* 47 F.Supp.2d 774, 780-81
> (S.D. Miss. 1998). Finally, malice may be inferred from a finding that the defendant acted
> in reckless disregard of the other person's rights. *Brown v. United States,* 653 F.2d 196,
> 199 (5th Cir. 1981), *cert. denied,* 456 U.S. 925, 102 S.Ct. 1970, 72 L.Ed.2d 440 (1982).

*Donaldson v. OVELLA*, 228 So. 3d 820 (Miss. Ct. App. 2017) (emphasis added).

Malice "refers to the defendant's objective, not his attitude." *Strong v. Nicholson*, 580 So. 2d 1288

(Miss. 1991).

"It is permissible for a defendant to show that he consulted an attorney as a part of his defense

to a charge of lack of probable cause and malice." *Pulliam v. Ott*, 150 So. 2d 143, 246 Miss. 739

(1963). The corollary is also true: not consulting an attorney when one is readily available to you on

existing retainer may show a lack of probable cause and malice.

"[A] contentious history" between the parties can be evidence of malice in instituting a

proceeding. *Hyer v. Caruso*, 102 So. 3d 1232 (Miss. Ct. App. 2012). Malice may be inferred as well

from the fact that a defendant may have acted with reckless disregard for the plaintiff's rights. *Nassar*

*v. Concordia Rod & Gun Club, Inc.,* 682 So.2d 1035, 1044-45 (Miss.1996). "[M]alice may be inferred

from a palpable lack of probable cause, *see, e.g., Harvill,* 128 So.2d 864-65; *Winters v. Griffis,* 233

Miss. 102, 101 So.2d 346, 348 (1958)." Using a lawsuit to seek settlement of some controversy as to

which the suit was not relevant can be evidence of malice. *Armco, Inc. v. Southern Rock, Inc.*, 778 F.2d

1134 (5th Cir. 1985). Malice can be inferred when there is some "other purpose" for initiating a lawsuit

based on a personal bias or discriminatory views, such as racism; *Royal Oil Co., Inc. v. Wells*, 500 So. 2d 439 (Miss. 1986) ("Pamela Wells was the target of the Millers' anger because of her marriage to a black man.").

Inability to provide evidence to underpin a legal allegation indicates lack of probable cause; Hyer, *supra* (defendant "provided no real evidence to support his assertion"). The timing of instituting or dropping proceedings may be circumstantial evidence of lack of probable cause. *Hammack v. Czaja*, 769 So. 2d 847 (Miss. Ct. App. 2000). "[U]nfounded suspicion and conjecture are not proper bases for finding probable cause." *TRILOGY COMMUNICATIONS v. TIMES FIBER COMMUN.*, 47 F. Supp. 2d 774 (S.D. Miss. 1998). The fact that a defendant did "not conduct an adequate investigation given the opportunity he had to readily discover additional information" before filing suit is evidence of lack of probable cause. *Nassar v. CONCORDIA ROD AND GUN CLUB*, 682 So. 2d 1035 (Miss. 1996). That is, "[t]his Court has stated that "where a reasonable person would investigate further before instituting a proceeding, the failure to do so is an absence of probable cause." *Benjamin*, 568 So.2d at 1191 (emphasis added)." *Junior Food Stores, Inc. v. Rice*, 671 So. 2d 67 (Miss. 1996).

## Handshoe's Lack of Probable Cause

Want of probable cause may be proven by circumstantial evidence; Benjamin, *supra*. Handshoe lacked probable cause to bring this lawsuit for multiple reasons:

1. As Handshoe himself has stated numerous times, Slabbed New Media, LLC, was the only possible party with standing in this case. Handshoe knew he personally never had standing and should have never brought suit in his personal name. He did so only, perhaps, because he could act *pro se* and save on incurring legal fees and it served his purpose of vexing and harassing Leary and other litigation opponents. This point was dramatically emphasized when, late in the day, Slabbed New Media attempted to intervene at his behest as sole member of the LLC. Lack of standing may be considered in the probable cause analysis on a malicious prosecution claim; *Berry v. Taggart*, A117329 (Cal. Ct. App. July 29, 2009); *Shaffer v. Stewart*, 326 Pa.Super. 135, 140, 473 A.2d 1017 (1984); *Joiner Ins. Agency v. Principal Cas. Ins.*, 684 So. 2d 1242 (Miss. 1996); *Shaffer v. Stewart, 326 Pa.Super. 135, 138, 473 A.2d 1017, 1019 (1984); Auburn Medical Center, Inc. v. Andrus*, 9 F. Supp. 2d 1291 (M.D. Ala. 1998) ("Plaintiff alleges that Defendants filed the post-judgment Motions and subsequent appeals despite the fact that they allegedly knew they had no standing to do so, yet did so nonetheless to cause Plaintiff's

pecuniary loss and delay in construction. [...] Plaintiff have [sic] alleged the second element of a prima facie claim for malicious prosecution.") As the motion to intervene of Slabbed New Media as well as Mr. Handshoe's own admissions have made plain, he knew from the outset that he had no standing to pursue the legal claims contained in the Complaint for Damages and each of its subsequent amendments. This Court has already found as much in its decision on Leary's Motion to Dismiss. "[A]ccording to the Third Amended Complaint, "Plaintiff in his personal capacity had no connection to the illustrative use of the photographs in question." *Id.* At 29." *Handshoe v. Perret*, 270 F. Supp. 3d 915 (S.D. Miss. 2017). In speaking to Slabbed's motion to intervene, the Court found:

> Plaintiff is a member or manager of, and operates, Slabbed. Slabbed has known or reasonably should have known of its interest in the case since the takedown notices were sent, or certainly by the date the original Complaint [1] was filed on November 16, 2015.

(ECF 157)

The same knowledge may be imputed to Mr. Handshoe, Slabbed's sole member, i.e. the knowledge he had no standing from the outset of this case. In addition, Handshoe amended his complaint three times, and still the claims contained in the TAC were found to be so meritless the Court found it "futile" for him to amend again (ECF 105; also ECF 221, page 6). In addition, with respect to Count 5, Mr. Handshoe knew, or reasonably should have known, he had illegally taken a photograph subject to copyright from the web page of the *Toronto Star* without permission when he filed this lawsuit. As the Court found: "Handshoe admits in his Memorandum [219] in support of his request for partial summary judgment that the Photograph was 'obtained by [him] for Slabbed New Media, LLC from the Toronto Star website,' but asserts that the Toronto Star owns the copyright." There was never any evidence of such ownership. Handshoe purportedly relied on an affidavit from Torstar (ECF 64-4), however that affidavit says *nothing whatsoever* about Torstar claiming ownership of the photograph, which always belonged to Trout Point Lodge, Limited. Dr. Leary repeatedly provided evidence of this, but Mr. Handshoe determined to continue with the claim. Indeed, Handshoe was repeatedly put on notice that the *Star* did not own the photograph, not only by Leary, but also by the Supreme Court of Nova Scotia in a decision that Handshoe attached as an exhibit to his original complaint. "It [the photograph] was placed on [the Star's] website where it was accessed by Mr. Handshoe. It was used by Mr. Handshoe alongside defamatory script. I have in evidence a Certificate of Registration Copyright dated July 8, 2013 in the name of Trout Point Lodge Ltd." Trout Point Lodge Ltd. v. Handshoe, 2014 NSSC 62 (CanLII), <http://canlii.ca/t/g344w>, retrieved on 2018-10-08. The Nova Scotia Court found Handshoe had infringed Trout Point's copyright; Mr. Handshoe not only ignored that judicial finding but then initiated this vexatious lawsuit based on facts he knew were false.

2. Handshoe sued parties, such as Progress Media, without knowing anything about them. "Q: Who owns Progress Media? A: Good question, they are up in Canada" (Handshoe judgment debtor examination, 35, 9-10). The sole reason for suing Progress Media was its positive association with Leary (along with Abel, Perret, and TPL).[11] Similarly there is strong evidence to suggest he sued Torstar, Ashoka, and the National Geographic Society precisely because they had positive public associations with Leary (Leary declaration of 12/20/18). Torstar, for

---

11 Handshoe alleged Progress sent a copyright infringement notice to his web host, but has failed to prosecute this claim even after defaulting the media company.

example, never once sent a DMCA "takedown" notice (cf. declaration submitted by Torstar, ECF 34-4), in yet Handshoe sued Torstar under 17 U.S.C. Section 512(f) for alleged misrepresentation in a DMCA notice. There was no reasonable basis for suing Torstar but to injure Leary's favorable relationship with the newspaper. The National Geographic Society sent a DMCA notice to Handshoe's service provider because "a photograph clearly displaying NGS's copyright" was being published without permission on "Slabbed's website" (ECF 15). The only reasonable explanation for involving such defendants in this litigation was to a desire punish these entities for publicly praising Leary and other co-defendants in the past; Leary declaration 12/20/18.

3.  Handshoe admitted on Slabbed in January, 2017, that this lawsuit was filed for the purpose of conducing a "bare knuckle bar room brawl" related to "that Canadian copyright judgment." He indicated frustration with the fact that his prior litigation opponents had sued his attorneys, which seems to give meaning to his "bare knuckle" characterization. He also summarily lumped Leary together with Daniel Abel, Vaughn Perret, and Trout Point Lodge as though there existed a conspiracy between them against him and all had acted in the same way.[12] This shows unfounded suspicion or conjecture. In fact, Leary had his own reasons for pursuing Handshoe through the courts, and any initiation of this litigation based on Handshoe's conspiracy theory would be an improper purpose. On Slabbed, Handshoe further stated this lawsuit was filed for the purpose of "litigating with them [Leary, Abel, Perret, and Trout Point Lodge] until I feel they are no longer a threat to this website." Litigating for the purpose of preserving the viability of a blog is an improper purpose. It shows he initiated this lawsuit to seek settlement of some controversy as to which the suit was not relevant. Handshoe expanded his admission by comparing the initiation of litigation with "a House of Cards season one, episode one moment," referring to the NetFlix series. "[S]o by God I grabbed them by the belt buckle, pulled them onto a level field of battle here in Mississippi, and gave them exactly what they wanted, for the better part of three years in fact" stated Mr. Handshoe.  http://slabbed.org/2018/01/05/slabbed-turns-ten-ask-slabbed-well-eventually-answer/#more-16301.

4.  As late as this year, Handshoe's evasive responses to Leary's discovery requests repeatedly refer to Slabbed New Media, LLC as the proper party to answer admissions, interrogatories, and requests for production, once again emphasizing Handshoe's subjective knowledge that he should have never initiated this lawsuit in his personal name (ECF 253-2).

5.  Throughout this lawsuit, Handshoe had probable cause to believe he was actually infringing copyright, including the fact that a court of competent jurisdiction in a final decision found he was infringing copyright in 2014. Other reasons include Handshoe's admission that organizations with legal counsel and with expertise in copyright—such as the National Geographic Society, Ashoka, Advance Publications (owner of the Times-Picayune), and

---

12  Daniel Abel is a private individual distinct from Charles Leary. Abel sued Handshoe and other defendants for defamation in Louisiana federal court; cf. *Abel v. Handshoe*, Civil Action No. 13-88 (E.D. La. May 20, 2013). Abel subsequently filed again in state court. Leary was never a party to any litigation between Abel and Handshoe. Handshoe was also sued by Leary's former process server; cf. *Yount v. Handshoe*, 171 So. 3d 381 (La. Ct. App. 2015). Leary was never a party to any litigation between Yount and Handshoe, except when Handshoe amended his complaint in this Court without permission or consent to add Leary as a defendant; cf. *Handshoe v. Abel*, Civil Action No. 1: 14-CV-159-KS-MTP (S.D. Miss. Jan. 8, 2016) ("Plaintiff exceeded this scope by adding claims, parties, and superfluous facts to his Amended Complaint [80]. The Court will strike these amendments and all added claims and parties will be dismissed without prejudice.").

Progress Media had sent copyright infringement notices to his web hosts regarding his illegal publication of both text and photographs on Slabbed. Therefore, copyright infringement notices sent to web hosts were, on the balance of probabilities, not misrepresented. Attempting to hide behind his sole proprietorship LLC when it suits him is not a reasonable basis for believing there existed probable cause to bring this action in his personal name.

6.  Handshoe had an attorney on retainer when he filed and when he amended, G. Gerald Cruthird, but apparently failed to consult without Cruthird regarding the filing of this suit; cf. Handshoe JDE deposition. This demonstrates a failure to properly investigate before filing, which demonstrates a lack of probable cause.

7.  When confronted with cross motions for partial summary judgment on Count 5, Handshoe could produce no evidence whatsoever in his favor (ECF 289); cf. Hyer, *supra*. In fact, Handshoe attempted to rely on deemed admissions from Leary based on requests for admissions sent to an address Handshoe knew was not Leary's correct address. That was his only purported evidence. This indicates a lack of probable cause.

8.  The timing of filing of this lawsuit, immediately after Leary's first attempt to enforce his copyright infringement judgment in Mississippi was dismissed *without prejudice*, indicates that the real purpose in filing suit was to use this lawsuit as a weapon by which to force settlement and/or cost Leary dearly in terms of legal fees, dissuading him from pursuing Handshoe again (cf. ECF 296 at page 10; this lawsuit was filed 3 days after the dismissal without prejudice). It can be inferred that Handshoe knew Leary and his fellow judgment creditors would likely re-enroll their judgment. In fact, Handshoe's Press Release indelibly connected Leary's attempt at judgment enrolment with filing this case. (cf. press release exhibit Leary declaration of 12/20/18).

9.  Also related, to timing, Handshoe admits to moving assets out of Leary's reach as a judgment creditor in his judgment debtor examination on August 14, 2017 (transcript, 43, 1-19). Handshoe states such movements of property occurred in early 2015, the same year this lawsuit was filed. Harrison County tax records indicate, however, that property ownership changed in 2016 to solely "Handshoe Jennifer Walton" from "Handshoe Doulgas K. Jennifer" in the 2015 calendar year; cf. Leary declaration. Using this lawsuit to distract and occupy Leary while Handshoe admittedly moved assets as a judgment debtor would be an improper purpose.

10. The Third Amended Complaint based on and full of "unfounded suspicion and conjecture." "Unfounded suspicion and conjecture are not proper bases for finding probable cause. *Miller v. East Baton Rouge Parish Sheriff's Dept.,* 511 So.2d 446, 453 (La. 1987); *Prosser & Keeton, supra,* at p. 876." *Benjamin v. Hooper Electronic Supply Co.*, 568 So. 2d 1182 (Miss. 1990). In fact, Handshoe's original complaint and its various amendments recount Handshoe's longstanding conspiracy theory from his blog "Slabbed," simply transferred to court pleadings. All of his criminal allegations were completely immaterial to his purported federal and state law claims. In addition, they lacked evidentiary basis. One of his allegations, made repeatedly as part of the Handshoe conspiracy theory, is that Leary knew Handshoe's identity in April and May, 2011, when he appeared in Nova Scotia Supreme Court seeking an order directed to Automattic, Inc., his service provider, for identifying information about anonymous online

commentators (cf. oral decision transcript, Nova Scotia Supreme Court, May 31, 2011).[13] Handshoe alleges Leary committed perjury in that hearing. See TAC, paragraph 29. In fact, screen shots of Slabbed in May, 2011, show Handshoe still publishing under the pseudonym "Sop81_1."[14] Even on his "contact" page, there was no indication of the true identity of the publisher (cf. Leary declaration in support of summary judgment). In addition, the Domain Tools "Domain Report" historical Whois Records evidences that Handshoe used "Domains by Proxy LLC" as late as January 11, 2012, to keep anonymous the name of the registrant of the domain slabbed.org. "Registrant Name: Registration Private." (see Domain Report, page 64). In the Whois Record of February 9, 2012, for the first time the Registrant is named as "Douglas Handshoe." Handshoe alone personally remained the Registrant until the Whois Record of September 3, 2015, when Slabbed New Media, LLC, was for the first time indicated as the "Registrant Organization" (page 38)[15]. *Id.* In addition, the service provider, Automattic chose to respond to the Nova Scotia court order, but also contacted Handshoe via email regarding the court order. According to Automattic, the person responsible for the blog Slabbed did not respond to or challenge the fact that Automattic would provide identifying information. *Id.*

> We have forwarded the order you initially presented to the blog owner(s) as per our policies. We provide our users with an opportunity to respond to such orders independently. If we are informed by the blog owner that they do not wish to challenge the order, or if they do not respond to us within a reasonable amount of time, we will deliver the requested information at that time.

. . .

> Have you heard anything from the affected users?

> They have not responded to us within a reasonable amount of time and so we are prepared to cooperate with this request.

> It should be noted that only one of the usernames (sop81) you have provided us is that of a WordPress.com user; the remainder are rather of commenters on the site.

Exhibit to Leary declaration supporting motion for summary judgment

Thus, there is no evidentiary basis whatsoever regarding Handshoe's allegations that Leary for certain knew his identity and committed perjury in Nova Scotia as part of an international plot led by Aaron Broussard to unmask his identity and those of other anonymous bloggers (cf TAC at paragraph 25). The statement from Automattic also cases serious doubt on Handshoe's repeated assertions that he was never notified of the court order or given a chance to respond.

---

13 In his sworn federal bankruptcy court testimony on June 2, 2016, Handshoe stated: "Despite the fact that they knew who I was, I was never given notice of those proceedings" (transcript, p. 10, 22-24). He repeats his assertions as late as ECF 323, p.9).

14 In the transcript of the Nova Scotia court hearing, the court reporter wrote Sop81_1 as "Soft81_1." Mr. Handshoe is a CPA. "Sop81-1" refers to Accounting for Performance of Construction-Type and Certain Production-Type Contracts. Handshoe testified on June 2, 2016, in federal bankruptcy court that he specializes in accounting for "a lot of construction companies" (transcript p. 3, 11-12).

15 Handshoe testified in federal bankruptcy court that the domain name was transferred in April, 2011. This purported fact is contradicted by the domain records. The bankruptcy was filed on June 16, 2015, at which time Handshoe personally owned the domain and web site, not Slabbed New Media. Leary recorded the Whois domain records for Slabbed on June 18, 2015, and the registrant remained Douglas Handshoe. Handshoe has denied the the domain was transferred after the bankruptcy in his defense filed in this case.

These facts speak to a complaint for damages founded on nothing but suspicion, conjecture, and unfounded conspiracy theory, and thus malicious prosecution.

11. Handshoe sought declarations from the Court without having conducted sufficient (or any) research into the law of declaratory judgments. He sought declaration of prospective rights, that is before any controversy existed or was ripe. Handshoe was aware that proscriptive equitable relief is not sound, as he has often criticized Nova Scotia Supreme Court's granting of a proscriptive permanent injunction against him in 2012. He based his legal theories regarding Fair Use in copyright on a case from the U.S. Court of Appeals for the Ninth Circuit that is not binding in this circuit (Lenz, supra), and in fact this theory of Fair Use as a prospective right (not an affirmative defense) has been explicitly rejected by other courts in other circuits; *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224 (11th Cir. 2010); *Tuteur v. Crosley-Corcoran*, 961 F. Supp. 2d 333 (D. Mass. 2013). He had no probable cause to bring these counts.

12. Handshoe also sought equitable relief regarding the Nova Scotia Supreme Court copyright infringement judgment. Plaintiff sought a declaration under the Securing the Protection of our Enduring and Established Constitutional Heritage Act, 28 U.S.C. § 4101, et seq. ("SPEECH Act") that

> as a matter of law each and every component judgment rendered in the case styled, Trout Point Lodge et al. v. Douglas Handshoe, Nova Scotia Supreme Court No. 41135 is REPUGNANT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA and unenforceable in the United States of America.

3d Am. Compl. [90] at 52.

Yet, by the time he filed the TAC, in January, 2017, this Court had already *twice* determined that the copyright infringement judgment was not subject to the SPEECH Act of 2010, once even before the original complaint was filed (cf. Case 1:14-cv-00241-LG-JCG Document 22 Filed 11/24/14 and Case 1:16-cv-00007-LG-RHW Document 8 Filed 02/16/16 "a judgment for copyright infringement is not within the purview of the SPEECH Act"). In fact, by January 26, 2017, when Handshoe filed the TAC, a Mississippi state court had *also* concluded that the Canadian copyright judgment was not repugnant to Mississippi law and not subject to the SPEECH Act. Thus there was a total absence of probable cause in bringing this cause of action, evidencing malicious prosecution.

## Malice

Malice may be *and usually is* shown by circumstantial evidence; *Strong v. Nicholson*, 580 So.

2d 1288 (Miss. 1991) (emphasis added).

### *Circumstantial evidence*

1. A lack of probable cause is evidence of malice (see above).

2. Handshoe's January 16, 2018, published admission--"I will be litigating with them [Leary, Perret, Abel, and Trout Point Lodge] until I feel they are no longer a threat to this website"-- shows his intention in filing suit was to whack down Leary, not to bring him to justice for

32

purported misrepresentations in copyright notices. Apparently, pursuing protection for copyrights is a "threat" to Mr. Handshoe and Slabbed (cf. exhibit to Leary declaration 12/20/18). Using a lawsuit to seek settlement of some controversy as to which the suit was not relevant can be evidence of malice. *Armco, Inc. v. Southern Rock, Inc.*, supra.

3. The "contentious history" between Handshoe and Leary (as well as Trout Point, Perret, and Abel) evidences malice in instituting this proceeding. There is ample evidence that Handshoe's objective was to embarrass, vex, and still Leary by instituting legal actions, including this one, not to seek justice for alleged copyright misrepresentation. Indeed, Handshoe publicly stated the "goats known as Leary and Perret will likely be seeing me at the Federal Courthouse in Gulfport in a painful hell of legal entanglement" (Leary declaration of December 20, 2018). This also included suing Leary in state court for racketeering, but then failing to prosecute (cf. Handshoe JDE deposition 33, 8-14; also case 13-cv-251 in this court) as well as serving Leary with process in a "John Doe" lawsuit in which Leary was never a named defendant that Handshoe then also failed to prosecute (see generally case 13-cv-174 in this court).

4. Handshoe targeted Leary online because of his sexual orientation (cf. *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481 (5th Cir. 2013); *Trout Point Lodge Ltd. v. Handshoe*, 2012 N.S.S.C. 245 (2012): Leary declaration 12/20/18). Holding discriminatory views may indicate malice in filing and maintaining a lawsuit. *Royal Oil Co., Inc. v. Wells, supra.*

5. The fact that Handshoe did not consult with the attorney he had on retainer in 2015—G. Gerald Cruthird-- regarding this suit indicates a lack of probable cause and malice. Cf. Handshoe JDE deposition. Handshoe: "I maintained Gerald [Cruthird] on a retainer just to have an attorney on retainer," referring to 2015, the year this case was filed (23, 9-10). Cruthird: "I haven't read the [settlement] agreement" with NGS in this case. "I've not represented Mr. Handshoe" in this case. (35, 21-22; 36, 4-5).[16]

6. The fact that Handshoe used the filing (not the winning) of this and other lawsuits for publicity purposes to publicly embarrass and prejudice his opponents, such as Leary, allows an inference of malice, and evidences the "contentious history." Cf. Leary declaration of 12/20/18. The Press Release issued by Handshoe directly implicated Trout Point Lodge, Leary's business, in being involved in a criminal "bribery scheme"; referred to a conspiracy involving Leary, the National Geographic Society and the Toronto Star in "acts of retaliation" against Handshoe for "exposing" Leary and his alleged co-conspirators; implied that Leary's judgment enrolment was dismissed for cause (it was not); and alleged a conspiracy involving media companies and Leary in "copyright trolling" was to intentionally deprive Handshoe of his First Amendment rights. This Court dismissed all those causes of action. In addition, Handshoe's pattern of using court cases and files for the same kind of purposes is equally as pronounced. In both the John Doe and Broussard cases, Handshoe proactively sought to publicly embarrass Leary by sending the complaints to media and blogs. On May 21, 2013, he sent the "John Doe" lawsuit to bloggers and *Frank* magazine of Halifax, Nova Scotia. On May 22, 2013, he wrote to a reporter at *Frank* magazine promising to send a copy of his lawsuit against Aaron Broussard, Leary, and others: "Once I have service on Broussard and certain of his codefendants, I will send you a

---

16 Handshoe testified in federal bankruptcy court on June 2, 2016, that "Slabbed New Media has just had a devil of a time finding legal help" (transcript p. 20, 22-23). Mr. Cruthird represented Slabbed New Media in this case in its motion to intervene.

stamped copy of what was filed yesterday in Hancock County Circuit Court. I think it will be of great interest." On May 29, 2013, Handshoe provided the magazine with a copy of the complaint.  This is a pattern: Handshoe v. Broussard complaint fed to Frank Magazine in Nova Scotia (2013); Handshoe v. Doe complaint fed to Frank Magazine in Nova Scotia and bloggers (2013); Chris Yount family court file pornographic drawing published on Slabbed along with insinuations of child abuse; and original complaint and press release in this case fed to Jackson Jambalaya and other internet sites. All evidence the willful filing of legal actions for an improper purpose, which indicates malice.

In sum, there is convincing evidence to establish the first four elements of malicious prosecution on the part of Mr. Handshoe.

## DAMAGES

Leary has already requested an injunction under the Copyright Act above. Damages are an essential element of the remaining claims. His damages flow from (a) misrepresentation under 17 U.S.C. 512(f) and (b) malicious prosecution. In addition, Dr. Leary is entitled to costs and fees under 17 USC Section 505; Lenz v. Universal Music Corp., 5:07-cv-03783-JF (N.D. Cal. Feb. 25. 2010). Section 505 indicates a court may award costs and reasonable attorneys' fees to the prevailing party. By definition, a 512(f) violation occurs only when the takedown notice sender has made a knowing and material misrepresentation, so this Court should exercise Its discretion favorably towards Dr. Leary. Furthermore, by implication, losing 512(f) plaintiffs could be ordered to pay the defendants' costs and attorneys' fees.

> "[A]n award of attorney's fees to the prevailing party in a copyright action is the rule rather than the exception and should be awarded routinely." *Virgin Records Am., Inc. v. Thompson,* 512 F.3d 724, 726 (5th Cir. 2008) (per curiam) (quotation marks omitted). That said, "recovery of attorney's fees is not automatic." *Id.* (the district court did not abuse its discretion in denying motion for award of attorney's fees under § 505). In determining whether a fee award is appropriate, a court may consider the following nonexclusive factors: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* (quoting *Fogerty,* 510 U.S. at 534 n.19).
> *GEOPHYSICAL SERVICES, INCORPORATED v. TGS-NOPEC GEOPHYSICAL SERVICES*, Civil Action No. 14-1368 (S.D. Tex. Jan. 4, 2016).

Actual damages, i.e. attorney's fees and costs may also be recovered for malicious prosecution.

In addition, ""[w]ithout proof of special damages, a plaintiff ... may recover `damages for (a) the harm to his reputation which normally results from such an accusation as that brought against him, and (b) the distress which normally results from the initiation of such proceedings.' IV Rest. Torts, § 670." *State Life Ins. Co. of Indianapolis, Ind. v. Hardy,* 189 Miss. 266, 280, 195 So. 708 (1940)." *Welford v. Dickerson,* 524 So. 2d 331 (Miss. 1988). "The very nature of the tort is such that, when committed, it will inflict mental anguish and emotional distress upon the [p]laintiff." Hyer, *supra.*

Section 512(f) provides that any person who makes knowing, material misrepresentations in filing a DMCA counter-notification "shall be liable for *any damages*, including costs and attorneys' fees, incurred by the copyright owner or copyright owner's authorized licensee who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in replacing the removed material or ceasing to disable access to it." 17 U.S.C. § 512(f) (emphasis added). "[T]he damages a [copyright holder] may recover under § 512(f) from "any person" are broader than monetary relief." *Lenz v. Universal Music Corp.*, 801 F.3d 1126 (9th Cir. 2015). "The use of "any damages" suggests strongly Congressional intent that recovery be available for damages even if they do not amount to ... substantial economic damages...." *Id*, quoting the district court. "[N]ominal damages are allowed without proof of injury." *Williams v. Kaufman County*, 352 F.3d 994 (5th Cir. 2003). "Recovery of damages for lost time and resources is also consistent with the legislative intent of § 512(f) in deterring knowingly false allegations of infringement because it gives wrongfully accused internet users the incentive to bring a claim."*Automattic Inc. v. Steiner,* 82 F. Supp. 3d 1011, 1022 (N.D. Cal. 2015).

This is a case of first impression for a counter-notification under 512(f). "Any damages" when a misrepresented counter-notification results in the infringing republication of a copyrighted work must include damages for the resulting copyright infringement, which in that case would be willful, i.e. knowingly. The Senate Report (S. Rept. 105-190) on the DMCA stated:

35

> Defendants who make such a *knowing* misrepresentation are liable for *any damages*, including costs and attorneys" fees, incurred by any of these parties as a result of the service provider's reliance upon the misrepresentation. This subsection is intended to *deter* knowingly false allegations to service providers in recognition that such misrepresentations are *detrimental to rights holders*, service providers, and Internet users. (emphasis added)

Notably, Congress does not look kindly on willful infringement. For example, statutory damages for copyright infringement are limited to $30,000 for a non-willful violation and $150,000 for a willful violation. *See* 17 U.S.C. § 504(c).

> [A] plaintiff may recover statutory damages "whether or not there is adequate evidence of the actual damages suffered by the plaintiff or of the profits reaped by defendant." *Harris,* 734 F.2d at 1335. The Supreme Court has stated that "[e]ven for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within [the] statutory limits to sanction and vindicate the statutory policy" of discouraging infringement. *Woolworth Co.,* 344 U.S. at 233, 73 S.Ct. at 225.

*Peer Intern. Corp. v. Pausa Records, Inc.*, 909 F.2d 1332 (9th Cir. 1990).

Leary will not attempt to detail or argue all of his damages here, but will discuss damages to the extent they are necessary for summary judgment. Leary requests the capacity to submit a brief addressing the exact monetary relief, including attorneys' fees and costs, to which the is entitled at a later date. In attorney's fees alone, however, in this case, Leary (along with former defendant Perret, his spouse) accumulated $13,780.00 in fees in 2016, and 41,845.00 in 2017, before Mr. Purvis withdrew (cf. Leary declaration). Total: $55,625.00. In addition, the malicious prosecution of this case by Handshoe has caused Leary substantial emotional distress, including at having been publicly accused of felonies via Handshoe's press release and publication of the original complaint. There has also been harm to Dr. Leary's reputation, which must be compensated for, and the loss of valuable positive relationships with the National Geographic Society, Ashoka, and the Toronto Star, among others.

## CONCLUSION

Dr. Leary prays that this Honorable Court find in his favor on summary judgment for (a) violation of 17 USC Section 512(f), (b) copyright infringement in 4 photographs on Slabbed and in Mr. Handshoe's YouTube video, and (c) malicious prosecution in this case. He seeks equitable relief for

copyright infringement as well as costs and fees. He seeks "all damages" under 512(f). Finally he seeks compensation for damages, emotional and mental distress, and damage to reputation for malicious prosecution.

RESPECTFULLY SUBMITTED, this the _31_ day of December , 2018.


CHARLES LEARY, DEFENDANT

appearing *pro se*



308 5th Ave E
Vancouver, BC V5T 1H4
Canada

802-440-0213
foodvacation@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that, on ___Dec 31___, 2018, I caused a true and correct copy of the above and foregoing to be filed utilizing the Court's CM/ECF electronic document filing system, which caused notice of such filing to be delivered to all counsel of record and parties requesting notice, and by United States First Class Mail, postage prepaid, to the following non-ECF participants having appeared in this action:

[none]

_____
**Charles L. Leary**