1

```
 1              UNITED STATES BANKRUPTCY COURT

 2              SOUTHERN DISTRICT OF MISSISSIPPI

 3

 4   IN RE:  SLABBED NEW MEDIA, LLC                Exhibit "K"

 5       CASE NO. 15-50963-KMS

 6

 7

 8

 9              FIRST CONFIRMATION HEARING

10              TESTIMONY OF DOUGLAS HANDSHOE

11
        Before the Honorable Katherine M. Samson
12            United States Bankruptcy Judge
                  Gulfport, Mississippi
13                   June 2, 2016

14

15   REPRESENTING THE U.S. TRUSTEE:

16       Mr. Christopher Steiskal (by video)

17   REPRESENTING THE DEBTOR:

18       Mr. Craig Geno

19

20

21

22

23

24

25
```

```
 1                    DOUGLAS HANDSHOE,
 2      being first duly sworn, testified as follows:
 3                    DIRECT EXAMINATION
 4    BY MR. GENO:
 5         Q     Mr. Handshoe, state your full name
 6    for the record, please, sir.
 7         A     Douglas Kyle Handshoe.
 8         Q     What is your business address?
 9         A     110 Hall Street, Wiggins,
10    Mississippi.
11         Q     Mr. Handshoe, tell the court your
12    formal educational background briefly, please,
13    sir.
14         A     Got a high school degree from
15    St. Stanislaus, honors diploma from The University
16    of Southern Mississippi, majoring in accounting.
17    And that's pretty much the formal education.  25
18    years-plus as a practicing CPA.  Lot of school of
19    hard knocks through that time, but there's....
20         Q     When did you obtain your Certified
21    Public Accountant license?
22         A     Actually obtained the license in 1993
23    after I fulfilled the experience requirements
24    associated with getting it.
25         Q     And have you been engaged in the
```

1    practice of general public accounting since that

2    time?

3         A    Yes.

4         Q    Do you have any specialties or

5    special areas in which your practice concentrates,

6    or are you in simply the general practice of

7    public accounting?

8         A    My practice has historically been

9    centered on auditing, including some forensic

10   auditing, a lot of K-12s here in Mississippi, a

11   bit of higher education, and a lot of construction

12   companies.

13        Q    Has your work experience branched out

14   into other areas in the recent past other than

15   public accounting?

16        A    Yes.

17        Q    Tell us about that.

18        A    After the hurricane, when insurance

19   became so topical down here as people were trying

20   to get their policies honored, that became a

21   tremendous area of interest, both in the news and

22   for myself personally.  And out of that, and

23   learning about not only the policies but the

24   litigation behind it -- and Lord, there's been a

25   lot; some of it's still going on -- got drawn into

1   actually blogging about the insurance litigation

2   here on the Coast after Katrina, also the similar

3   litigation that happened in Louisiana, which they

4   were affected by Katrina, Rita, those storms.  So

5   it actually turned into a regional-type subject

6   with that active 2005 hurricane season and

7   policyholders pretty much fighting that same

8   battle from Florida all the way over to Texas.

9        Q     So did it start out as sort of a

10  hobby and morphed into something more?

11       A     Be hard-pressed to call it a hobby.

12  More of kind of like a civics project more so than

13  a hobby.  We closely coordinated with Gene

14  Taylor's office.  At that time Gene was working

15  very hard to get some insurance solutions through

16  Congress.  And, of course, as a part of that, we

17  met a lot of the attorneys, the plaintiffs'

18  attorneys, the Rigsby sisters.

19            So a little bit more than a hobby.

20  Much more as a civic -- you know, trying to give

21  back a little bit.  We were very fortunate.  We

22  got paid on our insurance, all of our policies

23  after the hurricane, so we were just trying to

24  give back and help the community a little bit any

25  way we could.

1       Q     How did your blogging civics project
2  develop after some of the hurricane issues had
3  been resolved or had been blogged about
4  extensively?
5       A     Yeah.   In about 2009 some other
6  issues came up, including the political corruption
7  scandal in Jefferson Parish that's really the root
8  of all the lawsuits that I'm dealing with; the oil
9  spill in 2010, with some of the coverage that we
10  did.   And at that time there was a nice lady from
11  Central Mississippi who was also publishing
12  articles.
13            Out of the oil spill we had some
14  national recognition for some of the work that we
15  did related to that and some of the complex
16  multi-district litigation that was happening over
17  in New Orleans with the drill moratorium and those
18  sorts of things.   Seems like the topics never
19  stopped coming after that point; but with the
20  insurance battle largely wrapping up, we turned
21  our attention to the numerous public corruption
22  scandals that were in the area.
23       Q     Did you obtain a domain name?
24       A     Could you repeat that?
25       Q     Did you obtain a domain name?

1       A     Yes, I did, in 2010.  We were hosted

2   with WordPress, which was a free blogging service

3   based out of San Francisco.  And in 2010 we kind

4   of decided that we needed to go to a more formal

5   URL name.  Instead of Slabbed at WordPress dot

6   com, we reserved our own domain, Slabbed dot org.

7   And I did that, if I recall, in February of 2010,

8   about a year and a couple of months before the LLC

9   was actually formed.

10       Q     Who owned the domain name initially?

11       A     I did.

12       Q     And when did you form Slabbed New

13   Media, LLC?

14       A     In April of 2011.

15       Q     Did you personally transfer, then,

16   the domain name into Slabbed New Media?

17       A     Yes.

18       Q     Has it owned it since that time?

19       A     Yes.

20       Q     Describe for us the business

21   activities that you engaged in after obtaining the

22   domain name, and then after you transferred it to

23   Slabbed New Media, its business activities.

24       A     The domain itself, registering the

25   domain is, like, a $20 a year activity.  It's not

1   a whole lot.  But when you have to go execute a

2   hosting arrangement with an actual Web host to

3   hold your files, there begins to be some cost.  We

4   had always split the Pacer account previous to

5   formation in terms of the money, but that became a

6   pretty good-sized expense.

7              So in 2011 we started to solicit

8   reader support, not so much advertising but just

9   asking the readers, If you like what you see and

10  you want to support the mission, send some money

11  in and that will help us pay for the Web

12  registration and the monthly cost with the Web

13  host, the Pacer account, those sorts of things.

14             And revenue pretty well did cover

15  those costs.  Through time, was able to show small

16  profits in 2012, which was really -- January 2012

17  was when we really got started in earnest trying

18  to make money for the LLC to cover these costs.

19  And we were able to make a couple or $300 a year

20  in 2012, 2013.

21        Q     Is Slabbed New Media a for-profit or

22  a not-for-profit entity?

23        A     A for-profit.

24        Q     Was it your intent from the beginning

25  to make money at Slabbed New Media?

1       A    Yes.  Yes.  As an accountant I don't

2    believe in loss leaders.

3       Q    Has Slabbed New Media always filed

4    its own separate tax return?

5       A    Well, since it was a sole-owned LLC,

6    it filed as part of my personal tax filing, but it

7    did file its own Schedule Cs, yes.

8       Q    Tell us about some of the

9    investigative reporting work that Slabbed New

10   Media did after it was created.

11      A    Well, aside from the insurances and

12   the insurance battles, we covered the Jefferson

13   Parish political corruption scandal, which ended

14   up lasting a total of three years from its time in

15   the media until it culminated in convictions and

16   people going to jail.

17           The oil spill in 2010 which I

18   previously mentioned, we got national recognition

19   with what we did there.

20           In 2012 the Mississippi Department of

21   Marine Resources scandal was a real big news item

22   here on the Coast.  And we were able to do some

23   reporting, not just regurgitating what the

24   newspapers and the TV were saying, but actually we

25   were able to bring out some things that was

1    original to that particular public corruption

2    scandal.  A couple of the items resulted in state

3    prosecutions for, I believe, Kerwin Cuevas in

4    particular, a gentleman who was charged with a

5    multitude of things, but essentially he was giving

6    no-bid contracts to a company owned by his

7    brother-in-law without disclosing it.

8        Q     Did you also -- or did Slabbed New

9    Media also investigate the corruption scandals in

10   Jefferson Parish, Louisiana?

11       A     Oh, yes.  In depth.  We got a lot of

12   press recognition regionally out of that.  Slabbed

13   dot org has been cited several times in the *Times*

14   *Picayune*, the *New Orleans Advocate*.  I was -- I

15   appeared on WVUE, Channel 8, and gave an interview

16   in 2010.  And we did a lot of work in that area.

17       Q     After Slabbed New Media was created

18   and formed, Mr. Handshoe, have you personally

19   worked for it?

20       A     Yes.  Yes.

21       Q     Are you the principal and major

22   employee of Slabbed New Media?

23       A     Yes.

24       Q     Has all of the investigative

25   reporting work and blogging that you personally

1   have performed since Slabbed New Media was

2   incorporated and created, have been done and

3   dedicated to the furtherance of the Slabbed New

4   Media business?

5          A    Correct. Yes, sir.

6          Q    Do you do any investigative reporting

7   or blogging on your own?

8          A    No, I do not.

9          Q    Since Slabbed New Media was formed,

10  have you done investigative reporting and blogging

11  only as an employee and principal of Slabbed New

12  Media?

13         A    Yes.

14         Q    When did the lawsuits start getting

15  filed?

16         A    The threats actually started to come

17  in April of 2011. Mr. Leary, Mr. Perret, Mr. Abel

18  had already sued the *Times Picayune* and Channel 8

19  by that time. I started to get anonymous threat

20  letters in the mail. Unbeknownst to me they used

21  the Fox 8 case they had filed up in Canada to try

22  to get information on my commenters. Despite the

23  fact that they knew who I was, I was never given

24  notice of those proceedings.

25              In August of 2011 they filed the

1    first of what was three defamation suits up in

2    Canada.  The August 2011 suit was the one that

3    Judge Guirola decided under the SPEECH Act.

4              During the pendency of that SPEECH

5    Act case, in December of 2012 they filed a second

6    lawsuit against myself and against a former Web

7    host, Automattic.  They ended up dropping that

8    suit in January of 2013, and they refiled another

9    suit against me for defamation and copyright

10   infringement in Canada.  It's the judgments

11   related to that case that form the basis of my

12   indemnity.  So it really doesn't have anything to

13   do with the first case.  It's actually the -- the

14   pair of judgments that came out of the third case

15   that was filed in Canada.

16        Q    Were the activities that you were

17   charged with in those Canadian lawsuits activities

18   that you were performing as a principal and

19   employee of Slabbed New Media or on your own?

20        A    Oh, no.  They was all connected to

21   what was on Slabbed New Media and in connection

22   with my work on Slabbed New Media.

23        Q    And was litigation instituted --

24   affirmative litigation instituted against Trout

25   Point Lodge and others in the Southern District of

1    Mississippi, Case No. 1:12cv90?

2         A    That's correct.  That's the SPEECH

3    Act case, the removal of their attempt to enroll

4    the first defamation judgment.

5         Q    And was that claim filed by you

6    individually or by Slabbed New Media?

7         A    The judgments that came from Canada

8    were in my name, so the removal was done in my

9    name, and that's how that case was styled.

10        Q    Did you individually recover a claim

11   in that case for $48,000 for fees and costs?

12        A    That's correct.  Yes.

13        Q    Did you initially assign that claim

14   to -- or that judgment receivable to one of your

15   attorneys and one of Slabbed New Media's

16   attorneys?

17        A    That's correct.

18        Q    What's his name?

19        A    Jack Bobby Truitt.  Everyone calls

20   him Bobby.

21        Q    And did Mr. Truitt assign that claim

22   back to you?

23        A    Yes, he did.

24        Q    And did you transfer it to Slabbed

25   New Media?

1          A     Yes.

2                MR. GENO:   May I approach the

3     witness, Your Honor?

4                THE COURT:   Yes.

5     BY MR. GENO:

6          Q     Mr. Handshoe, I have handed you a

7     copy of the schedules in this case, and

8     particularly Schedule B of the schedules.   Do you

9     recognize those documents?

10         A     Yes, sir, I do.

11         Q     Is the judgment receivable in the

12    district court case, Southern District of

13    Mississippi, Trout Point Lodge, et al., against

14    you, listed as an asset of Slabbed New Media under

15    question 18, which asks for other liquidated debt

16    owing to debtor?

17         A     Yes.

18         Q     And the current value of that claim?

19         A     Still $48,000.

20         Q     Thank you.

21               MR. GENO:   Your Honor, we ask that

22    the schedules be marked and entered as Debtor's

23    Exhibit 1.

24               THE COURT:   Admitted as Exhibit 1.

25          (Debtor's Exhibit 1 received in evidence.)

1   BY MR. GENO:

2         Q      And is it Slabbed New Media's intent,

3   Mr. Handshoe, to pursue collection of that claim

4   in the event the court sees fit to confirm the

5   Plan?

6         A      Yes.

7         Q      And will the proceeds of that claim

8   be dedicated to paying the unsecured creditors in

9   this case?

10         A      Yes.

11         Q      You've talked about the Canadian

12   law --

13               (Transcriber's note:  first audio

14               file ended)

15         Q      -- and the claim that Slabbed New

16   Media has back as a result of that.  What other

17   lawsuits have been filed?

18         A      After -- in January of '13,

19   concurrent with Trout Point suing me up in Canada

20   and Mr. Leary and Mr. Perret, Daniel Abel, who's

21   also a partner in Trout Point, filed a defamation

22   lawsuit in the federal courts over there against

23   myself and one of the sources of the reporting

24   that we had on Jefferson Parish, a lady by the

25   name of Anne Marie Vandenweghe, who was actually a

1   resident of Mississippi at that time.  Mr. Abel

2   voluntarily dismissed that suit the day before it

3   was due to be heard under the Louisiana anti-SLAPP

4   statute.  We had moved to strike his Complaint.

5           He then refiled that Complaint in the

6   New Orleans Civil District Court.  Not only did he

7   sue myself, Ms. Vandenweghe.  He sued Bobby

8   Truitt.  He also sued the lawyers with -- oh, heck

9   -- Scott Sternberg and his crew that had signed on

10  to represent me in the federal court case, the

11  folks with Baldwin Haspel who had agreed to

12  represent me in that case.  Of course, he sued

13  them to conflict them out.

14      Q    Were the activities complained of in

15  both those lawsuits against you conducted as an

16  employee and a principal and an owner of Slabbed

17  New Media?

18      A    Yes.  Yes.  And not only that.  They

19  also duplicated allegations that were in the first

20  Canadian suit.  It was -- about half of that suit

21  was just a replay of the first suit in Canada that

22  Judge Guirola refused to extend comity on.

23      Q    What is the status of that litigation

24  currently?

25      A    The last movement in it was Mr. Abel

1   was supposed to be deposed.  They set a date in

2   February.  He filed a motion to quash his

3   deposition.  Mr. Truitt, who was pushing that,

4   filed a motion to compel him for a deposition.

5   The judge sided with Truitt.  A date was set in

6   March of this year for Mr. Abel to sit for his

7   deposition, and he did not show up for his

8   deposition.  Instead he filed another motion to

9   quash.

10          So that case really has not moved a

11  whole lot from the day he filed it in May of 2013

12  to today.  He has not done -- the case has not

13  advanced procedurally where I've even had to file

14  an Answer in that case.  So it's, in reality, at a

15  very early stage.

16      Q    Is that a case in which you have made

17  demand back against Slabbed New Media for

18  indemnification?

19      A    Yes.

20          MR. GENO:  May I approach the

21  witness, Your Honor?

22          THE COURT:  Yes.

23  BY MR. GENO:

24      Q    Mr. Handshoe, I've handed you a copy

25  of the Operating Agreement of Slabbed New Media,

1   LLC.  Can you identify that for us, please, sir?

2            A     Yes.  This is the Operating Agreement

3   for Slabbed New Media.

4            Q     Does it contain in Section 16 an

5   indemnification provision?

6            A     Yes, it does.

7            Q     And does that provision require

8   what's referred to as the Company, Slabbed New

9   Media, to indemnify any member, manager or other

10  person from and against any and all claims and

11  demands whatsoever?

12           A     Yes.

13           Q     Is there an exclusion in the

14  indemnity if a judgment or other final

15  adjudication adverse to the indemnity established

16  that the employee or manager was guilty of acts

17  committed in bad faith or the result of active and

18  deliberate dishonesty?

19           A     Yes.

20           Q     Are any of the acts that are

21  complained of by any of these claimants against

22  you -- were any of those actions done with

23  deliberate dishonesty or in bad faith by you?

24           A     No.

25           Q     Were they all done for and on behalf

1    of your -- and in furtherance of your employment

2    and your ownership of Slabbed New Media?

3        A    Yes.

4            MR. GENO:  Your Honor, we would ask

5    that the Operating Agreement of Slabbed New Media

6    be marked and entered as Debtor's Exhibit 2.

7            THE COURT:  Admitted as Exhibit 2.

8       (Debtor's Exhibit 2 received in evidence.)

9    BY MR. GENO:

10       Q    Are there other litigations, Mr.

11   Handshoe, that are being actively pursued arising

12   out of your employment and ownership of Slabbed

13   New Media?

14       A    Yes.  The Yount case in Jefferson

15   Parish where Slabbed New Media is actually named

16   as one of the defendants.

17       Q    And what's the status of that case?

18       A    It's really kind of the same as the

19   case that Abel has in the CDC.  At an early stage

20   an Answer was filed within a few days before the

21   filing of the Chapter 11.  Hasn't advanced since

22   that time.  We filed motions to strike under

23   Louisiana's anti-SLAPP statute.  The judge

24   sustained those.

25            As Judge Samson pointed out, those

1    anti-SLAPP strikes were reversed by the Fifth

2    Circuit Court of Appeals.  I did not appeal the

3    decision.  Bobby Truitt, who left a comment on my

4    blog about a court document, did appeal; and he

5    was denied.  And that's really where that case

6    sits, at a pretty early procedural stage.  There

7    could be other exceptions that could have

8    occurred, for instance, before I even would have

9    had to have filed an Answer, but there's really

10   nothing happened with that case for the past, at

11   least, year.

12           Q    I take it Mr. Truitt was also sued as

13   a defendant in that case, along with you?

14           A    Yes.  Yes.  To conflict him out.

15           Q    And along with Slabbed Media?

16           A    Yes.

17           Q    And were the actions that are

18   complained of by the plaintiff in that case

19   against you done and conducted for and in

20   furtherance of your role as an employee and owner

21   of Slabbed New Media?

22           A    Yes.

23           Q    Is that also one of the cases for

24   which you have made demand against Slabbed New

25   Media for indemnification?

1          A     Yes.

2          Q     Is there any other litigation that

3    has been filed against you or against Slabbed New

4    Media, Mr. Handshoe, arising out of your

5    activities as an employee and/or an owner of

6    Slabbed New Media?

7          A     Not to my knowledge.

8          Q     Are there claims or causes of action

9    that you believe Slabbed New Media has arising out

10   of some of this litigation that it will pursue?

11         A     Yes.  The Yount case, we asserted

12   counterclaims for abuse of process related to the

13   suing of Mr. Truitt, amongst other things.

14              There is also unasserted claims.  I

15   personally have a 17 U.S. Code 512(f) action

16   outstanding right now related to DMC takedown

17   notices that were submitted by the Trout Point

18   group over the course of the past three years

19   which I -- everything is under the statute of

20   limitations.  Several claims related to those

21   takedown notices are out there.

22              Slabbed New Media has just had a

23   devil of a time finding legal help because my

24   lawyers seem to get sued by these guys with

25   regularity.

1       Q     Is that one of the purposes of filing

2    this Chapter 11 case, so that Slabbed New Media

3    can hopefully obtain counsel when some of these

4    claims are taken care of in the bankruptcy case?

5       A     Yes.

6       Q     And is it one of its purposes in

7    filing bankruptcy to rid itself of some of these

8    claims that are out there or threaten to be out

9    there so it could start up its blogging and its

10   investigative reporting business again?

11      A     And more than that, to grow it.  I

12   had actually had discussions with a fairly

13   prominent journalist here on the Coast about

14   coming to work for Slabbed New Media.  The

15   propensity of everybody to get sued by the same

16   group of people for the mere act of association

17   has had a tremendously chilling affect on my

18   ability to attract anyone to help me.

19             There was a court hearing in Yount in

20   March of last year, the height of tax season.  And

21   my spouse represented Slabbed at that particular

22   hearing, in a sealed proceeding.  Yount was

23   sealed.  And that evening there was a blog called

24   RealMalice that covered those sealed proceedings

25   and threatened my wife and Connie Montgomery with

1    a lawsuit.  An anonymous blog, but someone who was

2    in that courtroom obviously had to have written

3    that entry.

4           Q      Tell us who Connie Montgomery is.

5           A      Pardon me?

6           Q      Tell us who Connie Montgomery is.

7           A      Ms. Montgomery is a very brave lady

8    who agreed to represent both myself and Slabbed

9    New Media in the CDC case that Mr. Abel had filed

10   and in the Jefferson Parish case that Mr. Abel

11   filed for Yount against Slabbed.

12          Q      And is Ms. Montgomery one of the

13   unsecured creditors in this case?

14          A      Yes.

15          Q      Along with Mr. Truitt.

16          A      Yes.

17          Q      Are there any other claims or causes

18   of action on behalf of Slabbed New Media,

19   Mr. Handshoe, that it intends to pursue in the

20   event the court sees fit to confirm the Plan in

21   this case?

22          A      Possibly -- quite possibly a

23   malicious prosection case, depending on how the

24   Yount case is resolved, in particular.

25          Q      Have there been threats of litigation

1    against Slabbed New Media that have not yet been

2    filed?

3         A    No.

4         Q    Are you concerned that absent a

5    discharge of any claims by any of these creditors

6    or plaintiffs you've talked about, that they may

7    end up filing claims against Slabbed New Media?

8         A    Perhaps, yes.

9         Q    Has that had a chilling effect on the

10   Slabbed New Media business and its ability to

11   attract counsel?

12        A    Oh, without a doubt.

13        Q    And is that one of the advantages you

14   hope to achieve by obtaining a Plan of

15   Reorganization -- a confirmed Plan of

16   Reorganization here?

17        A    Yeah, that's correct, sir.

18        Q    Mr. Handshoe, in the event there are

19   no funds forthcoming in the first anniversary of

20   the effective date of the Plan, if the court sees

21   fit to confirm it, and there are no profits -- net

22   operating profits from Slabbed New Media in that

23   same time frame, have you agreed to contribute

24   $10,000 to the reorganization for and on behalf of

25   the unsecured creditors?

1          A     Yes.

2          Q     Mr. Handshoe, has this case and the

3     Plan of Reorganization pending before the court

4     been filed in good faith?

5          A     Yes.

6          Q     Tell us what you hope to accomplish

7     by getting -- what Slabbed New Media hopes to

8     accomplish by getting a Plan confirmed here.

9          A     Well, I'd like to try, to the extent

10    possible, wrap all the litigation up into a

11    package and dispose of it so that the LLC can be

12    in a position to move forward, hire -- actually

13    hire a journalist, which is my big goal, and to

14    operate not only -- to operate freely, to be able

15    to have counsel engaged where there's not going to

16    be a threat that these guys are going to sue them

17    just to conflict them out and send a message that

18    anybody that associates with me is going to get

19    sued.  That's really kind of the big goal, is to

20    be able to move the business on to the next stage

21    and hopefully grow it.

22         Q     Do you believe in good faith that the

23    business can grow and operate at a meaningful

24    profit?

25         A     Yes.

1    Q    Has it satisfied the rules of the

2  Internal Revenue Service to be a profitable

3  business and not be deemed a hobby since it was

4  created?

5    A    Yes.  Yes, it has.

6    Q    In your view, is the Plan feasible?

7  In other words, can Slabbed New Media make the

8  payments that it has promised to make under the

9  terms of its Plan and under your agreement to

10  contribute funds to it if it does not raise those

11  funds in the first year?

12    A    Yes.

13    Q    In the event the court sees fit to

14  confirm the Plan, are your creditors getting at

15  least as much as they would get in a Chapter 7

16  case?

17    A    They'd get more.

18    Q    In the event the court sees fit to

19  confirm the Plan, do you feel there would be a

20  need for further reorganization or a liquidation

21  of any of the Slabbed New Media assets other than

22  its claims and causes of action which you plan to

23  liquidate?

24    A    No.

25        MR. GENO:  Your Honor, I don't have

```
1   any further examination of Mr. Handshoe at this

2   time, but I do have some additional exhibits I'd

3   like to put into the record --

4              THE COURT:  Okay.

5              MR. GENO:  -- that are all, I

6   believe, pleadings that already exist.

7              THE COURT:  There's no reason for you

8   to put those in the record as separate exhibits to

9   this hearing.  You can just announce that you're

10  relying on anything -- these are all docket

11  pleadings?

12             MR. GENO:  They are, Your Honor.

13             THE COURT:  There's no -- we're just

14  going to re-upload them, and so there's really no

15  reason to do that.  Why don't you just announce

16  what you're relying on --

17             MR. GENO:  Thank you, Your Honor.

18             THE COURT:  -- instead of us

19  re-uploading them all.

20             MR. GENO:  The Disclosure Statement,

21  which is Docket No. 73.  The Plan of

22  Reorganization, which is Docket No. 72.  The Order

23  conditionally approving the Disclosure Statement

24  and setting the Plan for objections, time for

25  ballots, Docket No. 80.  The Certificate of
```

1    Service, Docket No. 82, certifying that the Order

2    approving the Disclosure Statement conditionally,

3    the Disclosure Statement itself, the Plan of

4    Reorganization, Notice of Hearing and a ballot

5    have been submitted to creditors and parties in

6    interest.

7                    And then lastly, the Ballot Summary

8    and Certification certifying that all creditors

9    voting in Class 3, which is an impaired class,

10   voted to accept the Plan of Reorganization 100

11   percent in number of creditors voting and in 100

12   percent of dollar amounts.  Included in that

13   Ballot Summary, Your Honor, is Mr. Handshoe's

14   ballot; but if it is not considered or if it is

15   certified, the other ballots also all vote to

16   accept the Plan 100 percent in number of creditors

17   voting and 100 percent of dollar amounts.

18                    THE COURT:  Okay.

19                    MR. GENO:  Thank you, Mr. Handshoe.

20   No further questions of this witness.

21                    THE COURT:  Mr. Steiskal, do you have

22   some questions for Mr. Handshoe?

23                    MR. STEISKAL:  Briefly, Your Honor,

24   if I may.  May it please the court, once again,

25   Chris Steiskal for the U.S. Trustee.

```
 1                    CROSS-EXAMINATION
 2   BY MR. STEISKAL:
 3        Q    Good afternoon, Mr. Handshoe.  How
 4   are you today?
 5             THE COURT:  Hang on one second.  Can
 6   you see him on your screen?
 7             THE WITNESS:  No, ma'am, it's not on.
 8             (Off-record discussion).
 9             THE COURT:  Okay.
10   BY MR. STEISKAL:
11        Q    Mr. Handshoe, can you hear me okay?
12        A    Yes, I can.
13        Q    Mr. Handshoe, is Slabbed New Media
14   currently profitable?
15        A    This year it has not turned a profit
16   at this point.  I have not done any sort of heavy
17   fundraising pushes so far this year.  Typically do
18   that in the late spring or early summer.
19        Q    And why are you waiting to do it in
20   the summer?
21        A    Mainly it's just a question of time.
22   I'm a one-man band with two businesses, and in
23   order to -- my experience is to maximize reader
24   donations, you have to roll the request for money
25   out with a pretty good hard-hitting investigative
```

1   series, which I have one in progress that I'm

2   working on right now.

3        Q     Do you know what the net profits for

4   Slabbed New Media was for 2015?

5        A     Pre-petition, there would have been a

6   big loss because I paid a good-sized retainer to

7   Mr. Geno.  Post-petition, I believe the company

8   made over $1,000.  Actually, it would have

9   qualified as its best year ever.

10       Q     And Mr. Geno referred and you

11  testified regarding the Slabbed Operating

12  Agreement, which I believe has been admitted as

13  Exhibit 2.  Is that correct?

14       A     Yes, sir.

15       Q     Who drafted that agreement?

16       A     I did.

17       Q     Mr. Handshoe, do you currently take a

18  salary or any kind of distribution from Slabbed

19  New Media?

20       A     Not since we filed the Chapter 11

21  petition.  Before that I typically took

22  distributions at the end of the year based upon

23  profitability.

24       Q     And do you recall how much those

25  distributions were for the last couple of years

1    prior to the bankruptcy being filed?

2            A       Somewhere between 4- and $600 a year.

3            Q       If you're required to make the

4    $10,000 contribution to pay creditors in this case

5    after one year from the confirmation anniversary,

6    where will those funds come from?

7            A       Out of my personal money.

8            Q       And is that from your CPA work?

9            A       Yes, primarily.  That's my primary

10   source of income.  That's correct.

11                   MR. STEISKAL:  Thank you, Your Honor.

12   That's all the questions I have.

13                   THE COURT:  Okay.  Mr. Geno?

14                   MR. GENO:  Just one in redirect, Your

15   Honor.

16                       REDIRECT EXAMINATION

17   BY MR. GENO:

18           Q       Mr. Handshoe, have you backed off or

19   not been as active, maybe a better way to state

20   it, in raising money and contacting donors because

21   you fear they may get sued by some of these

22   claimants?

23           A       Without a doubt, if the names of my

24   donors got out, they would be threatened, without

25   a doubt.

1        Q       Thank you.

2                MR. GENO:  Nothing further, Your

3    Honor.

4                THE COURT:  Okay.  Mr. Handshoe, you

5    can step down.  Thank you.

6                MR. GENO:  Your Honor, that concludes

7    our presentation.

8

9                        * * * * *

10

11        CERTIFICATE OF TRANSCRIPTIONIST

12        I, Carol Winstead Gray, hereby certify that I

13   have transcribed the foregoing 30 pages, and

14   including this page, to the best of my ability

15   from an audio recording of the proceeding.

16        This the 28th day of December, 2018.

17

18                        /s/ Carol Winstead Gray

19

20

21

22

23

24

25