

SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**
JAN 17 2019
ARTHUR JOHNSTON
BY_____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

DOUGLAS HANDSHOE

v.                                    CIVIL ACTION NO. 1:15cv382-HSO-JCG

VAUGHN PERRET, CHARLES LEARY &
DANIEL ABEL, D/B/A/ TROUT POINT
LODGE LTD OF NOVA SCOTIA & IN
THEIR INDIVIIDUAL CAPACITIES
PROGRESS MEDIA GROUP LIMITED,
MARILYN SMULDERS, & ASHOKA

## MEMORANDUM IN SUPPORT OF RESPONSE IN OPPOSITION TO LEARY'S MOTION FOR SUMMARY JUDGMENT (ECF# 328)

This Memorandum in Support of Response in Opposition to Leary's Motion

for Summary Judgment is respectfully submitted by Plaintiff / Counter-defendant

Douglas Handshoe.

### Introduction

"Journalism is printing what someone else does not want printed:
everything else is public relations."[1]

The above quote or its kissing cousin, "News is something somebody doesn't

want printed; all else is advertising", attributed to William Randolph Hearst,

certainly describes this matter in a nutshell. What this case is not about is a blogger

filling a website with false publications as this assertion by Leary in his Motion for

---

[1] Quote widely attributed to George Orwell

1

Summary Judgment has been previously rejected in *Trout Point v Handshoe* where

Judge Guirola wrote:[2]

> The record indicates that Vaughn and Perret lived in Louisiana prior to establishing their business in Nova Scotia. A New Orleans attorney, Daniel Abel, was (or is) a long-time business partner of Vaughn's and Perret's, and he is also a former law partner of Aaron Broussard's. The plaintiffs have admitted that they, or their company, helped manage Broussard's property in Nova Scotia, which is located very close to Trout Point Lodge. The record contains a letter to Leary and Perret from Roy D'Aquila, a New Orleans attorney connected to Broussard, that discusses the possibility of placing Mr. Broussard's property on an insurance policy held by Trout Point Lodge. (Pls.' Mot. Ex. 10 at 24, ECF No. 6-10). Moreover, the Court is aware that there is a civil action pending in the United States District Court for the Eastern District of Louisiana against Broussard and others in which it is alleged that Trout Point Lodge, Ltd. was one of many "co-conspirators" in a criminal scheme involving various public officials. See Concrete Busters of Louisiana, Inc. and Waste Remediation of Plaquemines, LLC v. Frederick R. Heebe, et al., No. 2:12cv2596-NJB-KWR (E.D. La.). It has also been alleged that another business of Vaughn's and Perret's, Cerro Coyote, SA, is another "co-conspirator." According to the record, Daniel Abel was also an owner of Cerro Coyote. None of this proves that the plaintiffs were involved in Broussard's criminal activities. **However, the plaintiffs have not proved that Handshoe's publications regarding their connection to Broussard are false, and under the defamation law of this country, they are required to do so.** (Emphasis Added)

What this case is about is media coverage of a major public corruption

scandal, arrest and ensuing federal prosecution of Aaron Broussard. It is also about

Charles Leary, Vaughn Perret and Daniel Abel using Canadian libel laws in a vain

---

[2] See Guirola Opinion and Order in Trout Point et al v Handshoe, Case 1:12-cv-00090, ECF# 35, Pages 15 and 16.

attempt to squelch reporting on this matter of public interest by filing multiple libel lawsuits in a practice known as libel tourism against several greater New Orleans area media outlets including The New Orleans Times Picayune, Louisiana Media Company, LLC aka Fox 8 and Slabbed New Media's publisher Douglas Handshoe along with certain media companies in Nova Scotia.

Leary, Perret and Abel are particularly incensed with Handshoe as he obtained and published Leary, Perret and Abel's affidavits they swore in the Louisiana Media libel action which Leary, Perret and Trout Point filed in Yarmouth, Nova Scotia. Those affidavits and testimony from Broussard's ex-wife Karen Parker would later form the basis of a portion of the "Government's Notice of Intent to Introduce Intrinsic Evidence or, Alternatively, Notice Of "Other Act" Evidence Pursuant To Rule 404(B) Of The Federal Rules Of Evidence", which alleged that Broussard committed other crimes including the "receipt of a major ownership interest in a company holding Canadian resort property for little or no capital contribution, which was instead supplied by various Parish vendors."[3]

Noteworthy here is that both Leary[4] and Handshoe agree that the Government's Motion is flawed in one critical respect because Nova Scotia Enterprises, LLC never did in fact ever own any real property in Canada as the real

---

[3] See United States of America v Broussard et al, Louisiana Eastern District Criminal Case Number 2:11-cr-00299-HH-FHS, Document 146, beginning on page 4.

[4] Perret et al v Handshoe, Amended Statement of Claim of Perret, Leary and Trout Point dated September 30, 2013, paragraph 43

estate record is clear that Broussard owned property at the Trout Point Development personally, in his own name.

This fact did not stop Leary, Perret and Trout Point from falsely contending in 2011 in the Louisiana Media Defamation action in Canada that it was the interruption of their business relationship with Nova Scotia Enterprises, LLC, which they were then claiming owned the property at the Trout Point development (140 Trout Point Road)[5] rather than Broussard. Until late 2010 that property was actually titled in Broussard's personal name.[6] Leary, Perret and Trout Point even submitted sworn affidavits which included letters detailing the sham financial transactions they were conducting for Broussard through strawman entities such as Nova Scotia Enterprises, LLC. Those Leary affidavits sometimes included affidavits from certain members of Nova Scotia Enterprises, LLC, including Broussard's consigliere Roy D'Aquila, who died from a massive heart attack just days after his sworn affidavits and letters to Leary appeared on the Slabbed New Media website. It was this deception that even the United States Attorney did not catch in their motion in the Broussard prosecution.

---

[5] Perret would later use this address in this instant litigation. This address is also where the registered office of the successor entity to Trout Point Lodge, Ltd is located. In 2011 and prior, it was known as and marketed by Trout Point as the cabin rental known as "River Bend Lodge".

[6] The fact that Leary and Perret purchased Broussard's property holdings in late 2010 including 140 Trout Point Road underscores that fact.

If they had been informed that Broussard owned the Canadian property located at 140 Trout Point Road personally, the crime of money laundering would have also been strongly implicated since overwhelming evidence existed that sham financial transactions were being conducted on Broussard's behalf by the members of Nova Scotia Enterprises, LLC along with Leary and Perret in Canada.[7]

Unfortunately, the fact that Leary, Perret and Abel were treated as Broussard's Unindicted Co-conspirators only served to embolden them in their subsequent lawsuits against Handshoe attempting to force the removal of constitutionally protected speech and retaliate against him for the demise of their criminal enterprise. Leary's Counterclaims are the latest such attempt at retaliation. In any event, Leary's Motion is due to fail for several reasons, including the fact that Leary now attempts to taint these proceedings with inadmissible evidence and what Handshoe will show is the undisputed fact that Leary has not met his two-pronged burden under Fed. Civ. Proc Rule 56 to obtain Summary Judgment.

## Law and Argument

### Inadmissible Evidence

---

[7] As the FBI described it in their April 2012 Law Enforcement Bulletin: "money laundering entails taking criminal profits and moving them in a prohibited manner. Specifically, criminals or persons acting on their behalf generate proceeds in the form of money or property as a result of committing a crime designated as a specified unlawful activity (SUA). Criminals then move that money, often with the intent to disguise the nature, location, source, ownership, or control of the funds, which is known as "concealment" money laundering. Alternatively, in "promotion" money laundering, they reinvest the money in their criminal activities. Either theory suffices for a money laundering charge.

Leary's declaration in support of his motion at ECF 330, page 2 references Exhibits H and I, which are located at ECF Numbers 329-8 and 329-9.   ECF 329-9 specifically includes emails to AbelLawFirm@gmail.com from Ryan at WordPress regarding the Canadian Court order Leary, Perret and Trout Point obtained in the Canadian Louisiana Media Defamation civil action. Leary swore the following to this Court at ECF 330:

> When I appeared before Nova Scotia Supreme Court in May, 2011, I did not know beyond a reasonable doubt, or even on the balance of probabilities the identity of Sop81_1 who was the main publisher and author of Slabbed.

Leary then creates a strawman for the Court by Exhibiting the websites contact page circa April 2011, which does not list Handshoe by name. However, Leary admitted to this Court via affidavit sworn on July 25, 2012 that:[8]

> On May 6, 2011, a process server named Chris Yount served a Notice of Intended Action directed to Doug Handshoe on Doug Handshoe's wife at his residence in Bay St. Louis, Mississippi.

The Leary affidavit of July 25, 2012 contains an Exhibit B which is the Affidavit of Service of Process Server Chris Yount where he swore that he received the Notice of Intended Action from Leary on May 4, 2011 and after he served the

---

[8] See Item 20 on Page 6 of the Affidavit of Charles Leary dated July 25, 2012 filed in Trout Point al v Handshoe, case number 1:12-cv-90-LG-JMR, ECF Number 21, attached as Exhibit 1 to the Declaration accompanying this Opposition.

papers on Handshoe's wife that he faxed and mailed copies of the signed Notice of Intended Action to Leary.[9]

In October, 2011 Leary who was still seeking ex parte court orders in the Louisiana Media case directed at Handshoe would admit the obvious to the Canadian Court:

> On April 18, 2011 on slabbed, Sop8 1_1 published the contents of a letter written to the host for the web site slabbed.org, a company known as GoDaddy. It was signed:
>
> Sincerely,
> Doug
> Doug Handshoe
> Slabbed New Media LLC
> Post Office Box 788
> Wiggins, MS 39577

However, that stunning admission by Leary months after the fact is not definitive proof that he knew of Handshoe's identity prior to filing his Motions in the Louisiana Media case. For that this Court only need to consider the Affidavit that Charles Leary swore and filed on May 12, 2011 in the Louisiana Media case in advance of the hearing Leary references in his declaration. That affidavit was filed 8 days after Yount received Leary's Notice of Intended Action and 6 days after Yount faxed and mailed Leary the Affidavit of Service on Handshoe for the coming Canadian defamation action which would be the subject of the SPEECH Act. The

_____
[9] Id, at Pages 14 and 15.

May 12, 2011 Affidavit clearly shows that Leary purposely misled the Canadian Court as to his knowledge of Handshoe's identity.[10] [11]

That Leary has now perjured himself to this Court in his Declaration dated December 30, 2018 as to when he knew of Handshoe's true identity, as well as repeatedly to the Canadian Court where he purposely concealed Handshoe's identity from that Court is painfully obvious based upon Leary's own documented actions and affidavits. Such examples of Leary's bad faith permeate the records of all of the litigation Leary has since filed against Handshoe.

By the time Leary swore that July 25, 2012 affidavit that was filed in *Trout Point v Handshoe*, Leary had lied and perjured himself so many times before so many different Courts there was no way he could possibly keep track of all of the lies to keep a straight story. Now Leary seeks to introduce as evidence in this matter the fruits of that poisonous tree but to the extent it was fraudulently obtained by Leary precludes this Court from considering it. Simply put, Leary is an inveterate liar whose word cannot be trusted.

---

[10] See Affidavit of Charles Leary dated May 11, 2011 attached as Exhibit 2 to the Declaration accompanying this Opposition.

[11] Leary, Perret and Abel also mailed Handshoe a threatening, anonymous letter during the exact time period they were before the Court in the Louisiana Media case. The letter referenced their conduct submitting perjured affidavits in the Louisiana Media matter. It is attached as Exhibit 3 to the Declaration accompanying the opposition.

Further, as a matter of common law Handshoe respectfully suggests that the legal principle *Falsus in uno, falsus in omnibus* should preclude this Court from placing any weight on the Leary declaration whatsoever[12].

**Unclean Hands**

Examples abound of Leary's bad faith and unclean hands in this instant matter, for instance Nova Scotia Civil Procedure Rule 14.03 prohibits the "collateral use" of information obtained in litigation maintaining there is "an implied understanding not to use information disclosed or discovered in a proceeding for a purpose outside the proceeding, without the permission of a judge."[13]

A cursory look at the Leary Declaration shows that items 19, 20, 22 and 23 were all obtained via discovery in other Canadian litigation and have now been used for purposes outside of the originally proceeding.

What Leary and Perret are in reality attempting is to only have one side of this dispute covered in the media. While Leary pounds the table complaining about the same issues over and over wasting the Court's time, he would have the Court ignore his own actions such repeatedly smearing instant Plaintiff in the Canadian media all

---

[12] Black's Law Dictionary defines *Falsus in uno, falsus in omnibus* as False in one thing, false in everything. This maxim is particularly applied to the testimony of a witness, who, if he is shown to have sworn falsely in one detail, may be considered unworthy of belief as to all the rest of his evidence.
[13] The Rule, per the Nova Scotia Court's website states, "Nothing in Part 5 diminishes the application of the implied undertaking not to use information disclosed or discovered in a proceeding for a purpose outside the proceeding, without the permission of a judge." See
http://courts.ns.ca/civil_procedure_rules/CPRs_in_html/Rule_14.htm#Rule14.03

while attempting to silence Handshoe.[14] While Leary repeatedly complains to this Court about a press release that was issued by Handshoe in response to a media inquiry from Jackson Jambalaya when this civil action was filed, he would have this Court ignore their own actions such as writing about this instant matter and others under the pseudonym Randall Cajun at the blog Real-Malice.

Examples include missives titled, "Federal Court orders blogger Handshoe to show cause, still homophobic after all these years....tick tock" dated January 6, 2016[15] and "National geographic, Toronto Star respond to Douglas Handshoe lawsuit, conspiracy theories" also dated January 6, 2016.[16] It was known as early as January 10, 2013, that commenter Randall Cajun was posting from a Nova Scotia location very close to Trout Point Lodge when the American Zombie blog revealed that fact.[17] That any reasonable observer would connect Leary and Perret to the "anonymous coward" hiding behind Randall Cajun is beyond dispute.

Leary's repeated complaints about Handshoe's online activities are in reality, a manifestation of the defense mechanism known as psychotic projection as Leary attempts to attribute his exact behavior to others. The bottom line is that Leary approaches this Court with unclean hands, complaining about Handshoe's actions while he engages in the exact conduct to which he complains.

---

[14] Handshoe would force the removal of certain of these stories.
[15] See this posting at Exhibit 4 to the Declaration accompanying this Opposition.
[16] See this posting at Exhibit 5 to the Declaration accompanying this Opposition.
[17] See this posting at Exhibit 6 to the Declaration accompanying this Opposition.

**Leary has not met his burden of proof under Rule 56**

Leary has failed to prove the elements of the three remaining torts he asserted as follows:

**Malicious Prosecution**

The tort of malicious prosecution has five elements:

"(1) the institution or continuation of original judicial proceedings, either criminal or civil; (2) by, or at the instance of the defendants; (3) the termination of such proceedings in plaintiff's favor; (4) malice in instituting the proceedings; (5) want of probable cause in the proceedings; and (6) the suffering of damages as a result of the action or prosecution complained of." Mississippi Road Supply Co. v. Zurich-American Ins. Co., 501 So.2d 412, 414 (Miss.1987) (citing Harvill v. Tabor, 240 Miss. 750, 128 So.2d 863, 864 (1961)).

Here Handshoe agrees with Leary that elements 1, 2 and 3 are present and Handshoe concedes that Perret, Leary and Trout Point paid an attorney for a brief time to represent his, Perret and Trout Point's interests in this matter so Leary likely can also prove element six but to the extent he recites the totals paid to Jason Purvis in his declaration, such covering Purvis' services in actions instituted by Leary, Perret and Trout Point in State Court as well as the Federal Court the amounts Leary cited are not completely determinative of damages. Leary fails to prove element 4 (malice) and 5 (want of probable cause). His own arguments illustrate this.

11

With respect to the malice element this is what Leary pleaded:

> Handshoe's motivation was malicious in that he had no foundation for
> bringing the action in his personal name, as evidenced by the Slabbed
> intervention, the fact that he never had standing, and his futile
> amendments over one year and a half, which damaged Leary
> substantially. His true purpose in the institution of this judicial
> proceeding, and the motion to intervene, was to coerce and inflict injury
> and embarrassment, and to vex Leary and his fellow defendants. Leary
> incurred tens of thousands of dollars in attorney's fees and legal costs.
> Handshoe had no probable cause to bring the lawsuit, as stated above.[18]

Leary's allegations that Handshoe "had no foundation for bringing this action
in his personal name" is clearly belied by the fact that Count Five survived and that
Handshoe had a duty as a litigant to assert all of his causes of action to which he had
accrued and to the extent the Leary takedown notices were all aimed at Handshoe in
his personal capacity indicated Handshoe[19] had a personal cause of action, even if it
was not sufficiently pleaded. Further, Handshoe sought Court declarations for Fair
Use and Copyright Misuse and while they were dismissed by the Court, those two
Counts still remain salient to this litigation as defenses. Put another way Leary, by
alleging copyright infringement and Handshoe misrepresenting DMCA Counter

---

[18] Leary's amended statement of claim dated May 16, 2018 (ECF 233, Counterclaim paragraph 73

[19] As Leary has noted, the URI Slabbed.org was registered in Handshoe's name personally in a preformation act of
Slabbed New Media, LLC until the summer of 2015 thus Handshoe likely did have standing but such was not
sufficiently pleaded.

notifications proves there were justiciable issues between the litigants on the exact topics for which Handshoe sought declaratory relief.[20]

Finally, there is no need for Leary to attempt to divine Handshoe's true purpose in bringing this instant matter to the Court because it should be painfully obvious that Handshoe was sick and tired, after five years of Leary, Perret and Trout Point and others they solicited sending takedown notices over fair use content that these matters had to be brought to the Court and decided. Leary, never once from 2011 to the last takedown notice in January 2016 sought relief in a United States Courtroom for the Handshoe Counter notifications. Again, to the extent Leary now seeks relief from this Court on that issue reinforces the fact that justiciable issues exist between the litigants, which completely undermines the Leary allegation that Handshoe instituted these proceedings with malice.

That allegation is also somewhat contradicted by the fact this Court, in reading the proposed second and third amended complaints had to have found the proposed amendments were clearly not futile as a condition for granting the Handshoe Motions to Amend.

---

[20] The Court ruled those issues were not ripe for examination as far as Handshoe's claims. Leary, due his Counterclaims, now makes these matters ripe for this Court.

As to the lack of probable cause Leary's complaint contains only the conclusory accusation that, "Handshoe had no probable cause to bring the lawsuit, as stated above."

In his Motion for Summary Judgment Leary lists 12 reasons he claims Handshoe lacked probable cause several of which revolve around Leary' contention that Handshoe had no foundation to bring this case in his personal name, which Handshoe rebutted on the previous page.

Others include strawmen that Handshoe has previously debunked including that Handshoe gave "evasive responses to Leary's discovery requests" (such a complaint was never brought before the Court by Leary) or that Handshoe's refusal to provide discovery from third parties such as Slabbed New Media somehow constitutes proof that Handshoe should have never brought the suit in his personal name. That Handshoe "had probable cause to believe he was actually infringing copyright" when Handshoe has made no such admission is another such example. Similar strawmen include Leary's accusation of Handshoe's reliance on discovery that was later quashed in his Motion for Summary Judgment somehow proves a lack of probable cause.[21]

---

[21] To be clear, Leary did advise Handshoe via email prior to December 14, 2017 he would be having a new address "soon" but the change was not processed by the clerk's office until January, 2018, after the discovery was sent. The Clerk's office would mention "an envelope" and a December 14, 2017 filing as the basis for the address change but the envelope at ECF 202-1 filed on that date referenced by the clerk lists 140 Trout Point Road as the return address. Given that that Danny Abel was ghost writing and mailing Leary's pleadings from New Orleans Louisiana, Handshoe had basis to believe Leary was misleading him as to his new address, especially since it was not processed by the Court for well over a month after Leary's original email.

As to Leary's second assertion, he attempts to use Handshoe's deposition in another matter to prove that Handshoe sued parties without knowing anything about them.[22] However, this Court can clearly see from the Third Amended complaint that Handshoe knew a good bit of information about Progress Media, specifically that:

- Progress Media Group Ltd. is a limited company formed under the laws of Nova Scotia, with registered offices located 1202 - 1660 Hollis Street, Halifax, NS Canada B3J 1V7.
- On December 14, 2012, Canadian lawyer Bruce McLaughlin, representing Progress Media Group Limited and Marilyn Smulders, acting in close coordination and in concert with defendants Leary, Perret, Abel (the Trout Point Lodge Criminal Enterprise), filed a DMCA takedown notice with Plaintiff's web host objecting to a picture of defendants Leary, Perret and Abel that was posted to the Slabbed New Media website originally in January 2012 that was also used in publications published by Plaintiff to the Slabbed New Media LLC website in September and October of 2012.

Progress Media and Marilyn Smulders have since defaulted in this matter and are deemed to have admitted the allegations against them.

What Leary attempts in his memorandum is to conflate the actions of the Nova Scotia Supreme Court in 2013 and 2014 with the events which occurred in late 2012, before Leary had acquired the rights to the photographs. As a threshold matter the findings of the Nova Scotia Supreme Court are not salient to US Copyright law. Leary never sought enforcement of defamation judgment he obtained in Canada due

---

[22] The most likely explanation for Handshoe's answer to the deposition question was that it was directly responsive to the question that was asked.

to the United States SPEECH Act. Such is a tacit admission that he cannot prove that the publications which he complains are false[23]. Quite the opposite is true in fact.

However, no where are Leary's reasons to support his contention Handshoe had no probable cause to pursue this litigation laid bare as self-serving bull than his item 10 on page 30 of his memorandum where he writes:

> One of his allegations, made repeatedly as part of the Handshoe conspiracy theory, is that Leary knew Handshoe's identity in April and May, 2011, when he appeared in Nova Scotia Supreme Court seeking an order directed to Automattic, Inc., his service provider, for identifying information about anonymous online commentators (cf. oral decision transcript, Nova Scotia Supreme Court, May 31, 2011). Handshoe alleges Leary committed perjury in that hearing.

As Handshoe has previously demonstrated using Leary's own sworn affidavits, Leary absolutely knew of Handshoe's identity prior to May 4, 2011 when he sent the Notice of Intended Action to Yount, which was served on Handshoe's spouse on May 6, 2011. Yet on May 12, 2011 he was still swearing affidavits to the Canadian Court in advance of the hearing on the Louisiana Media motions where he claimed he did not know of Handshoe's identity. That Leary would attempt to mislead this Court on that subject sums up the total of Leary's proof of Handshoe maliciously prosecuting him – he has none. Better, he attempts to show his co-

---

[23] While Leary has levied the conclusory allegation that the postings were false, he has not offered any proof of such beyond the Defamation judgment in his third Canadian Defamation Action against Handshoe, which he did not seek to enforce and for which, as a matter of law he can no longer seek to enforce.

conspirator Abel as unconnected to Leary[24] when the fact is that Leary exhibited to Judge Guirola in his Motion for Original Discipline documents from the *Yount* matter that were under seal when Leary presented them in direct violation of the Louisiana judge's order sealing the case.[25] [26]

**Misrepresentation Claim**

With respect to Leary's Counts for Infringement and Misrepresentation claims Leary similarly does not meet his burden of proof. First it is clear that Leary was not engaging United States law when he sent his notice of infringement under the Canadian Copyright Act and included quotes from that foreign law. Assuming arguendo this Court were to find otherwise however, Handshoe offers the following:

- Leary swore in his Takedown Notice on January 6, 2016, during the pendency of this litigation.[27]
- Leary identified in his email exchanges with Amazon Web Services involving his takedown notice 2 photographs and a Slabbed New Media post which contained an inline link Leary alleged as infringing. (See ECF 96-11, Page 20 of 23)
- Handshoe obtained the photographs of the Lodge Leary referenced from Expedia, a United States entity whose web servers are located in the United States sometime in January, 2011.

---

[24] See Leary footnote 12 on Page 29 of his memorandum. Of note, is that while Yount was appealing the Louisiana Court's order of dismissal while the case was still sealed, Leary attempted to submit an amicus brief on Yount's behalf, telling their court they were familiar with the facts of the case. See the Leary Motion For Leave To File Amicus Curiae brief at Exhibit 7 to the Declaration accompanying this Opposition.

[25] See 1:12-cv-90-LG-JMR, ECF Number 64-3 at Exhibit 8 to the Declaration accompanying this Opposition, which contained as an exhibit sealed filings from the *Yount* matter.

[26] Also note that the Leary affidavit of June 13, 2011 shows Abel's intimate involvement at every level of this controversy dating to 2011 cannot be gainsaid. It is attached as Exhibit 9, Item 14 on page 4.

[27] Leary Exhibited the entire email chain at ECF 96-11 and is included with this filing at Exhibit 10 to the Declaration accompanying this Opposition. . Leary Exhibited the Handshoe Counter Notification at ECF 329-1

- Handshoe Counter Notified the Leary Canadian Copyright Act Notice on January 25, 2016.

The most glaring defect associated with the Leary takedown notice is obvious, Leary claimed as infringing a creative work that did not exist on the Slabbed New Media web server. Rather Leary claimed an inline linked image to the Toronto Star as infringing despite the fact Handshoe never copied it.[28] The Ninth Circuit tackled the topic of whether inline or deep linking can constitute infringement and found in *Perfect 10, Inc. v. Google, Inc.*, 508 F.3d 1146 (2007) that it does not. The Court found that inline linking simply did not constitute copying at all. Where Google's Image Search contained inline links to images hosted on another website, the court found that "[b]ecause Google's computers do not store the photographic images, Google does not have a copy of the images for purposes of the Copyright Act." Instead of communicating a copy of the image to the user, Google provides HTML instructions that direct a user's browser to a website publisher's web server that stores the full-size photographic image. The reasoning is sound and Handshoe submits is applicable in the Fifth Circuit, where Judges do not read into or divine meaning in otherwise non-ambiguous laws. In order for there to be infringement the

---

[28] *See* http://slabbed.org/2012/12/04/wash-rinse-repeat-aaron-broussards-formers-in-canada-again-sue-slabbed-for-defamation-in-nova-scotia/. Clicking the scaled photo in the Slabbed- Handshoe posting leads to
https://images.thestar.com/content/dam/thestar/news/canada/2012/02/02/ns_court_orders_mississippi_blogger_to_pay_gay_couple_425000/lodge.jpeg.size-custom-crop.583x328.jpeg

copying element must be met and it is conspicuously absent with respect to Leary's complaint about the inline link to the Torstar web site.[29]

Handshoe's counter notification thus could not have been misrepresented with respect to the Torstar material cited.

Additionally, Handshoe had a good faith belief that he was authorized to use the Expedia photo under the Fair Use provisions of the Copyright Act and he will cover that aspect in his discussion of Fair Use later within this document.

**Copyright Infringement**

Leary's complaint identified four photos he claims as infringing. As discussed above, the Torstar photo taken by Crowell was inline linked and thus could not constitute infringement as the copying element is missing from the equation. Notably Leary does not point out either to this Court or Handshoe to the actual publications he claims are infringing instead relying on an opinion of the Canadian Court finding infringement along what he claims are Handshoe's admissions of infringement as his basis for proving that Handshoe had infringed Leary's copyrights in the United States.

As a threshold matter Leary has not proven his allegations have been brought within the three year statute of limitations. Leary points to the fact that the Slabbed

---

[29] The Torstar inline linked post "Wash, rinse, repeat: Aaron Broussard's former property managers in Canada again sue Slabbed for defamation in Nova Scotia" and "He'll likely be remembered here for being a part of the gang that made the Times Picayune eat its own big toe........." are attached as Exhibits 11 and 12 to the Declaration accompanying this opposition

New Media has changed webhosts from Hostgator to Amazon Web Services[30] as evidence an infringing act has occurred within the statute of lmitations. However, Leary's logic must fail because when Slabbed.org changed webhost, the database and media were *moved*, not copied or distributed.

Assuming Arguendo this Court were to find otherwise, Leary has still not met his burden of proof as he has failed to submit the publications he claims are infringing, evidence that is central to the resolution of this matter.

**There are several material disputed facts in this matter.**

The Exhibits which Leary submitted to the Court in support of his Motion, 176 pages total, does not include a single post that Leary claims is infringing. Handshoe respectfully submits these posts are the most important single piece of evidence in this matter yet Leary has chosen to not present them to the Court for consideration while claiming the publications in which the photos were used do not constitute a fair use of the disputed intellectual property.

Leary attempts to bootstrap his Canadian Court case to this matter but this is the United States and Leary is seeking relief under United States laws and Section 107 is clear: Fair Use is not infringement.[31]

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or

---

[30] Leary's contention that CloudFlare is a webhost is mistaken. CloudFlare is a reverse proxy, which is a service that is designed to save bandwidth.
[31] *See* 17 U.S. Code § 107 - Limitations on exclusive rights: Fair use

phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.

The Copyright Act provides that fair use of copyrighted works for "news reporting" purposes are not infringement. The Supreme Court has only applied the fair use analysis to a situation involving news reporting purposes on one occasion: *Harper & Row v. Nation Enterprises*, in which the court decided in 1985 that The Nation's republication of about 300 words from a leaked manuscript of former President Gerald Ford's memoir, *A Time to Heal* was not a fair use.[32] While the essence of the court's opinion was about the importance of first publication by the copyright holder in the fair use analysis, both the six-justice majority and the dissenters noted the congressional intent behind including "news reporting" as a specific example of fair use. Justice O'Connor, writing for the majority, found that The Nation's excerpt of Ford's memoir was for "news reporting" purposes, which was listed by Congress as one of a "listing . . . not intended to be exhaustive" of potential fair uses. Thus, it was not "presumptively" a fair use, instead only qualifying the use for further fair use analysis. However, Justice Brennan disagreed, finding stronger import in Congress' decision to list "news reporting" specifically,

---

[32] *Harper & Row*, 471 U.S. at 542.

arguing that it is a "prime example" of intended fair uses that benefit the public by allowing dissemination of information to the public.

The justices in *Harper & Row* did agree that the analysis does not turn on the quality of the news report, but on the purpose in creating it, regardless of whether the information was actually "new" to the public. Justice O'Connor expressed that the Court should be wary of determining what is news and what is not, and instead should focus on whether the use was fair, while Brennan said this was proper, noting that "courts have no business making such evaluations of journalistic quality."

Regardless, the Court found that a qualifying purpose of the use such as news reporting is just one factor for courts to consider when considering whether a use is fair. The four factors for courts to consider in fair use cases are: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit education-al purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

The Supreme Court has noted that because fair use is rooted in an "equitable rule of reason," these four factors are not exclusive, though they are "especially relevant" as courts consider and apply the fair use analysis. The Supreme Court has

noted that this "task is not to be simplified with bright-line rules" as courts apply the factors on a case-by-case basis. The factors are not to be "treated in isolation," but rather, "all are to be explored, and the results weighed together, in light of the purposes of copyright."

There has been at least two other case in other districts that are analogous to this instant matter. One is *Katz v. Chevaldina*, 2014 WL 2815496 (S.D. Fla. June 17, 2014). What stands out about this case is that Katz didn't initially own the copyright to his photograph when they were published by Chevaldina. Instead, a year after Chevaldina published the photo, Katz acquired the copyright and then used it as an extra vector of legal attack against Chevaldina. Leary and Perret are not the first to think of copyright acquisitions as a backdoor way to suppress content online, and as such this case is part of that disturbing trend nationwide. That Court ruled the use of the photographs to be fair use finding:

- Nature of Use. Chevaldina's use was non-commercial. She ran a gripe site and didn't have any ads. The court also finds "the Photo was transformative because it served a very different function than did its original use" on the Israeli website.

- Nature of Work. The photo "captured Plaintiff in a public setting and was used simply to identify him."

- Amount Used. "Depending on the topic of her blog post, Defendant copied only as much of the Photo as was needed to further her criticism. Because the copyrighted work at issue is a photograph, I find that the third factor is neutral and does not weigh either for or against a finding of fair use."

- Market Effect. "there is no evidence that Defendant's use of the Photo caused any market harm. To the contrary, Plaintiff has stipulated that "he and his related companies have suffered no economic harm as a result of Defendant's infringement. Similarly, Plaintiff has not shown that a potential market exists for the Photo or that Defendant's use threatens the potential market. Significantly, Plaintiff disavows any interest in selling or profiting from the Photo." The court strongly implies, as is clearly the case here, that Katz's goal–to suppress the photo's publication as part of a copyright-as-privacy claim which categorically undercuts any argument that a licensing market would develop for it.

*Dhillon v. Does 1-10*, 2014 WL 722592 (N.D. Cal. Feb. 25, 2014) is another case where a headshot photo was used by a blogger. The result was identical to *Katz* with a finding of fair use.

Handshoe now analyses the fair use factors in the context of the current litigation:

*Factor One – Nature of Use*

The first fair use factor examines "the purpose and character of the use," and weighs the "commercial or nonprofit purpose of the use." *See* 17 U.S.C. § 107(1). While the commercial use of copyrighted work is presumptively unfair, the Copyright Act "expressly permits fair use for the purposes of criticism and commentary." *Hustler Magazine*, 796 F.2d at 1152-53. Thus, even if a particular use is solely commercial in nature, "the presumption of unfairness can be rebutted by the characteristics of the use." *Id.* The central purpose of the inquiry under this factor is to determine "whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is `transformative.'" *Campbell*, 510 U.S. at 579 (citations and internal quotation marks omitted) (alteration in original). The more transformative the allegedly infringing work is, the less important other concerns, including commercialism, become. *Id.*

One publication Leary complains is a parody video published to YouTube by Handshoe to his personal YouTube account. Handshoe's use here is clearly noncommercial, the video was licensed to him via creative commons

noncommercial no derivative license. Leary has not shown this work was used commercially and Handshoe avers it contains no advertising whatsoever nor has he ever monetized it. Leary does not allege the Slabbed website sold ads or monetized his photos. Rather Leary maintains that Slabbed New Media, LLC is a commercial for profit entity but he fails to show any connection between the photographs used and the financial results of the website, which is financed almost exclusively by voluntary reader donations. More recently the Website has taken paid political advertising but such occurred in 2015, years after the publications Leary complains.

Additionally, it is clear the use is transformative. The Supreme Court, in its 1993 decision in *Campbell v. Acuff-Rose Music, Inc.*, found that the central purpose of the first factor was to protect "transformative use[s]" that go beyond merely superseding the original work by adding "something new, with a further purpose or different character, altering the first with new expression, meaning, or message."[33] Cases that the Courts have found transformative use were typically those in which the secondary uses of the original "add original expression that clearly constitute criticism, commentary or scholarship."[34] Courts are also more likely to find

---

[33] *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. at 579
[34] Jeremy Kudon, *Form Over Function: Expanding the Transformative Use Test for Fair Use*, 80 B.U. L. REV. 579, 583 (2000)

transformative value in uses that benefit the public[35] as is the case with the Slabbed New Media website.

Courts have found that copyrighted photographs used for news purposes can have transformative value as well. In *Nunez v. Caribbean International News Corp.*, the First Circuit Court of Appeals held that newspaper El Vocero's republication of nude photographs of the reigning Miss Puerto Rico Universe qualified as "fair use" and thus was not in-fringing.[36]  In Nunez, photographer Sixto Nunez had intended for the photographs to be used as part of a modeling portfolio, a far different purpose than the news reporting purpose that El Vocero claimed. Further, the existence of the photographs had actually become the news, and reporting on the controversy would have been difficult without including the photos because "the pictures were the story."

Handshoe concedes the commercial nature of Slabbed New Media, LLC would weigh slightly against him but the nature of the commercial operations relying solely on voluntary reader donations mitigates that fact. The purposes of the original and secondary uses are vastly different—the original use of the photos was to advertise Trout Point Lodge, while the secondary use is for informing the public.

---

[35] *See* e.g.  *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 922 (2d Cir. 1994), in which the court explained, "courts are more willing to find a secondary use fair when it pro-duces a value that benefits the broader public interest."
[36] *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 25 (1st Cir. 2000).

Handshoe does not envy the Court in determining the first factor in this matter as he concedes it will be close but avers this favor factors the secondary use.

*Factor Two - Nature of the Work*

The second factor of the fair use analysis considers the "nature of the copyrighted work." Because copyright law "generally recognizes a greater need to disseminate factual works than works of fiction or fantasy,"[37] Courts are more likely to find fair use in works of fact, news and history than in more creative works. Courts also consider whether the copyright holder has circulated the work for publication which is the case with every photo at controversy here. Each photo Leary complains was published years before their use on Slabbed.

The Supreme Court has not expounded at length on this factor. In *Harper & Row*, the Court spent four paragraphs briefly summarizing the intent behind the factor. Other Courts have expanded on the concept as it regards photographs.

Courts focus on the level of expressive conduct shown by the photographer in determining whether works are factual or creative and whether they have been circulated publicly. In *Nunez*, the First Circuit noted, "certainly, photography is an art form that requires a significant amount of skill," but found that the modeling photos were less "artistic representations designed primarily to express Nunez's ideas, emotions, or feelings" than they were displaying the subject's potential as a

---

[37] *Harper & Row*, 471 U.S. at 563.

model. While the court was neutral about the creative aspect of the photo, it ultimately favored El Vocero in the second factor because the modeling photos were "hardly confidential or secret" and did not threaten Nunez's right of first publication.

Other Courts follow this logic and generally favor the secondary user when photographs are used for news reporting purposes. The Ninth Circuit found that this factor "strongly favors" KCAL in its unlicensed broadcast of Los Angeles News Service's tape of the Reginald Denny beating, which was "informational and factual and news" and had been previously circulated.[38] The Massachusetts district Court reached a similar conclusion in Fitzgerald, holding that this factor favored fair use in republication of the mobster photos because the photographer's works had been previously published and that the photographs showed "no more than the minimum authorial decision-making necessary to make a work copyrightable."[39]

In sum, Creative works are considered "closer to the core of intended copyright protection" than works that are merely "informational."[40] Here the pictures of used were to simply identify Abel, Leary and Perret for promotional purposes rather than creative purposes. As such this factor clearly favors Handshoe secondary use of the photos.

*Factor Three - Amount and Substantiality of Use*

---

[38] *Los Angeles News Service v. KCAL-TV Channel 9*, 108 F.3d at 1122.
[39] *Fitzgerald v. CBS*, 491 F. Supp. 2d at 188
[40] *Campbell*, 510 U.S. at 586.

Courts must examine photographs that have generally been republished in full. For this reason, the District Court of Massachusetts noted in *Fitzgerald* that the amount and substantiality factor "weighs less when considering a photograph—where all or most of the work often must be used in order to preserve any meaning at all." Even in this case, where the court found that CBS edited the photograph "in a way that was arguably more than superficial" by cropping out the portion of the photo with a state trooper, this was not enough to sway the court. Instead, the court found that the factor was split and, regardless, "the overall significance of this factor to the fair use determination is minor."[41] The First Circuit in *Nunez* reached a similar conclusion, finding that if El Vocero had copied any less than the photo in its entirety it "would have made the picture useless to the story."[42] While this finding of an entire taking certainly favored the copyright holder, the court minimized its import, saying it "count[ed] this factor as of little consequence to our analysis."

Courts seem to minimize the importance of the third factor in the fair use analysis, even noting in *Mathieson v. Associated Press* that this factor was "proportionally less significant" because of the relative weight of other fair use factors.[43]

*Factor Four - Effect on Potential Market of the Copyrighted Work*

---

[41] *Fitzgerald v. CBS*, 491 F. Supp. 2d at 188
[42] Nunez v. Caribbean Int'l News Corp., 235 F.3d at 24 (1st Cir. 2000).
[43] *Mathieson v. Associated Press*, 23 U.S.P.Q.2d at 1690

In evaluating this factor, Courts consider whether the secondary use, "(1) tends to diminish or prejudice the potential sale of the work . . .; (2) tends to interfere with the marketability of the work; or (3) fulfills the demand for the original work." *Hustler Magazine,* 796 F.2d at 1155-56 (alteration, citations, and internal quotation marks omitted). "[A] use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create." *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 450 (1984). This final factor is considered "undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566.

Courts have consistently announced this as an extraordinarily significant part of the analysis. In *Harper & Row*, the Supreme Court noted that "[t]his last factor is undoubtedly the single most important element of fair use," and in *Stewart v. Abend*, the court similarly found that this factor is "the 'most important, and indeed, central fair use factor.'"[44] A finding that the unauthorized secondary use harms the market of the original work strongly favors the copyright holder, while a neutral effect— such as a finding that the works were in different markets or that the secondary use may actually enhance the market of the original—favor a finding that the use was fair.

---

[44] *Stewart v. Abend*, 495 U.S. 207, 238 (1990)

Here, Charles Leary's deposition makes clear there never was a market for these photographs[45] and it strains credulity there will ever be a market for them. This instant matter shares that fact in common with both *Katz v. Chevaldina*, 2014 WL 2815496 (S.D. Fla. June 17, 2014) and *Dhillon v. Does 1-10*, 2014 WL 722592 (N.D. Cal. Feb. 25, 2014), cases where the Judges both found the Fourth Factor favored fair use. Notably, Leary did not brief the fourth factor in his Memorandum Supporting his Motion for Summary Judgment.

Attached as an Exhibit to the Declaration accompanying this memorandum is a specimen post titled, "Let's talk a bit more about Aaron Broussard's "evidence of other crimes" involving the resort at Trout Point Nova Scotia and the use of SLAPP suits by his business associates in Canada." so this Court can see a sample of the evidence that Leary did not furnish in support of his Motion for Summary Judgment, which must be denied.

---

[45] Deposition of Charles Leary on July 27, 2018 where in response to the direct question of him ever selling the photos, "I've already stated that they've never been for sale."

## Conclusion

Plaintiff respectfully requests this Court denies Mr. Leary's Motion for
Summary Judgment.

Respectfully submitted this 17th day of January,

2019,

Plaintiff
Douglas Handshoe
Post Office Box 788
110 Hall Street
Wiggins, MS 39577
(601) 928-5380
earning04@gmail.com

## CERTIFICATE OF SERVICE

I, Douglas Handshoe, hereby certify that on January 17, 2019 the foregoing was sent for electronically filing by me via the Clerk of the Court using the ECF system which sent notification to all counsel of record upon filing by the Clerk.

I, Douglas Handshoe, hereby certify that on January 17, 2019, I mailed the foregoing to Charles Leary at 308 5th Ave E, Vancouver, BC V5T 1H4 Canada.

Respectfully submitted this 17th day of January, 2019,

Douglas Handshoe
Post Office Box 788
110 Hall Street
Wiggins, MS 39577
(601) 928-5380
earning04@gmail.com